# EXHIBIT A



# MANAGEMENT EQUITY OFFERING DOCUMENTS

## FOR

## MICHAEL NOBLE

## OMNIBUS SIGNATURE PAGE

---

Name of Management Stockholder:
Mike Noble


Address:
4717 E Quartz Mountain Rd
Paradise Valley, AZ 85253

---

Do you wish to purchase shares of common stock of USF Holding Corp. pursuant to the Management Stockholder's Agreement?

☑ Yes  ☐ No

If yes, please indicate the dollar value of shares of USF Holding Corp. common stock that you wish to purchase (*note that shares purchased with this amount will be rounded down to the nearest whole share*): $500,000.00.


IN WITNESS WHEREOF, I hereby agree to be a party to each of the following agreements as a "Management Stockholder", "Optionee" or "Participant", as applicable, as of the date of such agreements:

1.  Management Stockholder's Agreement with USF Holding Corp.

2.  Sale Participation Agreement with USF Holding Corp., U.S. Foodservice, Inc., and the Sponsors

3.  Stock Option Agreement with USF Holding Corp.

Signature: *[signature]*

Dated as of: November 16, 2007

Execution Copy

## MANAGEMENT STOCKHOLDER'S AGREEMENT

This Management Stockholder's Agreement (this "Agreement") is entered into as of November 16, 2007 (the "Effective Date") among USF Holding Corp., a Delaware corporation (the "Company") and the undersigned person (the "Management Stockholder") (the Company and the Management Stockholder being hereinafter collectively referred to as the "Parties"). All capitalized terms not immediately defined are hereinafter defined in Section 6(b) of this Agreement.

WHEREAS, pursuant to the Stock Purchase Agreement (the "Stock Purchase Agreement"), dated May 2, 2007, by and between Restore Acquisition Corp., a Delaware corporation and direct, wholly owned subsidiary of the Company ("Restore"), Ahold U.S.A., Inc., a Maryland corporation ("Seller"), and Koninklijke Ahold N.V., a public company with limited liability organized under the laws of the Netherlands, on July 3, 2007 (the "Closing Date"), Restore purchased from Seller all of the outstanding shares of common stock of U.S. Foodservice, a Delaware corporation ("USF"), and certain related assets (the "Acquisition");

WHEREAS, it is contemplated that USF will be merged with and into U.S. Foodservice, Inc., its wholly owned subsidiary;

WHEREAS, in connection with the Acquisition, Clayton, Dubilier & Rice Fund VII, L.P., Clayton, Dubilier & Rice Fund VII (Co-Investment), L.P., CD&R Parallel Fund VII, L.P., CDR USF Co-Investor L.P., CDR USF Co-Investor No. 2, L.P., KKR 2006 Fund L.P., KKR PEI Investments, L.P., KKR Partners III, L.P. and OPERF Co-Investment LLC (collectively, the "Investors") contributed certain funds to the Company in exchange for shares of the Company's common stock, par value $0.01 per share (the "Common Stock");

WHEREAS, in connection with the Acquisition, the Management Stockholder has been selected by the Company (i) to purchase shares of Common Stock from the Company for cash (the "Purchased Stock"); and (ii) to receive options to purchase shares of Common Stock (the "Options") pursuant to the terms set forth below and the terms of the 2007 Stock Incentive Plan for Key Employees of USF Holding Corp. and its Affiliates (the "Option Plan") and the Stock Option Agreement, dated as of the date hereof, entered into by and between the Company and the Management Stockholder (the "Option Agreement"); and

WHEREAS, this Agreement is one of several other agreements ("Other Management Stockholders Agreements"), which, concurrently with the execution hereof or in the future, will be entered into between the Company and other individuals who are or will be key employees of the Company or one of its subsidiaries (collectively, the "Other Management Stockholders").

NOW THEREFORE, to implement the foregoing and in consideration of the mutual agreements contained herein, the Parties agree as follows:

1. Issuance of Purchased Shares; Options; Voting.

(a) Subject to the terms and conditions hereinafter set forth, the Management Stockholder hereby subscribes for and shall purchase, as of the Effective Date, and the Company shall issue and deliver to the Management Stockholder as of the Effective Date, the

number of shares of Purchased Stock at a per share purchase price (such price, with respect to the shares of Purchased Stock, or the price per share paid by the Management Stockholder with respect to any shares of Common Stock purchased after the date hereof, as applicable, the "Base Price"), in each case as set forth on Schedule I hereto, which per share purchase price is equal to the effective per share purchase price paid by the Investors for the shares of Common Stock of the Company in connection with the Acquisition.

(b) Subject to the terms and conditions hereinafter set forth and as set forth in the Option Plan and the Option Agreement, as of the Effective Date the Company is granting to the Management Stockholder Options to acquire the number of shares of Common Stock as set forth on Schedule I hereto, at an initial per share exercise price equal to the Base Price, and the Parties shall execute and deliver to each other copies of the Option Agreement concurrently with the issuance of the Options.

(c) The Company shall have no obligation to sell any Purchased Stock to any person who (i) is a resident or citizen of a state or other jurisdiction in which the sale of the Common Stock to him or her would constitute a violation of the securities or "blue sky" laws of such jurisdiction or (ii) is not an employee or director of the Company or its subsidiaries as of the Effective Date.

2. Management Stockholder's Representations, Warranties and Agreements.

(a) The Management Stockholder agrees and acknowledges that he or she will not, directly or indirectly, offer, transfer, sell, assign, pledge, hypothecate or otherwise dispose of (any of the foregoing acts being referred to herein as a "transfer") any shares of Purchased Stock, and, at the time of exercise, Common Stock issuable upon exercise of Options ("Option Stock"; together with all Purchased Stock and any other Common Stock otherwise acquired and/or held by the Management Stockholder Entities as of or after the date hereof, "Stock"), except as provided in this Section 2(a) below and Section 3 hereof. If the Management Stockholder is an Affiliate of the Company, the Management Stockholder also agrees and acknowledges that he or she will not transfer any shares of Stock unless:

(i) the transfer is pursuant to an effective registration statement under the Securities Act of 1933, as amended, and the rules and regulations in effect thereunder (the "Act"), and in compliance with applicable provisions of state securities laws; or

(ii) (A) counsel for the Management Stockholder (which counsel shall be reasonably acceptable to the Company) shall have furnished the Company with an opinion or other advice, reasonably satisfactory in form and substance to the Company, that no such registration is required because of the availability of an exemption from registration under the Act and (B) if the Management Stockholder is a citizen or resident of any country other than the United States, or the Management Stockholder desires to effect any transfer in any such country, counsel for the Management Stockholder (which counsel shall be reasonably satisfactory to the Company) shall have furnished the Company with an opinion or other advice reasonably satisfactory in form and substance to the Company to the effect that such transfer will comply with the securities laws of such jurisdiction.

Notwithstanding the foregoing, the Company acknowledges and agrees that any of the following transfers of Stock are deemed to be in compliance with the Act and this Agreement (including without limitation any restrictions or prohibitions herein) and no opinion of

2

counsel is required in connection therewith: (I) a transfer made pursuant to Sections 3, 4, 5 or 8 hereof, (II) a transfer upon the death or Permanent Disability of the Management Stockholder to the Management Stockholder's Estate or a transfer to the executors, administrators, testamentary trustees, legatees or beneficiaries of a person who has become a holder of Stock in accordance with the terms of this Agreement; provided that it is expressly understood that any such transferee shall be bound by the provisions of this Agreement, (III) a transfer made after the Closing Date in compliance with the federal securities laws to a Management Stockholder's Trust, provided that such transfer is made expressly subject to this Agreement and that the transferee agrees in writing to be bound by the terms and conditions hereof as a "Management Stockholder" with respect to the representations and warranties and other obligations of this Agreement, and provided further that it is expressly understood and agreed that if such Management Stockholder's Trust at any point includes any person or entity other than the Management Stockholder, his spouse (or ex-spouse) or his lineal descendants (including adopted children) such that it fails to meet the definition thereof as set forth in Section 6(b) hereof, such transfer shall no longer be deemed in compliance with this Agreement and shall be subject to Section 3(d) below, (IV) a transfer of Stock made by the Management Stockholder to Other Management Stockholders, provided that it is expressly understood that any such transferee(s) shall be bound by the provisions of this Agreement (in addition to the provisions set forth in an Other Management Stockholders Agreement to which such Other Management Stockholders are a party), and (V) a transfer made by the Management Stockholder, with the Board's approval, to the Company or any subsidiary of the Company.

(b) The certificate (or certificates) representing the Stock, if any, shall bear the following legend:

> "THE SHARES REPRESENTED BY THIS CERTIFICATE MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED OF UNLESS SUCH TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION COMPLIES WITH THE PROVISIONS OF THE MANAGEMENT STOCKHOLDER'S AGREEMENT BETWEEN USF HOLDING CORP. (THE "COMPANY") AND THE MANAGEMENT STOCKHOLDER NAMED ON THE FACE HEREOF AND THE SALE PARTICIPATION AGREEMENT AMONG SUCH MANAGEMENT STOCKHOLDER AND CLAYTON, DUBILIER & RICE FUND VII, L.P., CLAYTON, DUBILIER & RICE FUND VII (CO-INVESTMENT), L.P., CD&R PARALLEL FUND VII, L.P., CDR USF CO-INVESTOR L.P., CDR USF CO-INVESTOR NO. 2, L.P., KKR 2006 FUND L.P., KKR PEI INVESTMENTS, L.P., KKR PARTNERS III, L.P. AND OPERF CO-INVESTMENT LLC, IN EACH CASE DATED AS OF NOVEMBER 16, 2007 (COPIES OF WHICH ARE ON FILE WITH THE SECRETARY OF THE COMPANY) AND ALL APPLICABLE FEDERAL AND STATE SECURITIES LAWS."

(c) The Management Stockholder acknowledges that he or she has been advised that (i) the shares of the Stock are characterized as "restricted securities" under the Act inasmuch as they are being acquired from the Company in a transaction not involving a Public Offering and that the Stock may be resold without registration under the Act only in certain limited circumstances, (ii) a restrictive legend in the form heretofore set forth shall be placed on the certificates (if any) representing the Stock and (iii) a notation shall be made in

3

the appropriate records of the Company indicating that the Stock is subject to restrictions on transfer and appropriate stop transfer restrictions will be issued to the Company's transfer agent with respect to the Stock.

(d) If any shares of the Stock are to be disposed of in accordance with Rule 144 under the Act or otherwise, the Management Stockholder shall promptly notify the Company of such intended disposition and shall deliver to the Company at or prior to the time of such disposition such documentation as the Company may reasonably request in connection with such sale and take any actions requested by the Company prior to any such sale and, in the case of a disposition pursuant to Rule 144, shall deliver to the Company an executed copy of any notice on Form 144 required to be filed with the SEC.

(e) The Management Stockholder agrees that, if any shares of the Stock are offered to the public pursuant to an effective registration statement under the Act (other than registration of securities issued on Form S-8, S-4 or any successor or similar form), the Management Stockholder will not effect any public sale or distribution of any shares of the Stock not covered by such registration statement from the time of the receipt of a notice from the Company that the Company has filed or imminently intends to file such registration statement to, or within 180 days (or such shorter period as may be consented to by the managing underwriter or underwriters) in the case of an initial Public Offering and ninety (90) days (or in an underwritten offering such shorter period as may be consented to by the managing underwriter or underwriters, if any) in the case of any other Public Offering after the effective date of such registration statement, unless otherwise agreed to in writing by the Company.

(f) The Management Stockholder represents and warrants that (i) with respect to the Purchased Stock and Option Stock, the Management Stockholder has received and reviewed the available information relating to such Stock, including having received and reviewed the documents related thereto, certain of which documents set forth the rights, preferences and restrictions relating to the Options and the Stock underlying the Options and (ii) the Management Stockholder has been given the opportunity to obtain any additional information or documents and to ask questions and receive answers about such information, the Company and the business and prospects of the Company which the Management Stockholder deems necessary to evaluate the merits and risks related to the Management Stockholder's investment in the Stock and to verify the information contained in the information received as indicated in this Section 2(f), and the Management Stockholder has relied solely on such information.

(g) The Management Stockholder further represents and warrants that (i) the Management Stockholder's financial condition is such that the Management Stockholder can afford to bear the economic risk of holding the Stock for an indefinite period of time and has adequate means for providing for the Management Stockholder's current needs and personal contingencies, (ii) the Management Stockholder can afford to suffer a complete loss of his or her investment in the Stock, (iii) the Management Stockholder understands and has taken cognizance of all risk factors known or made available to the Management Stockholder related to the purchase of the Stock, (iv) the Management Stockholder's knowledge and experience in financial and business matters are such that the Management Stockholder is capable of evaluating the merits and risks of the Management Stockholder's purchase of the Stock as contemplated by this Agreement and (v) with respect to the Purchased Stock, such Purchased Stock is being acquired by the Management Stockholder for his or her own

4

account, not as nominee or agent, and not with a view to the resale or distribution of any part thereof in violation of the Act, and the Management Stockholder has no present intention of selling or otherwise distributing the Purchased Stock in violation of the Act.

      3.   Transferability of Stock.

      (a) The Management Stockholder agrees that he or she will not transfer any shares of Stock at any time without the consent of the Investors; provided, however, that the Management Stockholder may transfer shares of Stock pursuant to one of the following exceptions: (i) transfers permitted by Sections 4 or 5; (ii) transfers permitted by clauses (II), (III) and (IV) of Section 2(a); (iii) a sale of shares of Common Stock pursuant to an effective registration statement under the Act filed by the Company upon the proper exercise of registration rights of such Management Stockholder under Section 8 (excluding any registration on Form S-8, S-4 or any successor or similar form); (iv) transfers permitted pursuant to the Sale Participation Agreement (as defined in Section 6(b)); (v) transfers permitted by the Board or (vi) transfers to the Company or its designee (any such exception, a "Permitted Transfer").

      (b) Notwithstanding anything to the contrary herein, Section 3(a) shall terminate and be of no further force or effect upon the occurrence of a Change in Control.

      (c) No transfer of any shares of Stock in violation hereof shall be made or recorded on the books of the Company and any such transfer shall be void ab initio and of no effect.

      (d) Notwithstanding anything to the contrary herein, the Company may, at any time and from time to time, waive the restrictions on transfers contained in Section 3(a), whether such waiver is made prior to or after the transferee has effected or committed to effect the transfer, or has notified the Investors of such transfer or commitment to transfer. Any transfers made pursuant to such waiver or which are later made subject to such a waiver shall, as of the date of the waiver and at all times thereafter, not be deemed to violate any applicable restrictions on transfers contained in this Agreement.

      4.   The Management Stockholder's Right to Resell Stock and Options to the Company.

      (a) Subject to Section 5(g), if the Management Stockholder's employment with the Company (or, if applicable, any of its subsidiaries or affiliates) terminates as a result of the death or Permanent Disability of the Management Stockholder, then the applicable Management Stockholder Entity shall, for 365 days following the date of such termination for death or Permanent Disability, have the right to:

      (i) With respect to Stock, sell to the Company, and the Company shall be required to purchase, on one occasion, all of the shares of Stock then held by the applicable Management Stockholder Entities at a per share price equal to Fair Market Value on the Repurchase Calculation Date (the "Section 4 Repurchase Price"); and

      (ii) With respect to any outstanding, vested Options, sell to the Company, and the Company shall be required to purchase, on one occasion, all of the vested Options then held by the applicable Management Stockholder Entities for an amount equal to the product of (x) the excess, if any, of the Section 4 Repurchase Price over the Option

5

Exercise Price and (y) the number of Exercisable Option Shares, which Options shall be terminated in exchange for such payment. In the event the Management Stockholder Entity elects to sell under this Section 4(a)(ii) and the foregoing Option Excess Price is zero or a negative number, all outstanding exercisable Options granted to the Management Stockholder shall be automatically terminated without any payment in respect thereof. In addition, and for the avoidance of doubt, all unvested Options shall be terminated and cancelled without any payment therefor.

(b) In the event the applicable Management Stockholder Entities intend to exercise their rights pursuant to Section 4(a), such Management Stockholder Entities shall send written notice to the Company, at any time during the applicable period set forth in Section 4(a) (the "Put Period"), of their intention to sell shares of Stock in exchange for the payment referred to in Section 4(a)(i) and/or to sell such Options in exchange for the payment referred to in Section 4(a)(ii) and shall indicate the number of shares of Stock to be sold and the number of Options (based on the number of Exercisable Option Shares) to be sold (the "Redemption Notice"). The completion of the purchases shall take place at the principal office of the Company on no later than the twentieth business day (such date to be determined by the Company) after the giving of the Redemption Notice. The applicable Repurchase Price (including any payment with respect to the Options as described above) shall be paid by delivery to the applicable Management Stockholder Entities, at the option of the Company, of a certified bank check or checks in the appropriate amount payable to the order of each of the applicable Management Stockholder Entities (or by wire transfer of immediately available funds, if the Management Stockholder Entities provide to the Company wire transfer instructions) against delivery of certificates or other instruments representing the Stock so purchased and appropriate documents cancelling the Options so terminated appropriately endorsed or executed by the applicable Management Stockholder Entities or any duly authorized representative.

(c) Notwithstanding anything in this Section 4 to the contrary, if there exists and is continuing a default or an event of default on the part of the Company or any subsidiary of the Company under any loan, guarantee or other agreement under which the Company or any subsidiary of the Company has borrowed money or if the repurchase referred to in Section 4(a) (or Section 5 below, as the case may be) would result in a default or an event of default on the part of the Company or any affiliate of the Company under any such agreement or if a repurchase would not be permitted under the Delaware General Corporation Law ("DGCL") (or if the Company reincorporates in another state, the business corporation law of such state) or any federal or state securities laws or regulations (each such occurrence being an "Event"), the Company shall not be obligated to repurchase any of the Stock or the Options from the applicable Management Stockholder Entities, to the extent the Company is prohibited from purchasing such Stock and Options by the existence of the Event, for cash but instead, with respect to such portion with respect to which cash settlement is so prohibited, will, subject to the Management Stockholder Entities' rescission rights below, satisfy its obligations with respect to the Management Stockholder Entities' exercise of their rights under Section 4(a) by delivering to the applicable Management Stockholder Entity a promissory note with a principal amount equal to the amount payable under this Section 4 that was not paid in cash, having terms acceptable to the Company's (and its affiliate's, as applicable) lenders and permitted under the Company's (and its affiliate's, as applicable) debt instruments but which in any event (i) shall be mandatorily repayable promptly and to the extent that an Event no longer prohibits the payment of cash to the applicable Management Stockholder Entity pursuant to this Agreement; and (ii) shall bear

6