interest at a rate equal to the effective rate of interest in respect of the Company's U.S. dollar-denominated subordinated public debt securities (including any original issue discount). Notwithstanding the foregoing and subject to Section 4(d), if an Event exists that prohibits the Company from purchasing Stock and Options, above, and is continuing for ninety (90) days, prior to completion of such purchase by the Company, the Management Stockholder Entities shall be permitted by written notice to rescind any Redemption Notice with respect to that portion of the Stock and Options to be repurchased by the Company from the Management Stockholder Entities pursuant to this Section 4 with the note described in the foregoing sentence, provided that, the Management Stockholder Entity shall have another thirty (30) days from the date the Event ceases to prohibit such purchase to give another Redemption Notice on the terms applicable to the first Redemption Notice.

(d) *Effect of Change in Control*. Notwithstanding anything in this Agreement to the contrary, except for any payment obligation of the Company which has arisen prior to the occurrence of a Change in Control, this Section 4 shall terminate and be of no further force or effect upon the occurrence of such Change in Control.

5. The Company's Option to Purchase Stock and Options of the Management Stockholder Upon Certain Terminations of Employment.

(a) *Termination for Cause by the Company and other Call Events*. If (i) the Management Stockholder's active employment with the Company (or, if applicable, its subsidiaries or affiliates) is terminated by the Company (or, if applicable, its subsidiaries or affiliates) for Cause, or (ii) the Management Stockholder Entities effect a transfer of Stock (or Options) that is prohibited under this Agreement (or the Stock Option Agreements, as applicable), after notice from the Company of such impermissible transfer and a reasonable opportunity to cure such transfer which is not so cured (each event described above, a "Section 5(a) Call Event"), and subject to Section 5(g), then:

(I) With respect to Stock, the Company may purchase all or any portion of the shares of Stock then held by the applicable Management Stockholder Entities at a per share purchase price equal to the lesser of (x) the Base Price and (y) the Fair Market Value on the Repurchase Calculation Date and;

(II) With respect to all Options, all outstanding Options shall be automatically terminated without any payment in respect thereof upon the occurrence of the Section 5(a) Call Event.

(b) *Termination without Cause by the Company, Termination for Good Reason by the Management Stockholder, Termination due to death or Permanent Disability.* If the Management Stockholder's active employment with the Company (or, if applicable, its subsidiaries or affiliates) is terminated (i) by the Company (or, if applicable, its subsidiaries or affiliates) without Cause, (ii) by the Management Stockholder for Good Reason (if applicable), (iii) due to the Management Stockholder's death or Permanent Disability or (iv) under the circumstances described in Section 5(c)(ii) (each, a "Section 5(b) Call Event"), and subject to Section 5(g), then:

(I) With respect to Stock, the Company may purchase all or any portion of the shares of such Stock then held by the applicable Management Stockholder Entities at a per share purchase price equal to Fair Market Value on the Repurchase Calculation Date;

7

(II) With respect to any outstanding, vested Options, the Company may purchase all or any portion of the vested Options held by the applicable Management Stockholder Entities for an amount equal to the product of (x) the excess, if any, of the Fair Market Value on the Repurchase Calculation Date over the Option Exercise Price and (y) the number of Exercisable Option Shares (solely relating to vested Options), which vested Options shall be terminated in exchange for such payment. In the event the Company elects to repurchase under this Section 5(b)(II) and the foregoing Option Excess Price is zero or a negative number, all outstanding and exercisable vested Options shall be automatically terminated without any payment in respect thereof; and

(III) With respect to unvested Options, all outstanding unvested Options shall automatically be terminated without any payment in respect thereof.

(c) *Termination by the Management Stockholder.* (i) If the Management Stockholder's active employment with the Company (and/or, if applicable, its subsidiaries or affiliates) is terminated by the Management Stockholder (other than for Good Reason (if applicable) or due to death or Permanent Disability) (a "Section 5(c) Call Event"), and subject to Section 5(g), then:

(I) With respect to any Stock, the Company may purchase all or any portion of the shares of such Stock then held by the applicable Management Stockholder Entities at a per share purchase price equal to (A) if such termination occurs prior to the third anniversary of the Closing Date, the lesser of (x) the Fair Market Value as of the Repurchase Calculation Date and (y) the Base Price, or (B) if such termination occurs on or after the third anniversary of the Closing Date, the Fair Market Value as of the Repurchase Calculation Date (such purchase price as set forth in clause (A) or (B), as applicable, the "Section 5(c) Repurchase Price"); and

(II) With respect to any outstanding, vested Options, the Company may purchase all or any portion of the exercisable vested Options then held by the applicable Management Stockholder Entities for an amount equal to the product of (x) the excess, if any, of the Section 5(c) Repurchase Price over the Option Exercise Price, and (y) the number of Exercisable Option Shares (solely relating to vested Options). All unvested Options held by the applicable Management Stockholder Entities will terminate immediately without payment in respect thereof;

(d) *Call Notice.* The Company shall have a period (the "Call Period") of one hundred eighty (180) days from the date of any Call Event (or, if later, with respect to a Section 5(a) Call Event, the date after discovery of, and the applicable cure period for, an impermissible transfer constituting a Section 5(a) Call Event) in which to give notice in writing to the Management Stockholder of its election to exercise its rights and obligations pursuant to this Section 5 ("Repurchase Notice"). The completion of the purchases pursuant to the foregoing shall take place at the principal office of the Company no later than the twentieth business day after the giving of the Repurchase Notice. The applicable Repurchase Price (including any payment with respect to the Options as described in this Section 5) shall be paid by delivery to the applicable Management Stockholder Entities of a certified bank check or checks in the appropriate amount payable to the order of each of the applicable Management Stockholder Entities (or by wire transfer of immediately available funds, if the Management Stockholder Entities provide to the Company wire transfer instructions) against delivery of certificates or other instruments representing the Stock so purchased and appropriate documents canceling the Options so terminated, appropriately endorsed or

8

executed by the applicable Management Stockholder Entities or any duly authorized representative.

(e) *Use of Note to Satisfy Call Payment.* Notwithstanding any other provision of this Section 5 to the contrary, if there exists and is continuing any Event, the Company will, to the extent it has exercised its rights to purchase Stock or Options pursuant to this Section 5 and subject to the rescission rights of the Management Stockholder Entities below, in order to complete the purchase of any Stock or Options pursuant to this Section 5, deliver to the applicable Management Stockholder Entities (i) a cash payment for any amounts payable pursuant to this Section 5 that would not cause an Event that prohibits the Company from purchasing Stock and Options for cash and (ii) a promissory note having the same terms as that provided in Section 4(c) above with a principal amount equal to the amount payable but not paid in cash pursuant to this Section 5 due to the Event to the extent that, pursuant to the Event, the Company is prohibited from purchasing such Stock and Options in cash. Notwithstanding the foregoing, if an Event exists that causes the Company to be prohibited from such purchase and is continuing for ninety (90) days, prior to closing such purchase the Management Stockholder Entities shall be permitted by written notice to cause the Company to rescind any Repurchase Notice with respect to that portion of the Stock and Options repurchased by the Company from the Management Stockholder Entities pursuant to this Section 5 with the note described in the foregoing sentence, provided that, the Company shall have another thirty (30) days from the date the Event ceases to prohibit such purchase to give another Repurchase Notice on the terms applicable to the first Repurchase Notice.

(f) *Effect of Change in Control.* Notwithstanding anything in this Agreement to the contrary, except for any payment obligation of the Company which has arisen prior to the occurrence of a Change in Control, this Section 5 shall terminate and be of no further force or effect upon the occurrence of such Change in Control.

(g) *Effect of Accounting Principles.* Notwithstanding anything set forth in Section 4 or 5 to the contrary, in the event that it is determined by the Board that any of the provisions of either of Section 4 or 5 would result in any of the Options being classified as a liability as contemplated by FASB Statement No. 123R, Share-Based Payment, including any amendments and interpretations thereto, then the following terms shall apply:

(i) Any shares of Stock that are to be purchased by the Company pursuant to Section 4 or 5, as applicable, may only be so purchased if and when such shares have been held by the applicable Management Stockholder Entities for at least six months; and

(ii) With respect to any exercisable Options, upon the occurrence of the applicable event identified in Section 4 giving rise to the Management Stockholder's rights thereunder or a Call Event, the Management Stockholder Entities may be required by the Company to elect, in accordance with the terms of the relevant Stock Option Agreement, to receive from the Company, on one occasion, in exchange for all of the exercisable Options then held by the applicable Management Stockholder Entities, if any, a number of shares of Stock equal to the quotient of (x) the product of (A) the excess, if any, of the Fair Market Value over the Option Exercise Price and (B) the number of shares then acquirable on exercise, divided by (y) the Fair Market Value, which Options shall be terminated in exchange for such payment of shares of Stock (such shares of Stock, the "Net Settled Stock"). (In the event the foregoing Option Excess Price is zero or a negative number, all outstanding exercisable Options

9

shall be automatically terminated without any payment in respect thereof.) Upon the occurrence of such net settlement of all exercisable Options, the Put Period or the Call Period, as applicable, shall be deemed to be the period that is 30 days following the date that is six months after the receipt by the applicable Management Stockholder Entities of the Net Settled Stock, during which time the Company may, on delivery of Repurchase Notice (or upon delivery of a Redemption Notice), purchase (or be required to purchase in the case of Section 4) all (in the case of a purchase pursuant to Section 4) or all or any portion (in the case of a purchase pursuant to Section 5) of the Net Settled Stock held by the applicable Management Stockholder Entities, at a per share price equal to the applicable Repurchase Price for Option Stock identified in Section 4 or Section 5, as applicable.

6. Adjustment of Repurchase Price; Definitions.

(a) *Adjustment of Repurchase Price*. In determining the applicable repurchase price of the Stock and Options, as provided for in Sections 4 and 5 above, appropriate equitable adjustments shall be made for any stock dividends, splits, combinations, recapitalizations or any other adjustment in the number of outstanding shares of Stock in order to maintain, as nearly as practicable, the intended operation of the provisions of Sections 4 and 5.

(b) *Definitions*. All capitalized terms used in this Agreement and not defined herein shall have such meaning as such terms are defined in the Option Plan. Terms used herein and as listed below shall be defined as follows:

"Act" shall have the meaning set forth in Section 2(a)(i) hereof.

"Acquisition" shall have the meaning set forth in the first recital.

"Affiliate" means, with respect to any Person, any entity directly or indirectly controlling, controlled by or under common control with such Person.

"Agreement" shall have the meaning set forth in the introductory paragraph.

"Base Price" shall have the meaning set forth in Section 1(a) hereof.

"Board" shall mean the Board of Directors of the Company.

"Call Events" shall mean, collectively, Section 5(a) Call Events, Section 5(b) Call Events and Section 5(c) Call Events.

"Call Notice" shall have the meaning set forth in Section 5(d) hereof.

"Call Period" shall have the meaning set forth in Section 5(d) hereof.

"Cause" shall mean "Cause" as such term may be defined in any employment or other severance agreement in effect at the time of termination between the Management Stockholder and the Company or any of its subsidiaries or Affiliates (or as previously in effect immediately prior to any expiration of such agreement due to a Company nonrenewal of the agreement term)(any such employment or severance agreement, an "Employment Agreement"), or, if there otherwise is no such agreement or such term is not defined therein, "Cause" shall mean (i) the Management Stockholder's willful and continued failure to

10

perform his or her material duties with respect to the Company or its subsidiaries which continues beyond ten business days after a written demand for substantial performance is delivered to the Management Stockholder by the Company (the "Cure Period"); (ii) a willful and material breach of by the Management Stockholder of this Agreement or other agreements with the Company, if any, which continues beyond the Cure Period (to the extent that, in the Board's reasonable judgment, such breach can be cured); (iii) any act involving fraud or material dishonesty in connection with the business of the Company or any of its subsidiaries; (iv) a material violation of the Company's Code of Conduct; (v) attendance at work in a state of intoxication or otherwise being found in possession at his place of work of any prohibited drug or substance, possession of which constitute a criminal offense; (vi) assault or other act of violence; or (vii) conviction of, or a plea of *nolo contendere* to, any felony whatsoever or any misdemeanor that would preclude employment under the Company's hiring policy.

"Change in Control" means, in one or a series of transactions, (i) the sale of all or substantially all of the assets of the Company (or of all of such of its operating Subsidiaries) to any Person (or Group of Persons acting in concert), other than to (x) the Investors or their Affiliates or (y) any employee benefit plan (or trust forming a part thereof) maintained by the Company or its Affiliates or other Person of which a majority of its voting power or other equity securities is owned, directly or indirectly, by the Company (any Person described in the foregoing clauses (x) or (y), an "Affiliated Person"); or (ii) a sale by the Company, the Investors or any of their respective Affiliates, to a Person (or Group of Persons acting in concert) of Common Stock, or a merger, consolidation or similar transaction involving the Company, in any case, that results in more than 50% of the Common Stock of the Company (or any resulting company after a merger) being held by a Person (or Group of Persons acting in concert) that does not include an Affiliated Person; in any event, which results in the Investors and their Affiliates or such employee benefit plan ceasing to hold the ability to elect a majority of the members of the Board.

"Closing Date" shall mean the date of closing of the Acquisition pursuant to the Stock Purchase Agreement.

"Common Stock" shall have the meaning set forth in the third recital.

"Company" shall have the meaning set forth in the introductory paragraph.

"Confidential Information" shall mean all non-public information concerning trade secret, know-how, software, developments, inventions, processes, technology, designs, the financial data, strategic business plans or any proprietary or confidential information, documents or materials in any form or media, including any of the foregoing relating to research, operations, finances, current and proposed products and services, vendors, customers, advertising and marketing, and other non-public, proprietary, and confidential information of the Restricted Group.

"Custody Agreement and Power of Attorney" shall have the meaning set forth in Section 8(e) hereof.

"DGCL" shall have the meaning set forth in Section 4(c) hereof.

"Event" shall have the meaning set forth in Section 4(c) hereof.

11

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended (or any successor section thereto).

"Exercisable Option Shares" shall mean the shares of Common Stock that, at the time that any Redemption Notice or Repurchase Notice is delivered (as applicable), could be purchased by the Management Stockholder upon exercise of his or her outstanding and exercisable Options.

"Fair Market Value" shall mean, (i) prior to the date on which shares of Common Stock are traded on an exchange or in another public market, the fair market value of one share of Common Stock on any given date (without regard to discounts for minority status), as determined reasonably and in good faith by the Board, consistent with the determination of an independent, third party appraisal of the fair market value of one share of Common Stock that shall be performed at least annually for the Board for purposes of, among other things, reporting such value to the Investors, but in all events satisfying Section 409A under the Internal Revenue Code of 1986, as amended, so that no Option shall constitute "deferral of compensation" thereunder, or (ii) after the date on which shares of Common Stock are traded on an exchange or in another public market, (A) the last sale price of a share of Common Stock on the Repurchase Calculation Date on the principal stock exchange on which the shares of Common Stock may at the time be listed or, (B) if there shall have been no sales on such exchange on the Repurchase Calculation Date, the average of the closing bid and asked prices on such exchange on the Repurchase Calculation Date or, (C) if there is no such bid and asked price on the Repurchase Calculation Date, on the next preceding date when such bid and asked price occurred or, (D) if shares of Common Stock shall not be so listed, the closing sale price as reported by NASDAQ for the last trading day immediately preceding the Repurchase Calculation Date in the over-the-counter market.

"Good Reason" shall have the meaning set forth in any Employment Agreement, if any.

"Group" shall mean "group," as such term is used for purposes of Section 13(d) or 14(d) of the Exchange Act.

"Investors" shall have the meaning set forth in the second recital.

"Liquidity" shall mean, with respect to each share of Common Stock held, directly or indirectly, by the Investors, (i) the achievement by the Investors of an internal rate of return (determined on a fully diluted basis, assuming inclusion of all Option Stock) of (A) on or prior to December 31, 2011, at least 25% or (B) after December 31, 2011, at least 20% and (ii) the Investors having earned a return of at least 3.0 times the effective per share purchase price paid by the Investors for the shares of Common Stock of the Company in connection with the Acquisition.

"Management Stockholder" shall have the meaning set forth in the introductory paragraph.

"Management Stockholder Entities" shall mean the Management Stockholder's Trust, the Management Stockholder and the Management Stockholder's Estate, collectively.

"Management Stockholder's Estate" shall mean the conservators, guardians, executors, administrators, testamentary trustees, legatees or beneficiaries of the Management Stockholder.

"Management Stockholder's Trust" shall mean a partnership, limited liability company, corporation, trust, private foundation or custodianship, the beneficiaries of which may include only the Management Stockholder, his or her spouse (or ex-spouse) or his or her lineal descendants (including adopted) or spouse (or ex-spouse) of such lineal descendants or, if at any time after any such transfer there shall be no then living spouse or lineal descendants, then to the ultimate beneficiaries of any such trust or to the estate of a deceased beneficiary.

"Options" shall have the meaning set forth in the fourth recital.

"Option Excess Price" shall mean the aggregate amount paid or payable by the Company in respect of Exercisable Option Shares, as determined pursuant to Section 4 or 5 hereof, as applicable.

"Option Exercise Price" shall mean the then-current exercise price of the shares of Common Stock covered by the applicable Option.

"Option Plan" shall have the meaning set forth in the fourth recital.

"Option Stock" shall have the meaning set forth in Section 2(a) hereof.

"Other Management Stockholders" shall have the meaning set forth in the fifth recital.

"Other Management Stockholders Agreements" shall have the meaning set forth in the fifth recital.

"Parties" shall have the meaning set forth in the introductory paragraph.

"Permanent Disability" shall mean "Disability" as such term is defined in any Employment Agreement, or, if there otherwise is no such Employment Agreement, shall mean "Disability" as defined in the Option Plan.

"Permitted Transfer" shall have the meaning set forth in Section 3(a).

"Person" shall mean "person," as such term is used for purposes of Section 13(d) or 14(d) of the Exchange Act.

"Piggyback Notice" shall have the meaning set forth in Section 8(b) hereof.

"Piggyback Registration Rights" shall have the meaning set forth in Section 8(a) hereof.

"Proposed Registration" shall have the meaning set forth in Section 8(b) hereof.

"Public Offering" shall mean the sale of shares of Common Stock to the public subsequent to the date hereof pursuant to a registration statement under the Act which has been declared effective by the SEC (other than a registration statement on Form S-4, S-8 or any other similar form).

13

"Purchased Stock" shall have the meaning set forth in the fourth recital.

"Put Period" shall have the meaning set forth in Section 4(a) hereof.

"Redemption Notice" shall have the meaning set forth in Section 4(c) hereof.

"Registration Rights Agreement" shall have the meaning set forth in Section 8(a) hereof.

"Qualified Public Offering" means an initial Public Offering and all subsequent Public Offerings after and pursuant to which the Investors have sold an aggregate of at least 35% of the shares of Common Stock held immediately after the Closing Date (taking into account any adjustment as a result of any stock dividend, split, reverse split, combination, recapitalization, liquidation, reclassification, merger, consolidation or otherwise), directly or indirectly, by the Investors.

"Repurchase Calculation Date" shall mean (i) prior to the occurrence of a Public Offering, the last day of the month preceding the month in which date of repurchase occurs, and (ii) on and after the occurrence of a Public Offering, the date immediately preceding the date of repurchase.

"Repurchase Notice" shall have the meaning set forth in Section 5(e) hereof.

"Repurchase Price" shall mean the amount to be paid in respect of the Stock and Options to be purchased by the Company pursuant to Section 4 and Section 5, as applicable.

"Request" shall have the meaning set forth in Section 8(b) hereof.

"Restricted Group" shall mean, collectively, the Company, its subsidiaries, the Investors and their respective Affiliates.

"Sale Participation Agreement" shall mean that certain sale participation agreement entered into by and between the Management Stockholder and the Investors dated as of the date hereof.

"SEC" shall mean the Securities and Exchange Commission.

"Stock" shall have the meaning set forth in Section 2(a) hereof.

"Stock Purchase Agreement" shall have the meaning set forth in the first recital.

"Stock Option Agreements" shall have the meaning set forth in the fourth recital.

"transfer" shall have the meaning set forth in Section 2(a) hereof.

    7. The Company's Representations and Warranties and Covenants.

(a) The Company represents and warrants to the Management Stockholder that (i) this Agreement has been duly authorized, executed and delivered by the Company and is enforceable against the Company in accordance with its terms and (ii) the Stock, when issued and delivered in accordance with the terms hereof and the other agreements contemplated hereby, will be duly and validly issued, fully paid and nonassessable.

(b) If the Company becomes subject to the reporting requirements of Section 12 of the Exchange Act, the Company will file the reports required to be filed by it under the Act and the Exchange Act and the rules and regulations adopted by the SEC thereunder, to the extent required from time to time to enable the Management Stockholder to sell shares of Stock, subject to compliance with the provisions hereof without registration under the Exchange Act within the limitations of the exemptions provided by (A) Rule 144 under the Act, as such Rule may be amended from time to time, or (B) any similar rule or regulation hereafter adopted by the SEC. Notwithstanding anything contained in this Section 7(b), the Company may de-register under Section 12 of the Exchange Act if it is then permitted to do so pursuant to the Exchange Act and the rules and regulations thereunder and, in such circumstances, shall not be required hereby to file any reports which may be necessary in order for Rule 144 or any similar rule or regulation under the Act to be available. Nothing in this Section 7(b) shall be deemed to limit in any manner the restrictions on transfers of Stock contained in this Agreement.

(c) Upon an initial Public Offering, the Company will, as promptly as practicable, file a registration statement on Form S-8 under the Act pursuant to which all Option Stock will be registered and list the Option Stock for trading on the exchange on which shares of Common Stock are then listed.

8. "Piggyback" Registration Rights.

(a) The Management Stockholder hereby agrees to be bound by all of the terms, conditions and obligations of the piggyback registration rights contained in Section 2 of the Registration Rights Agreement (the "Registration Rights Agreement") entered into by and among the Company and investors party thereto (the "Piggyback Registration Rights"), as in effect on the date hereof (subject to any amendments thereto to which the Management Stockholder has agreed in writing to be bound), and, if any of the Investors are selling stock, shall have all of the rights and privileges of the Piggyback Registration Rights (including, without limitation, any rights to indemnification and/or contribution from the Company and/or the Investors), in each case as if the Management Stockholder were an original party (other than the Company) to the Registration Rights Agreement, subject to applicable and customary underwriter restrictions; provided, however, that at no time shall the Management Stockholder have any rights to request registration under Section 3(a) of the Registration Rights Agreement. All Stock purchased or held by the applicable Management Stockholder Entities pursuant to this Agreement shall be deemed to be "Registrable Securities" as defined in the Registration Rights Agreement.

(b) In the event of a sale of Common Stock by any of the Investors in accordance with the terms of the Registration Rights Agreement, the Company will promptly notify each Management Stockholder (a "Piggyback Notice") of any proposed registration (a "Proposed Registration"). If within five (5) days of the receipt by the Management Stockholder of such Piggyback Notice, the Company receives from the applicable Management Stockholder Entities of Management Stockholder a written request (a "Request") to register shares of Stock held by the applicable Management Stockholder Entities (which Request will be irrevocable unless otherwise mutually agreed to in writing by the Management Stockholder and the Company), shares of Stock will be so registered as provided in this Section 8; provided, however, that for each such registration statement only one Request, which shall be executed by the applicable Management Stockholder Entities,