may be submitted for all Registrable Securities held by the applicable Management Stockholder Entities.

(c) The maximum number of shares of Stock which will be registered pursuant to a Request will be the number of shares of Stock then held by the Management Stockholder Entities, including all shares of Stock which the Management Stockholder Entities are then entitled to acquire under an unexercised Option to the extent then exercisable, multiplied by a fraction, the numerator of which is the aggregate number of shares of Stock being sold by holders of Registrable Securities and the denominator of which is the aggregate number of shares of Stock owned by the holders of Registrable Securities, as reduced pursuant to Section 2(b) or 3(b) of the Registration Rights Agreement, if applicable.

(d) Upon delivering a Request a Management Stockholder will, if requested by the Company, execute and deliver a custody agreement and power of attorney having customary terms and in form and substance reasonably satisfactory to the Company with respect to the shares of Stock to be registered pursuant to this Section 8 (a "Custody Agreement and Power of Attorney"). The Custody Agreement and Power of Attorney will provide, among other things, that the Management Stockholder will deliver to and deposit in custody with the custodian and attorney-in-fact named therein a certificate or certificates (to the extent applicable) representing such shares of Stock (duly endorsed in blank by the registered owner or owners thereof or accompanied by duly executed stock powers in blank) and irrevocably appoint said custodian and attorney-in-fact as the Management Stockholder's agent and attorney-in-fact with full power and authority to act under the Custody Agreement and Power of Attorney on the Management Stockholder's behalf with respect to the matters specified therein, subject to the obligations of the Investors and the Company to the Management Stockholder under this Agreement.

(e) The Management Stockholder agrees that he will execute such other agreements as the Company may reasonably request to further evidence the provisions of this Section 8, including reasonable and customary lock-up agreements.

(f) This Section 8 will terminate upon the occurrence of a Change in Control.

9. Rights to Negotiate Repurchase Price. Nothing in this Agreement shall be deemed to restrict or prohibit the Company from purchasing, redeeming or otherwise acquiring for value shares of Stock or Options from the Management Stockholder, at any time, upon such terms and conditions, and for such price, as may be mutually agreed upon in writing between the Parties, whether or not at the time of such purchase, redemption or acquisition circumstances exist which specifically grant the Company the right to purchase, or the Management Stockholder the right to sell, shares of Stock or any Options under the terms of this Agreement; provided that no such purchase, redemption or acquisition shall be consummated, and no agreement with respect to any such purchase, redemption or acquisition shall be entered into, without the prior approval of the Board.

10. Covenant Regarding 83(b) Election. Except as the Company may otherwise agree in writing, the Management Stockholder hereby covenants and agrees that the Management Stockholder will make an election provided pursuant to Treasury Regulation Section 1.83-2 in the form attached as Schedule II hereto with respect to the Purchased Stock and the Option Stock acquired on exercise of any Options; and the Management Stockholder further covenants and agrees that he or she will furnish the Company with copies of the forms of election the Management Stockholder files within

16

thirty (30) days after the date of purchase of the Purchased Stock, and within thirty (30) days after each exercise of the Management Stockholder's Options and with evidence that each such election has been filed in a timely manner.

11. Notice of Change of Beneficiary. Immediately prior to any transfer of Stock to a Management Stockholder's Trust, the Management Stockholder shall provide the Company with a copy of the instruments creating the Management Stockholder's Trust and with the identity of the beneficiaries of the Management Stockholder's Trust. The Management Stockholder shall notify the Company as soon as practicable prior to any change in the identity of any beneficiary of the Management Stockholder's Trust.

12. Recapitalizations, etc. The provisions of this Agreement shall apply, to the full extent set forth herein with respect to the Stock or the Options, to any and all shares of capital stock of the Company or any capital stock, partnership units or any other security evidencing ownership interests in any successor or assign of the Company (whether by merger, consolidation, sale of assets or otherwise) which may be issued in respect of, in exchange for, or substitution of the Stock or the Options by reason of any stock dividend, split, reverse split, combination, recapitalization, liquidation, reclassification, merger, consolidation or otherwise.

13. Management Stockholder's Employment by the Company. Nothing contained in this Agreement (i) obligates the Company or any subsidiary or Affiliate of the Company to employ the Management Stockholder in any capacity whatsoever or (ii) prohibits or restricts the Company (or any such subsidiary or Affiliate) from terminating the employment of the Management Stockholder at any time or for any reason whatsoever, with or without Cause, and the Management Stockholder hereby acknowledges and agrees that neither the Company nor any other Person has made any representations or promises whatsoever to the Management Stockholder concerning the Management Stockholder's employment or continued employment by the Company or any subsidiary or Affiliate of the Company.

14. Binding Effect. The provisions of this Agreement shall be binding upon and accrue to the benefit of the parties hereto and their respective heirs, legal representatives, successors and assigns. In the case of a transferee permitted under Section 2(a) or Section 3(a) (other than clauses (iii) or (iv) thereof) hereof, such transferee shall be deemed the Management Stockholder hereunder; provided, however, that no transferee (including without limitation, transferees referred to in Section 2(a) or Section 3(a) hereof) shall derive any rights under this Agreement unless and until such transferee has delivered to the Company a valid undertaking and becomes bound by the terms of this Agreement. No provision of this Agreement is intended to or shall confer upon any Person other than the Parties any rights or remedies hereunder or with respect hereto.

15. Amendment. This Agreement may be amended by the Company at any time upon notice to the Management Stockholder thereof; provided that any amendment (i) that disadvantages the Management Stockholder in any respect (other than in a de minimis manner) shall not be effective unless and until the Management Stockholder has consented thereto in writing and (ii) that disadvantages a class of stockholders in more than a de minimis way but less than a material way shall require the consent of a majority of the equity interests held by such affected class of stockholders.

17

16. Closing. Except as otherwise provided herein, the closing of each purchase and sale of shares of Stock pursuant to this Agreement shall take place at the principal office of the Company on the tenth business day following delivery of the notice by either Party to the other of its exercise of the right to purchase or sell such Stock hereunder.

17. Applicable Law; Jurisdiction; Arbitration; Legal Fees.

(a) The laws of the State of Delaware applicable to contracts executed and to be performed entirely in such state shall govern the interpretation, validity and performance of the terms of this Agreement.

(b) In the event of any controversy among the parties hereto arising out of, or relating to, this Agreement which cannot be settled amicably by the parties, such controversy shall be finally, exclusively and conclusively settled by mandatory arbitration conducted expeditiously in accordance with the American Arbitration Association rules by a single independent arbitrator. Such arbitration process shall take place in New York, New York. The Company shall pay all fees and costs of such arbitration. The decision of the arbitrator shall be final and binding upon all parties hereto and shall be rendered pursuant to a written decision, which contains a detailed recital of the arbitrator's reasoning, subject to enforcement of the arbitration award hereunder or for vacation or modification thereof as provided under the Federal Arbitration Act, Title 9 U.S. Code Chapter 1. Judgment upon the award rendered may be entered in any court having jurisdiction thereof.

(c) Notwithstanding the foregoing, the Management Stockholder acknowledges and agrees that the Company, its subsidiaries, the Investors and any of their respective Affiliates shall be entitled to injunctive or other relief in order to enforce the covenant not to compete, covenant not to solicit and/or confidentiality covenants as set forth in Section 22(a) of this Agreement.

(d) In the event of any arbitration or other disputes with regard to this Agreement or any other document or agreement referred to herein, each Party shall pay its own legal fees and expenses, unless otherwise determined by the arbitrator.

18. Assignability of Certain Rights by the Company. The Company shall have the right to assign any or all of its rights or obligations to purchase shares of Stock pursuant to Sections 4 and 5 hereof.

19. Miscellaneous.

(a) In this Agreement all references to "dollars" or "$" are to United States dollars and the masculine pronoun shall include the feminine and neuter, and the singular the plural, where the context so indicates.

(b) If any provision of this Agreement shall be declared illegal, void or unenforceable by any court of competent jurisdiction, the other provisions shall not be affected, but shall remain in full force and effect.

20. Withholding. The Company or its subsidiaries shall have the right to deduct from any cash payment made under this Agreement to the applicable Management Stockholder Entities any federal, state or local income or other taxes required by law to be withheld with respect to such payment, if applicable.

18

21. <u>Notices</u>. All notices and other communications provided for herein shall be in writing. Any notice or other communication hereunder shall be deemed duly given (i) upon electronic confirmation of facsimile, (ii) one business day following the date sent when sent by overnight delivery and (iii) five (5) business days following the date mailed when mailed by registered or certified mail return receipt requested and postage prepaid, in each case as follows:

(a) If to the Company, to it at the following address:

USF Holding Corp.
c/o U.S. Foodservice, Inc.
9755 Patuxent Woods Drive
Columbia, Maryland 21046
Attention: David Eberhardt
Fax: (410) 309-6465

with a copy (which shall not constitute notice) to:

Kohlberg Kravis Roberts & Co. L.P.
2800 Sand Hill Road, Suite 94025
Menlo Park, California 94025
Attention: Michael Calbert
Fax: (650) 233-6548

and

Clayton, Dubilier & Rice, Inc.
375 Park Avenue
18th Floor
New York, New York 10152
Attention: Richard J. Schnall
Fax: (212) 407-5252

with a copy (which shall not constitute notice) to:

Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, New York 10017
Attention: Marni Lerner, Esq.
Fax: (212) 455-2502

and

Debevoise & Plimpton LLP
919 Third Avenue
New York, New York 10022
Attention: Franci J. Blassberg, Esq.
Fax: (212) 909-7531

19

(b) If to the Management Stockholder, to the Management Stockholder at the address set forth below under the Management Stockholder's signature; or at such other address as either party shall have specified by notice in writing to the other.

22. <u>Covenant Not to Disclose Confidential Information and Other Restrictive Covenants</u>.

(a) In consideration of, and as a condition to, the Company entering into this Agreement and the Stock Option Agreement with the Management Stockholder, the Management Stockholder hereby agrees that, effective as of the date of this Agreement, the Management Stockholder shall execute a Non-Disclosure and Non-Solicitation Agreement with the Company and its subsidiaries, in a form to be provided by the Company (the "<u>Restrictive Covenant Agreement</u>"), and all provisions contained in the Restrictive Covenant Agreement shall be and are hereby incorporated by reference herein and made a part of this Agreement; <u>provided, however,</u> that if the Management Stockholder has entered into an Employment Agreement, any covenants not to compete, not to solicit customers, clients, or employees, and/or not to disclose confidential information, and any other similar restrictive covenants contained therein, shall be and are hereby incorporated by reference herein and made a part of this Agreement, such that the Management Stockholder shall not be required to execute a Restrictive Covenant Agreement.

(b) Notwithstanding clause (a) above, if at any time a court holds that the restrictions incorporated by reference into such clause (a) are unreasonable or otherwise unenforceable under circumstances then existing, the parties hereto agree that the maximum period, scope or geographic area determined to be reasonable under such circumstances by such court will be substituted for the stated period, scope or area. Because the Management Stockholder's services are unique and because the Management Stockholder has had access to Confidential Information, the parties hereto agree that money damages will be an inadequate remedy for any breach of this Agreement. In the event of a breach or threatened breach of this Agreement (including the provisions incorporated into Section 22(a) from any Employment Agreement or Restrictive Covenant Agreement), the Company or its successors or assigns may, in addition to other rights and remedies existing in their favor, apply to any court of competent jurisdiction for specific performance and/or injunctive relief in order to enforce, or prevent any violations of, the provisions hereof (without the posting of a bond or other security).

(c) In the event that the Management Stockholder breaches any of the provisions of Section 22(a) (including those provisions incorporated by reference therein from any Employment Agreement or Restrictive Covenant Agreement), in addition to all other remedies that may be available to the Company, the Management Stockholder shall be required to pay to the Company any amounts actually paid to him or her by the Company in respect of any repurchase by the Company of any Options or Stock held by such Management Stockholder; <u>provided</u> that (x) with respect to Purchased Stock, the Management Stockholder shall be required to pay to the Company only such amounts, if any, that the Management Stockholder received in excess of the Base Price paid by the Management Stockholder in acquiring such Purchased Stock, on a net after-tax basis, and (y) with respect to Option Stock, the Management Stockholder shall be required to pay to the Company only such amounts, if any, that the Management Stockholder received in excess of the exercise price paid by the Management Stockholder in acquiring such Option Stock, on a net after-tax basis.

20

*[Signatures on next page.]*

21

**Schedule II**

SECTION 83(b) ELECTION FORM

_____, 2007

CERTIFIED MAIL
<u>RETURN RECEIPT REQUESTED</u>

Internal Revenue Service Center
_____
_____

Re: <u>Election Under §83(b) of the Internal Revenue Code</u>

Dear Sir:

The undersigned hereby elects under Section 83(b) of the Internal Revenue Code to include in the taxpayer's gross income for the taxable year in which the property described below was transferred, the excess (if any), of the fair market value of such property at the time of its transfer, over the amount (if any) paid for such property. Pursuant to Treas. Reg. § 1.83-2(e) the following information is submitted:

1. Name of taxpayer: _____

    Address of taxpayer:
    _____
    _____

    Taxpayer's Identification Number: _____

2. Property with respect to which the election is being made: _____ shares of common stock of USF Holding Corp. ("USF").

3. Date transferred:

4. Taxable year for which this election is being made: Calendar year 2007.

5. Nature of the restriction or restrictions to which the property is subject:

    While the shares described in Paragraph 2 are held by the undersigned, such shares shall be subject to restrictions on transfer and to the right of USF to repurchase such shares at an agreed upon price, which price may be lower than the fair market value of the shares upon certain types of terminations of the undersigned's employment with USF or any of its subsidiaries (including US Foodservice), which transfer restrictions and right of repurchase shall lapse upon the later to occur of certain events.

6. Fair market value of the property at the time of transfer: $_____ per share.

7. Amount paid for the property: $\_\_\_\_\_ per share.

8. A copy of this election has been furnished to Dave Essler at US Foodservice.

Very truly yours,

_____
(Signature of Taxpayer)

Execution Copy

## SALE PARTICIPATION AGREEMENT

November 16, 2007

To: The Person whose name is
set forth on the signature page hereof

Dear Sir or Madam:

    You have entered into a Management Stockholder's Agreement, dated as of the date hereof, between USF Holding Corp., a Delaware corporation (the "Company"), and you (the "Stockholder's Agreement") relating to (i) the purchase by you of the Purchased Stock (as defined in the Stockholder's Agreement) and/or (ii) the grant by the Company to you of Options (as defined in the Stockholder's Agreement) to purchase shares of common stock, par value $0.01 per share, of the Company (the "Common Stock"). The undersigned, Clayton, Dubilier & Rice Fund VII, L.P., Clayton, Dubilier & Rice Fund VII (Co-Investment), L.P., CD&R Parallel Fund VII, L.P., CDR USF Co-Investor L.P. and CDR USF Co-Investor No. 2, L.P. (collectively, the "CD&R Investors") and KKR 2006 Fund L.P., KKR PEI Investments, L.P., KKR Partners III, L.P. and OPERF Co-Investment LLC (collectively, the "KKR Investors" and together with the CD&R Investors, each an "Investor" and together the "Investors"), hereby agrees with you as follows, effective as of the Effective Date (as defined in the Stockholder's Agreement):

    1. (a) In the event that at any time on or after the Effective Date any of the Investors or their Affiliates (as defined in the Stockholder's Agreement) (the "Selling Investors") proposes to sell for cash or any other consideration any shares of Common Stock owned by the Selling Investors, in any transaction other than a Public Offering (as defined in the Stockholder's Agreement) or a sale, directly or indirectly, to a Permitted Transferee (as defined in the Investor Stockholder's Agreement (as defined below)) of a Selling Investor, then, unless the Selling Investors exercise the drag-along rights pursuant to paragraph 7 below and the Drag Transaction is consummated, the Selling Investors will notify you or your Management Stockholder's Estate or Management Stockholder's Trust (as such terms are defined in the Stockholder's Agreement, and collectively with you, the "Management Stockholder Entities"), as the case may be, promptly, and in any event not less than 10 business days prior to the consummation of the Proposed Sale, in writing (a "Notice") of such proposed sale (a "Proposed Sale") specifying the principal terms and conditions of the Proposed Sale (the "Material Terms").

    (b)  If, within 10 business days after the delivery of Notice under Section 1(a) the Selling Investors are given written notice from a Management Stockholder Entity requesting (a "Request") to include Common Stock held by such Management Stockholder Entity in the Proposed Sale (which Request shall be irrevocable except as otherwise mutually agreed to in writing by such Management Stockholder Entity and the Selling Investors), the Common Stock held by such Management Stockholder Entity (not in any event to exceed the total number of shares of Common Stock permitted to be included in a Proposed Sale pursuant to Section 2) will be so included as provided herein. Promptly after the execution of the Sale Agreement, the

2

Selling Investors will furnish each such Management Stockholder Entity with a copy of the Sale Agreement, if any.

2. (a) The number of shares of Common Stock that a Management Stockholder Entity will be permitted to include in a Proposed Sale pursuant to a Request will be the product of (i) the sum of the number of shares of Common Stock held by such Management Stockholder Entity plus all shares of Common Stock which such Management Stockholder Entity is then entitled to acquire under any unexercised Option or portion thereof, to the extent such Option (or portion thereof) is then exercisable or would become exercisable as a result of the consummation of the Proposed Sale, multiplied by (ii) a fraction (such fraction, expressed as a percentage, the "Tag-Along Sale Percentage") (A) the numerator of which is the number of shares of Common Stock proposed to be purchased by the buyer in the Proposed Sale and (B) the denominator of which is the total number of shares of Common Stock owned, directly or indirectly, or which would be owned upon exercise of any exercisable Options (to the extent any such Options are then exercisable or would become exercisable as a result of the consummation of the Proposed Sale), by the Investors, the Management Stockholder Entities and other holders of shares of Common Stock who have been granted the same rights granted to the Management Stockholder Entities to participate in the Proposed Sale (such other holders, together with the Management Stockholder Entities, the "Eligible Holders").

(b) If one or more Eligible Holders elect not to include the maximum number of shares of Common Stock which such holders would have been permitted to include in a Proposed Sale pursuant to Paragraph 2(a) (such non-included shares, the "Eligible Shares"), then each of the Selling Investors, or the remaining Eligible Holders, or any of them, will have the right to sell in the Proposed Sale a number of additional shares of their Common Stock equal to their pro rata portion of the number of Eligible Shares, based on the relative number of shares of Common Stock then held by each such holder plus all shares of Common Stock which such holder is then entitled to acquire under any unexercised Option or portion thereof, to the extent such Option (or portion thereof) is then exercisable or would become exercisable as a result of the consummation of the Proposed Sale. The Selling Investors, or any of them, will have the right to sell in the Proposed Sale additional shares of Common Stock owned by them equal to the number, if any, of remaining Eligible Shares which will not be included in the Proposed Sale pursuant to the foregoing.

3. Except as may otherwise be provided herein, shares of Common Stock subject to a Request will be included in a Proposed Sale pursuant hereto and in any agreements with purchasers relating thereto on the same terms and subject to the same conditions applicable to the shares of Common Stock which the Selling Investors propose to sell in the Proposed Sale. Such terms and conditions shall include, without limitation: the pro rata reduction of the number of shares of Common Stock to be sold by the Selling Investors, the Management Stockholder Entities and any Eligible Holders to be included in the Proposed Sale if required by the party proposing such Sale; the sale price; the payment of fees, commissions and expenses (which shall not include any such amounts as may be payable by the selling stockholders to an Investor or an Affiliate of an Investor); the provision of, and representation and warranty as to, information reasonably requested by the Selling Investors covering matters regarding the Management Stockholder Entities' ownership of shares; and the provision of requisite indemnification; provided that any indemnification provided by the Management Stockholder Entities shall be pro