rata in proportion with the number of shares of Common Stock to be sold and liability thereunder shall be limited to the after-tax proceeds received by such Management Stockholder Entity for such Common Stock to be sold. Notwithstanding anything to the contrary in the foregoing, if the consideration payable for shares of Common Stock is securities and the acquisition of such securities by a Management Stockholder Entity would reasonably be expected to be prohibited under U.S., foreign or state securities laws, such Management Stockholder Entity shall be entitled to receive an amount in cash equal to the value of any such securities such Person would otherwise be entitled to receive.

4. Upon delivering a Request, the Management Stockholder Entities will, if requested by the Selling Investors, execute and deliver a custody agreement and power of attorney in form and substance reasonably satisfactory to the Selling Investors and the Designated Employee Representative (as defined below) with respect to the shares of Common Stock which are to be sold by the Management Stockholder Entities pursuant hereto (a "Custody Agreement and Power of Attorney"). The Custody Agreement and Power of Attorney will contain customary provisions and will provide, among other things, that the Management Stockholder Entities will deliver to and deposit in custody with the custodian and attorney-in-fact named therein a certificate or certificates (if such shares are certificated) representing such shares of Common Stock (duly endorsed in blank by the registered owner or owners thereof) and irrevocably appoint said custodian and attorney-in-fact as the Management Stockholder Entities' agent and attorney-in-fact with full power and authority to act under the Custody Agreement and Power of Attorney on the Management Stockholder Entities' behalf with respect to the matters specified therein, subject to the obligations of Investors and the Company under this Sale Participation Agreement. For purposes hereof, the term "Designated Employee Representative" means: Robert Aiken, provided that he is the Chief Executive Officer of the Company at the relevant time (or his or her designee); and if Robert Aiken is not such Chief Executive Officer, then the Management Stockholder or Other Management Stockholder (as defined in the Stockholder's Agreement), as applicable, whose Management Stockholder Entities hold the largest number of shares of Common Stock, relative to all Other Management Stockholders .

5. The Management Stockholder Entities' right pursuant hereto to participate in a Proposed Sale shall be contingent on the Management Stockholder Entities' strict compliance with each of the provisions hereof and the Management Stockholder Entities' respective willingness to execute such documents in connection therewith as may be reasonably requested by the Selling Investors.

6. If the consideration to be paid in exchange for shares of Common Stock in a Proposed Sale pursuant to Section 1 includes any securities, and the receipt thereof by the Selling Investors and a Management Shareholder Entity would require under applicable law (a) the registration or qualification of such securities or of any Person as a broker or dealer or agent with respect to such securities or (b) the provision to any selling Management Shareholder Entity of any information regarding the Company, its subsidiaries, such securities or the issuer thereof that would not be required to be delivered in an offering solely to a limited number of "accredited investors" under Regulation D promulgated under the Securities Act of 1933, as amended, and the rules and regulations in effect thereunder, the Selling Stockholders shall have the right to cause to be paid to such selling Management Shareholder Entity in lieu thereof, against surrender of the shares of Common Stock which would have otherwise been sold by such selling

Management Shareholder Entity to the prospective buyer in the proposed sale, an amount in cash equal to the Fair Market Value (as defined in the Stockholder's Agreement) of such shares of Common Stock as of the date such securities would have been issued in exchange for such shares of Common Stock.

       7.  (a)  If an Investor or group of Investors (including any Investors selling shares of Common Stock as a result of the exercise by another Investor of the rights set forth in Section 3.5 of the Stockholder's Agreement, dated July 3, 2007, between the Company and the Investors (the "Investor Stockholder's Agreement") (the "Initiating Investors") proposes to transfer, directly or indirectly, a number of shares of Common Stock to a non-Affiliate of the Initiating Investors (such Person, the "Drag-Along Purchaser"), such that the transaction (a "Drag Transaction") would result in a Change of Control (taking into account all interests (including pursuant to this Section 7(a) and Section 3.5 of the Investor Stockholder's Agreement) being "dragged"), then if requested by the Initiating Investors, each Management Stockholder Entity shall be required to sell a number of shares of Common Stock equal to the aggregate number of shares of Common Stock held by such Management Stockholder Entity plus all shares of Common Stock which such Management Stockholder Entity is then entitled to acquire under any unexercised Option or portion thereof, to the extent such Option (or portion thereof) is then exercisable or would become exercisable as a result of the consummation of the Drag Transaction, multiplied by the Tag-Along Sale Percentage.

       (b)     Shares of Common Stock held by the Management Stockholder Entities included in a Drag Transaction will be included in any agreements with the Drag-Along Purchaser relating thereto on the same terms and subject to the same conditions applicable to the shares of Common Stock which the Initiating Investors propose to sell in the Drag Transaction. Such terms and conditions shall include, without limitation: the pro rata reduction of the number of shares of Common Stock to be sold by the Initiating Investors and the Management Stockholder Entities to be included in the Drag Transaction if required by the Drag-Along Purchaser; the sale price; the payment of fees, commissions and expenses (which shall not include any such amounts as may be payable by the selling stockholders to an Investor or an Affiliate of an Investor); the provision of, and representation and warranty as to, information reasonably requested by Parent covering matters regarding the Management Stockholder Entities' ownership of shares; and the provision of requisite indemnification; provided that any indemnification provided by the Management Stockholder Entities shall be pro rata in proportion with the number of shares of Common Stock to be sold and liability thereunder shall be limited to the after-tax proceeds received by such Management Stockholder Entity for such Common Stock to be sold.

       (c)     Your pro rata share of any amount to be paid pursuant to Paragraph 3 or 7(b) shall be based upon the number of shares of Common Stock intended to be transferred by the Management Stockholder Entities plus the number of shares of Common Stock you would have the right to acquire under any unexercised portion of the Option which is then vested or would become vested as a result of the Proposed Sale or Drag Transaction, assuming that you receive a payment in respect of such Option.

       (d)     Notwithstanding anything to the contrary in the foregoing, if the consideration payable for shares of Common Stock is securities and the acquisition of such

5

securities by a Management Stockholder Entity would reasonably be expected to be prohibited under U.S., foreign or state securities laws, such Management Stockholder Entity shall be entitled to receive an amount in cash equal to the value of any such securities such Person would otherwise be entitled to receive.

      8. The obligations of the Investors hereunder shall extend only to you and your transferees ("Permitted Transferees") who (a) are Other Management Stockholders (as defined in the Stockholder's Agreement), (b) are party to a Management Stockholder's Agreement with the Company and (c) have acquired Common Stock pursuant to a Permitted Transfer (as defined in the Stockholder's Agreement), and none of the Management Stockholder Entities' successors or assigns, with the exception of any Permitted Transferee and only with respect to the Common Stock acquired by such Permitted Transferee pursuant to a Permitted Transfer, shall have any rights pursuant hereto.

      9. This Agreement shall terminate and be of no further force and effect on the occurrence of the earlier of the consummation of a Qualified Public Offering (as defined in the Stockholder's Agreement) or a Change in Control (as defined in the Stockholder's Agreement).

      10. All notices and other communications required or permitted hereunder shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by confirmed facsimile if sent during normal business hours of the recipient, if not, then on the next business day, provided that a copy of such notice is also sent via nationally recognized overnight courier, specifying next day delivery, with written verification of receipt, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid or (d) one (1) business day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be sent to such party's address as set forth below or at such other address or to such other person as the party shall have furnished to each other party in writing in accordance with this provision:

      If to the Company, to:

      USF Holding Corp.
      c/o U.S. Foodservice, Inc.
      9755 Patuxent Woods Drive
      Columbia, Maryland 21046
      Attention: David Eberhardt
      Facsimile: (410) 309-6465

      with a copy (which shall not constitute notice) to:

      Kohlberg Kravis Roberts & Co. L.P.
      2800 Sand Hill Road, Suite 94025
      Menlo Park, California 94025
      Attention: Michael Calbert
      Fax: (650) 233-6548

      and

Clayton, Dubilier & Rice, Inc.
375 Park Avenue
18th Floor
New York, New York 10152
Attention: Richard J. Schnall
Fax: (212) 407-5252

with a copy (which shall not constitute notice) to:

Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, New York 10017
Attention: Marni Lerner, Esq.
Fax: (212) 455-2502

and

Debevoise & Plimpton LLP
919 Third Avenue
New York, New York 10022
Attention: Franci J. Blassberg, Esq.
Fax: (212) 909-7531

if to a KKR Investor, to:

Kohlberg Kravis Roberts & Co. L.P.
2800 Sand Hill Road, Suite 94025
Menlo Park, California 94025
Attention: Michael Calbert
Fax: (650) 233-6548

with a copy (which shall not constitute notice) to:

Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, New York 10017
Attention: Marni Lerner, Esq.
Fax: (212) 455-2502

if to a CD&R Investor, to:

Clayton, Dubilier & Rice, Inc.
375 Park Avenue
18th Floor
New York, New York 10152
Attention: Richard J. Schnall
Fax: (212) 407-5252

8

*[Signatures on next page]*

If the foregoing accurately sets forth our agreement, please acknowledge your acceptance thereof in the space provided below for that purpose.

Very truly yours,

USF HOLDING CORP.

By: _____

Name: David B. Eberhardt
Title: Executive Vice President General Counsel & Secretary

U.S. FOODSERVICE, INC.

By: _____

Name: David B. Eberhardt
Title: Executive Vice President, General Counsel & Secretary

KKR 2006 FUND, L.P.

By:   KKR Associates 2006 L.P.,
      its General Partner

By:   KKR 2006 GP LLC,
      its General Partner

By: _____

Name:
Title:

[Signature Page to Sale Participation Agreement]

KKR PEI INVESTMENTS, L.P.

By: KKR PEI Associates, L.P.,
its General Partner

By: KKR PEI GP Limited, the General Partner
of KKR PEI Associates, L.P.

By: _____
Name: William J. Janetschek
Title: Director


KKR PARTNERS III, L.P.

By: KKR III GP LLC,
its General Partner

By: _____
Name: William J. Janetschek
Title: Director


OPERF CO-INVESTMENT LLC

By: KKR Associates 2006 L.P.,
its Manager

By: KKR 2006 GP LLC,
its General Partner

By: _____
Name: William J. Janetschek
Title: Director


[Signature Page to Sale Participation Agreement]

CDR USF CO-INVESTOR NO. 2, L.P.

By:   CDR USF Co-Investor GP No. 2 Limited,
      its General Partner

By:   _____
      Name: Nate Slope
      Title: Partner

Accepted and agreed this      day of
October 2007.

_____
Name:

[Signature Page to Sale Participation Agreement]

CDR USF CO-INVESTOR NO. 2, L.P.

By:  CDR USF Co-Investor GP No. 2 Limited,
     its General Partner

By: _____
    Name:
    Title:

Accepted and agreed this 16th day of
November 2007.

_____
Name: Michael Noble

*[Signature page to Sale Participation Agreement]*

Execution Copy

## STOCK OPTION AGREEMENT

THIS AGREEMENT, dated as of November 16, 2007 (the "Grant Date") is made by and between USF Holding Corp., a Delaware corporation (hereinafter referred to as the "Company"), and the individual whose name is set forth on the signature page hereof, who is an employee of the Company or a Subsidiary or Affiliate of the Company, hereinafter referred to as the "Optionee". Any capitalized terms herein not otherwise defined in Article I shall have the meaning set forth in the 2007 Stock Incentive Plan for Key Employees of USF Holding Corp. and its Affiliates (the "Plan").

WHEREAS, the Company wishes to carry out the Plan, the terms of which are hereby incorporated by reference and made a part of this Agreement; and

WHEREAS, the Compensation Committee of the Board of the Company (or, if no such committee is appointed, the Board) (the "Committee") has determined that it would be to the advantage and best interest of the Company and its shareholders to grant the Option provided for herein to the Optionee as an incentive for increased efforts during his term of office with the Company or its Subsidiaries or Affiliates, and has advised the Company thereof and instructed the undersigned officers to issue said Option;

NOW, THEREFORE, in consideration of the mutual covenants herein contained and other good and valuable consideration, receipt of which is hereby acknowledged, the parties hereto do hereby agree as follows:

### ARTICLE I

### DEFINITIONS

Whenever the following terms are used in this Agreement, they shall have the meaning specified below unless the context clearly indicates to the contrary.

Section 1.1. Aggregate Investment

"Aggregate Investment" shall mean the total amount of all equity securities of the Company held by the Investors, directly and indirectly (taking into account any adjustment as a result of any stock dividend, split, reverse split, combination, recapitalization, liquidation, reclassification, merger, consolidation or otherwise).

Section 1.2. Base Price

"Base Price" shall mean the effective per share price paid by the Investors in the Merger (e.g. $5.00, as adjusted).

Section 1.3. Cause

"Cause" shall mean "Cause" as such term may be defined in any employment agreement or other severance agreement in effect at the time of termination of employment (or as previously in effect immediately prior to any expiration of such agreement due to a Company nonrenewal of the agreement term) between the Optionee and the Company or any of its Subsidiaries or Affiliates, or, if there is no such employment or severance agreement, "Cause" shall mean, with respect to an Optionee: (i) willful and continued failure to perform his or her material duties with respect to the Company or it

subsidiaries which continues beyond ten business days after a written demand for substantial performance is delivered to the Optionee by the Company (the "Cure Period"); (ii) a willful and material breach of the Optionee's Management Stockholder's Agreement or other agreements, if any, which continues beyond the Cure Period (to the extent that, in the Board's reasonable judgment, such breach can be cured); (iii) any act involving fraud or material dishonesty in connection with the business of the Company; (iv) a material violation of the Company's Code of Conduct; (v) attendance at work in a state of intoxication or otherwise being found in possession at his place of work of any prohibited drug or substance, possession of which constitutes to a criminal offense; (vi) assault or other unlawful act of violence; or (vii) conviction of, or a plea of *nolo contendere* to, any felony whatsoever or any misdemeanor that would preclude employment under the Company's hiring policy.

Section 1.4.  Closing Date

"Closing Date" shall have the same meaning as that term is defined in the Merger Agreement.

Section 1.5.  Fiscal Year

"Fiscal Year" shall mean each of the 2007, 2008, 2009, 2010, and 2011 fiscal years of the Company.

Section 1.6.  Good Reason

"Good Reason" shall mean "Good Reason" as such term may be defined in any employment agreement or other severance agreement in effect at the time of termination of employment (or as previously in effect immediately prior to any expiration of such agreement due to a Company nonrenewal of the agreement term) between the Optionee and the Company or any of its Subsidiaries or Affiliates.

Section 1.7.  Investor IRR

"Investor IRR" shall mean, on any given date, a pretax compounded annual internal rate of return realized by the Investors after the Closing Date on any Shares held by the Investors.  On a per Share, fully diluted basis (including all Shares subject to all outstanding options granted to any persons under the Plan), based on the Aggregate Investment; provided, however, that (a) any calculation of Investor IRR will, for purposes of Section 3.1(b), be calculated solely with respect to that portion of the Aggregate Investment actually sold or otherwise disposed of in the applicable transaction, and (b) in any event, Investor IRR will not be calculated taking into account the receipt by the Investors or any of their Affiliates of any management, monitoring, transaction or other fees (including transaction advisory fees and related expenses) payable to such parties by the Company.

Section 1.8.  Investor Return

"Investor Return" shall mean, on any date, as determined on a cumulative, fully diluted per Share basis (including all Shares subject to all outstanding options granted to any persons under the Plan), all cash and marketable securities received by the Investors after the Closing Date on any Share held by the Investors as proceeds in any sale or other disposition of such Share, and any extraordinary cash dividends paid on such Share; provided, however, that any calculations of Investor Return will, for purposes of: (a) Section 3.1(b), also include all cash and marketable securities ultimately received by the Investors after the Closing Date as proceeds from any extraordinary dividend and the sale or other disposition of any illiquid property (e.g., equity securities of another corporation or debt securities)

2

received in exchange for or in respect of a Share, which for such purposes shall be deemed received on the date such illiquid property is received; (b) Section 3.1(b), be calculated solely with respect to that portion of the Aggregate Investment actually sold or otherwise disposed of; and (c) Section 3.1(c)(ii), also include the fair market value of any illiquid property received in exchange for or in respect of a Share.

Section 1.9. Liquidity

"Liquidity" shall mean (A) on or prior to December 31, 2011, the Investors achieve an Investor IRR of at least 25% *and* (ii) the Investors earn an Investor Return of at least 3.0 times the Aggregate Investment, *or* (B) after December 31, 2011, the Investors achieve an Investor IRR of at least 20% *and* (ii) the Investors earn an Investor Return of at least 3.0 times the Base Price on the Aggregate Investment.

Section 1.10. Management Stockholder's Agreement

"Management Stockholder's Agreement" shall mean that certain Management Stockholder's Agreement between the Optionee and the Company.

Section 1.11. Option

"Option" shall mean the aggregate of the Time Option and the Performance Option granted under Section 2.1 of this Agreement.

Section 1.12. Performance Option

"Performance Option" shall mean the right and option to purchase, on the terms and conditions set forth herein, all or any part of an aggregate of the number of shares of Common Stock set forth on the signature page hereof opposite the term Performance Option.

Section 1.13. Permanent Disability

"Permanent Disability" shall mean "Disability" as such term is defined in any employment agreement between Optionee and the Company or any of its Subsidiaries (or as previously in effect immediately prior to any expiration of such agreement due to a Company nonrenewal of the agreement term), or, if there is no such employment agreement, "Disability" as defined in the long-term disability plan of the Company (or Subsidiary sponsoring such plan).

Section 1.14. Qualified Public Offering

"Qualified Public Offering" shall mean, after a Public Offering of Holdings, the Investors sell, in one transaction or a series of transactions, an aggregate of at least 35% of the Aggregate Investment.

Section 1.15. Secretary

"Secretary" shall mean the Secretary of the Company.

Section 1.16.   Stock Purchase Agreement

"Stock Purchase Agreement" shall mean the Stock Purchase Agreement by and between Restore Acquisition Corp., Ahold U.S.A., Inc. and Koninklijke Ahold N.V., dated May 2, 2007.

Section 1.17.   Time Option

"Time Option" shall mean the right and option to purchase, on the terms and conditions set forth herein, all or any part of an aggregate of the number of shares of Common Stock set forth on the signature page hereof opposite the term Time Option.

## ARTICLE II

## GRANT OF OPTIONS

Section 2.1.   - Grant of Options

For good and valuable consideration, on and as of the date hereof, the Company irrevocably grants to the Optionee the following Stock Options:  (a) the Time Option and (b) the Performance Option, in each case on the terms and conditions set forth in this Agreement.

Section 2.2.   - Exercise Price

Subject to Section 2.4, the exercise price of the shares of Common Stock covered by the Option (the "Exercise Price") shall be as set forth on the signature page hereof, which shall be the Fair Market Value.

Section 2.3.   - No Guarantee of Employment

Nothing in this Agreement or in the Plan shall confer upon the Optionee any right to continue in the employ of the Company or any Service Recipient or shall interfere with or restrict in any way the rights of the Company and its Service Recipients, which are hereby expressly reserved, to terminate the employment of the Optionee at any time for any reason whatsoever, with or without cause.

Section 2.4.   - Adjustments to Option

The Option shall be subject to the adjustment provisions of Sections 8 and 9 of the Plan, provided, however, that in the event of the payment of an extraordinary dividend by the Company to its stockholders, then; first, the Exercise Prices of the Option shall be equitably reduced with respect to the amount of the dividend paid, but only to the extent the Committee determines it to be permitted without material adverse effect on Optionee under applicable tax laws; and, if such reduction cannot be fully effected due to such tax laws and it will not have material adverse tax consequences to the Optionee, second, the Board shall make an equitable provision as to any further actions to be taken with respect to the Option.