ARTICLE III

PERIOD OF EXERCISABILITY

Section 3.1. - Commencement of Exercisability

(a) So long as the Optionee continues to be employed by the Company or any other Service Recipients, the Option shall become exercisable pursuant to the following schedules:

(i) *Time Option*. The Time Option shall become vested and exercisable with respect to 20% of the Shares subject to such Option on the last day of each of the five Fiscal Years ending after the Closing Date, beginning with the Fiscal Year in which the Closing Date occurs (e.g., the first 20% installment of vesting will occur on December 31, 2007).

(ii) *Performance Option*. The Performance Option shall be eligible to become vested and exercisable as to 20% of the Shares subject to such Option on the last day of each of the five Fiscal Years ending after the Closing Date, beginning with the Fiscal Year in which the Closing Date occurs, if the Company, on a consolidated basis, achieves its annual EBITDA targets as set forth in Schedule A attached hereto (each an "Annual EBITDA Target") for the given Fiscal Year. This vesting method is hereby referred to as the "Primary Vesting Method." Notwithstanding the foregoing, in the event that an Annual EBITDA Target is not achieved in a particular Fiscal Year, then that portion of the Performance Option that was eligible to vest but failed to vest due to the Company's failure to achieve its EBITDA Target shall nevertheless vest and become exercisable at the end of any subsequent Fiscal Years if the cumulative EBITDA Target (each a "Cumulative EBITDA Target") set forth on Schedule A attached hereto is achieved on a cumulative basis at the end of such subsequent Fiscal Year. This secondary vesting method is hereby referred to as the "Missed Year Catch-up Vesting."

(b) In addition to the foregoing, if, after a Qualified Public Offering, the Investors sell, in one transaction or a series of related transactions, and/or receive extraordinary cash dividends on, sufficient Shares such that the Investors achieve Liquidity on any percentage of the Aggregate Investment that is in excess of the percentage of the Performance Options that could have become vested pursuant to the Primary Vesting Method or the Missed Year Catch-up Vesting in the Fiscal Year that immediately precedes the Fiscal Year in which such transaction or series of transactions occurs, then the Performance Option shall become vested, to the extent not already vested, up to the same percentage of Performance Option that could have become vested in respect of any previously completed fiscal years pursuant to either the Primary Vesting Method or the Missed Year Catch-up Vesting. This vesting method is hereby referred to as the "QPO Catch-up Vesting". See Appendix I for examples hereof.

(c) Notwithstanding the foregoing, upon the occurrence of a Change in Control:

(i) the Time Option shall become immediately exercisable as to 100% of the shares of Common Stock subject to such Option immediately prior to a Change in Control (but only to the extent such Option has not otherwise terminated or become exercisable); and

(ii) the Performance Option shall become immediately exercisable as to 100% of the shares of Common Stock subject to such Option immediately prior to a Change in Control (but only to the extent such Option has not otherwise terminated or become exercisable) if as a result of the Change in Control, the Investors achieve Liquidity on the entire Aggregate Investment.

(d) In the event that Optionee's employment terminates due to the Optionee's death or Permanent Disability, a pro rata portion of the Time Options that would have vested on the December

31 that first occurs after the date of such termination of employment will vest and a pro rata portion of the Performance Options will also vest, but only if and to the extent that the Performance Option would have vested under Section 3.1 above if the Optionee had remained employed with the Company, as of the December 31 that first occurs after the date of such termination of employment. In each case, such pro rata portion will be determined based on the number of days the Optionee worked during the year in which the termination occurred relative to 365 days. Such Performance Options will expire 30 days after notice to Optionee of the amount of Optionee's pro rata vesting (if any), or if earlier, according to Section 3.2 of this Agreement.

(e) Notwithstanding the foregoing, except as otherwise provided in Section 3.1(d) above, of the Agreement, no Option shall become exercisable as to any additional shares of Common Stock following the termination of employment of the Optionee for any reason and any Option, which is unexercisable as of the Optionee's termination of employment, shall immediately expire without payment therefor.

Section 3.2. – Expiration of Option

The Optionee may not exercise the Option to any extent after the first to occur of the following events:

(a) The tenth anniversary of the Closing Date, so long as the Optionee remains employed with the Company or any Service Recipient through such date;

(b) The first anniversary of the date of the Optionee's termination of employment with the Company and all Service Recipients, if the Optionee's employment is terminated by reason of death or Permanent Disability (unless earlier terminated as provided in Section 3.2(g) below);

(c) Immediately upon the date of the Optionee's termination of employment by the Company and all Service Recipients for Cause;

(d) Thirty (30) days after the date of the Optionee's termination of employment with the Company and all Service Recipients by the Optionee (except due to death or Permanent Disability or a termination for Good Reason (if such a termination is provided for in the Optionee's individual employment or other severance agreement, as such term may be defined therein));

(e) One hundred and eighty (180) days after the date of an Optionee's termination of employment by the Company and all Service Recipients without Cause (other than due to Permanent Disability);

(f) One hundred and eighty (180) days after the date of an Optionee's termination of employment with the Company and all Service Recipients by the Optionee for Good Reason (if such a termination is provided for in the Optionee's individual employment or other severance agreement);

(g) The date the Option is terminated pursuant to Section 5 or 6 of the Management Stockholder's Agreement; or

(h) At the discretion of the Company consistent with any determination by the Committee pursuant to Section 9 of the Plan.

For the purposes of this Section 3.2, if an Optionee's employment with the Company and all Service Recipients is terminated without Cause by the Company, for Good Reason by an Optionee (if

such a termination is provided for in the Optionee's individual employment or other severance agreement), or due to an Optionee's death or Permanent Disability after the end of any Fiscal Year, but prior to the date the Company determines whether or not the applicable Annual EBITDA Target and/or Cumulative EBITDA Target has been achieved, the Performance Option that could vest in respect of such Fiscal Year will remain outstanding until 30 days after notice to Optionee of such determination and effect on the vesting of such Performance Option, such that, if such determination results in the Performance Option vesting in respect of such Fiscal Year, the Optionee shall have such 30-day period to exercise such Performance Option, which will otherwise expire at the close of business on the last day of such period.

ARTICLE IV

EXERCISE OF OPTION

Section 4.1. – Person Eligible to Exercise

During the lifetime of the Optionee, only the Optionee (or his or her duly authorized legal representative) may exercise an Option or any portion thereof. After the death of the Optionee, any exercisable portion of an Option may, prior to the time when an Option becomes unexercisable under Section 3.2, be exercised by his personal representative or by any person empowered to do so under the Optionee's will or under the then applicable laws of descent and distribution.

Section 4.2. -- Partial Exercise

Any exercisable portion of an Option or the entire Option, if then wholly exercisable, may be exercised in whole or in part at any time prior to the time when the Option or portion thereof becomes unexercisable under Section 3.2; provided, however, that any partial exercise shall be for whole shares of Common Stock only.

Section 4.3. – Manner of Exercise

An Option, or any exercisable portion thereof, may be exercised solely by delivering to the Secretary or his office all of the following prior to the time when the Option or such portion becomes unexercisable under Section 3.2:

(a) Notice in writing signed by the Optionee or the other person then entitled to exercise the Option or portion thereof, stating that the Option or portion thereof is thereby exercised, such notice complying with all applicable rules established by the Committee;

(b) (i) Full payment (in cash or by check or by a combination thereof) for the Shares with respect to which such Option or portion thereof is exercised or (ii) indication that the Optionee elects to have the number of Shares that would otherwise be issued to the Optionee reduced by a number of Shares having an equivalent Fair Market Value to the payment that would otherwise be made by Optionee to the Company pursuant to clause (i) of this subsection (b);

(c) Full payment (in cash or by check or by a combination thereof) to satisfy the minimum withholding tax obligation with respect to which such Option or portion thereof is exercised, except as provided under Section 4.3(f);

(d) A bona fide written representation and agreement, in a form satisfactory to the Committee, signed by the Optionee or other person then entitled to exercise such Option or portion thereof, stating that the shares of Common Stock are being acquired for his own account, for investment and without any present intention of distributing or reselling said shares or any of them except as may be permitted under the Securities Act of 1933, as amended (the "Act"), and then applicable rules and regulations thereunder, and that the Optionee or other person then entitled to exercise such Option or portion thereof will indemnify the Company against and hold it free and harmless from any loss, damage, expense or liability resulting to the Company if any sale or distribution of the shares by such person is contrary to the representation and agreement referred to above; provided, however, that the Committee may, in its reasonable discretion, take whatever additional actions it deems reasonably necessary to ensure the observance and performance of such representation and agreement and to effect compliance with the Act and any other federal or state securities laws or regulations; and

(e) In the event the Option or portion thereof shall be exercised pursuant to Section 4.1 by any person or persons other than the Optionee, appropriate proof of the right of such person or persons to exercise the option.

(f) In the event there has not occurred a Public Offering of the Company and an Optionee's employment with the Company and all Service Recipients is terminated without Cause by the Company, for Good Reason by an Optionee (if such a termination is provided for in an Optionee's employment or other severance arrangement), or due to an Optionee's death or Permanent Disability, the Optionee will, to the extent it does not materially adversely impact the short-term liquidity needs of the Company, be allowed to pay any minimum tax withholding due upon any exercise of a vested Option out of the Shares otherwise deliverable upon exercise (using the Fair Market Value on the date of exercise to determine the number of Shares to be withheld in respect of such minimum tax withholding due).

(g) Once a Public Offering of the Company has occurred, an Optionee may use a Regulation T, Sarbanes-Oxley-compliant program which shall be established by the Company to sell Shares to pay the exercise price and the minimum taxes due upon exercise of any then vested Options subject to any limitations on transfer imposed under applicable securities laws or any underwriter.

Without limiting the generality of the foregoing, the Committee may require an opinion of counsel acceptable to it to the effect that any subsequent transfer of shares acquired on exercise of an Option does not violate the Act, and may issue stop-transfer orders covering such shares. Share certificates evidencing stock issued on exercise of this Option shall bear an appropriate legend referring to the provisions of subsection (d) above and the agreements herein. The written representation and agreement referred to in subsection (d) above shall, however, not be required if the shares to be issued pursuant to such exercise have been registered under the Act, and such registration is then effective in respect of such shares.

Section 4.4. – Conditions to Issuance of Stock Certificates

The shares of stock deliverable upon the exercise of an Option, or any portion thereof, may be either previously authorized but unissued shares or issued shares, which have then been reacquired by the Company. Such shares shall be fully paid and nonassessable. The Company shall not be required to issue or deliver any certificate or certificates for shares of stock purchased (if certified, or if not certified, register the issuance of such shares on its books and records) upon the exercise of an Option or portion thereof prior to fulfillment of all of the following conditions:

(a) The obtaining of approval or other clearance from any state or federal governmental agency which the Committee shall, in its reasonable and good faith discretion, determine to be necessary or advisable;

(b) The execution by the Optionee of the Management Stockholder's Agreement and a Sale Participation Agreement; and

(c) The lapse of such reasonable period of time following the exercise of the Option as the Committee may from time to time establish for reasons of administrative convenience or as may otherwise be required by applicable law.

Section 4.5. – Rights as Stockholder

Except as otherwise provided in Section 2.4 of this Agreement, the holder of an Option shall not be, nor have any of the rights or privileges of, a stockholder of the Company in respect of any shares purchasable upon the exercise of the Option or any portion thereof unless and until certificates representing such shares shall have been issued by the Company to such holder.

## ARTICLE V

## MISCELLANEOUS

Section 5.1. – Administration

The Committee shall have the power to interpret the Plan and this Agreement and to adopt such rules for the administration, interpretation and application of the Plan as are consistent therewith and to interpret or revoke any such rules. All actions taken and all interpretations and determinations made by the Committee shall be final and binding upon the Optionee, the Company and all other interested persons. No member of the Committee shall be personally liable for any action, determination or interpretation made in good faith with respect to the Plan or the Option. In its absolute discretion, the Board may at any time and from time to time exercise any and all rights and duties of the Committee under the Plan and this Agreement.

Section 5.2. – Option Not Transferable

Neither the Option nor any interest or right therein or part thereof shall be liable for the debts, contracts or engagements of the Optionee or his successors in interest or shall be subject to disposition by transfer, alienation, anticipation, pledge, encumbrance, assignment or any other means whether such disposition be voluntary or involuntary or by operation of law by judgment, levy, attachment, garnishment or any other legal or equitable proceedings (including bankruptcy), and any attempted disposition thereof shall be null and void and of no effect; provided, however, that this Section 5.2 shall not prevent transfers by will or by the applicable laws of descent and distribution.

Section 5.3. – Notices

Any notice to be given under the terms of this Agreement to the Company shall be addressed to the Company in care of its Secretary, and any notice to be given to the Optionee shall be addressed to him at the address given beneath his signature hereto. By a notice given pursuant to this Section 5.3, either party may hereafter designate a different address for notices to be given to him. Any notice, which is required to be given to the Optionee, shall, if the Optionee is then deceased, be given to the Optionee's personal representative if such representative has previously informed the Company of his status and address by written notice under this Section 5.3. Any notice shall have been deemed duly given when (i) delivered in person, (ii) enclosed in a properly sealed envelope or wrapper addressed as aforesaid, three business days after which it is deposited (with postage prepaid) in a post office or branch post office regularly maintained by the United States Postal Service, or (iii) enclosed in a properly sealed

envelope or wrapper addressed as aforesaid, the first business day following the day after which it is deposited (with fees prepaid) in an office (and not a drop box) regularly maintained by FedEx, UPS, or comparable non-public overnight national courier.

Section 5.4. – Titles; Pronouns

Titles are provided herein for convenience only and are not to serve as a basis for interpretation or construction of this Agreement. The masculine pronoun shall include the feminine and neuter, and the singular the plural, where the context so indicates.

Section 5.5. – Applicability of Plan, Management Stockholder's Agreement and Sale Participation Agreement

The Option and the shares of Common Stock issued to the Optionee upon exercise of the Option shall be subject to all of the terms and provisions of the Plan, the Management Stockholder's Agreement and a Sale Participation Agreement, to the extent applicable to the Option and such Shares.

Section 5.6. –Entire Agreement; Amendment

Subject to Section 10 of the Plan, this Agreement may be amended only by a writing executed by the parties hereto, which specifically states that it is amending this Agreement. This Agreement constitutes the entire agreement among the parties with respect to any agreements regarding any equity-based incentive awards by the Company and supersedes all prior and contemporaneous agreements (including any change in control, executive retention, employment or other agreements regarding the vesting of any equity-based awards, or payment of cash or Shares in respect of any equity-based awards upon a termination of employment), discussions, understandings and negotiations, whether written or oral, with respect to any of the foregoing.

Section 5.7. – Governing Law

The laws of the State of Delaware shall govern the interpretation, validity and performance of the terms of this Agreement regardless of the law that might be applied under principles of conflicts of laws.

Section 5.8. – Arbitration

In the event of any controversy among the parties hereto arising out of, or relating to, this Agreement which cannot be settled amicably by the parties, such controversy shall be finally, exclusively and conclusively settled by mandatory arbitration conducted expeditiously in accordance with the American Arbitration Association rules, by a single independent arbitrator. Such arbitration process shall take place within New York, New York. The decision of the arbitrator shall be final and binding upon all parties hereto and shall be rendered pursuant to a written decision, which contains a detailed recital of the arbitrator's reasoning, subject to enforcement of the arbitration award hereunder or for vacation or modification thereof as provided under the Federal Arbitration Act, Title 9 U.S. Code Chapter 1. Judgment upon the award rendered may be entered in any court having jurisdiction thereof. The Company shall pay the arbitrator's fees and all other costs of such arbitration. Each party shall bear its own legal fees and expenses, unless otherwise determined by the arbitrator.

[*Signatures on next page.*]

IN WITNESS WHEREOF, this Agreement has been executed and delivered by the parties hereto.

USF HOLDING CORP.

By: ______________________

Its: David B. Eberhardt
Executive Vice President, General Counsel & Secretary

[Signature Page to Stock Option Agreement]

**Schedule A**
**Annual and Cumulative EBITDA Targets**

The Annual and Cumulative EBITDA Targets are based on the Company's achievement of the following EBITDA targets for the following Fiscal Years:

| Fiscal Year | Annual Performance Target | Cumulative Performance Target |
|---|---|---|
| 2007 | $570.5 million [1] | $570.5 million |
| 2008 | $707.1 million | $1,277.6 million |
| 2009 | $819.0 million | $2,096.6 million |
| 2010 | $907.8 million | $3,004.4 million |
| 2011 | $998.8 million | $4,003.1 million |

Note (1): Assumes $588mm of reported U.S. GAAP EBITDA - $10mm of Real Estate gain - $7.5mm of 6 months of MAC Relief = $570.5mm.

"EBITDA" shall mean earnings before interest, taxes, depreciation and amortization plus transaction, management and/or similar fees (including any transaction advisory fees and related expenses) paid to the Investors and/or its Affiliates. The Board shall, fairly and appropriately, and in good faith, adjust the calculation of EBITDA to reflect, to the extent not contemplated in the management plan, the following: acquisitions, divestitures, major capital programs, any stock option and other stock-based compensation charges, any costs or expenses incurred by the Company in connection with any litigation matters subject to potential indemnification by Ahold under the terms of the Stock Purchase Agreement and related documents, fees or expenses related to any equity offering or repayment or refinancing of indebtedness approved by the Board, any other any restructuring charges or extraordinary or unusual fees, expenses or losses approved by the Board, which approval shall not be unreasonably withheld, any LIFO adjustments, and, in 2007, any incremental one-time costs attributable to the separation of the Company from the Ahold consolidated group. The Board's determination of such adjustment shall be in good faith and based on the Company's accounting as set forth in its books and records and on the financial plan of the Company pursuant to which the Annual EBITDA Targets were originally established.

Annual EBITDA Targets and Cumulative EBITDA Targets will be equitably adjusted by the Board for any acquisitions, divestitures or major capital investment programs not contemplated in management's base case, to the extent permitted under U.S. generally accepted accounting principles and applicable law ("GAAP").

Appendix I

- Examples:

→ Company does not achieve the Annual Performance Target for FY 2007. In FY 2008, a Qualified Public Offering occurs wherein the Investors achieve Liquidity on 40% of the Investors' New Stock. Upon such event, the 20% of the Performance Options that could have, but did not, become vested if the Company had achieved the Annual Performance Target for FY 2007, becomes vested. Because the QPO Catch-up Vesting is only available to provide for catch-up vesting in respect of any previously completed fiscal years, if the Company does not achieve the Annual Performance Target for FY 2008 or the Cumulative Performance Target for FY 2008, no vesting will occur under this method with respect to the Performance Options that might otherwise have become vested in respect of FY 2008.

→ Company does not achieve the Annual Performance Target for either of FY 2007 or FY 2008 (nor does it achieve the Cumulative Annual Performance Target for FY 2008). In FY 2009, a Qualified Public Offering occurs wherein the Investors achieve Liquidity on 40% of the Investors' New Stock. Upon such event, the 20% of the Performance Options that could have, but did not, become vested if the Company had achieved the Annual Performance Target for each of FY 2007 and FY 2008 (or the Cumulative Annual Performance Target for FY 2008), becomes vested, such that the Performance Options will be 40% vested as of the date of such event. If the Company then achieves either the Annual Performance Target or the Cumulative Annual Performance Target for FY 2009, the 20% of the Performance Options that is due to be vested in respect of FY 2009 will become vested in the ordinary course.

# PLEDGE AGREEMENT

PLEDGE AGREEMENT, dated as of November 16, 2007 made by Mike Noble(the "Employee") in favor of USF Holding Corp., a Delaware corporation (the "Company").

WITNESSETH:

WHEREAS, in connection with the Employee's acquisition of the Purchased Stock (as defined in the Management Stockholder's Agreement dated as of November 16, 2007 by and between the Company and the Employee (as amended, supplemented or otherwise modified from time to time, the "Management Stockholder's Agreement")), the Company has agreed to make a loan (the "Loan") to the Employee, in the form of the note being executed by the Employee in the form of Exhibit A hereto (the "Note") and delivered to the Company as partial payment by the Employee of the purchase price for the Purchased Stock under the Management Stockholder's Agreement concurrently herewith;

WHEREAS, the Employee will be the legal and beneficial owner of the shares of Pledged Stock (as hereinafter defined) issued by the Company; and

WHEREAS, it is a condition precedent to the obligation of the Company to make the Loan to, and accept the Note in partial payment of the purchase price for the Purchased Stock from, the Employee that the Employee shall have executed and delivered this Pledge Agreement to the Company.

NOW, THEREFORE, in consideration of the premises and to induce the Company to make the Loan to, and accept the Note in partial payment of the purchase price for the Purchased Stock from, the Employee, the Employee hereby agrees with the Company as follows:

1. Defined Terms. (a) Unless otherwise defined herein, terms defined in the Management Stockholder's Agreement or the Note, as the case may be, and used herein shall have the meanings assigned to them in the Management Stockholder's Agreement and the Note, respectively.

(b) The following terms shall have the following meanings:

"Agreement": this Pledge Agreement, as the same may be amended, modified or otherwise supplemented from time to time.

"Code": the Uniform Commercial Code from time to time in effect in the State of New York.

"Collateral": the Pledged Stock and all Proceeds.

"Collateral Account": any account established to hold money Proceeds, maintained under the sole dominion and control of the Company.

"Default": any event that is or with the passage of time or the giving of notice or both would be an Event of Default under the Note.

"Lien": with respect to the Collateral, any mortgage, deed of trust, lien, pledge, hypothecation, security interest, or other encumbrance or charge of any kind or nature, in, on or of such Collateral.

"Obligations": the collective reference to the unpaid principal of and interest on the Note (including, without limitation, interest accruing at the then applicable rate provided in the Note after the maturity of the Loan and interest accruing at the then applicable rate provided in the Note after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to the Employee, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), and any other amounts, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with the Note and this Agreement or any other document made, delivered or given in connection therewith, in each case whether on account of principal, interest, costs, expenses or otherwise.

"Person": any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

"Pledged Stock": the shares of capital stock listed on Schedule 1 hereto, together with all shares of capital stock and stock certificates received upon exercise of any options, warrants or other rights of any nature whatsoever that may be issued or granted by The Company to the Employee while this Agreement is in effect.

"Proceeds": all "proceeds" as such term is defined in Section 9-306(1) of the Uniform Commercial Code in effect in the State of New York on the date hereof and, in any event, shall include, without limitation, all dividends or other income from the Pledged Stock, collections thereon or distributions with respect thereto.

"Securities Act": the Securities Act of 1933, as amended.

(c) The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and section and paragraph references are to this Agreement unless otherwise specified.

(d) The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.