# EXHIBIT B

# In The Matter Of:

*The interview of*
*Michael Noble*

*February 14, 2013*

*Marzullo Reporting Agency*
*345 North LaSalle, 1605*
*Chicago, IL 60654*
*(312) 321-9365*

Original File pm2-14-13.txt
Min-U-Script® with Word Index

This Page Intentionally Left Blank

The Interview of
Michael Noble
February 14, 2013

---

**Page 1**

```
 1
 2
 3   ------------------------------------- )
                                          )
 4   IN THE:  THE INTERVIEW OF MICHAEL NOBLE )
                                          )
 5   ------------------------------------- )

 6

 7          The report of interview of MICHAEL NOBLE in the

 8   above-entitled matter, taken before PAMELA A. MARZULLO, a

 9   Certified Shorthand Reporter and Notary Public in and for

10   the County of Cook and State of Illinois, at Three First

11   National Plaza, Suite 4200, Chicago, Illinois, on February

12   14th, 2013, at the hour of 8:00 o'clock a.m.

13

14

15

16

17

18

19

20

21

22

23

24
```

MARZULLO REPORTING AGENCY  (312) 321-9365

---

**Page 2**

```
 1   PRESENT:
 2        JABURG, WILK
          BY:  MR. KRAIG J. MARTON
 3        3200 North Central Avenue
          20th Floor
 4        Phoenix, Arizona    85012

 5           on behalf of Michael Nobel;

 6        KAYE SCHOLER, LLP.
          BY:  MS. Z. SCOTT and MS. LAUREN SCHRERO
 7        Three First National Plaza
          Suite 4100
 8        Chicago, Illinois    60602

 9                 and

10        US FOODS
          BY:  MS. JULIETTE PRYOR
11        9399 West Higgins Road
          Suite 500
12        Rosemont, Illinois    60018

13           on behalf of US Foods.

14

15

16

17

18

19

20

21

22

23

24
```

MARZULLO REPORTING AGENCY  (312) 321-9365

---

**Page 3**

```
 1                    I N D E X

 2   WITNESS:                                    PAGE

 3   MICHAEL NOBLE

 4       Questions by Ms. Scott                    4

 5                 E X H I B I T S

 6   EXHIBIT                                     PAGE

 7     1                                          16
       2                                          75
 8     3                                          79
       4                                          87
 9     5                                          89
       6  and 7                                   93
10     8                                         105
       9                                         115
11    10 and 11                                  125
      12                                         130
12    13                                         131
      14                                         133
13    15                                         135
      16                                         136
14    17                                         139
      18                                         148
15    19 and 20                                  151

16

17

18

19

20

21

22

23

24
```

MARZULLO REPORTING AGENCY  (312) 321-9365

---

**Page 4**

1  MICHAEL NOBLE,

2  called in for an interview herein, was questioned and

3  answered as follows:

4  QUESTIONS BY

5  BY MS. SCOTT:

6  Q.  First of all, I want to say good morning.

7  We are here pursuant to the agreement between Mr.

8  Noble and the company.  I know you've had ample time

9  to go over that agreement with him and the

10  parameters of our discussion today.

11     We will attempt to move expeditiously with

12  our questions.  This isn't designed to harass or you

13  know upset anyone.  At any point, Mr. Noble, if you

14  would like to speak to your counsel outside the

15  room, we have a private room for you to consult with

16  that.

17  A.  I appreciate that.

18  Q.  We'll give you time to do that.  We are

19  going to time our discussion today, so we'll make

20  sure we follow the parameters of the agreement.

21     One concern we did have we don't have the

22  documents from Quest.  While I understand that you

23  brought documents here from your own private file,

24  one of the important parts of the agreement is that

MARZULLO REPORTING AGENCY  (312) 321-9365

---

Page 49

1  discussed. You know, there was nothing remarkable
2  it.
3      So, I don't remember exactly, but telecom
4  was being discussed, you know, for another iteration
5  around reimbursement of what should be reimbursed to
6  employees, what should be the policy around it, and
7  the conversation somehow went to this capability.
8      This is kind of where, you know, my mind
9  went to Kindle somehow. I thought that Kindle had a
10 relationship with some executive. I wasn't sure
11 who, because of the nature of the way they were
12 getting business and maintaining the business.
13     That led to, "Let's look at some of these
14 phone reports." So we picked Lederer's. What
15 jumped out at me was the number of calls to a 312
16 number on a daily basis, you know, early morning,
17 late at night, weekends, that type of thing.
18     So, I went out and figured out, you know,
19 who that person was.
20 Q.  How did you do that?
21 A.  There's a service I paid 7 or $8 for, put
22 the phone number in. It was on the Internet.
23 Q.  Were you -- was your focus, at the time
24 that you were examining Lederer's phone records,

MARZULLO REPORTING AGENCY (312) 321-9365

Page 50

1  just an examination of phone records, or looking for
2  a connection to Kindle?
3  A.  I think it was a little bit of both. I
4  didn't think that there would be anything.
5  Q.  So, but you were also -- were you looking
6  at what John was up to, to figure out from his phone
7  records?
8  A.  Not really. I didn't really care.
9  Q.  But you weren't examining his phone
10 records?
11 A.  We did, yes.
12 Q.  Was this -- did you also -- I'm going to
13 ask you among the things that you looked at, in
14 addition to his phone records, did you also look at
15 his E-mail?
16 A.  No.
17 Q.  Did Phil go into his personal E-mail?
18 A.  No.
19 Q.  Did he go into his company E-mail?
20 A.  No.
21 Q.  Did you then also look at look at his --
22 at any other aspect of his life that touched the
23 business?
24 A.  No.

MARZULLO REPORTING AGENCY (312) 321-9365

Page 51

1  Q.  Like his expense reports, or did you look
2  at any of that?
3  A.  I had seen his expense reports from time
4  to time just through -- just normal reviews, but not
5  in particular.
6  Q.  So, is anyone helping you with this phone
7  record examination? You got to have numbers that
8  are repeat, you have to know times.
9      Somebody physically gave you a copy of the
10 records, or gave you a summary of the phone numbers,
11 or what?
12 A.  Phil was able to download it in an Excel
13 spreadsheet.
14 Q.  The phone numbers at work?
15 A.  Right, then I think he just sorted it by
16 frequency.
17 Q.  Where is this record, the Excel
18 spreadsheet that he gave to you, where is it?
19 A.  He had it on his screen.
20 Q.  Did he give you a copy of it?
21 A.  I believe so.
22 Q.  And what did you do with your copy?
23 A.  I would have deleted it.
24 Q.  You deleted it? You have no further

MARZULLO REPORTING AGENCY (312) 321-9365

Page 52

1  record of this?
2  A.  No.
3  Q.  It's all gone? When did you delete it?
4  A.  When did I delete it?
5  Q.  Yes.
6  A.  I don't know. It could have been
7  yesterday or prior.
8  Q.  It's been within the last --
9  A.  Six months.
10 Q.  Okay.
11 A.  I had no need for it, after I found what I
12 found out.
13 Q.  So, Phil Roszak prepares a spreadsheet for
14 you?
15 A.  Uh-huh.
16 Q.  He gives us a copy of it. Do you give it
17 to anyone else?
18 A.  I believe I sent it to Flosi.
19 Q.  Okay. Flosi would have been one
20 recipient.
21     Anyone else inside or outside of the
22 company?
23 A.  Not that I recall.
24     MS. PRYOR: Can we recap what was on the

MARZULLO REPORTING AGENCY (312) 321-9365

Page 113

1 Q. Did you share that with her in a
2 face-to-face conversation?
3 A. I don't remember.
4 Q. Once you came to Rosemont, met with him,
5 talked to Juliette and left, did you tell her what
6 happened?
7 A. Yes.
8 Q. How did you tell her what happened, you
9 had a telephone conversation with her?
10 A. I think she called me, and she wanted to
11 -- and she informed me that she had been asked to
12 come to Rosemont the next day, as I recall, what she
13 should she do. I think I told her, "Do whatever you
14 want."
15 Q. You didn't tell her at all what to say?
16 A. No. What was the point? That's for you
17 to answer.
18 Q. Before you came to your meeting in
19 Rosemont, did you go into your computer systems at
20 all and download information, copy information,
21 erase information?
22 A. Before I came to Rosemont?
23 Q. Yes.
24 A. No.

MARZULLO REPORTING AGENCY (312) 321-9365

Page 114

1 Q. After you left Rosemont, did you do that?
2 Did you go into your computer system and
3 erase information?
4 A. After I left the meeting with you and
5 Juliette?
6 Q. Yes.
7 A. No. I had no access, nor did I try.
8 Q. Do you know whether Phil downloaded
9 information or erased information?
10 A. No clue.
11 Q. Or kept a company computer?
12 A. I know that he was supposed to come the
13 next day, the next day, too. He decided that he was
14 going to resign instead, and I do know that he was
15 supposed to provide his laptop to some law firm. I
16 presume he did.
17 Q. Do you know whether or not he accessed
18 company information, downloaded company information,
19 erased company information?
20 A. No clue, not that I'm aware of.
21 Q. Are you familiar with the term "drop box"
22 in terms of documents?
23 MR. MARTON: What was that?
24

MARZULLO REPORTING AGENCY (312) 321-9365

Page 115

1 BY MS. SCOTT:
2 Q. Drop box?
3 A. Do I know what a drop box is?
4 Q. Yes, drop box.
5 A. Yes.
6 Q. Did Phil share any documents with you that
7 he had placed in or used a drop box for?
8 A. No. That is where you would set up, like,
9 a mutual E-mail account where you both access.
10 MR. MARTON: It's not really E-mail.
11 THE WITNESS: However they do it.
12 MR. MARTON: Cloud.
13 BY MS. SCOTT:
14 Q. I'll show you this document. It is an
15 E-mail from you to Phil -- from Phil to you. It's
16 dated July.
17 (Said document was marked as
18 Exhibit No. 9 for
19 identification.)
20 BY MS. SCOTT:
21 Q. At the bottom where you are talking about
22 -- you're asking Phil to send you requested data to
23 the E-mail address we talked about.
24 A. Hold on. I'm trying to catch up what this

MARZULLO REPORTING AGENCY (312) 321-9365

Page 116

1 is. Okay, go ahead.
2 Q. So --
3 A. This would have been my personal E-mail
4 account.
5 Q. And you're asking him to E-mail to send
6 some data to you?
7 A. It would probably have been the phone
8 report.
9 Q. This is what we're talking about?
10 A. I'm not sure. I would have to go look.
11 Q. If you were looking, what would you be
12 looking for?
13 A. Just look for the E-mail from will Phil on
14 July 9th.
15 Q. Would that E-mail have -- do you still
16 have a copy of that?
17 A. I don't know.
18 Q. Before you came here today, did you go
19 through --
20 MR. MARTON: Just one second.
21 BY MS. SCOTT:
22 Q. But if this E-mail, indeed, references the
23 spreadsheet of John Lederer's phone call history,
24 then that would be information that came from US

MARZULLO REPORTING AGENCY (312) 321-9365

Page 117

1 Foods files; is that right?
2 A. Yes.
3 Q. And that would be information that you are
4 required to give us back, right?
5 A. Yes.
6 Q. Did you do a search of your personal
7 E-mail account?
8 A. I did.
9 Q. To look for -- looking at all of your
10 Roszak E-mails?
11 A. I didn't do Roszak. Now that I see this,
12 I should have, but I didn't. It wasn't Intentional.
13 I went to all E-mails that came from US Foods from
14 me, and I erased them all, deleted them all, but I'm
15 more than happy --
16 Q. To look for Roszak?
17 A. Yes, I'm not trying to keep anything.
18 Q. Now, let's go back to -- maybe we should
19 stop for lunch.
20 A. We can keep going right through lunch.
21    MS. PRYOR: I think we should take a break for
22 lunch, even if you only want to take a 30-minute
23 break, so we could stop the time.
24

MARZULLO REPORTING AGENCY (312) 321-9365

Page 118

1    (Recess taken.)
2 BY MS. SCOTT:
3 Q. I just have a couple followup questions,
4 and then we're going to move to another area.
5    I want to go back to something you said
6 earlier about Kindle. You said that Kindle had
7 gotten on your radar before you discovered the
8 connection between John and Colette May; is that
9 right?
10 A. Yes.
11 Q. And the reason it was on your radar is
12 because of some cost-cutting measures, or you were
13 looking at pricing, or what?
14 A. A combination of all those.
15 Q. And did anyone bring it to your attention,
16 or did you discover this on own your? Did anyone
17 highlight it for you?
18 A. It was brought to my -- it was a result
19 of, you know, the whole process more generically,
20 "Let's go back at the marketing, let's go look who's
21 got the big areas to spend. Let's go talk to the
22 people that own or are managing the areas of spend,
23 and see if we can put it out to bid."
24 Q. Now, once it was brought to your

MARZULLO REPORTING AGENCY (312) 321-9365

Page 119

1 attention, you mentioned that you were -- some
2 people said to you, "This was an untouchable area of
3 the company"; is that what I understand to be
4 correct?
5 A. Right.
6 Q. Specifically, do you recall who told you
7 that?
8 A. I think I heard it, as I mentioned before,
9 from some people in merchandising, I think Jody
10 Wilmes, somehow. I think Jennifer said that she had
11 contacted people.
12    I think I remember she said she talked to
13 this guy Steve Horan, and then there were other
14 people in marketing. I don't recall the names.
15 They were newer people.
16 Q. Okay.
17 A. Eric Cronert was a name I remember.
18 Q. He mentioned this can't be touched?
19 A. Right.
20 Q. Sacred cow?
21 A. You're going 18 months, two years, in my
22 memory bank.
23 Q. It could be a hard trip to take sometimes.
24    We talked a little bit about the phone

MARZULLO REPORTING AGENCY (312) 321-9365

Page 120

1 record retrieval. I mean, how are employees' phone
2 records input into your system, personal cell phone
3 records; do you know?
4 A. There isn't any personal cell phone
5 records. This is all company-paid cell phones.
6 Q. Company-paid cell phones?
7 A. Correct.
8 Q. So, as far as you know, John Lederer has a
9 company-issued cell phone that he uses?
10 A. He does have one.
11 Q. Okay.
12 A. He had one.
13 Q. He had one. Whose idea was it to look at
14 his cell phone records to see if you could find a
15 connection somewhere?
16 A. Probably mutual. I don't remember
17 exactly.
18 Q. Just so I'm clear, when you were looking
19 into the company's systems for information about
20 John, it stopped with the cell phone; is that
21 correct?
22 A. Correct.
23 Q. No one looked at his personal E-mail?
24 A. No.

MARZULLO REPORTING AGENCY (312) 321-9365

Page 133

1   with the credit card company.
2       I don't remember what the whole deal was
3   about.
4   Q.   I would like to show you one last message
5   dated November 5th last year.
6       (Said document was marked as
7       Exhibit No. 14 for
8       identification.)
9       BY MS. SCOTT:
10  Q.   Do you know what that's about?
11  A.   I don't recall.  I mean, it could be about
12  what was going on.  It could be about something
13  else.  I honestly don't remember.
14  Q.   So, tell me have you intervened Mike's
15  behalf, to make sure that he keeps business, gets
16  business?
17  A.   No, he's on his own.
18  Q.   Have you kept him aware, up to date, on
19  the discussions, the criticisms of your former
20  colleagues about his business or processing?
21  A.   If there was an issue regarding one of the
22  applications they were involved with, I typically
23  would let him know.
24  Q.   Is this -- would you have expected your

MARZULLO REPORTING AGENCY  (312) 321-9365

Page 134

1   people, who were directly accountable for that
2   process, to also communicate with him?
3   A.   Yes.
4   Q.   Do you think that any of the
5   communications that you had to him, with him, or
6   through him, or about him and his business, were
7   helpful to him in keeping the business?
8   A.   I don't know if I would characterize it
9   that way.  I would say it was helpful towards
10  getting to delivering whatever solution we were
11  trying to collaborate between IT, the business and
12  him.
13      It wasn't something that was -- remember,
14  I had a stake in getting things done and getting
15  processes improved.
16  Q.   When you told him what you were doing, in
17  regard to the private investigator, was he
18  encouraging to you?
19  A.   I don't remember.
20  Q.   There came a time when you -- I just want
21  to ask you again about your communications off of
22  the US Foods E-mail system when you and Ms. Steinke
23  were communicating on private E-mail addresses; is
24  that right, using private E-mail addresses?

MARZULLO REPORTING AGENCY  (312) 321-9365

Page 135

1   A.   I kind of lost you there a little bit.
2   Q.   You recall the time when you were using --
3   toward the end of your time with US Foods, when you
4   were communicating with Jennifer Steinke, using her
5   personal E-mail address as opposed to her US Foods
6   E-mail address?
7   A.   I may have, I don't know.  As I told you
8   before, I didn't pay attention to every E-mail,
9   where it came from.
10  Q.   You don't recall her directing you to use
11  her personal E-mail?
12  A.   She could have.  I'm not sure.  I mean, if
13  you got some E-mail there with a line item that's
14  what it says, then, yes.  I don't know.  I don't
15  remember.
16      (Said document was marked as
17      Exhibit No. 15 for
18      identification.)
19      BY MS. SCOTT:
20  Q.   I'm going to show you an E-mail.  It talks
21  about a leadership briefing, and it's dated in April
22  of last year.
23      You are forwarding an E-mail to an
24  individual named Jerome Prahl, P-r-a-h-l.  Who is

MARZULLO REPORTING AGENCY  (312) 321-9365

Page 136

1   that?
2   A.   I was staying at my father-in-law's for
3   that trip, and so I was letting him know when I was
4   going to be there.
5   Q.   Jerome Prahl is your father-in-law?
6   A.   Uh-huh.
7       (Said document was marked as
8       Exhibit No. 16 for
9       identification.)
10      BY MS. SCOTT:
11  Q.   I'm going to show you an E-mail that you
12  forwarded to -- it's from February of last year to
13  Jerry Prahl and Jodi Noble.
14  A.   Okay.
15  Q.   Why did you forward this to your wife and
16  your father-in-law?
17  A.   Because I was pleased that we were doing
18  it, and it had been just general things that I had
19  talked to either Jerry or Jodi about, in terms of my
20  ideas for the company, in terms of improving our
21  capabilities.
22  Q.   So, it was just an FYI?
23  A.   Yes.  I mean, you see where all this stuff
24  you're talking about two years ago, this is always

MARZULLO REPORTING AGENCY  (312) 321-9365

Page 137

1  happening. I also had those conversations. Jerry
2  is interesting.
3  Q. I'm going to go back just a little to ICG.
4  Who owns ICG?
5  A. Mike Makings.
6  Q. Is he the owner? Does he have any
7  business parters?
8  A. I'm not fully aware of what the structure
9  of his ownership is.
10 Q. Do you have any interest in it?
11 A. None.
12 Q. I don't want to have to go like through
13 specific line and verse of your prior interviews, in
14 connection with this; but suffice it to say, you
15 were asked questions about your knowledge of
16 letters, your knowledge of people being interested
17 in travel.
18     You were not truthful; is that right?
19 A. You can make that observation if you like.
20 Q. I'm asking you.
21 A. I don't know if I want to answer that
22 question.
23     MR. MARTON: You aren't under oath, so I'm not
24 concerned.

Page 138

1     BY MS. SCOTT:
2  Q. In one interview you are shown a copy of
3  the Best Buy audit report that was enclosed with a
4  letter. You said you had never seen the report
5  before.
6     That wasn't true, was it?
7  A. No, of course not.
8  Q. And those are the things I'm talking about
9  when you were asked questions in your prior --
10 A. Yes, you are right.
11 Q. Let me ask you a couple questions about
12 Shane Guilliams. He reported to you; is that right?
13 Did Shane Guilliams come to you and tell
14 you Jennifer Steinke had been the subject of an HR
15 investigation about her delivery of travel
16 information to you?
17 A. No.
18 Q. Did he tell you that?
19 A. No.
20 Q. Did you give Jennifer Steinke any
21 direction whatsoever regarding how to conceal from
22 the company her delivery of executive travel
23 information to you? Did you give her any direction?
24 A. I don't recall.

Page 139

1  Q. You don't recall telling her to use her
2  private E-mail at all?
3  A. I'm not saying I didn't, but I don't
4  remember. I mean, I probably would have, but I
5  don't remember for sure. I don't know dates, times.
6  Q. Do you recall putting any pressure on her
7  to give you the information?
8  A. I didn't put pressure on her.
9  Q. Do you think she was in any way abusing
10 her access to that information?
11 A. In my opinion, no.
12     (Said document was marked as
13     Exhibit No. 17 for
14     identification.)
15 BY MS. SCOTT:
16 Q. I'm going to show you E-mail from
17 September of last year.
18 A. Okay.
19 Q. Do you recall those messages at all?
20 A. Uh-huh.
21 Q. Was there anything about those messages
22 that stood out now, in terms of John's whereabouts?
23 A. No. I mean, no, not really.
24 Q. If John was going to be in -- taking a

Page 140

1  meeting on the 26th, that means he couldn't have
2  gone to the President's Cup; is that right?
3  A. Yes.
4  Q. Is that when you found out he was not
5  going to the President's Cup?
6  A. Gosh, I don't know.
7  Q. Do you recall having Jennifer Steinke call
8  around to confirm whether he was going to be
9  traveling with Colette May to the President's Cup?
10 A. Yes, I do.
11 Q. Do you recall her coming back and later
12 telling you that he was not going?
13 A. I don't know if she was the first with one
14 to tell me. It might have been Al. I'm not sure.
15 Q. Did you specifically direct Jennifer to
16 find out when he was traveling and who he was
17 traveling with?
18 A. Yeah, I think so, yes.
19 Q. Did she ask you any questions about why
20 you wanted to know his traveling companion?
21 A. No.
22 Q. You know Jennifer Steinke, right?
23 A. Uh-huh.
24 Q. She's not the kind of person who would not

Page 141

1   make -- ask a second question, is she?
2     Does she strike you as somebody who would
3   ask a second question?
4 A.  No, she doesn't, okay; but with hindsight,
5   okay, as I stated to you earlier, you know, I didn't
6   know she knew, but I believe she did know.
7     So, she wasn't pushing back. It wasn't my
8   intent for her to know.
9 Q.  Do you recall an E-mail when Lee Flosi was
10   giving you his Rome resume, telling you how good he
11   was?
12 A.  Yes.
13 Q.  He could do the job?
14 A.  Right. Why would I have needed -- why
15   would I need anything on Rome? Think about what I
16   was trying to do. I had what I needed.
17     The reason I believe Rome came up was, and
18   I was interested, is that the timing of the letter,
19   okay, as you recall, was September 26th. Okay?
20     So, I wanted Juliette to get it or have a
21   week, or as many days as possible, without him
22   there. So, it had nothing to do with wanting to
23   know where John was and following him around in
24   Rome.

MARZULLO REPORTING AGENCY (312) 321-9365

Page 142

1     I mean, there was no need for that, or I
2   got what I had needed on July 6, or whenever it was.
3 Q.  The second letter was the timing of your
4   disclosure was right in the middle of another US
5   Foods event, when you mentioned that you were going
6   to disclose on a certain day, there was going to be
7   a huge meeting in Chicago; is that right?
8 A.  I didn't know that at the time.
9 Q.  That wasn't intentional?
10 A.  No.
11 Q.  The only thing is we don't have -- is
12   there anything that you would think Quest would have
13   in its files, did you give them any piece of paper
14   or documents, or was all the information you
15   provided to them orally?
16 A.  I think Lee got some of the phone records.
17   I did not give him any pieces of paper, that I
18   recall. I think that's all he got.
19 Q.  You don't think that you gave him -- you
20   think you may have E-mailed him some documents?
21 A.  Only the phone records, as I recall.
22 Q.  The phone record spreadsheet you E-mailed
23   that to him?
24 A.  Right, I think so.

MARZULLO REPORTING AGENCY (312) 321-9365

Page 143

1 Q.  You would have E-mailed that from your
2   personal E-mail?
3 A.  Yes.
4 Q.  Did you check your personal E-mail to see
5   if it was there?
6 A.  I deleted everything.
7 Q.  You went through and said "Lee Flosi" and
8   you deleted it?
9 A.  I did. Now that I saw this other way of
10   doing it, I'll make sure I double check. I have no
11   reason to keep it.
12 Q.  So, as far as you know, the only document
13   that you delivered to him would have been the phone
14   summary spreadsheet?
15 A.  Yes, and maybe a document with what I
16   thought was John's address on it, and --
17 Q.  But that would have been the lease?
18 A.  Yes, the only other document that I recall
19   would be the engagement letter.
20 Q.  Your engagement between?
21 A.  Yes, that I had to sign.
22 Q.  Between the two of you?
23 A.  Right.
24 Q.  Was there ever a time, I think I asked you

MARZULLO REPORTING AGENCY (312) 321-9365

Page 144

1   this, when you talked to Lee either, getting a
2   report from him or giving him information where you
3   were not the only participant in that conversation?
4 A.  Never.
5 Q.  It was just the two of you?
6 A.  Correct.
7 Q.  In terms of payment for his services, they
8   came only from you, no one contributed?
9 A.  No.
10     MS. SCOTT: Can we have one break before we
11   wrap up? I think we're done.
12     (Recess taken.)
13     BY MS. SCOTT:
14 Q.  Let me ask you since you left US Foods, do
15   you have ongoing interactions with Phil Roszak?
16 A.  Yes.
17 Q.  Okay. Does he know you're here today?
18 A.  No.
19 Q.  What about Jennifer Steinke after you
20   left?
21 A.  Limited.
22 Q.  Limited? It was limited to what? Tell us
23   about that.
24 A.  A few phone conversations. I have taken

MARZULLO REPORTING AGENCY (312) 321-9365

The interview of
Michael Noble

Page 153

1  deleted all of them.
2    BY MS. SCOTT:
3  Q.  Did any of the documents that are in the
4  file that you've given us, the accordion file, or on
5  the thumb drive, have anything to do with the
6  matters that we've discussed today?
7  A.  Not that I'm aware of, but I wouldn't bet,
8  you know, I wouldn't bet my life on it.  Not that
9  I'm aware of.
10    MR. MARTON: I'll make this offer if after you
11  look at the thumb drive, if there is some document
12  that you want to ask us about, whenever we schedule
13  the call, we'll be glad to answer them.
14    I do want to note the court reporter will
15  keep a copy of all exhibits, along with the
16  transcript, in the event that I order it is that
17  normal process here?
18    MS. PRYOR: When should we expect that we'll
19  hear from Lee Flosi?  When is he back in the
20  country.
21    MR. MARTON: Did he tell you that, Mike?
22    THE WITNESS: His E-mail was very
23  disappointing.  He promised me last week he would do
24  this, and he didn't.

MARZULLO REPORTING AGENCY  (312) 321-9365

Page 154

1    I seem to remember it was an extended
2  period like March 5th.  So, this was my note to
3  Mr. Flosi, "Lee, please see below the first
4  paragraph taken directly from my agreement with US
5  Foods, and you have my authorization to comply with
6  the data requested outlined below."
7    The second is from my lawyer, Kraig
8  Marton, with clarifying instructions, and a request
9  that he is CCed on the information provided.  "Let
10  me know if you have any questions."
11    He responded with, "Mike and Kraig, this
12  could not have come at a worse time."  I had called
13  him.  "As I had noted in our phone call, I am
14  leaving Friday morning for a four-week trip to the
15  Far East, and will not be back in my office until
16  3-5-13.  I cannot possibly comply with this request
17  due to other activities I must deal with prior to my
18  Friday departure.  Please advise US foods and assure
19  them that this matter will receive prompt attention
20  upon my return."
21    If you would like to see this E-mail, I
22  would be glad to send it to you.  Upon receipt of
23  that E-mail, I called him.  I said, "Hey, Lee, you
24  can't have that big of a file.  There isn't that

MARZULLO REPORTING AGENCY  (312) 321-9365

Page 155

1  much stuff.  Can't you pull it together?"
2    This was like on a Wednesday.  This is
3  dated February 6th, which I believe was a Wednesday.
4  He indicated that he would do what he could.
5    And then you followed up with an E-mail
6  the next day, Thursday, and said, "Hey, thanks.
7  Mike tells me you are going to make efforts to get
8  this done.  We appreciate whatever you sent to
9  Juliette send to me."
10    We haven't heard anything from him since.
11  I tried to call there yesterday, and see if I could
12  get an admin or Bob, whatever his name is; and I did
13  not get anywhere with the receptionist, and Bob
14  Scigalski did not call me back; but I don't think
15  based upon these response here, that there's going
16  to be any question he'll provide the information.
17    MS. SCOTT: Once he gets back, he'll give us
18  the documents.
19    MS. PRYOR: Mike, you have a home computer
20  that's an PC or a Mac?
21    THE WITNESS: It is just an HP?  Just one.
22    MS. PRYOR: Just one?
23    THE WITNESS: Uh-huh.
24    MS. PRYOR: Do you have an iPad?  The other

MARZULLO REPORTING AGENCY  (312) 321-9365

Page 156

1  thing we were supposed to do is we're going to have
2  a third party IT person.  We'll be glad to get that
3  arranged.
4    MR. MARTON: That's fine.
5    MS. PRYOR: I guess that's it.
6    THE WITNESS: If you think of it, E-mail me.
7    MS. PRYOR: We'll follow up.
8  (WHICH WERE ALL THE PROCEEDINGS HAD.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

MARZULLO REPORTING AGENCY  (312) 321-9365

Page 157



```
 1   STATE OF ILLINOIS )
                      )  SS:
 2   COUNTY OF C O O K )

 3

 4        PAMELA A. MARZULLO, C.S.R., being first duly sworn,

 5   says that she is a court reporter doing business in the city

 6   of Chicago; that she reported in shorthand the proceedings

 7   had at the Proceedings of said cause; that the foregoing is

 8   a true and correct transcript of her shorthand notes, so

 9   taken as aforesaid, and contains all the proceedings of said

10   interview.

11                              PAMELA A. MARZULLO
12                              License No. 084-001624

13

14   SUBSCRIBED AND SWORN TO
     before me this _____ day
15   of _____ 2013.

16   _____
17   Notary Public

18

19

20

21

22

23

24

           MARZULLO REPORTING AGENCY  (312) 321-9365
```

# EXHIBIT C



December 12, 2012

**VIA OVERNIGHT MAIL**

Michael J. Noble
4717 E. Quartz Mountain Road
Paradise Valley, Arizona 85253-3202

**Re: Termination of Employment with US Foods and Post-Employment Obligations**

Dear Mr. Noble:

I am writing to confirm our discussion yesterday concerning the termination of your employment with US Foods. I am also writing to advise you of your contractual, statutory and common law obligations as a former US Foods employee and fiduciary.

As you know, US Foods has been engaged in a confidential and privileged internal investigation. As a result of that investigation, the Company concluded that you breached its Code of Conduct in several respects. First, you used your position to gain access to confidential US Foods information and used that information for your own personal gain. Second, you disclosed confidential US Foods information to unauthorized US Foods employees and to third parties, including Quest Consultants International, Ltd. Third, you sent threatening anonymous letters to US Foods executives and owners with the intent of harming US Foods.

Finally, you lied and concealed information and refused to cooperate during the Company's internal investigation, including your interview yesterday morning. Documentary evidence uncovered during USF's forensic review irrefutably demonstrates that your repeated claims of lack of knowledge and involvement were false. In addition, USF learned during the course of the day today that you made copies in USF's office in the early morning today prior to your flight to Rosemont. In addition to violating the Code of Conduct, these actions also violate your duty of loyalty and fiduciary duty to US Foods, your contractual obligations, and various federal and state laws.

As a result of your termination, US Foods has eliminated your access to US Foods' email and databases. You do not have the authority to act on behalf of or hold yourself out as an employee or representative of US Foods. You should not return to your office or attempt to access any of US Foods' offices or facilities. You also have ongoing legal obligations and duties to US Foods. You signed a Non-Solicitation and Non-Disclosure Agreement with US Foods on November 16, 2007. The restrictive covenants in that agreement were incorporated in the Management Stockholder's Agreement that you signed that same day. For your reference, copies of those agreements are enclosed with this letter.

Michael J. Noble
December 12, 2012
Page 2

In these agreements, you agreed to a number of restrictive covenants forbidding you from taking certain actions after the termination of your employment with US Foods. Specifically, you agreed not to use or disclose any of US Foods' confidential and proprietary information. This prohibition on the disclosure of confidential information applies, among other things, to all information concerning the confidential and privileged internal investigation in which you participated. The obligation not to disclose confidential and proprietary information of the company is also imposed by federal and state law and the common law.

You also agreed that you will not solicit customers of US Foods with whom you have had contact for one year after the termination of your employment. You also may not solicit employees of US Foods for one year after your termination. Furthermore, you may not engage in conduct that is detrimental to US Foods, including making any statement that disparages or is intended to disparage US Foods or its executives and owners or their respective reputations.

You also agreed to return all of US Foods' property, documents and data at the time of your termination. Pursuant to this provision, you are instructed to return all US Foods' property, documents and data including, without limitation, all keys and access cards, badges, credit and telephone cards, telephones, pagers, all computers and computer related equipment (i.e. hardware, software, diskettes, electronic storage devices, etc), all passwords, access codes and other information necessary to access any computer, communications device or electronic database, and all books, files, documents and electronic data and media. You also have an obligation to copy and return to US Foods any and all electronic data of US Foods on your personal computers and electronic communications and storage devices.

You must physically return all US Foods property, documents and data, including all documents that you copied in US Foods offices in the early morning of December 10, 2012, and all emails and documents forwarded to your personal email address, to Joshua R. Woodard of Snell & Wilmer located at 400 E. Van Buren St. #1900, Phoenix, Arizona, 85004-2202, no later than tomorrow at 5:00 p.m. Electronic data must be returned in native format, with all associated metadata intact. After this property, documents and data are returned, US Foods will coordinate with you regarding the permanent deletion of US Foods' data from your personal computers and devices.

These are just some of the restrictions contained in the agreements. We recommend that you review the agreements to remind yourself of and understand thoroughly all of your post-employment commitments. In addition, you should be aware that, even in the absence of an agreement, any and all confidential, proprietary, and trade secret information of the Company is the property of the Company and cannot be used or disclosed by you under the common law and various state and federal statutes. You also have continuing fiduciary duties to US Foods as a former executive. Violations of these obligations can expose you, as well as anyone who induces or aides and abets you to violate your obligations to the Company, to criminal and civil liability.

In addition, because US Foods anticipates litigation concerning your employment with and your actions while employed by the Company, you have an obligation to preserve and not to destroy or spoliate relevant evidence. This preservation obligation includes all documents relating to your retention and

Michael J. Noble
December 12, 2012
Page 3

payment of, all work performed by, communications with and about, and reports, videos and picture of Quest and all information and documents provided to Quest. It also includes all documents reflecting, referencing or relating to the anonymous letters sent to US Foods executives and owners. Your preservation obligations are described in more detail in the enclosure to this letter.

This letter serves as notice to you that you must abide by your contractual obligations and your legal duties as a former employee of US Foods. US Foods intends diligently to monitor your compliance, and, should it learn that you are in violation of your obligations, it will take any and all measures against you necessary to protect its rights. You have agreed that US Foods may seek—in addition to other available remedies—immediate injunctive relief and repayment of some of the stock you received pursuant to the Management Shareholder's Agreement if you violate these obligations.

If you have any questions about the above or your continuing obligations to US Foods, please contact me immediately.

Sincerely,

Juliette Pryor
Executive Vice President, General Counsel and
Chief Compliance Officer

Enclosures

# EXHIBIT D



February 4, 2013

Michael J. Noble
4717 E Quartz Mountain Road
Paradise Valley, AZ 85253-3202

<u>CONFIDENTIAL SEPARATION AGREEMENT AND RELEASE</u>

Dear Mr. Noble:

This letter (hereinafter, the "Separation Agreement") confirms the terms related to the termination of your employment with US Foods, Inc. ("US Foods" or the "Company").

1. <u>Termination.</u> Your employment with the Company terminated effective December 11, 2012 (your "Termination Date"). Since your Termination Date, a dispute has arisen concerning the Company's obligation to repurchase stock and options in the Company held by you on your Termination Date and to pay severance and a bonus to you. Without admitting any liability or fault, the Company and you have agreed to the following terms to resolve these and all other disputes and claims between you and the Company.

2. <u>Settlement Payment.</u> In consideration of the promises and other good and valuable consideration set forth herein, if you sign and do not revoke this Separation Agreement, the Company agrees to pay you $175,000 (the "Settlement Payment").

   a. The parties agree that $100,000 of the payment represents the appreciation on the value of the 100,000 shares of Company stock purchased by you in 2007 and $75,000 of the payment is for the repurchase of that number of shares of vested stock options held by you as of the Termination Date determined by the Company to have a value of $75,000. All remaining vested stock options held by you as of the Termination Date shall expire and have no value.

   b. The Company agrees to repurchase your stock for a total of $600,000. $500,000 of that amount represents in the amount you initially paid for the stock. The $100,000 payment referenced above represents the appreciation in the value of the stock since you purchased it.

      c.   The Settlement Payment and stock purchase monies, totaling $675,000, will be mailed to your counsel within ten (10) days of the Effective Date of this Agreement.

3.   <u>No Additional Benefits.</u>  Your right to continue qualifying coverage at your own cost pursuant to COBRA (the Consolidated Omnibus Budget Reconciliation Act of 1986, as amended) shall be governed by applicable law and the terms of the Company's plans and programs as has or will be explained to you in separate correspondence. You agree that you are not and will not be entitled to any severance benefits under the Company's Severance Plans. You further agree that you are not entitled to any additional compensation under the Management Stockholder's Agreement, Sale Participation Agreement, or Stock Option Agreement that you signed on November 16, 2007 and that the Settlement Payment satisfies any and all of US Foods' obligations to pay you for stocks and options issued to you pursuant to those agreements or any other agreement. You further agree that any remaining stocks and options you previously held or owned have expired. You acknowledge that it is the Company's position that the Settlement Payment is a payment to which you are not otherwise entitled. You acknowledge that, except as expressly provided in this Separation Agreement, you will not receive any additional compensation or benefits, including salary, stock or equity rights or payments, bonus, or severance benefits from the Company.

4.   <u>Claims Released.</u>  It is also understood that, in exchange for your Separation Payment and other benefits set forth herein, you **<u>release and waive</u>** all claims, causes of action or the like, known or unknown, to the extent permitted by law, that you, your heirs, executors, administrators, and assigns have, had or may have in the future against the Company, and/or any of their respective owners, parents, predecessors, successors, affiliates, and/or subsidiaries, employee benefit plans, employee benefit plan administrators and/or fiduciaries, including each of their current or past directors, officers, agents and employees, and/or anyone else connected with any of the foregoing (collectively, "Released Parties"), with respect to all matters of your employment and separation from employment with the Company, including but not limited to, all allegations, claims, and violations related to severance, any reductions-in-force, notice of termination, the payment of your salary and benefits and all claims arising under the following, in each case as amended: the Age Discrimination in Employment Act of 1967, as amended by the Older Workers Benefit Protection Act of 1990; Title VII of the Civil Rights Act of 1964; the Civil Rights Act of 1991; the Equal Pay Act of 1963; the Americans with Disabilities Act of 1990; the Family and Medical Leave Act of 1993; the Civil Rights Act of 1866; the Worker Adjustment and Retraining Notification Act; the Employee Retirement Income Security Act of 1974; any applicable Executive Order Programs; the Fair Labor Standards Act; section 806 of the Sarbanes-Oxley Act of 2002; the False Claims Act and all of the state or local counterparts, or any other federal, state or local statute, constitution or ordinance; or under any public policy, contract or tort, or under any common law, including without limitation for wrongful discharge; or arising under any practices or procedures of the Company; or any claim for breach of contract, infliction of emotional distress, defamation, or any claim for costs, fees or other expenses, including attorneys' fees and expenses, incurred in these matters.

5. <u>Pursuit of Released Claims and Scope of Release.</u> You agree and covenant not to file any suit, action, arbitration, or complaint against the Released Parties, and not to assist in any such action in any court, administrative or private proceeding with regard to any claim, demand, liability or obligation arising out of any alleged act or omission of US Foods, your employment with US Foods or your separation therefrom. You further represent that no claims, complaints, charges, arbitrations, or other proceedings are pending in any court, administrative agency or department, commission or other forum relating directly or indirectly to the conduct of US Foods or your employment with US Foods.

6. <u>Unreleased Claims.</u> You understand that this Agreement is a full and final release applying to all known and unknown or unanticipated injuries or damages of any kind arising from those matters released herein. You expressly and knowingly waive all rights you may have under any law that is intended to protect you from waiving unknown claims. You understand that this release and waiver does not waive or release your right to unemployment benefits or worker's compensation in accordance with applicable law, claims that arise based on acts or occurrences after the Effective Date, your right to enforce this Separation Agreement, vested retirement savings benefits, and your right to file a charge with the Equal Employment Opportunity Commission ("EEOC"). You are, however, waiving your right to recover money in connection with any such EEOC charge. You are also waiving your right to recover money in connection with a charge filed by any other individual or by the EEOC or other federal or state agency.

7. <u>Release of Claims Against Employee.</u> The Company releases you, as well as your heirs, executors, administrators, and assigns, from any and all claims, debts, rights, demands, judgments, obligations, causes of action, liabilities, costs and expenses, known or unknown, in law or in equity, arising out of or related to your employment with the Company. Notwithstanding anything to the contrary in the subsection above, the Company's release of Employee does not apply to nor prohibit any claims by the Company unknown to the General Counsel of the Company as of the Effective Date of this Agreement. The Parties' releases also do not prohibit claims by any Party to enforce the terms of this Agreement.

8. <u>Confidentiality.</u> You agree that, except as hereinafter provided, you will keep the negotiations leading to and the terms, conditions and existence of this Separation Agreement in strict confidence and shall not disclose them to anyone except: (a) to your attorney and bona fide tax and financial advisors (only if they agree in writing to be bound by and to comply with the provisions of this Agreement); (b) your spouse (only if she agrees in writing to be bound by and to comply with the provisions of this paragraph); or (c) pursuant to compulsory legal process or a court order. If there is any proceeding to enforce the terms of this Agreement, this Agreement shall be filed under seal, pursuant to the rules and provisions of the court in which the proceeding is filed. If you receive a subpoena or other request to produce this Agreement, or to provide or produce testimony or documents subject to this Paragraph, you will immediately notify in writing the General Counsel of US Foods.

9. <u>Return of Company Property.</u> You certify that you have returned to the Company all property, documents and data of the Company or relating to your work for the Company

("Company Data") in your possession, custody or control, including without limitation, all keys and access cards, badges, credit and telephone cards, telephones, pagers, all computers and computer related equipment (i.e. hardware, software, diskettes, electronic storage devices, etc), all passwords, access codes and other information necessary to access any computer, communications device or electronic database, and all books, files, documents and electronic data and media. Electronic data should be returned in native format, with all associated metadata intact. You agree, upon the Company's request, to permit a third-party IT technician retained by the Company to inspect all of your personal computers and electronic communications and storage devices to identify and recover any additional Company Data and to undertake the permanent deletion of any Company Data. Said technician will not transmit or disclose to the Company any data on your personal computers and devices that is not Company Data.

10. <u>Other Agreements.</u> You agree that you remain bound by all post-employment restrictions in your previous agreements with US Foods as found in:

- Sections 17 and 22 of the Management Stockholder's Agreement signed by you on November 16, 2007; and

- The provisions of the Non-Solicitation and Non-Disclosure Agreement signed by you on November 16, 2007 that are incorporated by reference into Section 22 of the Management Stockholder's Agreement.

11. <u>Non-Disparagement.</u> You agree not to make any disparaging remarks now, or at any time in the future, about the Released Parties. You further agree that you will not, directly or indirectly, follow, investigate, photograph, videotape, or stalk (in person or through electronic or other means) any of the Releasees. US Foods will instruct John Lederer, Juliette Pryor, Stuart Schuette, David Esler, Al Swanson and Michael Ranchino not to make any statements that disparage or defame you. If US Foods is contacted by your prospective employers, it will provide neutral reference information consistent with Company policy. Nothing in this Agreement shall prohibit you or the Company from providing accurate information to any court or governmental entity; or to any person or organization in response to legal process or otherwise as required by law. You agree that if you violate this provision you forfeit the Settlement Payment given to you as part of this Separation Agreement.

12. <u>Cooperation.</u> You agree to cooperate and assist the Company and the Released Parties in any court, agency, arbitration or other legal matters about which you have knowledge relevant to the matter. You acknowledge and agree that such assistance may include, but will not be limited to, providing complete and truthful background information regarding any matter on which you previously worked, aiding in the drafting of declarations and similar documents, executing declarations and similar documents, testifying or otherwise appearing at investigation interviews, depositions, arbitrations or court hearings and preparation for the above-described or similar activities as requested by the Company or required by legal process. The Company will use its best efforts to ensure that any assistance requested will be arranged so that it does not unreasonably interfere with your other employment or family commitments. The Company will reimburse you for the

reasonable expenses that you incur in complying with this cooperation obligation, as long as they are approved in writing in advance by the General Counsel. Nothing in this Paragraph is intended to cause you to make a false statement or testify untruthfully in any legal proceeding, and you agree not to do so.

13. Disgorgement. You agree and understand that if you materially breach Paragraphs 8, 9, 10, 11 or 12, the Company may recover from you the Settlement Payment as liquidated damages, as well as its reasonable attorneys' fees and costs and any other damages or remedies allowed by law.

14. Quest Consultants. You will authorize and direct Quest Consultants International, Ltd. ("Quest") to provide all information related to the project for which you hired Quest including, but not limited to, all communications with you, all surveillance reports, all video and audio recordings, all pictures, and all supporting documentation and work product and all US Foods documents and data. US Foods agrees to reimburse Quest for the reasonable copying costs that it incurs in producing the information required by this Paragraph. This Agreement will not be effective until Quest complies with your directive and produces all documents and data subject to this Paragraph.

15. Interview. You agree that you will be interviewed by US Foods and/or its designated counsel in Chicago, Illinois, but not in Rosemont. US Foods will pay for your reasonable food, travel, and lodging expenses for traveling to and attending the interview. The interview will cover the following topics: the anonymous letters to US Foods postmarked September 20, 2012 and November 9, 2012; your participation in the preparation and sending of those letters; the allegations contained in the letters; the surveillance referenced in that letter and otherwise performed by Quest or by or at the request of you or any other current or former employee of US Foods; the retention and payment of Quest; the topics addressed in the December 12, 2012 letter from Juliette Pryor to you and the December 18, 2012 letter from your counsel, Kraig J. Marton, to Juliette Pryor of US Foods; and any allegations by you regarding US Foods' pricing on its contracts with or purchases by the federal government, including whether US Foods instructs its vendors to increase the amount of their invoices to amounts greater than actual true prices paid to the vendor, whether such invoices are then submitted to the US government or other governmental entities, and any and all subjects related to the above topics. The interview may be recorded and/or transcribed at the Company's discretion. Your counsel may be present at the interview. You understand that you have an obligation to provide truthful, complete, responsive and accurate statements in response to counsel's questions. You will also provide information to either support or rescind your implied allegations related to US Foods' pricing practices under its government contracts. The Settlement Payment will not be made until you have complied with this Paragraph by appearing for the interview and by completely and truthfully answering questions about the above topics for such time as required by the person conducting the interview, but not more than eight (8) hours. US Foods will have the option of requiring you to sign a sworn statement summarizing all or a portion of your statements during the interview.

16. <u>Entire Agreement.</u> This Separation Agreement contains the entire understanding between you and the Company regarding the subject matters set forth herein, and supersedes any and all other prior agreements, understandings, discussions, and negotiations whether written or oral between you and the Company, except the Other Agreements referenced in Paragraph 10. This Separation Agreement cannot be changed except in a writing signed by you and an authorized representative of the Company. You acknowledge that neither the Company nor any representative of the Company has made any representation or promise to you other than as set forth herein.

17. <u>Construction.</u> Each party and its counsel have reviewed this Separation Agreement and have been provided the opportunity to review this Separation Agreement and accordingly, the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Separation Agreement. Instead, the language of all parts of this Separation Agreement shall be construed as a whole, and according to their fair meaning, and not strictly for or against either party.

18. <u>Severability.</u> If any provision in this Separation Agreement is found to be unenforceable, all other provisions will remain fully enforceable. The covenants set forth in this Separation Agreement shall be considered and construed as separate and independent covenants. Should any part or provision of any provision of this Separation Agreement be held invalid, void or unenforceable in any court of competent jurisdiction, such invalidity, voidness or unenforceability shall not render invalid, void or unenforceable any other part or provision of this Separation Agreement.

19. <u>Interpretation.</u> This Agreement shall be construed as a whole according to its fair meaning. It shall not be construed strictly for or against you or the Company. Unless the context indicates otherwise, the singular or plural number shall be deemed to include the other. Captions are intended solely for convenience of reference and shall not be used in the interpretation of this Agreement.

20. <u>Choice of Law/Dispute Resolution.</u> The terms of this Agreement shall be interpreted under the laws of the State of Delaware. The parties shall use good faith efforts to resolve any controversy or claim arising out of, or relating to this Agreement or the breach thereof. If, despite their good faith efforts, the parties are unable to resolve such controversy or claim, then such controversy or claim shall be resolved by arbitration in Chicago, Illinois, with one (1) arbitrator, in accordance with the National Rules for Resolution of Employment Disputes of the American Arbitration Association, and judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. The arbitrator shall have the discretion to award reasonable attorneys' fees, costs and expenses, including fees and costs of the arbitrator and the arbitration, to the prevailing party.

21. <u>Non-Admission of Liability.</u> This Separation Agreement does not constitute an admission of any liability or wrongdoing on the part of any party, and each party expressly denies same.

22. <u>Consideration Period.</u> You know and understand the contents of this Separation Agreement and its binding effect, and you are hereby advised to consult with an attorney prior to signing this Agreement. You voluntarily and knowingly agree to the terms of this Separation Agreement, You acknowledge that you have been advised that you have twenty-one (21) days to consider this Separation Agreement. In the event that you execute this Separation Agreement prior to the expiration of the 21-day period, you hereby waive the balance of said period. If you do not sign this Separation Agreement within the 21-day period, you understand that it will become null and void.

23. <u>Revocation Period.</u> You will have seven (7) days following the date on which you execute this Separation Agreement to revoke this Separation Agreement, and this Separation Agreement shall not become effective or enforceable until such revocation period has expired. Any revocation within this period shall be submitted in writing and personally delivered or mailed to Juliette Pryor, Executive Vice President, General Counsel and Chief Compliance Officer, US Foods, 9399 West Higgins Road, Rosemont, Illinois 60018, and post-marked, where applicable, within seven (7) days of the date following execution of this Separation Agreement. No Separation Payment or other benefits will be paid or provided until after such seven (7) day revocation period has expired and this Separation Agreement has become effective. If this Separation Agreement is revoked by you then you shall forfeit all of your Separation Payment and/or other benefits, and the Company shall not be required to provide you with any such payments, benefits or other consideration.

24. <u>Counterparts.</u> This Separation Agreement may be executed in counterparts, and each counterpart, when executed, shall have the efficacy of a signed original. Photographic and facsimiled copies of such signed counterparts may be used in lieu of the originals for any purpose.

25. <u>Effective Date.</u> The Effective Date of this Agreement shall be the latest of the date that is fully executed by the Parties, the expiration of the seven-day revocation period set forth in Paragraph 23, the certification of the return of all Company property in Paragraph 9, complete production of the records and data by Quest as described in Paragraph 14, and the completion of the interview required by Paragraph 15.


PLEASE READ THIS AGREEMENT CAREFULLY. EXCEPT AS OTHERWISE PROVIDED HEREIN, IT CONTAINS A **RELEASE** OF ALL KNOWN AND UNKNOWN CLAIMS.

YOU AGREE THAT YOU RECEIVED VALUABLE CONSIDERATION IN EXCHANGE FOR ENTERING INTO THIS AGREEMENT AND THAT THE COMPANY HEREBY ADVISES YOU TO CONSULT AN ATTORNEY PRIOR TO SIGNING THIS AGREEMENT. YOU HAVE BEEN PROVIDED 21 DAYS WITHIN WHICH TO CONSIDER WHETHER YOU SHOULD SIGN THIS AGREEMENT AND WAIVE AND RELEASE ALL CLAIMS AND RIGHTS INCLUDING BUT NOT LIMITED TO THOSE ARISING UNDER THE FEDERAL AGE DISCRIMINATION IN EMPLOYMENT ACT. YOU SHALL HAVE SEVEN (7) DAYS WITHIN WHICH TO REVOKE THIS AGREEMENT AND THIS

AGREEMENT SHALL NOT BECOME EFFECTIVE OR ENFORCEABLE UNTIL THAT
REVOCATION PERIOD HAS EXPIRED.

YOU PROMISE THAT NO REPRESENTATIONS OR INDUCEMENTS HAVE BEEN
MADE TO YOU EXCEPT AS SET FORTH HEREIN, AND THAT YOU HAVE SIGNED
THE SAME KNOWINGLY AND VOLUNTARILY.

     If the terms of this Separation Agreement are acceptable to you, please sign and date this
Separation Agreement and return it to the undersigned.

US FOODS, INC.

By: _____

Name
Juliette Pryor

Date: 05 February 2013

Agreed and accepted on this

_____ day of _____, 2013

Signature:_____

Michael J. Noble

AGREEMENT SHALL NOT BECOME EFFECTIVE OR ENFORCEABLE UNTIL THAT REVOCATION PERIOD HAS EXPIRED.

YOU PROMISE THAT NO REPRESENTATIONS OR INDUCEMENTS HAVE BEEN MADE TO YOU EXCEPT AS SET FORTH HEREIN, AND THAT YOU HAVE SIGNED THE SAME KNOWINGLY AND VOLUNTARILY.

       If the terms of this Separation Agreement are acceptable to you, please sign and date this Separation Agreement and return it to the undersigned.

US FOODS, INC.

By: _____
       Name
       Juliette Pryor

Date:_____

Agreed and accepted on this

*5th* day of *February*, 2013

Signature: *Michael J Noble*
       Michael J. Noble

# EXHIBIT E



Proskauer Rose LLP   1001 Pennsylvania Avenue, NW Suite 400 South   Washington, DC 20004-2533

May 9, 2013 (9:00 a.m. EDT)

VIA EMAIL AND FIRST CLASS MAIL

Kraig J. Marton
Jaburg Wilk
3200 N. Central Avenue, 20th Floor
Phoenix, AZ  85012

Re:     Michael Noble

Connie N. Bertram
Member of the Firm
d 202.416.6810
f 202.416.6899
cbertram@proskauer.com
www.proskauer.com

Dear Mr. Marton:

I am writing in response to your May 2, 2013 letter enclosing proposed revisions to the draft computer forensics protocol that I forwarded to you on April 12, 2013.  I respond below to each of the open points raised in your letter:

We are not "flat wrong" in claiming that there are deficiencies in Quest's production.  It is evident from the March 15 email from you to Mr. Flosi that Mr. Flosi's certification is not accurate and that Mr. Noble has not complied with his obligations under that provision.  In your email, you tell Mr. Flosi that you "understand that you [Mr. Flosi] do not want to provide your administrative file, which is fine."  I have attached a copy of that email for your reference.  Hopefully, the Company will be able to obtain all of the documents required by the Release Agreement through Z. Scott's interview of Mr. Flosi tomorrow.

The revisions to the computer forensics protocol proposed in your letter and the attached revisions are inconsistent with the parties' Release Agreement and are entirely unacceptable.  During our call on April 5, we laid out an acceptable framework for a protocol for the review, return and deletion of US Foods documents and data.  After I sent a draft protocol on April 12 consistent with our discussions, you indicated that your client was not willing to accept that approach because he "does not trust" US Foods.  Despite repeated requests, we did not receive proposed revisions until May 2, over two weeks later.

Under the terms of the parties' Release Agreement, Mr. Noble is required to return to US Foods "all property, documents and data of the Company or relating to your work for the Company ('Company Data') in your possession, custody or control."  Mr. Noble is required to return electronic data "in native format, with all associated metadata intact."  Although Mr. Noble certified at the end of his interview that he had complied with these requirements, it is evident from his interview and our discussions and information we have received through our investigation that his certification was false.

The protocol that I proposed was intended to establish a mechanism for the recovery and return of electronic data of the Company, including documents and emails that had been deleted by Mr. Noble in violation of litigation hold instructions and obligations, while protecting privileged communications.  The revisions proposed by Mr. Noble in your May 2 letter do not comport with his obligations under the Release Agreement.   Among other things:

- The protocol states that the "Effective Date" of the Release Agreement will occur on the delivery of Mr. Noble's devices to the IT technician.  This provision is inconsistent with the Release



Kraig J. Marton
May 9, 2013
Page 2

Agreement, which requires the actual return (with all metadata attached) of Company Data to US Foods. Moreover, this provision does not address the other steps, including the production of all Quest documents, necessary to satisfy the definition of Effective Date.

- Paragraph 5 of the draft protocol requires the IT technician to delete all Noble Data, other than Searched Noble Data. The Noble Data should be preserved until the parties resolve their disputes concerning the production of documents by Mr. Noble.

- The logging process required by Paragraph 6 places an undue burden on the IT technician and excessive costs on US Foods. In addition, the log does not provide information sufficient for US Foods to determine whether to challenge Mr. Noble's designation of individual documents.

- Paragraph 7, which gives Mr. Noble the authority to "deem" any document non-Company Data, is inappropriate. US Foods – not Mr. Noble – should review the data identified through the search process (after an appropriate screening for privilege) to identify what constitutes Company Data.

- The restrictions and modifications to the search terms are inappropriate. For instance, by requiring specified names to also be included in a communication or document with another search name, the name searches are nullified.

Throughout our communications, you have repeatedly stated that Mr. Noble and you believe that US Foods has no intention of paying Mr. Noble the payments contemplated by the Release Agreement. Throughout our discussions, US Foods has been willing to pay Mr. Noble *if and when* he complies with the Agreement. Although we have been patient in attempting to work with Mr. Noble, we cannot continue to allow him to flout his contractual obligations. We will provide to him one last and final opportunity to provide an acceptable protocol for the retrieval, review and return of US Foods' data. If we do not receive such a protocol by 5:00 p.m. EDT on Friday, May 10, we will consider Mr. Noble in breach of this additional provision of the Release Agreement.

Thank you for your assistance with this matter.

Regards,

Connie N. Bertram

Enclosure

cc:     Juliette Pryor

**From:** Kraig J. Marton [mailto:kjm@jaburgwilk.com]
**Sent:** Friday, March 15, 2013 12:30 PM
**To:** lflosi@questinvestigations.net
**Cc:** Michael J. Noble [mn5967@yahoo.com]
**Subject:** Flosi Declaration.DOC

Lee,

Thank you for calling and explaining your concerns.  I now understand that you do not want to provide
your administrative file, which is fine.  I have revised the declaration and it is now worded in such a way
that I hope will address your concerns.  If you are satisfied, could you sign this declaration and email it
along with your investigative file, to juliette.Pryor@USFoods.com with copy to me?

Thanks again for your help.

Kraig J. Marton
Jaburg & Wilk, P.C.
3200 North Central #2000
Phoenix, AZ 85012

602 248 1017 (DID)
602 297 5017 (Direct Fax)
www.jaburgwilk.com

NOTICE: this email may be between attorney and client, and, as such, is intended to be private,
privileged and confidential.  If you have received this transmission in error, please reply that you have
received it mistakenly, and destroy the original email and any attachments.  Thank you.