# EXHIBIT F



## MANAGEMENT EQUITY OFFERING DOCUMENTS

### FOR

### PHILLIP G. ROSZAK

**OMNIBUS SIGNATURE PAGE**

| | |
|---|---|
| Name of Management Stockholder: | *Phil Roszak* |
| | *14815 S. 14th Place* |
| Address: | *Phoenix, AZ 85048* |

IN WITNESS WHEREOF, I hereby agree to be a party to each of the following agreements as a "Management Stockholder", "Optionee" or "Participant", as applicable, as of the date of such agreements:

1.    Management Stockholder's Agreement with USF Holding Corp.

2.    Sale Participation Agreement with USF Holding Corp., U.S. Foodservice, Inc., and the Sponsors

3.    Stock Option Agreement with USF Holding Corp.

Signature: _*Phil Roszak*_

Dated as of: October 19, 2007



## MANAGEMENT STOCKHOLDER'S AGREEMENT

This Management Stockholder's Agreement (this "Agreement") is entered into as of October 19, 2007 (the "Effective Date") among USF Holding Corp., a Delaware corporation (the "Company") and the undersigned person (the "Management Stockholder") (the Company and the Management Stockholder being hereinafter collectively referred to as the "Parties"). All capitalized terms not immediately defined are hereinafter defined in Section 6(b) of this Agreement.

WHEREAS, pursuant to the Stock Purchase Agreement (the "Stock Purchase Agreement"), dated May 2, 2007, by and between Restore Acquisition Corp., a Delaware corporation and direct, wholly owned subsidiary of the Company ("Restore"), Ahold U.S.A., Inc., a Maryland corporation ("Seller"), and Koninklijke Ahold N.V., a public company with limited liability organized under the laws of the Netherlands, on July 3, 2007 (the "Closing Date"), Restore purchased from Seller all of the outstanding shares of common stock of U.S. Foodservice, a Delaware corporation ("USF"), and certain related assets (the "Acquisition");

WHEREAS, it is contemplated that USF will be merged with and into U.S. Foodservice, Inc., its wholly owned subsidiary;

WHEREAS, in connection with the Acquisition, Clayton, Dubilier & Rice Fund VII, L.P., Clayton, Dubilier & Rice Fund VII (Co-Investment), L.P., CD&R Parallel Fund VII, L.P., CDR USF Co-Investor L.P., CDR USF Co-Investor No. 2, L.P., KKR 2006 Fund L.P., KKR PEI Investments, L.P., KKR Partners III, L.P. and OPERF Co-Investment LLC (collectively, the "Investors") contributed certain funds to the Company in exchange for shares of the Company's common stock, par value $0.01 per share (the "Common Stock");

WHEREAS, in connection with the Acquisition, the Management Stockholder has been selected by the Company to receive options to purchase shares of Common Stock (the "Options") pursuant to the terms set forth below and the terms of the 2007 Stock Incentive Plan for Key Employees of USF Holding Corp. and its Affiliates (the "Option Plan") and the Stock Option Agreement, dated as of the date hereof, entered into by and between the Company and the Management Stockholder (the "Option Agreement"); and

WHEREAS, this Agreement is one of several other agreements ("Other Management Stockholders Agreements"), which, concurrently with the execution hereof or in the future, will be entered into between the Company and other individuals who are or will be key employees of the Company or one of its subsidiaries (collectively, the "Other Management Stockholders").

NOW THEREFORE, to implement the foregoing and in consideration of the mutual agreements contained herein, the Parties agree as follows:

1. Options.

(a) Subject to the terms and conditions hereinafter set forth and as set forth in the Option Plan and the Option Agreement, as of the Effective Date the Company is granting to the Management Stockholder Options to acquire the number of shares of Common Stock as set forth on Schedule I hereto, at an initial per share exercise price equal to the Base Price,

and the Parties shall execute and deliver to each other copies of the Option Agreement concurrently with the issuance of the Options.

(b) The Company shall have no obligation to grant any Options to any person who is not an employee or director of the Company or its subsidiaries as of the Effective Date.

2. <u>Management Stockholder's Representations, Warranties and Agreements</u>.

(a) The Management Stockholder agrees and acknowledges that he or she will not, directly or indirectly, offer, transfer, sell, assign, pledge, hypothecate or otherwise dispose of (any of the foregoing acts being referred to herein as a "<u>transfer</u>") any shares of Common Stock issuable upon exercise of Options ("<u>Option Stock</u>"; together with any other Common Stock otherwise acquired and/or held by the Management Stockholder Entities after the date hereof, "<u>Stock</u>"), except as provided in this Section 2(a) below and Section 3 hereof. If the Management Stockholder is an Affiliate of the Company, the Management Stockholder also agrees and acknowledges that he or she will not transfer any shares of Stock unless:

(i) the transfer is pursuant to an effective registration statement under the Securities Act of 1933, as amended, and the rules and regulations in effect thereunder (the "<u>Act</u>"), and in compliance with applicable provisions of state securities laws; or

(ii) (A) counsel for the Management Stockholder (which counsel shall be reasonably acceptable to the Company) shall have furnished the Company with an opinion or other advice, reasonably satisfactory in form and substance to the Company, that no such registration is required because of the availability of an exemption from registration under the Act and (B) if the Management Stockholder is a citizen or resident of any country other than the United States, or the Management Stockholder desires to effect any transfer in any such country, counsel for the Management Stockholder (which counsel shall be reasonably satisfactory to the Company) shall have furnished the Company with an opinion or other advice reasonably satisfactory in form and substance to the Company to the effect that such transfer will comply with the securities laws of such jurisdiction.

Notwithstanding the foregoing, the Company acknowledges and agrees that any of the following transfers of Stock are deemed to be in compliance with the Act and this Agreement (including without limitation any restrictions or prohibitions herein) and no opinion of counsel is required in connection therewith: (I) a transfer made pursuant to Sections 3, 4, 5 or 8 hereof, (II) a transfer upon the death or Permanent Disability of the Management Stockholder to the Management Stockholder's Estate or a transfer to the executors, administrators, testamentary trustees, legatees or beneficiaries of a person who has become a holder of Stock in accordance with the terms of this Agreement; <u>provided</u> that it is expressly understood that any such transferee shall be bound by the provisions of this Agreement, (III) a transfer made after the Closing Date in compliance with the federal securities laws to a Management Stockholder's Trust, <u>provided</u> that such transfer is made expressly subject to this Agreement and that the transferee agrees in writing to be bound by the terms and conditions hereof as a "Management Stockholder" with respect to the representations and warranties and other obligations of this Agreement, and <u>provided</u> <u>further</u> that it is expressly understood and agreed that if such Management Stockholder's Trust at any point includes any person or entity other than the Management Stockholder, his spouse (or ex-spouse) or his lineal descendants (including adopted children) such that it fails to meet the definition thereof

2

as set forth in Section 6(b) hereof, such transfer shall no longer be deemed in compliance with this Agreement and shall be subject to Section 3(d) below, (IV) a transfer of Stock made by the Management Stockholder to Other Management Stockholders, provided that it is expressly understood that any such transferee(s) shall be bound by the provisions of this Agreement (in addition to the provisions set forth in an Other Management Stockholders Agreement to which such Other Management Stockholders are a party), and (V) a transfer made by the Management Stockholder, with the Board's approval, to the Company or any subsidiary of the Company.

(b) The certificate (or certificates) representing the Stock, if any, shall bear the following legend:

> "THE SHARES REPRESENTED BY THIS CERTIFICATE MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED OF UNLESS SUCH TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION COMPLIES WITH THE PROVISIONS OF THE MANAGEMENT STOCKHOLDER'S AGREEMENT BETWEEN USF HOLDING CORP. (THE "COMPANY") AND THE MANAGEMENT STOCKHOLDER NAMED ON THE FACE HEREOF AND THE SALE PARTICIPATION AGREEMENT AMONG SUCH MANAGEMENT STOCKHOLDER AND CLAYTON, DUBILIER & RICE FUND VII, L.P., CLAYTON, DUBILIER & RICE FUND VII (CO-INVESTMENT), L.P., CD&R PARALLEL FUND VII, L.P., CDR USF CO-INVESTOR L.P., CDR USF CO-INVESTOR NO. 2, L.P., KKR 2006 FUND L.P., KKR PEI INVESTMENTS, L.P., KKR PARTNERS III, L.P. AND OPERF CO-INVESTMENT LLC, IN EACH CASE DATED AS OF OCTOBER 19, 2007 (COPIES OF WHICH ARE ON FILE WITH THE SECRETARY OF THE COMPANY) AND ALL APPLICABLE FEDERAL AND STATE SECURITIES LAWS."

(c) The Management Stockholder acknowledges that he or she has been advised that (i) the shares of the Stock are characterized as "restricted securities" under the Act inasmuch as they are being acquired from the Company in a transaction not involving a Public Offering and that the Stock may be resold without registration under the Act only in certain limited circumstances, (ii) a restrictive legend in the form heretofore set forth shall be placed on the certificates (if any) representing the Stock and (iii) a notation shall be made in the appropriate records of the Company indicating that the Stock is subject to restrictions on transfer and appropriate stop transfer restrictions will be issued to the Company's transfer agent with respect to the Stock.

(d) If any shares of the Stock are to be disposed of in accordance with Rule 144 under the Act or otherwise, the Management Stockholder shall promptly notify the Company of such intended disposition and shall deliver to the Company at or prior to the time of such disposition such documentation as the Company may reasonably request in connection with such sale and take any actions requested by the Company prior to any such sale and, in the case of a disposition pursuant to Rule 144, shall deliver to the Company an executed copy of any notice on Form 144 required to be filed with the SEC.

(e) The Management Stockholder agrees that, if any shares of the Stock are offered to the public pursuant to an effective registration statement under the Act (other than registration of securities issued on Form S-8, S-4 or any successor or similar form), the

3

Management Stockholder will not effect any public sale or distribution of any shares of the Stock not covered by such registration statement from the time of the receipt of a notice from the Company that the Company has filed or imminently intends to file such registration statement to, or within 180 days (or such shorter period as may be consented to by the managing underwriter or underwriters) in the case of an initial Public Offering and ninety (90) days (or in an underwritten offering such shorter period as may be consented to by the managing underwriter or underwriters, if any) in the case of any other Public Offering after the effective date of such registration statement, unless otherwise agreed to in writing by the Company.

(f) The Management Stockholder represents and warrants that (i) with respect to the Option Stock, the Management Stockholder has received and reviewed the available information relating to such Stock, including having received and reviewed the documents related thereto, certain of which documents set forth the rights, preferences and restrictions relating to the Options and the Stock underlying the Options and (ii) the Management Stockholder has been given the opportunity to obtain any additional information or documents and to ask questions and receive answers about such information, the Company and the business and prospects of the Company which the Management Stockholder deems necessary to evaluate the merits and risks related to the Management Stockholder's investment in the Stock and to verify the information contained in the information received as indicated in this Section 2(f), and the Management Stockholder has relied solely on such information.

(g) The Management Stockholder further represents and warrants that, at the time of any purchase of Stock by the Management Stockholder, (i) the Management Stockholder's financial condition will be such that the Management Stockholder can afford to bear the economic risk of holding the Stock for an indefinite period of time and will have adequate means for providing for the Management Stockholder's current needs and personal contingencies, (ii) the Management Stockholder will be able to afford to suffer a complete loss of his or her investment in the Stock, (iii) the Management Stockholder will understand and take cognizance of all risk factors known or made available to the Management Stockholder related to the purchase of the Stock, (iv) the Management Stockholder's knowledge and experience in financial and business matters will be such that the Management Stockholder is capable of evaluating the merits and risks of the Management Stockholder's purchase of the Stock and (v) such Stock will be acquired by the Management Stockholder for his or her own account, not as nominee or agent, and not with a view to the resale or distribution of any part thereof in violation of the Act, and the Management Stockholder will have no present intention of selling or otherwise distributing the Stock in violation of the Act.

3. <u>Transferability of Stock</u>.

(a) The Management Stockholder agrees that he or she will not transfer any shares of Stock at any time without the consent of the Investors; <u>provided</u>, <u>however</u>, that the Management Stockholder may transfer shares of Stock pursuant to one of the following exceptions: (i) transfers permitted by Sections 4 or 5; (ii) transfers permitted by clauses (II), (III) and (IV) of Section 2(a); (iii) a sale of shares of Common Stock pursuant to an effective registration statement under the Act filed by the Company upon the proper exercise of registration rights of such Management Stockholder under Section 8 (excluding any registration on Form S-8, S-4 or any successor or similar form); (iv) transfers permitted

4

pursuant to the Sale Participation Agreement (as defined in Section 6(b)); (v) transfers permitted by the Board or (vi) transfers to the Company or its designee (any such exception, a "Permitted Transfer").

(b) Notwithstanding anything to the contrary herein, Section 3(a) shall terminate and be of no further force or effect upon the occurrence of a Change in Control.

(c) No transfer of any shares of Stock in violation hereof shall be made or recorded on the books of the Company and any such transfer shall be void ab initio and of no effect.

(d) Notwithstanding anything to the contrary herein, the Company may, at any time and from time to time, waive the restrictions on transfers contained in Section 3(a), whether such waiver is made prior to or after the transferee has effected or committed to effect the transfer, or has notified the Investors of such transfer or commitment to transfer. Any transfers made pursuant to such waiver or which are later made subject to such a waiver shall, as of the date of the waiver and at all times thereafter, not be deemed to violate any applicable restrictions on transfers contained in this Agreement.

4. <u>The Management Stockholder's Right to Resell Stock and Options to the Company.</u>

(a) Subject to Section 5(g), if the Management Stockholder's employment with the Company (or, if applicable, any of its subsidiaries or affiliates) terminates as a result of the death or Permanent Disability of the Management Stockholder, then the applicable Management Stockholder Entity shall, for 365 days following the date of such termination for death or Permanent Disability, have the right to:

(i) With respect to Stock, sell to the Company, and the Company shall be required to purchase, on one occasion, all of the shares of Stock then held by the applicable Management Stockholder Entities at a per share price equal to Fair Market Value on the Repurchase Calculation Date (the "Section 4 Repurchase Price"); and

(ii) With respect to any outstanding, vested Options, sell to the Company, and the Company shall be required to purchase, on one occasion, all of the vested Options then held by the applicable Management Stockholder Entities for an amount equal to the product of (x) the excess, if any, of the Section 4 Repurchase Price over the Option Exercise Price and (y) the number of Exercisable Option Shares, which Options shall be terminated in exchange for such payment. In the event the Management Stockholder Entity elects to sell under this Section 4(a)(ii) and the foregoing Option Excess Price is zero or a negative number, all outstanding exercisable Options granted to the Management Stockholder shall be automatically terminated without any payment in respect thereof. In addition, and for the avoidance of doubt, all unvested Options shall be terminated and cancelled without any payment therefor.

(b) In the event the applicable Management Stockholder Entities intend to exercise their rights pursuant to Section 4(a), such Management Stockholder Entities shall send written notice to the Company, at any time during the applicable period set forth in Section 4(a) (the "Put Period"), of their intention to sell shares of Stock in exchange for the payment referred to in Section 4(a)(i) and/or to sell such Options in exchange for the payment referred to in Section 4(a)(ii) and shall indicate the number of shares of Stock to be sold and

051200-0523-10862-NY03.2619658.2

the number of Options (based on the number of Exercisable Option Shares) to be sold (the "Redemption Notice"). The completion of the purchases shall take place at the principal office of the Company on no later than the twentieth business day (such date to be determined by the Company) after the giving of the Redemption Notice. The applicable Repurchase Price (including any payment with respect to the Options as described above) shall be paid by delivery to the applicable Management Stockholder Entities, at the option of the Company, of a certified bank check or checks in the appropriate amount payable to the order of each of the applicable Management Stockholder Entities (or by wire transfer of immediately available funds, if the Management Stockholder Entities provide to the Company wire transfer instructions) against delivery of certificates or other instruments representing the Stock so purchased and appropriate documents cancelling the Options so terminated appropriately endorsed or executed by the applicable Management Stockholder Entities or any duly authorized representative.

(c) Notwithstanding anything in this Section 4 to the contrary, if there exists and is continuing a default or an event of default on the part of the Company or any subsidiary of the Company under any loan, guarantee or other agreement under which the Company or any subsidiary of the Company has borrowed money or if the repurchase referred to in Section 4(a) (or Section 5 below, as the case may be) would result in a default or an event of default on the part of the Company or any affiliate of the Company under any such agreement or if a repurchase would not be permitted under the Delaware General Corporation Law ("DGCL") (or if the Company reincorporates in another state, the business corporation law of such state) or any federal or state securities laws or regulations (each such occurrence being an "Event"), the Company shall not be obligated to repurchase any of the Stock or the Options from the applicable Management Stockholder Entities, to the extent the Company is prohibited from purchasing such Stock and Options by the existence of the Event, for cash but instead, with respect to such portion with respect to which cash settlement is so prohibited, will, subject to the Management Stockholder Entities' rescission rights below, satisfy its obligations with respect to the Management Stockholder Entities' exercise of their rights under Section 4(a) by delivering to the applicable Management Stockholder Entity a promissory note with a principal amount equal to the amount payable under this Section 4 that was not paid in cash, having terms acceptable to the Company's (and its affiliate's, as applicable) lenders and permitted under the Company's (and its affiliate's, as applicable) debt instruments but which in any event (i) shall be mandatorily repayable promptly and to the extent that an Event no longer prohibits the payment of cash to the applicable Management Stockholder Entity pursuant to this Agreement; and (ii) shall bear interest at a rate equal to the effective rate of interest in respect of the Company's U.S. dollar-denominated subordinated public debt securities (including any original issue discount). Notwithstanding the foregoing and subject to Section 4(d), if an Event exists that prohibits the Company from purchasing Stock and Options, above, and is continuing for ninety (90) days, prior to completion of such purchase by the Company, the Management Stockholder Entities shall be permitted by written notice to rescind any Redemption Notice with respect to that portion of the Stock and Options to be repurchased by the Company from the Management Stockholder Entities pursuant to this Section 4 with the note described in the foregoing sentence, provided that, the Management Stockholder Entity shall have another thirty (30) days from the date the Event ceases to prohibit such purchase to give another Redemption Notice on the terms applicable to the first Redemption Notice.

(d) *Effect of Change in Control.* Notwithstanding anything in this Agreement to the contrary, except for any payment obligation of the Company which has arisen prior to

6

the occurrence of a Change in Control, this Section 4 shall terminate and be of no further force or effect upon the occurrence of such Change in Control.

5. The Company's Option to Purchase Stock and Options of the Management Stockholder Upon Certain Terminations of Employment.

(a) *Termination for Cause by the Company and other Call Events.* If (i) the Management Stockholder's active employment with the Company (or, if applicable, its subsidiaries or affiliates) is terminated by the Company (or, if applicable, its subsidiaries or affiliates) for Cause, or (ii) the Management Stockholder Entities effect a transfer of Stock (or Options) that is prohibited under this Agreement (or the Stock Option Agreements, as applicable), after notice from the Company of such impermissible transfer and a reasonable opportunity to cure such transfer which is not so cured (each event described above, a "Section 5(a) Call Event"), and subject to Section 5(g), then:

(I) With respect to Stock, the Company may purchase all or any portion of the shares of Stock then held by the applicable Management Stockholder Entities at a per share purchase price equal to the lesser of (x) the Base Price and (y) the Fair Market Value on the Repurchase Calculation Date and;

(II) With respect to all Options, all outstanding Options shall be automatically terminated without any payment in respect thereof upon the occurrence of the Section 5(a) Call Event.

(b) *Termination without Cause by the Company, Termination for Good Reason by the Management Stockholder, Termination due to death or Permanent Disability.* If the Management Stockholder's active employment with the Company (or, if applicable, its subsidiaries or affiliates) is terminated (i) by the Company (or, if applicable, its subsidiaries or affiliates) without Cause, (ii) by the Management Stockholder for Good Reason (if applicable), (iii) due to the Management Stockholder's death or Permanent Disability or (iv) under the circumstances described in Section 5(c)(ii) (each, a "Section 5(b) Call Event"), and subject to Section 5(g), then:

(I) With respect to Stock, the Company may purchase all or any portion of the shares of such Stock then held by the applicable Management Stockholder Entities at a per share purchase price equal to Fair Market Value on the Repurchase Calculation Date;

(II) With respect to any outstanding, vested Options, the Company may purchase all or any portion of the vested Options held by the applicable Management Stockholder Entities for an amount equal to the product of (x) the excess, if any, of the Fair Market Value on the Repurchase Calculation Date over the Option Exercise Price and (y) the number of Exercisable Option Shares (solely relating to vested Options), which vested Options shall be terminated in exchange for such payment. In the event the Company elects to repurchase under this Section 5(b)(II) and the foregoing Option Excess Price is zero or a negative number, all outstanding and exercisable vested Options shall be automatically terminated without any payment in respect thereof; and

(III) With respect to unvested Options, all outstanding unvested Options shall automatically be terminated without any payment in respect thereof.

7

(c) *Termination by the Management Stockholder.* (i) If the Management Stockholder's active employment with the Company (and/or, if applicable, its subsidiaries or affiliates) is terminated by the Management Stockholder (other than for Good Reason (if applicable) or due to death or Permanent Disability) (a "Section 5(c) Call Event"), and subject to Section 5(g), then:

(I)      With respect to any Stock, the Company may purchase all or any portion of the shares of such Stock then held by the applicable Management Stockholder Entities at a per share purchase price equal to (A) if such termination occurs prior to the third anniversary of the Closing Date, the lesser of (x) the Fair Market Value as of the Repurchase Calculation Date and (y) the Base Price, or (B) if such termination occurs on or after the third anniversary of the Closing Date, the Fair Market Value as of the Repurchase Calculation Date (such purchase price as set forth in clause (A) or (B), as applicable, the "Section 5(c) Repurchase Price"); and

(II)      With respect to any outstanding, vested Options, the Company may purchase all or any portion of the exercisable vested Options then held by the applicable Management Stockholder Entities for an amount equal to the product of (x) the excess, if any, of the Section 5(c) Repurchase Price over the Option Exercise Price, and (y) the number of Exercisable Option Shares (solely relating to vested Options). All unvested Options held by the applicable Management Stockholder Entities will terminate immediately without payment in respect thereof;

(d) *Call Notice.* The Company shall have a period (the "Call Period") of one hundred eighty (180) days from the date of any Call Event (or, if later, with respect to a Section 5(a) Call Event, the date after discovery of, and the applicable cure period for, an impermissible transfer constituting a Section 5(a) Call Event) in which to give notice in writing to the Management Stockholder of its election to exercise its rights and obligations pursuant to this Section 5 ("Repurchase Notice"). The completion of the purchases pursuant to the foregoing shall take place at the principal office of the Company no later than the twentieth business day after the giving of the Repurchase Notice. The applicable Repurchase Price (including any payment with respect to the Options as described in this Section 5) shall be paid by delivery to the applicable Management Stockholder Entities of a certified bank check or checks in the appropriate amount payable to the order of each of the applicable Management Stockholder Entities (or by wire transfer of immediately available funds, if the Management Stockholder Entities provide to the Company wire transfer instructions) against delivery of certificates or other instruments representing the Stock so purchased and appropriate documents canceling the Options so terminated, appropriately endorsed or executed by the applicable Management Stockholder Entities or any duly authorized representative.

(e) *Use of Note to Satisfy Call Payment.* Notwithstanding any other provision of this Section 5 to the contrary, if there exists and is continuing any Event, the Company will, to the extent it has exercised its rights to purchase Stock or Options pursuant to this Section 5 and subject to the rescission rights of the Management Stockholder Entities below, in order to complete the purchase of any Stock or Options pursuant to this Section 5, deliver to the applicable Management Stockholder Entities (i) a cash payment for any amounts payable pursuant to this Section 5 that would not cause an Event that prohibits the Company from purchasing Stock and Options for cash and (ii) a promissory note having the same terms as that provided in Section 4(c) above with a principal amount equal to the amount payable

8

but not paid in cash pursuant to this Section 5 due to the Event to the extent that, pursuant to the Event, the Company is prohibited from purchasing such Stock and Options in cash. Notwithstanding the foregoing, if an Event exists that causes the Company to be prohibited from such purchase and is continuing for ninety (90) days, prior to closing such purchase the Management Stockholder Entities shall be permitted by written notice to cause the Company to rescind any Repurchase Notice with respect to that portion of the Stock and Options repurchased by the Company from the Management Stockholder Entities pursuant to this Section 5 with the note described in the foregoing sentence, provided that, the Company shall have another thirty (30) days from the date the Event ceases to prohibit such purchase to give another Repurchase Notice on the terms applicable to the first Repurchase Notice.

(f)  *Effect of Change in Control.*  Notwithstanding anything in this Agreement to the contrary, except for any payment obligation of the Company which has arisen prior to the occurrence of a Change in Control, this Section 5 shall terminate and be of no further force or effect upon the occurrence of such Change in Control.

(g)  *Effect of Accounting Principles.*  Notwithstanding anything set forth in Section 4 or 5 to the contrary, in the event that it is determined by the Board that any of the provisions of either of Section 4 or 5 would result in any of the Options being classified as a liability as contemplated by FASB Statement No. 123R, Share-Based Payment, including any amendments and interpretations thereto, then the following terms shall apply:

(i)  Any shares of Stock that are to be purchased by the Company pursuant to Section 4 or 5, as applicable, may only be so purchased if and when such shares have been held by the applicable Management Stockholder Entities for at least six months; and

(ii)  With respect to any exercisable Options, upon the occurrence of the applicable event identified in Section 4 giving rise to the Management Stockholder's rights thereunder or a Call Event, the Management Stockholder Entities may be required by the Company to elect, in accordance with the terms of the relevant Stock Option Agreement, to receive from the Company, on one occasion, in exchange for all of the exercisable Options then held by the applicable Management Stockholder Entities, if any, a number of shares of Stock equal to the quotient of (x) the product of (A) the excess, if any, of the Fair Market Value over the Option Exercise Price and (B) the number of shares then acquirable on exercise, divided by (y) the Fair Market Value, which Options shall be terminated in exchange for such payment of shares of Stock (such shares of Stock, the "Net Settled Stock"). (In the event the foregoing Option Excess Price is zero or a negative number, all outstanding exercisable Options shall be automatically terminated without any payment in respect thereof.) Upon the occurrence of such net settlement of all exercisable Options, the Put Period or the Call Period, as applicable, shall be deemed to be the period that is 30 days following the date that is six months after the receipt by the applicable Management Stockholder Entities of the Net Settled Stock, during which time the Company may, on delivery of Repurchase Notice (or upon delivery of a Redemption Notice), purchase (or be required to purchase in the case of Section 4) all (in the case of a purchase pursuant to Section 4) or all or any portion (in the case of a purchase pursuant to Section 5) of the Net Settled Stock held by the applicable Management Stockholder Entities, at a per share price equal to the applicable Repurchase Price for Option Stock identified in Section 4 or Section 5, as applicable.

9

6. <u>Adjustment of Repurchase Price; Definitions.</u>

(a) *Adjustment of Repurchase Price.* In determining the applicable repurchase price of the Stock and Options, as provided for in Sections 4 and 5 above, appropriate equitable adjustments shall be made for any stock dividends, splits, combinations, recapitalizations or any other adjustment in the number of outstanding shares of Stock in order to maintain, as nearly as practicable, the intended operation of the provisions of Sections 4 and 5.

(b) *Definitions.* All capitalized terms used in this Agreement and not defined herein shall have such meaning as such terms are defined in the Option Plan. Terms used herein and as listed below shall be defined as follows:

"<u>Act</u>" shall have the meaning set forth in Section 2(a)(i) hereof.

"<u>Acquisition</u>" shall have the meaning set forth in the first recital.

"<u>Affiliate</u>" means, with respect to any Person, any entity directly or indirectly controlling, controlled by or under common control with such Person.

"<u>Agreement</u>" shall have the meaning set forth in the introductory paragraph.

"<u>Base Price</u>" shall have the meaning set forth in Section 1(a) hereof.

"<u>Board</u>" shall mean the Board of Directors of the Company.

"<u>Call Events</u>" shall mean, collectively, Section 5(a) Call Events, Section 5(b) Call Events and Section 5(c) Call Events.

"<u>Call Notice</u>" shall have the meaning set forth in Section 5(d) hereof.

"<u>Call Period</u>" shall have the meaning set forth in Section 5(d) hereof.

"<u>Cause</u>" shall mean "Cause" as such term may be defined in any employment or other severance agreement in effect at the time of termination between the Management Stockholder and the Company or any of its subsidiaries or Affiliates (or as previously in effect immediately prior to any expiration of such agreement due to a Company nonrenewal of the agreement term)(any such employment or severance agreement, an "<u>Employment Agreement</u>"), or, if there otherwise is no such agreement or such term is not defined therein, "Cause" shall mean (i) the Management Stockholder's willful and continued failure to perform his or her material duties with respect to the Company or its subsidiaries which continues beyond ten business days after a written demand for substantial performance is delivered to the Management Stockholder by the Company (the "<u>Cure Period</u>"); (ii) a willful and material breach of by the Management Stockholder of this Agreement or other agreements with the Company, if any, which continues beyond the Cure Period (to the extent that, in the Board's reasonable judgment, such breach can be cured); (iii) any act involving fraud or material dishonesty in connection with the business of the Company or any of its subsidiaries; (iv) a material violation of the Company's Code of Conduct; (v) attendance at work in a state of intoxication or otherwise being found in possession at his place of work of any prohibited drug or substance, possession of which constitute a criminal offense; (vi) assault or other act of violence; or (vii) conviction of, or a plea of *nolo contendere* to, any

10

felony whatsoever or any misdemeanor that would preclude employment under the Company's hiring policy.

"Change in Control" means, in one or a series of transactions, (i) the sale of all or substantially all of the assets of the Company (or of all of such of its operating Subsidiaries) to any Person (or Group of Persons acting in concert), other than to (x) the Investors or their Affiliates or (y) any employee benefit plan (or trust forming a part thereof) maintained by the Company or its Affiliates or other Person of which a majority of its voting power or other equity securities is owned, directly or indirectly, by the Company (any Person described in the foregoing clauses (x) or (y), an "Affiliated Person"); or (ii) a sale by the Company, the Investors or any of their respective Affiliates, to a Person (or Group of Persons acting in concert) of Common Stock, or a merger, consolidation or similar transaction involving the Company, in any case, that results in more than 50% of the Common Stock of the Company (or any resulting company after a merger) being held by a Person (or Group of Persons acting in concert) that does not include an Affiliated Person; in any event, which results in the Investors and their Affiliates or such employee benefit plan ceasing to hold the ability to elect a majority of the members of the Board.

"Closing Date" shall mean the date of closing of the Acquisition pursuant to the Stock Purchase Agreement.

"Common Stock" shall have the meaning set forth in the third recital.

"Company" shall have the meaning set forth in the introductory paragraph.

"Confidential Information" shall mean all non-public information concerning trade secret, know-how, software, developments, inventions, processes, technology, designs, the financial data, strategic business plans or any proprietary or confidential information, documents or materials in any form or media, including any of the foregoing relating to research, operations, finances, current and proposed products and services, vendors, customers, advertising and marketing, and other non-public, proprietary, and confidential information of the Restricted Group.

"Custody Agreement and Power of Attorney" shall have the meaning set forth in Section 8(e) hereof.

"DGCL" shall have the meaning set forth in Section 4(c) hereof.

"Event" shall have the meaning set forth in Section 4(c) hereof.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended (or any successor section thereto).

"Exercisable Option Shares" shall mean the shares of Common Stock that, at the time that any Redemption Notice or Repurchase Notice is delivered (as applicable), could be purchased by the Management Stockholder upon exercise of his or her outstanding and exercisable Options.

"Fair Market Value" shall mean, (i) prior to the date on which shares of Common Stock are traded on an exchange or in another public market, the fair market value of one share of Common Stock on any given date (without regard to discounts for minority status), as determined reasonably and in good faith by the Board, consistent with the determination of

11

an independent, third party appraisal of the fair market value of one share of Common Stock that shall be performed at least annually for the Board for purposes of, among other things, reporting such value to the Investors, but in all events satisfying Section 409A under the Internal Revenue Code of 1986, as amended, so that no Option shall constitute "deferral of compensation" thereunder, or (ii) after the date on which shares of Common Stock are traded on an exchange or in another public market, (A) the last sale price of a share of Common Stock on the Repurchase Calculation Date on the principal stock exchange on which the shares of Common Stock may at the time be listed or, (B) if there shall have been no sales on such exchange on the Repurchase Calculation Date, the average of the closing bid and asked prices on such exchange on the Repurchase Calculation Date or, (C) if there is no such bid and asked price on the Repurchase Calculation Date, on the next preceding date when such bid and asked price occurred or, (D) if shares of Common Stock shall not be so listed, the closing sale price as reported by NASDAQ for the last trading day immediately preceding the Repurchase Calculation Date in the over-the-counter market.

"Good Reason" shall have the meaning set forth in any Employment Agreement, if any.

"Group" shall mean "group," as such term is used for purposes of Section 13(d) or 14(d) of the Exchange Act.

"Investors" shall have the meaning set forth in the second recital.

"Liquidity" shall mean, with respect to each share of Common Stock held, directly or indirectly, by the Investors, (i) the achievement by the Investors of an internal rate of return (determined on a fully diluted basis, assuming inclusion of all Option Stock) of (A) on or prior to December 31, 2011, at least 25% or (B) after December 31, 2011, at least 20% and (ii) the Investors having earned a return of at least 3.0 times the effective per share purchase price paid by the Investors for the shares of Common Stock of the Company in connection with the Acquisition.

"Management Stockholder" shall have the meaning set forth in the introductory paragraph.

"Management Stockholder Entities" shall mean the Management Stockholder's Trust, the Management Stockholder and the Management Stockholder's Estate, collectively.

"Management Stockholder's Estate" shall mean the conservators, guardians, executors, administrators, testamentary trustees, legatees or beneficiaries of the Management Stockholder.

"Management Stockholder's Trust" shall mean a partnership, limited liability company, corporation, trust, private foundation or custodianship, the beneficiaries of which may include only the Management Stockholder, his or her spouse (or ex-spouse) or his or her lineal descendants (including adopted) or spouse (or ex-spouse) of such lineal descendants or, if at any time after any such transfer there shall be no then living spouse or lineal descendants, then to the ultimate beneficiaries of any such trust or to the estate of a deceased beneficiary.

"Options" shall have the meaning set forth in the fourth recital.

12

"Option Excess Price" shall mean the aggregate amount paid or payable by the Company in respect of Exercisable Option Shares, as determined pursuant to Section 4 or 5 hereof, as applicable.

"Option Exercise Price" shall mean the then-current exercise price of the shares of Common Stock covered by the applicable Option.

"Option Plan" shall have the meaning set forth in the fourth recital.

"Option Stock" shall have the meaning set forth in Section 2(a) hereof.

"Other Management Stockholders" shall have the meaning set forth in the fifth recital.

"Other Management Stockholders Agreements" shall have the meaning set forth in the fifth recital.

"Parties" shall have the meaning set forth in the introductory paragraph.

"Permanent Disability" shall mean "Disability" as such term is defined in any Employment Agreement, or, if there otherwise is no such Employment Agreement, shall mean "Disability" as defined in the Option Plan.

"Permitted Transfer" shall have the meaning set forth in Section 3(a).

"Person" shall mean "person," as such term is used for purposes of Section 13(d) or 14(d) of the Exchange Act.

"Piggyback Notice" shall have the meaning set forth in Section 8(b) hereof.

"Piggyback Registration Rights" shall have the meaning set forth in Section 8(a) hereof.

"Proposed Registration" shall have the meaning set forth in Section 8(b) hereof.

"Public Offering" shall mean the sale of shares of Common Stock to the public subsequent to the date hereof pursuant to a registration statement under the Act which has been declared effective by the SEC (other than a registration statement on Form S-4, S-8 or any other similar form).

"Put Period" shall have the meaning set forth in Section 4(a) hereof.

"Redemption Notice" shall have the meaning set forth in Section 4(c) hereof.

"Registration Rights Agreement" shall have the meaning set forth in Section 8(a) hereof.

"Qualified Public Offering" means an initial Public Offering and all subsequent Public Offerings after and pursuant to which the Investors have sold an aggregate of at least 35% of the shares of Common Stock held immediately after the Closing Date (taking into account any adjustment as a result of any stock dividend, split, reverse split, combination, recapitalization, liquidation, reclassification, merger, consolidation or otherwise), directly or indirectly, by the Investors.

13

"Repurchase Calculation Date" shall mean (i) prior to the occurrence of a Public Offering, the last day of the month preceding the month in which date of repurchase occurs, and (ii) on and after the occurrence of a Public Offering, the date immediately preceding the date of repurchase.

"Repurchase Notice" shall have the meaning set forth in Section 5(e) hereof.

"Repurchase Price" shall mean the amount to be paid in respect of the Stock and Options to be purchased by the Company pursuant to Section 4 and Section 5, as applicable.

"Request" shall have the meaning set forth in Section 8(b) hereof.

"Restricted Group" shall mean, collectively, the Company, its subsidiaries, the Investors and their respective Affiliates.

"Sale Participation Agreement" shall mean that certain sale participation agreement entered into by and between the Management Stockholder and the Investors dated as of the date hereof.

"SEC" shall mean the Securities and Exchange Commission.

"Stock" shall have the meaning set forth in Section 2(a) hereof.

"Stock Purchase Agreement" shall have the meaning set forth in the first recital.

"Stock Option Agreements" shall have the meaning set forth in the fourth recital.

"transfer" shall have the meaning set forth in Section 2(a) hereof.

7. The Company's Representations and Warranties and Covenants.

(a) The Company represents and warrants to the Management Stockholder that (i) this Agreement has been duly authorized, executed and delivered by the Company and is enforceable against the Company in accordance with its terms and (ii) the Option Stock, when issued and delivered in accordance with the terms hereof and the other agreements contemplated hereby, will be duly and validly issued, fully paid and nonassessable.

(b) If the Company becomes subject to the reporting requirements of Section 12 of the Exchange Act, the Company will file the reports required to be filed by it under the Act and the Exchange Act and the rules and regulations adopted by the SEC thereunder, to the extent required from time to time to enable the Management Stockholder to sell shares of Stock, subject to compliance with the provisions hereof without registration under the Exchange Act within the limitations of the exemptions provided by (A) Rule 144 under the Act, as such Rule may be amended from time to time, or (B) any similar rule or regulation hereafter adopted by the SEC. Notwithstanding anything contained in this Section 7(b), the Company may de-register under Section 12 of the Exchange Act if it is then permitted to do so pursuant to the Exchange Act and the rules and regulations thereunder and, in such circumstances, shall not be required hereby to file any reports which may be necessary in order for Rule 144 or any similar rule or regulation under the Act to be available. Nothing in this Section 7(b) shall be deemed to limit in any manner the restrictions on transfers of Stock contained in this Agreement.

14

(c) Upon an initial Public Offering, the Company will, as promptly as practicable, file a registration statement on Form S-8 under the Act pursuant to which all Option Stock will be registered and list the Option Stock for trading on the exchange on which shares of Common Stock are then listed.

8. "Piggyback" Registration Rights.

(a) The Management Stockholder hereby agrees to be bound by all of the terms, conditions and obligations of the piggyback registration rights contained in Section 2 of the Registration Rights Agreement (the "Registration Rights Agreement") entered into by and among the Company and investors party thereto (the "Piggyback Registration Rights"), as in effect on the date hereof (subject to any amendments thereto to which the Management Stockholder has agreed in writing to be bound), and, if any of the Investors are selling stock, shall have all of the rights and privileges of the Piggyback Registration Rights (including, without limitation, any rights to indemnification and/or contribution from the Company and/or the Investors), in each case as if the Management Stockholder were an original party (other than the Company) to the Registration Rights Agreement, subject to applicable and customary underwriter restrictions; provided, however, that at no time shall the Management Stockholder have any rights to request registration under Section 3(a) of the Registration Rights Agreement. All Stock purchased or held by the applicable Management Stockholder Entities pursuant to this Agreement shall be deemed to be "Registrable Securities" as defined in the Registration Rights Agreement.

(b) In the event of a sale of Common Stock by any of the Investors in accordance with the terms of the Registration Rights Agreement, the Company will promptly notify each Management Stockholder (a "Piggyback Notice") of any proposed registration (a "Proposed Registration"). If within five (5) days of the receipt by the Management Stockholder of such Piggyback Notice, the Company receives from the applicable Management Stockholder Entities of Management Stockholder a written request (a "Request") to register shares of Stock held by the applicable Management Stockholder Entities (which Request will be irrevocable unless otherwise mutually agreed to in writing by the Management Stockholder and the Company), shares of Stock will be so registered as provided in this Section 8; provided, however, that for each such registration statement only one Request, which shall be executed by the applicable Management Stockholder Entities, may be submitted for all Registrable Securities held by the applicable Management Stockholder Entities.

(c) The maximum number of shares of Stock which will be registered pursuant to a Request will be the number of shares of Stock then held by the Management Stockholder Entities, including all shares of Stock which the Management Stockholder Entities are then entitled to acquire under an unexercised Option to the extent then exercisable, multiplied by a fraction, the numerator of which is the aggregate number of shares of Stock being sold by holders of Registrable Securities and the denominator of which is the aggregate number of shares of Stock owned by the holders of Registrable Securities, as reduced pursuant to Section 2(b) or 3(b) of the Registration Rights Agreement, if applicable.

(d) Upon delivering a Request a Management Stockholder will, if requested by the Company, execute and deliver a custody agreement and power of attorney having customary terms and in form and substance reasonably satisfactory to the Company with respect to the shares of Stock to be registered pursuant to this Section 8 (a "Custody Agreement and Power of Attorney"). The Custody Agreement and Power of Attorney will

15

provide, among other things, that the Management Stockholder will deliver to and deposit in custody with the custodian and attorney-in-fact named therein a certificate or certificates (to the extent applicable) representing such shares of Stock (duly endorsed in blank by the registered owner or owners thereof or accompanied by duly executed stock powers in blank) and irrevocably appoint said custodian and attorney-in-fact as the Management Stockholder's agent and attorney-in-fact with full power and authority to act under the Custody Agreement and Power of Attorney on the Management Stockholder's behalf with respect to the matters specified therein, subject to the obligations of the Investors and the Company to the Management Stockholder under this Agreement.

(e) The Management Stockholder agrees that he will execute such other agreements as the Company may reasonably request to further evidence the provisions of this Section 8, including reasonable and customary lock-up agreements.

(f) This Section 8 will terminate upon the occurrence of a Change in Control.

9. <u>Rights to Negotiate Repurchase Price</u>. Nothing in this Agreement shall be deemed to restrict or prohibit the Company from purchasing, redeeming or otherwise acquiring for value shares of Stock or Options from the Management Stockholder, at any time, upon such terms and conditions, and for such price, as may be mutually agreed upon in writing between the Parties, whether or not at the time of such purchase, redemption or acquisition circumstances exist which specifically grant the Company the right to purchase, or the Management Stockholder the right to sell, shares of Stock or any Options under the terms of this Agreement; <u>provided</u> that no such purchase, redemption or acquisition shall be consummated, and no agreement with respect to any such purchase, redemption or acquisition shall be entered into, without the prior approval of the Board.

10. <u>Covenant Regarding 83(b) Election</u>. Except as the Company may otherwise agree in writing, the Management Stockholder hereby covenants and agrees that the Management Stockholder will make an election provided pursuant to Treasury Regulation Section 1.83-2 in the form attached as Schedule II hereto with respect to the Option Stock acquired on exercise of any Options and any other Stock acquired by the Management Stockholder; and the Management Stockholder further covenants and agrees that he or she will furnish the Company with copies of the forms of election the Management Stockholder files within thirty (30) days after each exercise of the Management Stockholder's Options and, as applicable, the date of any other acquisition of Stock, with evidence that each such election has been filed in a timely manner.

11. <u>Notice of Change of Beneficiary</u>. Immediately prior to any transfer of Stock to a Management Stockholder's Trust, the Management Stockholder shall provide the Company with a copy of the instruments creating the Management Stockholder's Trust and with the identity of the beneficiaries of the Management Stockholder's Trust. The Management Stockholder shall notify the Company as soon as practicable prior to any change in the identity of any beneficiary of the Management Stockholder's Trust.

12. <u>Recapitalizations, etc.</u> The provisions of this Agreement shall apply, to the full extent set forth herein with respect to the Stock or the Options, to any and all shares of capital stock of the Company or any capital stock, partnership units or any other security evidencing ownership interests in any successor or assign of the Company (whether by merger, consolidation, sale of assets or otherwise) which may be issued in respect of, in exchange for, or substitution of the Stock or the Options by reason of any stock dividend,

16

split, reverse split, combination, recapitalization, liquidation, reclassification, merger, consolidation or otherwise.

13. <u>Management Stockholder's Employment by the Company</u>. Nothing contained in this Agreement (i) obligates the Company or any subsidiary or Affiliate of the Company to employ the Management Stockholder in any capacity whatsoever or (ii) prohibits or restricts the Company (or any such subsidiary or Affiliate) from terminating the employment of the Management Stockholder at any time or for any reason whatsoever, with or without Cause, and the Management Stockholder hereby acknowledges and agrees that neither the Company nor any other Person has made any representations or promises whatsoever to the Management Stockholder concerning the Management Stockholder's employment or continued employment by the Company or any subsidiary or Affiliate of the Company.

14. <u>Binding Effect</u>. The provisions of this Agreement shall be binding upon and accrue to the benefit of the parties hereto and their respective heirs, legal representatives, successors and assigns. In the case of a transferee permitted under Section 2(a) or Section 3(a) (other than clauses (iii) or (iv) thereof) hereof, such transferee shall be deemed the Management Stockholder hereunder; <u>provided</u>, <u>however</u>, that no transferee (including without limitation, transferees referred to in Section 2(a) or Section 3(a) hereof) shall derive any rights under this Agreement unless and until such transferee has delivered to the Company a valid undertaking and becomes bound by the terms of this Agreement. No provision of this Agreement is intended to or shall confer upon any Person other than the Parties any rights or remedies hereunder or with respect hereto.

15. <u>Amendment</u>. This Agreement may be amended by the Company at any time upon notice to the Management Stockholder thereof; <u>provided</u> that any amendment (i) that disadvantages the Management Stockholder in any respect (other than in a de minimis manner) shall not be effective unless and until the Management Stockholder has consented thereto in writing and (ii) that disadvantages a class of stockholders in more than a de minimis way but less than a material way shall require the consent of a majority of the equity interests held by such affected class of stockholders.

16. <u>Closing</u>. Except as otherwise provided herein, the closing of each purchase and sale of shares of Stock pursuant to this Agreement shall take place at the principal office of the Company on the tenth business day following delivery of the notice by either Party to the other of its exercise of the right to purchase or sell such Stock hereunder.

17. <u>Applicable Law; Jurisdiction; Arbitration; Legal Fees</u>.

(a) The laws of the State of Delaware applicable to contracts executed and to be performed entirely in such state shall govern the interpretation, validity and performance of the terms of this Agreement.

(b) In the event of any controversy among the parties hereto arising out of, or relating to, this Agreement which cannot be settled amicably by the parties, such controversy shall be finally, exclusively and conclusively settled by mandatory arbitration conducted expeditiously in accordance with the American Arbitration Association rules by a single independent arbitrator. Such arbitration process shall take place in New York, New York. The Company shall pay all fees and costs of such arbitration. The decision of the arbitrator shall be final and binding upon all parties hereto and shall be rendered pursuant to a written

17

decision, which contains a detailed recital of the arbitrator's reasoning, subject to enforcement of the arbitration award hereunder or for vacation or modification thereof as provided under the Federal Arbitration Act, Title 9 U.S. Code Chapter 1. Judgment upon the award rendered may be entered in any court having jurisdiction thereof.

(c) Notwithstanding the foregoing, the Management Stockholder acknowledges and agrees that the Company, its subsidiaries, the Investors and any of their respective Affiliates shall be entitled to injunctive or other relief in order to enforce the covenant not to compete, covenant not to solicit and/or confidentiality covenants as set forth in Section 22(a) of this Agreement.

(d) In the event of any arbitration or other disputes with regard to this Agreement or any other document or agreement referred to herein, each Party shall pay its own legal fees and expenses, unless otherwise determined by the arbitrator.

18. <u>Assignability of Certain Rights by the Company</u>. The Company shall have the right to assign any or all of its rights or obligations to purchase shares of Stock pursuant to Sections 4 and 5 hereof.

19. <u>Miscellaneous</u>.

(a) In this Agreement all references to "dollars" or "$" are to United States dollars and the masculine pronoun shall include the feminine and neuter, and the singular the plural, where the context so indicates.

(b) If any provision of this Agreement shall be declared illegal, void or unenforceable by any court of competent jurisdiction, the other provisions shall not be affected, but shall remain in full force and effect.

20. <u>Withholding</u>. The Company or its subsidiaries shall have the right to deduct from any cash payment made under this Agreement to the applicable Management Stockholder Entities any federal, state or local income or other taxes required by law to be withheld with respect to such payment, if applicable.

21. <u>Notices</u>. All notices and other communications provided for herein shall be in writing. Any notice or other communication hereunder shall be deemed duly given (i) upon electronic confirmation of facsimile, (ii) one business day following the date sent when sent by overnight delivery and (iii) five (5) business days following the date mailed when mailed by registered or certified mail return receipt requested and postage prepaid, in each case as follows:

(a) If to the Company, to it at the following address:

USF Holding Corp.
c/o U.S. Foodservice, Inc.
9755 Patuxent Woods Drive
Columbia, Maryland 21046
Attention: David Eberhardt
Fax: (410) 309-6465

with a copy (which shall not constitute notice) to:

18

Kohlberg Kravis Roberts & Co. L.P.
2800 Sand Hill Road, Suite 94025
Menlo Park, California 94025
Attention: Michael Calbert
Fax: (650) 233-6548

and

Clayton, Dubilier & Rice, Inc.
375 Park Avenue
18th Floor
New York, New York 10152
Attention: Richard J. Schnall
Fax: (212) 407-5252

with a copy (which shall not constitute notice) to:

Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, New York 10017
Attention: Marni Lerner, Esq.
Fax: (212) 455-2502

and

Debevoise & Plimpton LLP
919 Third Avenue
New York, New York 10022
Attention: Franci J. Blassberg, Esq.
Fax: (212) 909-7531

(b) If to the Management Stockholder, to the Management Stockholder at the address set forth below under the Management Stockholder's signature; or at such other address as either party shall have specified by notice in writing to the other.

22. Covenant Not to Disclose Confidential Information and Other Restrictive Covenants.

(a) In consideration of, and as a condition to, the Company entering into this Agreement and the Stock Option Agreement with the Management Stockholder, the Management Stockholder hereby agrees that, effective as of the date of this Agreement, the Management Stockholder shall execute a Non-Disclosure and Non-Solicitation Agreement with the Company and its subsidiaries, in a form to be provided by the Company (the "Restrictive Covenant Agreement"), and all provisions contained in the Restrictive Covenant Agreement shall be and are hereby incorporated by reference herein and made a part of this Agreement; provided, however, that if the Management Stockholder has entered into an Employment Agreement, any covenants not to compete, not to solicit customers, clients, or employees, and/or not to disclose confidential information, and any other similar restrictive covenants contained therein, shall be and are hereby incorporated by reference herein and made a part of this Agreement, such that the Management Stockholder shall not be required to execute a Restrictive Covenant Agreement.

19

(b) Notwithstanding clause (a) above, if at any time a court holds that the restrictions incorporated by reference into such clause (a) are unreasonable or otherwise unenforceable under circumstances then existing, the parties hereto agree that the maximum period, scope or geographic area determined to be reasonable under such circumstances by such court will be substituted for the stated period, scope or area. Because the Management Stockholder's services are unique and because the Management Stockholder has had access to Confidential Information, the parties hereto agree that money damages will be an inadequate remedy for any breach of this Agreement. In the event of a breach or threatened breach of this Agreement (including the provisions incorporated into Section 22(a) from any Employment Agreement or Restrictive Covenant Agreement), the Company or its successors or assigns may, in addition to other rights and remedies existing in their favor, apply to any court of competent jurisdiction for specific performance and/or injunctive relief in order to enforce, or prevent any violations of, the provisions hereof (without the posting of a bond or other security).

(c) In the event that the Management Stockholder breaches any of the provisions of Section 22(a) (including those provisions incorporated by reference therein from any Employment Agreement or Restrictive Covenant Agreement), in addition to all other remedies that may be available to the Company, the Management Stockholder shall be required to pay to the Company any amounts actually paid to him or her by the Company in respect of any repurchase by the Company of any Options or Stock held by such Management Stockholder; provided that (x) with respect to Option Stock, the Management Stockholder shall be required to pay to the Company only such amounts, if any, that the Management Stockholder received in excess of the exercise price paid by the Management Stockholder in acquiring such Option Stock, on a net after-tax basis, and (y) with respect to any other Stock acquired by the Management Stockholder, the Management Stockholder shall be required to pay to the Company only such amounts, if any, that the Management Stockholder received in excess of the price paid by the Management Stockholder in acquiring such Stock, on a net after-tax basis.

*[Signatures on next page.]*

20

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

USF HOLDING CORP.

By: _____

Name: **David B. Eberhardt**
Title: **Executive Vice President, General Counsel & Secretary**


MANAGEMENT STOCKHOLDER


_____

Name:
Address:


[Signature Page to Management Stockholder's Agreement]

051200-0523-10862-NY03 2612799 6

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

USF HOLDING CORP.

By: _____

Name:

Title:

MANAGEMENT STOCKHOLDER

_____

Name: Phillip G. Roszak

Address:

**<u>Schedule I</u>**

Management Stockholder: Phillip G. Roszak

<u>OPTIONS</u>

Number of shares of Common Stock underlying Options: **<u>20,000</u>**

Schedule II

## SECTION 83(b) ELECTION FORM

_____, 2007

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Internal Revenue Service Center

_____
_____

Re:  Election Under §83(b) of the Internal Revenue Code

Dear Sir:

The undersigned hereby elects under Section 83(b) of the Internal Revenue Code to include in the taxpayer's gross income for the taxable year in which the property described below was transferred, the excess (if any), of the fair market value of such property at the time of its transfer, over the amount (if any) paid for such property.  Pursuant to Treas. Reg. § 1.83-2(e) the following information is submitted:

1.      Name of taxpayer:                    _____

         Address of taxpayer:               _____

                                                         _____

         Taxpayer's Identification Number:    _____

2.      Property with respect to which the election is being made: _____ shares of common stock of USF Holding Corp. ("USF").

3.      Date transferred:

4.      Taxable year for which this election is being made:  Calendar year 2007.

5.      Nature of the restriction or restrictions to which the property is subject:

         While the shares described in Paragraph 2 are held by the undersigned, such shares shall be subject to restrictions on transfer and to the right of USF to repurchase such shares at an agreed upon price, which price may be lower than the fair market value of the shares upon certain types of terminations of the undersigned's employment with USF or any of its subsidiaries (including US Foodservice), which transfer restrictions and right of repurchase shall lapse upon the later to occur of certain events.

6.      Fair market value of the property at the time of transfer: $_____ per share.

7.      Amount paid for the property: $_____ per share.

8.      A copy of this election has been furnished to Dave Essler at US Foodservice.

                              Very truly yours,

                              _____
                              (Signature of Taxpayer)



## SALE PARTICIPATION AGREEMENT

October 19, 2007

To: The Person whose name is
set forth on the signature page hereof

Dear Sir or Madam:

You have entered into a Management Stockholder's Agreement, dated as of the date hereof, between USF Holding Corp., a Delaware corporation (the "Company"), and you (the "Stockholder's Agreement") relating to (i) the purchase by you of the Purchased Stock (as defined in the Stockholder's Agreement) and/or (ii) the grant by the Company to you of Options (as defined in the Stockholder's Agreement) to purchase shares of common stock, par value $0.01 per share, of the Company (the "Common Stock"). The undersigned, Clayton, Dubilier & Rice Fund VII, L.P., Clayton, Dubilier & Rice Fund VII (Co-Investment), L.P., CD&R Parallel Fund VII, L.P., CDR USF Co-Investor L.P. and CDR USF Co-Investor No. 2, L.P. (collectively, the "CD&R Investors") and KKR 2006 Fund L.P., KKR PEI Investments, L.P., KKR Partners III, L.P. and OPERF Co-Investment LLC (collectively, the "KKR Investors" and together with the CD&R Investors, each an "Investor" and together the "Investors"), hereby agrees with you as follows, effective as of the Effective Date (as defined in the Stockholder's Agreement):

1. (a) In the event that at any time on or after the Effective Date any of the Investors or their Affiliates (as defined in the Stockholder's Agreement) (the "Selling Investors") proposes to sell for cash or any other consideration any shares of Common Stock owned by the Selling Investors, in any transaction other than a Public Offering (as defined in the Stockholder's Agreement) or a sale, directly or indirectly, to a Permitted Transferee (as defined in the Investor Stockholder's Agreement as defined below)) of a Selling Investor, then, unless the Selling Investors exercise the drag-along rights pursuant to paragraph 7 below and the Drag Transaction is consummated, the Selling Investors will notify you or your Management Stockholder's Estate or Management Stockholder's Trust (as such terms are defined in the Stockholder's Agreement, and collectively with you, the "Management Stockholder Entities"), as the case may be, promptly, and in any event not less than 10 business days prior to the consummation of the Proposed Sale, in writing (a "Notice") of such proposed sale (a "Proposed Sale") specifying the principal terms and conditions of the Proposed Sale (the "Material Terms").

(b) If, within 10 business days after the delivery of Notice under Section 1(a) the Selling Investors are given written notice from a Management Stockholder Entity requesting (a "Request") to include Common Stock held by such Management Stockholder Entity in the Proposed Sale (which Request shall be irrevocable except as otherwise mutually agreed to in writing by such Management Stockholder Entity and the Selling Investors), the Common Stock held by such Management Stockholder Entity (not in any event to exceed the total number of shares of Common Stock permitted to be included in a Proposed Sale pursuant to Section 2) will be so included as provided herein. Promptly after the execution of the Sale Agreement, the

Selling Investors will furnish each such Management Stockholder Entity with a copy of the Sale Agreement, if any.

2. (a) The number of shares of Common Stock that a Management Stockholder Entity will be permitted to include in a Proposed Sale pursuant to a Request will be the product of (i) the sum of the number of shares of Common Stock held by such Management Stockholder Entity plus all shares of Common Stock which such Management Stockholder Entity is then entitled to acquire under any unexercised Option or portion thereof, to the extent such Option (or portion thereof) is then exercisable or would become exercisable as a result of the consummation of the Proposed Sale, multiplied by (ii) a fraction (such fraction, expressed as a percentage, the "Tag-Along Sale Percentage") (A) the numerator of which is the number of shares of Common Stock proposed to be purchased by the buyer in the Proposed Sale and (B) the denominator of which is the total number of shares of Common Stock owned, directly or indirectly, or which would be owned upon exercise of any exercisable Options (to the extent any such Options are then exercisable or would become exercisable as a result of the consummation of the Proposed Sale), by the Investors, the Management Stockholder Entities and other holders of shares of Common Stock who have been granted the same rights granted to the Management Stockholder Entities to participate in the Proposed Sale (such other holders, together with the Management Stockholder Entities, the "Eligible Holders").

(b) If one or more Eligible Holders elect not to include the maximum number of shares of Common Stock which such holders would have been permitted to include in a Proposed Sale pursuant to Paragraph 2(a) (such non-included shares, the "Eligible Shares"), then each of the Selling Investors, or the remaining Eligible Holders, or any of them, will have the right to sell in the Proposed Sale a number of additional shares of their Common Stock equal to their pro rata portion of the number of Eligible Shares, based on the relative number of shares of Common Stock then held by each such holder plus all shares of Common Stock which such holder is then entitled to acquire under any unexercised Option or portion thereof, to the extent such Option (or portion thereof) is then exercisable or would become exercisable as a result of the consummation of the Proposed Sale. The Selling Investors, or any of them, will have the right to sell in the Proposed Sale additional shares of Common Stock owned by them equal to the number, if any, of remaining Eligible Shares which will not be included in the Proposed Sale pursuant to the foregoing.

3. Except as may otherwise be provided herein, shares of Common Stock subject to a Request will be included in a Proposed Sale pursuant hereto and in any agreements with purchasers relating thereto on the same terms and subject to the same conditions applicable to the shares of Common Stock which the Selling Investors propose to sell in the Proposed Sale. Such terms and conditions shall include, without limitation: the pro rata reduction of the number of shares of Common Stock to be sold by the Selling Investors, the Management Stockholder Entities and any Eligible Holders to be included in the Proposed Sale if required by the party proposing such Sale; the sale price; the payment of fees, commissions and expenses (which shall not include any such amounts as may be payable by the selling stockholders to an Investor or an Affiliate of an Investor); the provision of, and representation and warranty as to, information reasonably requested by the Selling Investors covering matters regarding the Management Stockholder Entities' ownership of shares; and the provision of requisite indemnification; provided that any indemnification provided by the Management Stockholder Entities shall be pro

rata in proportion with the number of shares of Common Stock to be sold and liability thereunder shall be limited to the after-tax proceeds received by such Management Stockholder Entity for such Common Stock to be sold. Notwithstanding anything to the contrary in the foregoing, if the consideration payable for shares of Common Stock is securities and the acquisition of such securities by a Management Stockholder Entity would reasonably be expected to be prohibited under U.S., foreign or state securities laws, such Management Stockholder Entity shall be entitled to receive an amount in cash equal to the value of any such securities such Person would otherwise be entitled to receive.

4. Upon delivering a Request, the Management Stockholder Entities will, if requested by the Selling Investors, execute and deliver a custody agreement and power of attorney in form and substance reasonably satisfactory to the Selling Investors and the Designated Employee Representative (as defined below) with respect to the shares of Common Stock which are to be sold by the Management Stockholder Entities pursuant hereto (a "Custody Agreement and Power of Attorney"). The Custody Agreement and Power of Attorney will contain customary provisions and will provide, among other things, that the Management Stockholder Entities will deliver to and deposit in custody with the custodian and attorney-in-fact named therein a certificate or certificates (if such shares are certificated) representing such shares of Common Stock (duly endorsed in blank by the registered owner or owners thereof) and irrevocably appoint said custodian and attorney-in-fact as the Management Stockholder Entities' agent and attorney-in-fact with full power and authority to act under the Custody Agreement and Power of Attorney on the Management Stockholder Entities' behalf with respect to the matters specified therein, subject to the obligations of Investors and the Company under this Sale Participation Agreement. For purposes hereof, the term "Designated Employee Representative" means: Robert Aiken, provided that he is the Chief Executive Officer of the Company at the relevant time (or his or her designee); and if Robert Aiken is not such Chief Executive Officer, then the Management Stockholder or Other Management Stockholder (as defined in the Stockholder's Agreement), as applicable, whose Management Stockholder Entities hold the largest number of shares of Common Stock, relative to all Other Management Stockholders .

5. The Management Stockholder Entities' right pursuant hereto to participate in a Proposed Sale shall be contingent on the Management Stockholder Entities' strict compliance with each of the provisions hereof and the Management Stockholder Entities' respective willingness to execute such documents in connection therewith as may be reasonably requested by the Selling Investors.

6. If the consideration to be paid in exchange for shares of Common Stock in a Proposed Sale pursuant to Section 1 includes any securities, and the receipt thereof by the Selling Investors and a Management Shareholder Entity would require under applicable law (a) the registration or qualification of such securities or of any Person as a broker or dealer or agent with respect to such securities or (b) the provision to any selling Management Shareholder Entity of any information regarding the Company, its subsidiaries, such securities or the issuer thereof that would not be required to be delivered in an offering solely to a limited number of "accredited investors" under Regulation D promulgated under the Securities Act of 1933, as amended, and the rules and regulations in effect thereunder, the Selling Stockholders shall have the right to cause to be paid to such selling Management Shareholder Entity in lieu thereof, against surrender of the shares of Common Stock which would have otherwise been sold by such selling

Management Shareholder Entity to the prospective buyer in the proposed sale, an amount in cash equal to the Fair Market Value (as defined in the Stockholder's Agreement) of such shares of Common Stock as of the date such securities would have been issued in exchange for such shares of Common Stock.

7.    (a)    If an Investor or group of Investors (including any Investors selling shares of Common Stock as a result of the exercise by another Investor of the rights set forth in Section 3.5 of the Stockholder's Agreement, dated July 3, 2007, between the Company and the Investors (the "Investor Stockholder's Agreement") (the "Initiating Investors") proposes to transfer, directly or indirectly, a number of shares of Common Stock to a non-Affiliate of the Initiating Investors (such Person, the "Drag-Along Purchaser"), such that the transaction (a "Drag Transaction") would result in a Change of Control (taking into account all interests (including pursuant to this Section 7(a) and Section 3.5 of the Investor Stockholder's Agreement) being "dragged"), then if requested by the Initiating Investors, each Management Stockholder Entity shall be required to sell a number of shares of Common Stock equal to the aggregate number of shares of Common Stock held by such Management Stockholder Entity plus all shares of Common Stock which such Management Stockholder Entity is then entitled to acquire under any unexercised Option or portion thereof, to the extent such Option (or portion thereof) is then exercisable or would become exercisable as a result of the consummation of the Drag Transaction, multiplied by the Tag-Along Sale Percentage.

(b)    Shares of Common Stock held by the Management Stockholder Entities included in a Drag Transaction will be included in any agreements with the Drag-Along Purchaser relating thereto on the same terms and subject to the same conditions applicable to the shares of Common Stock which the Initiating Investors propose to sell in the Drag Transaction. Such terms and conditions shall include, without limitation: the pro rata reduction of the number of shares of Common Stock to be sold by the Initiating Investors and the Management Stockholder Entities to be included in the Drag Transaction if required by the Drag-Along Purchaser; the sale price; the payment of fees, commissions and expenses (which shall not include any such amounts as may be payable by the selling stockholders to an Investor or an Affiliate of an Investor); the provision of, and representation and warranty as to, information reasonably requested by Parent covering matters regarding the Management Stockholder Entities' ownership of shares; and the provision of requisite indemnification; provided that any indemnification provided by the Management Stockholder Entities shall be pro rata in proportion with the number of shares of Common Stock to be sold and liability thereunder shall be limited to the after-tax proceeds received by such Management Stockholder Entity for such Common Stock to be sold.

(c)    Your pro rata share of any amount to be paid pursuant to Paragraph 3 or 7(b) shall be based upon the number of shares of Common Stock intended to be transferred by the Management Stockholder Entities plus the number of shares of Common Stock you would have the right to acquire under any unexercised portion of the Option which is then vested or would become vested as a result of the Proposed Sale or Drag Transaction, assuming that you receive a payment in respect of such Option.

(d)    Notwithstanding anything to the contrary in the foregoing, if the consideration payable for shares of Common Stock is securities and the acquisition of such

securities by a Management Stockholder Entity would reasonably be expected to be prohibited under U.S., foreign or state securities laws, such Management Stockholder Entity shall be entitled to receive an amount in cash equal to the value of any such securities such Person would otherwise be entitled to receive.

8.   The obligations of the Investors hereunder shall extend only to you and your transferees ("Permitted Transferees") who (a) are Other Management Stockholders (as defined in the Stockholder's Agreement), (b) are party to a Management Stockholder's Agreement with the Company and (c) have acquired Common Stock pursuant to a Permitted Transfer (as defined in the Stockholder's Agreement), and none of the Management Stockholder Entities' successors or assigns, with the exception of any Permitted Transferee and only with respect to the Common Stock acquired by such Permitted Transferee pursuant to a Permitted Transfer, shall have any rights pursuant hereto.

9.   This Agreement shall terminate and be of no further force and effect on the occurrence of the earlier of the consummation of a Qualified Public Offering (as defined in the Stockholder's Agreement) or a Change in Control (as defined in the Stockholder's Agreement).

10.  All notices and other communications required or permitted hereunder shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by confirmed facsimile if sent during normal business hours of the recipient, if not, then on the next business day, provided that a copy of such notice is also sent via nationally recognized overnight courier, specifying next day delivery, with written verification of receipt, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid or (d) one (1) business day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt.  All communications shall be sent to such party's address as set forth below or at such other address or to such other person as the party shall have furnished to each other party in writing in accordance with this provision:

　　　　If to the Company, to:

　　　　USF Holding Corp.
　　　　c/o U.S. Foodservice, Inc.
　　　　9755 Patuxent Woods Drive
　　　　Columbia, Maryland  21046
　　　　Attention: David Eberhardt
　　　　Facsimile: (410) 309-6465

　　　　with a copy (which shall not constitute notice) to:

　　　　Kohlberg Kravis Roberts & Co. L.P.
　　　　2800 Sand Hill Road, Suite 94025
　　　　Menlo Park, California  94025
　　　　Attention:  Michael Calbert
　　　　Fax: (650) 233-6548

　　　　and

Clayton, Dubilier & Rice, Inc.
375 Park Avenue
18th Floor
New York, New York 10152
Attention: Richard J. Schnall
Fax: (212) 407-5252

with a copy (which shall not constitute notice) to:

Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, New York 10017
Attention: Marni Lerner, Esq.
Fax: (212) 455-2502

and

Debevoise & Plimpton LLP
919 Third Avenue
New York, New York 10022
Attention: Franci J. Blassberg, Esq.
Fax: (212) 909-7531

if to a KKR Investor, to:

Kohlberg Kravis Roberts & Co. L.P.
2800 Sand Hill Road, Suite 94025
Menlo Park, California 94025
Attention: Michael Calbert
Fax: (650) 233-6548

with a copy (which shall not constitute notice) to:

Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, New York 10017
Attention: Marni Lerner, Esq.
Fax: (212) 455-2502

if to a CD&R Investor, to:

Clayton, Dubilier & Rice, Inc.
375 Park Avenue
18th Floor
New York, New York 10152
Attention: Richard J. Schnall
Fax: (212) 407-5252

with a copy (which shall not constitute notice) to:

Debevoise & Plimpton LLP
919 Third Avenue
New York, New York 10022
Attention: Franci J. Blassberg, Esq.
Fax: (212) 909-7531

If to you, to you at the address set forth in the Management Stockholder's Agreement to which you are a party.

If to your Management Stockholder's Estate or Management Stockholder's Trust, to the address provided to the Company by such entity.

11. The laws of the State of Delaware shall govern the interpretation, validity and performance of the terms of this Agreement. In the event of any controversy among the parties hereto arising out of, or relating to, this Agreement which cannot be settled amicably by the parties, such controversy shall be finally, exclusively and conclusively settled by mandatory arbitration conducted expeditiously in accordance with the American Arbitration Association rules, by a single independent arbitrator. Such arbitration process shall take place in New York, New York. The decision of the arbitrator shall be final and binding upon all parties hereto and shall be rendered pursuant to a written decision, which contains a detailed recital of the arbitrator's reasoning. Judgment upon the award rendered may be entered in any court having jurisdiction thereof. The Company shall pay all fees and costs of such arbitration; provided, each party shall bear its own legal fees and expenses, unless otherwise determined by the arbitrator. Each party hereto hereby irrevocably waives any right that it may have had to bring an action in any court, domestic or foreign, or before any similar domestic or foreign authority with respect to this Agreement, except for enforcement of the arbitration award hereunder or for vacation or modification thereof as provided under the Federal Arbitration Act, Title 9 U.S. Code Chapter 1.

12. This Agreement may be executed in counterparts, and by different parties on separate counterparts, each of which shall be deemed an original, but all such counterparts shall together constitute one and the same instrument.

13. It is the understanding of the undersigned that you are aware that no Proposed Sale is contemplated and that such a sale may never occur.

14. This Agreement may be amended by the Company and the Investors at any time upon notice to the Management Stockholder thereof; provided that any amendment (i) that materially disadvantages the Management Stockholder shall not be effective unless and until the Management Stockholder has consented thereto in writing and (ii) that disadvantages a class of stockholders in more than a de minimis way but less than a material way shall require the consent of a majority of the equity interests held by such affected class of stockholders.

15. Capitalized terms used by not defined herein shall have the meaning ascribed to such terms in the Stockholder's Agreement.

8

*[Signatures on next page]*

If the foregoing accurately sets forth our agreement, please acknowledge your acceptance thereof in the space provided below for that purpose.

Very truly yours,

USF HOLDING CORP.

By: _____
    Name:  David B. Eberhardt
    Title: Executive Vice President, General
           Counsel & Secretary

U.S. FOODSERVICE, INC.

By: _____
    Name:  David B. Eberhardt
    Title: Executive Vice President, General
           Counsel & Secretary

KKR 2006 FUND, L.P.

By:  KKR Associates 2006 L.P.,
     its General Partner

By:  KKR 2006 GP LLC,
     its General Partner

By: _____
    Name:
    Title:

[Signature Page to Sale Participation Agreement]

If the foregoing accurately sets forth our agreement, please acknowledge your acceptance thereof in the space provided below for that purpose.

Very truly yours,

USF HOLDING CORP.

By: _____
      Name:
      Title:

U.S. FOODSERVICE, INC.

By: _____
      Name:
      Title:

KKR 2006 FUND, L.P.

By:    KKR Associates 2006 L.P.,
       its General Partner

By:    KKR 2006 GP LLC,
       its General Partner

By:
      Name: William J. Janetschek
      Title: Director

[Signature Page to Sale Participation Agreement]

KKR PEI INVESTMENTS, L.P.

By:   KKR PEI Associates, L.P.,
       its General Partner

By:   KKR PEI GP Limited, the General Partner
       of KKR PEI Associates, L.P.

By: _____
      Name: William J. Janetschek
      Title: Director


KKR PARTNERS III, L.P.

By:   KKR III GP LLC,
       its General Partner

By: _____
      Name: William J. Janetschek
      Title: Director


OPERF CO-INVESTMENT LLC

By:   KKR Associates 2006 L.P.,
       its Manager

By:   KKR 2006 GP LLC,
       its General Partner

By: _____
      Name: William J. Janetschek
      Title: Director


[Signature Page to Sale Participation Agreement]

CLAYTON, DUBILIER & RICE
FUND VII, L.P.

By:  CD&R Associates VII, Ltd.,
     its General Partner

By: _____

     Name: Nate Sleeper
     Title: Partner


CLAYTON, DUBILIER & RICE FUND VII
(CO-INVESTMENT), L.P.

By:  CD&R Associates VII (Co-Investment),
     Ltd., its          General Partner

By: _____

     Name: Nate Sleeper
     Title: Partner


CD&R PARALLEL FUND VII, L.P.

By:  CD&R Parallel Fund Associates VII, Ltd.,
     its          General Partner

By: _____

     Name: Nate Sleeper
     Title: Partner


CDR USF CO-INVESTOR L.P.

By:  CDR USF Co-Investor GP Limited,
     its General Partner

By: _____

     Name: Nate Sleeper
     Title: Partner


[Signature Page to Sale Participation Agreement]

CDR USF CO-INVESTOR NO. 2, L.P.

By:   CDR USF Co-Investor GP No. 2 Limited,
      its General Partner

By: _____
    Name: Nate Sleeper
    Title: Partner

Accepted and agreed this      day of
October 2007.

_____
Name:

[Signature Page to Sale Participation Agreement]

By:   CDR USF Co-Investor GP No. 2 Limited,
        its General Partner

By: _____
     Name:
     Title:

Accepted and agreed this 19th day of
October 2007.


_____
Name: Phillip G. Roszak

## STOCK OPTION AGREEMENT

THIS AGREEMENT, dated as of October 19, 2007 (the "Grant Date") is made by and between USF Holding Corp., a Delaware corporation (hereinafter referred to as the "Company"), and the individual whose name is set forth on the signature page hereof, who is an employee of the Company or a Subsidiary or Affiliate of the Company, hereinafter referred to as the "Optionee". Any capitalized terms herein not otherwise defined in Article I shall have the meaning set forth in the 2007 Stock Incentive Plan for Key Employees of USF Holding Corp. and its Affiliates (the "Plan").

WHEREAS, the Company wishes to carry out the Plan, the terms of which are hereby incorporated by reference and made a part of this Agreement; and

WHEREAS, the Compensation Committee of the Board of the Company (or, if no such committee is appointed, the Board) (the "Committee") has determined that it would be to the advantage and best interest of the Company and its shareholders to grant the Option provided for herein to the Optionee as an incentive for increased efforts during his term of office with the Company or its Subsidiaries or Affiliates, and has advised the Company thereof and instructed the undersigned officers to issue said Option;

NOW, THEREFORE, in consideration of the mutual covenants herein contained and other good and valuable consideration, receipt of which is hereby acknowledged, the parties hereto do hereby agree as follows:

## ARTICLE I

## DEFINITIONS

Whenever the following terms are used in this Agreement, they shall have the meaning specified below unless the context clearly indicates to the contrary.

Section 1.1.  Aggregate Investment

"Aggregate Investment" shall mean the total amount of all equity securities of the Company held by the Investors, directly and indirectly (taking into account any adjustment as a result of any stock dividend, split, reverse split, combination, recapitalization, liquidation, reclassification, merger, consolidation or otherwise).

Section 1.2.  Base Price

"Base Price" shall mean the effective per share price paid by the Investors in the Merger (e.g. $5.00, as adjusted).

Section 1.3.  Cause

"Cause" shall mean "Cause" as such term may be defined in any employment agreement or other severance agreement in effect at the time of termination of employment (or as previously in effect immediately prior to any expiration of such agreement due to a Company nonrenewal of the agreement term) between the Optionee and the Company or any of its Subsidiaries or Affiliates, or, if there is no such employment or severance agreement, "Cause" shall mean, with respect to an Optionee: (i) willful and continued failure to perform his or her material duties with respect to the Company or it

subsidiaries which continues beyond ten business days after a written demand for substantial performance is delivered to the Optionee by the Company (the "Cure Period"); (ii) a willful and material breach of the Optionee's Management Stockholder's Agreement or other agreements, if any, which continues beyond the Cure Period (to the extent that, in the Board's reasonable judgment, such breach can be cured); (iii) any act involving fraud or material dishonesty in connection with the business of the Company; (iv) a material violation of the Company's Code of Conduct; (v) attendance at work in a state of intoxication or otherwise being found in possession at his place of work of any prohibited drug or substance, possession of which constitutes to a criminal offense; (vi) assault or other unlawful act of violence; or (vii) conviction of, or a plea of *nolo contendere* to, any felony whatsoever or any misdemeanor that would preclude employment under the Company's hiring policy.

        Section 1.4.   <u>Closing Date</u>

        "Closing Date" shall have the same meaning as that term is defined in the Merger Agreement.

        Section 1.5.   <u>Fiscal Year</u>

        "Fiscal Year" shall mean each of the 2007, 2008, 2009, 2010, and 2011 fiscal years of the Company.

        Section 1.6.   <u>Good Reason</u>

        "Good Reason" shall mean "Good Reason" as such term may be defined in any employment agreement or other severance agreement in effect at the time of termination of employment (or as previously in effect immediately prior to any expiration of such agreement due to a Company nonrenewal of the agreement term) between the Optionee and the Company or any of its Subsidiaries or Affiliates.

        Section 1.7.   <u>Investor IRR</u>

        "Investor IRR" shall mean, on any given date, a pretax compounded annual internal rate of return realized by the Investors after the Closing Date on any Shares held by the Investors. On a per Share, fully diluted basis (including all Shares subject to all outstanding options granted to any persons under the Plan), based on the Aggregate Investment; provided, however, that (a) any calculation of Investor IRR will, for purposes of Section 3.1(b), be calculated solely with respect to that portion of the Aggregate Investment actually sold or otherwise disposed of in the applicable transaction, and (b) in any event, Investor IRR will not be calculated taking into account the receipt by the Investors or any of their Affiliates of any management, monitoring, transaction or other fees (including transaction advisory fees and related expenses) payable to such parties by the Company.

        Section 1.8.   <u>Investor Return</u>

        "Investor Return" shall mean, on any date, as determined on a cumulative, fully diluted per Share basis (including all Shares subject to all outstanding options granted to any persons under the Plan), all cash and marketable securities received by the Investors after the Closing Date on any Share held by the Investors as proceeds in any sale or other disposition of such Share, and any extraordinary cash dividends paid on such Share; provided, however, that any calculations of Investor Return will, for purposes of: (a) Section 3.1(b), also include all cash and marketable securities ultimately received by the Investors after the Closing Date as proceeds from any extraordinary dividend and the sale or other disposition of any illiquid property (e.g., equity securities of another corporation or debt securities)

received in exchange for or in respect of a Share, which for such purposes shall be deemed received on the date such illiquid property is received; (b) Section 3.1(b), be calculated solely with respect to that portion of the Aggregate Investment actually sold or otherwise disposed of; and (c) Section 3.1(c)(ii), also include the fair market value of any illiquid property received in exchange for or in respect of a Share.

Section 1.9.  Liquidity

"Liquidity" shall mean (A) on or prior to December 31, 2011, the Investors achieve an Investor IRR of at least 25% *and* (ii) the Investors earn an Investor Return of at least 3.0 times the Aggregate Investment, *or* (B) after December 31, 2011, the Investors achieve an Investor IRR of at least 20% *and* (ii) the Investors earn an Investor Return of at least 3.0 times the Base Price on the Aggregate Investment.

Section 1.10.  Management Stockholder's Agreement

"Management Stockholder's Agreement" shall mean that certain Management Stockholder's Agreement between the Optionee and the Company.

Section 1.11.  Option

"Option" shall mean the aggregate of the Time Option and the Performance Option granted under Section 2.1 of this Agreement.

Section 1.12.  Performance Option

"Performance Option" shall mean the right and option to purchase, on the terms and conditions set forth herein, all or any part of an aggregate of the number of shares of Common Stock set forth on the signature page hereof opposite the term Performance Option.

Section 1.13.  Permanent Disability

"Permanent Disability" shall mean "Disability" as such term is defined in any employment agreement between Optionee and the Company or any of its Subsidiaries (or as previously in effect immediately prior to any expiration of such agreement due to a Company nonrenewal of the agreement term), or, if there is no such employment agreement, "Disability" as defined in the long-term disability plan of the Company (or Subsidiary sponsoring such plan).

Section 1.14.  Qualified Public Offering

"Qualified Public Offering" shall mean, after a Public Offering of Holdings, the Investors sell, in one transaction or a series of transactions, an aggregate of at least 35% of the Aggregate Investment.

Section 1.15.  Secretary

"Secretary" shall mean the Secretary of the Company.

3

Section 1.16.   Stock Purchase Agreement

"Stock Purchase Agreement" shall mean the Stock Purchase Agreement by and between Restore Acquisition Corp., Ahold U.S.A., Inc. and Koninklijke Ahold N.V., dated May 2, 2007.

Section 1.17.   Time Option

"Time Option" shall mean the right and option to purchase, on the terms and conditions set forth herein, all or any part of an aggregate of the number of shares of Common Stock set forth on the signature page hereof opposite the term Time Option.

ARTICLE II

GRANT OF OPTIONS

Section 2.1.   - Grant of Options

For good and valuable consideration, on and as of the date hereof, the Company irrevocably grants to the Optionee the following Stock Options:  (a) the Time Option and (b) the Performance Option, in each case on the terms and conditions set forth in this Agreement.

Section 2.2.   - Exercise Price

Subject to Section 2.4, the exercise price of the shares of Common Stock covered by the Option (the "Exercise Price") shall be as set forth on the signature page hereof, which shall be the Fair Market Value.

Section 2.3.   - No Guarantee of Employment

Nothing in this Agreement or in the Plan shall confer upon the Optionee any right to continue in the employ of the Company or any Service Recipient or shall interfere with or restrict in any way the rights of the Company and its Service Recipients, which are hereby expressly reserved, to terminate the employment of the Optionee at any time for any reason whatsoever, with or without cause.

Section 2.4.   - Adjustments to Option

The Option shall be subject to the adjustment provisions of Sections 8 and 9 of the Plan, provided, however, that in the event of the payment of an extraordinary dividend by the Company to its stockholders, then; first, the Exercise Prices of the Option shall be equitably reduced with respect to the amount of the dividend paid, but only to the extent the Committee determines it to be permitted without material adverse effect on Optionee under applicable tax laws; and, if such reduction cannot be fully effected due to such tax laws and it will not have material adverse tax consequences to the Optionee, second, the Board shall make an equitable provision as to any further actions to be taken with respect to the Option.

4

## ARTICLE III

### PERIOD OF EXERCISABILITY

Section 3.1.   - Commencement of Exercisability

(a)      So long as the Optionee continues to be employed by the Company or any other Service Recipients, the Option shall become exercisable pursuant to the following schedules:

(i)      *Time Option.* The Time Option shall become vested and exercisable with respect to 20% of the Shares subject to such Option on the last day of each of the five Fiscal Years ending after the Closing Date, beginning with the Fiscal Year in which the Closing Date occurs (e.g., the first 20% installment of vesting will occur on December 31, 2007).

(ii)      *Performance Option.* The Performance Option shall be eligible to become vested and exercisable as to 20% of the Shares subject to such Option on the last day of each of the five Fiscal Years ending after the Closing Date, beginning with the Fiscal Year in which the Closing Date occurs, if the Company, on a consolidated basis, achieves its annual EBITDA targets as set forth in Schedule A attached hereto (each an "Annual EBITDA Target") for the given Fiscal Year. This vesting method is hereby referred to as the "Primary Vesting Method." Notwithstanding the foregoing, in the event that an Annual EBITDA Target is not achieved in a particular Fiscal Year, then that portion of the Performance Option that was eligible to vest but failed to vest due to the Company's failure to achieve its EBITDA Target shall nevertheless vest and become exercisable at the end of any subsequent Fiscal Years if the cumulative EBITDA Target (each a "Cumulative EBITDA Target") set forth on Schedule A attached hereto is achieved on a cumulative basis at the end of such subsequent Fiscal Year. This secondary vesting method is hereby referred to as the "Missed Year Catch-up Vesting."

(b)      In addition to the foregoing, if, after a Qualified Public Offering, the Investors sell, in one transaction or a series of related transactions, and/or receive extraordinary cash dividends on, sufficient Shares such that the Investors achieve Liquidity on any percentage of the Aggregate Investment that is in excess of the percentage of the Performance Options that could have become vested pursuant to the Primary Vesting Method or the Missed Year Catch-up Vesting in the Fiscal Year that immediately precedes the Fiscal Year in which such transaction or series of transactions occurs, then the Performance Option shall become vested, to the extent not already vested, up to the same percentage of Performance Option that could have become vested in respect of any previously completed fiscal years pursuant to either the Primary Vesting Method or the Missed Year Catch-up Vesting. This vesting method is hereby referred to as the "QPO Catch-up Vesting". See Appendix I for examples hereof.

(c)      Notwithstanding the foregoing, upon the occurrence of a Change in Control:

(i)      the Time Option shall become immediately exercisable as to 100% of the shares of Common Stock subject to such Option immediately prior to a Change in Control (but only to the extent such Option has not otherwise terminated or become exercisable); and

(ii)      the Performance Option shall become immediately exercisable as to 100% of the shares of Common Stock subject to such Option immediately prior to a Change in Control (but only to the extent such Option has not otherwise terminated or become exercisable) if as a result of the Change in Control, the Investors achieve Liquidity on the entire Aggregate Investment.

(d)      In the event that Optionee's employment terminates due to the Optionee's death or Permanent Disability, a pro rata portion of the Time Options that would have vested on the December

5

31 that first occurs after the date of such termination of employment will vest and a pro rata portion of the Performance Options will also vest, but only if and to the extent that the Performance Option would have vested under Section 3.1 above if the Optionee had remained employed with the Company, as of the December 31 that first occurs after the date of such termination of employment. In each case, such pro rata portion will be determined based on the number of days the Optionee worked during the year in which the termination occurred relative to 365 days. Such Performance Options will expire 30 days after notice to Optionee of the amount of Optionee's pro rata vesting (if any), or if earlier, according to Section 3.2 of this Agreement.

(e) Notwithstanding the foregoing, except as otherwise provided in Section 3.1(d) above, of the Agreement, no Option shall become exercisable as to any additional shares of Common Stock following the termination of employment of the Optionee for any reason and any Option, which is unexercisable as of the Optionee's termination of employment, shall immediately expire without payment therefor.

Section 3.2. – <u>Expiration of Option</u>

The Optionee may not exercise the Option to any extent after the first to occur of the following events:

(a) The tenth anniversary of the Closing Date, so long as the Optionee remains employed with the Company or any Service Recipient through such date;

(b) The first anniversary of the date of the Optionee's termination of employment with the Company and all Service Recipients, if the Optionee's employment is terminated by reason of death or Permanent Disability (unless earlier terminated as provided in Section 3.2(g) below);

(c) Immediately upon the date of the Optionee's termination of employment by the Company and all Service Recipients for Cause;

(d) Thirty (30) days after the date of the Optionee's termination of employment with the Company and all Service Recipients by the Optionee (except due to death or Permanent Disability or a termination for Good Reason (if such a termination is provided for in the Optionee's individual employment or other severance agreement, as such term may be defined therein));

(e) One hundred and eighty (180) days after the date of an Optionee's termination of employment by the Company and all Service Recipients without Cause (other than due to Permanent Disability);

(f) One hundred and eighty (180) days after the date of an Optionee's termination of employment with the Company and all Service Recipients by the Optionee for Good Reason (if such a termination is provided for in the Optionee's individual employment or other severance agreement);

(g) The date the Option is terminated pursuant to Section 5 or 6 of the Management Stockholder's Agreement; or

(h) At the discretion of the Company consistent with any determination by the Committee pursuant to Section 9 of the Plan.

For the purposes of this Section 3.2, if an Optionee's employment with the Company and all Service Recipients is terminated without Cause by the Company, for Good Reason by an Optionee (if

6

such a termination is provided for in the Optionee's individual employment or other severance agreement), or due to an Optionee's death or Permanent Disability after the end of any Fiscal Year, but prior to the date the Company determines whether or not the applicable Annual EBITDA Target and/or Cumulative EBITDA Target has been achieved, the Performance Option that could vest in respect of such Fiscal Year will remain outstanding until 30 days after notice to Optionee of such determination and effect on the vesting of such Performance Option, such that, if such determination results in the Performance Option vesting in respect of such Fiscal Year, the Optionee shall have such 30-day period to exercise such Performance Option, which will otherwise expire at the close of business on the last day of such period.

### ARTICLE IV

### EXERCISE OF OPTION

Section 4.1.    – <u>Person Eligible to Exercise</u>

During the lifetime of the Optionee, only the Optionee (or his or her duly authorized legal representative) may exercise an Option or any portion thereof. After the death of the Optionee, any exercisable portion of an Option may, prior to the time when an Option becomes unexercisable under Section 3.2, be exercised by his personal representative or by any person empowered to do so under the Optionee's will or under the then applicable laws of descent and distribution.

Section 4.2.    – <u>Partial Exercise</u>

Any exercisable portion of an Option or the entire Option, if then wholly exercisable, may be exercised in whole or in part at any time prior to the time when the Option or portion thereof becomes unexercisable under Section 3.2; provided, however, that any partial exercise shall be for whole shares of Common Stock only.

Section 4.3.    – <u>Manner of Exercise</u>

An Option, or any exercisable portion thereof, may be exercised solely by delivering to the Secretary or his office all of the following prior to the time when the Option or such portion becomes unexercisable under Section 3.2:

(a)    Notice in writing signed by the Optionee or the other person then entitled to exercise the Option or portion thereof, stating that the Option or portion thereof is thereby exercised, such notice complying with all applicable rules established by the Committee;

(b)    (i) Full payment (in cash or by check or by a combination thereof) for the Shares with respect to which such Option or portion thereof is exercised or (ii) indication that the Optionee elects to have the number of Shares that would otherwise be issued to the Optionee reduced by a number of Shares having an equivalent Fair Market Value to the payment that would otherwise be made by Optionee to the Company pursuant to clause (i) of this subsection (b);

(c)    Full payment (in cash or by check or by a combination thereof) to satisfy the minimum withholding tax obligation with respect to which such Option or portion thereof is exercised, except as provided under Section 4.3(f);

7

(d)      A bona fide written representation and agreement, in a form satisfactory to the Committee, signed by the Optionee or other person then entitled to exercise such Option or portion thereof, stating that the shares of Common Stock are being acquired for his own account, for investment and without any present intention of distributing or reselling said shares or any of them except as may be permitted under the Securities Act of 1933, as amended (the "Act"), and then applicable rules and regulations thereunder, and that the Optionee or other person then entitled to exercise such Option or portion thereof will indemnify the Company against and hold it free and harmless from any loss, damage, expense or liability resulting to the Company if any sale or distribution of the shares by such person is contrary to the representation and agreement referred to above; provided, however, that the Committee may, in its reasonable discretion, take whatever additional actions it deems reasonably necessary to ensure the observance and performance of such representation and agreement and to effect compliance with the Act and any other federal or state securities laws or regulations; and

(e)      In the event the Option or portion thereof shall be exercised pursuant to Section 4.1 by any person or persons other than the Optionee, appropriate proof of the right of such person or persons to exercise the option.

(f)      In the event there has not occurred a Public Offering of the Company and an Optionee's employment with the Company and all Service Recipients is terminated without Cause by the Company, for Good Reason by an Optionee (if such a termination is provided for in an Optionee's employment or other severance arrangement), or due to an Optionee's death or Permanent Disability, the Optionee will, to the extent it does not materially adversely impact the short-term liquidity needs of the Company, be allowed to pay any minimum tax withholding due upon any exercise of a vested Option out of the Shares otherwise deliverable upon exercise (using the Fair Market Value on the date of exercise to determine the number of Shares to be withheld in respect of such minimum tax withholding due).

(g)      Once a Public Offering of the Company has occurred, an Optionee may use a Regulation T, Sarbanes-Oxley-compliant program which shall be established by the Company to sell Shares to pay the exercise price and the minimum taxes due upon exercise of any then vested Options subject to any limitations on transfer imposed under applicable securities laws or any underwriter.

Without limiting the generality of the foregoing, the Committee may require an opinion of counsel acceptable to it to the effect that any subsequent transfer of shares acquired on exercise of an Option does not violate the Act, and may issue stop-transfer orders covering such shares. Share certificates evidencing stock issued on exercise of this Option shall bear an appropriate legend referring to the provisions of subsection (d) above and the agreements herein. The written representation and agreement referred to in subsection (d) above shall, however, not be required if the shares to be issued pursuant to such exercise have been registered under the Act, and such registration is then effective in respect of such shares.

Section 4.4.   – Conditions to Issuance of Stock Certificates

The shares of stock deliverable upon the exercise of an Option, or any portion thereof, may be either previously authorized but unissued shares or issued shares, which have then been reacquired by the Company. Such shares shall be fully paid and nonassessable. The Company shall not be required to issue or deliver any certificate or certificates for shares of stock purchased (if certified, or if not certified, register the issuance of such shares on its books and records) upon the exercise of an Option or portion thereof prior to fulfillment of all of the following conditions:

(a)      The obtaining of approval or other clearance from any state or federal governmental agency which the Committee shall, in its reasonable and good faith discretion, determine to be necessary or advisable;

8

(b)     The execution by the Optionee of the Management Stockholder's Agreement and a Sale Participation Agreement; and

(c)     The lapse of such reasonable period of time following the exercise of the Option as the Committee may from time to time establish for reasons of administrative convenience or as may otherwise be required by applicable law.

Section 4.5.   – Rights as Stockholder

Except as otherwise provided in Section 2.4 of this Agreement, the holder of an Option shall not be, nor have any of the rights or privileges of, a stockholder of the Company in respect of any shares purchasable upon the exercise of the Option or any portion thereof unless and until certificates representing such shares shall have been issued by the Company to such holder.


ARTICLE V

MISCELLANEOUS

Section 5.1.   – Administration

The Committee shall have the power to interpret the Plan and this Agreement and to adopt such rules for the administration, interpretation and application of the Plan as are consistent therewith and to interpret or revoke any such rules. All actions taken and all interpretations and determinations made by the Committee shall be final and binding upon the Optionee, the Company and all other interested persons. No member of the Committee shall be personally liable for any action, determination or interpretation made in good faith with respect to the Plan or the Option. In its absolute discretion, the Board may at any time and from time to time exercise any and all rights and duties of the Committee under the Plan and this Agreement.

Section 5.2.   – Option Not Transferable

Neither the Option nor any interest or right therein or part thereof shall be liable for the debts, contracts or engagements of the Optionee or his successors in interest or shall be subject to disposition by transfer, alienation, anticipation, pledge, encumbrance, assignment or any other means whether such disposition be voluntary or involuntary or by operation of law by judgment, levy, attachment, garnishment or any other legal or equitable proceedings (including bankruptcy), and any attempted disposition thereof shall be null and void and of no effect; provided, however, that this Section 5.2 shall not prevent transfers by will or by the applicable laws of descent and distribution.

Section 5.3.   – Notices

Any notice to be given under the terms of this Agreement to the Company shall be addressed to the Company in care of its Secretary, and any notice to be given to the Optionee shall be addressed to him at the address given beneath his signature hereto. By a notice given pursuant to this Section 5.3, either party may hereafter designate a different address for notices to be given to him. Any notice, which is required to be given to the Optionee, shall, if the Optionee is then deceased, be given to the Optionee's personal representative if such representative has previously informed the Company of his status and address by written notice under this Section 5.3. Any notice shall have been deemed duly given when (i) delivered in person, (ii) enclosed in a properly sealed envelope or wrapper addressed as aforesaid, three business days after which it is deposited (with postage prepaid) in a post office or branch post office regularly maintained by the United States Postal Service, or (iii) enclosed in a properly sealed

9

envelope or wrapper addressed as aforesaid, the first business day following the day after which it is deposited (with fees prepaid) in an office (and not a drop box) regularly maintained by FedEx, UPS, or comparable non-public overnight national courier.

Section 5.4. – Titles; Pronouns

Titles are provided herein for convenience only and are not to serve as a basis for interpretation or construction of this Agreement. The masculine pronoun shall include the feminine and neuter, and the singular the plural, where the context so indicates.

Section 5.5. – Applicability of Plan, Management Stockholder's Agreement and Sale Participation Agreement

The Option and the shares of Common Stock issued to the Optionee upon exercise of the Option shall be subject to all of the terms and provisions of the Plan, the Management Stockholder's Agreement and a Sale Participation Agreement, to the extent applicable to the Option and such Shares.

Section 5.6. –Entire Agreement; Amendment

Subject to Section 10 of the Plan, this Agreement may be amended only by a writing executed by the parties hereto, which specifically states that it is amending this Agreement. This Agreement constitutes the entire agreement among the parties with respect to any agreements regarding any equity-based incentive awards by the Company and supersedes all prior and contemporaneous agreements (including any change in control, executive retention, employment or other agreements regarding the vesting of any equity-based awards, or payment of cash or Shares in respect of any equity-based awards upon a termination of employment), discussions, understandings and negotiations, whether written or oral, with respect to any of the foregoing.

Section 5.7. – Governing Law

The laws of the State of Delaware shall govern the interpretation, validity and performance of the terms of this Agreement regardless of the law that might be applied under principles of conflicts of laws.

Section 5.8. – Arbitration

In the event of any controversy among the parties hereto arising out of, or relating to, this Agreement which cannot be settled amicably by the parties, such controversy shall be finally, exclusively and conclusively settled by mandatory arbitration conducted expeditiously in accordance with the American Arbitration Association rules, by a single independent arbitrator. Such arbitration process shall take place within New York, New York. The decision of the arbitrator shall be final and binding upon all parties hereto and shall be rendered pursuant to a written decision, which contains a detailed recital of the arbitrator's reasoning, subject to enforcement of the arbitration award hereunder or for vacation or modification thereof as provided under the Federal Arbitration Act, Title 9 U.S. Code Chapter 1. Judgment upon the award rendered may be entered in any court having jurisdiction thereof. The Company shall pay the arbitrator's fees and all other costs of such arbitration. Each party shall bear its own legal fees and expenses, unless otherwise determined by the arbitrator.

*[Signatures on next page.]*

10

IN WITNESS WHEREOF, this Agreement has been executed and delivered by the parties hereto.

USF HOLDING CORP.

By: _____

Its: _____
      David B. Eberhardt
      Executive Vice President, General
      Counsel & Secretary

[Signature Page to Stock Option Agreement]

12

**Option Grants**:

Aggregate number of shares of Common Stock
for which the **Time Option** granted hereunder is
exercisable (100% of number of shares):          **10,000**

Aggregate number of shares of Common Stock
for which the **Performance Option**
granted hereunder is exercisable (100% of the
number of shares):          **10,000**

**Exercise Price of all options:**          $5.00 per share

**Grant Date**:          October 19, 2007

OPTIONEE:

_____

**Phillip G. Roszak**

_____

Address

_____

**[Signature Page of Stock Option Agreement]**

### Schedule A
### Annual and Cumulative EBITDA Targets

The Annual and Cumulative EBITDA Targets are based on the Company's achievement of the following EBITDA targets for the following Fiscal Years:

| Fiscal Year | Annual Performance Target | Cumulative Performance Target |
|:---:|:---:|:---:|
| 2007 | $570.5 million [1] | $570.5 million |
| 2008 | $707.1 million | $1,277.6 million |
| 2009 | $819.0 million | $2,096.6 million |
| 2010 | $907.8 million | $3,004.4 million |
| 2011 | $998.8 million | $4,003.1 million |

Note (1): Assumes $588mm of reported U.S. GAAP EBITDA - $10mm of Real Estate gain - $7.5mm of 6 months of MAC Relief = $570.5mm.

"EBITDA" shall mean earnings before interest, taxes, depreciation and amortization plus transaction, management and/or similar fees (including any transaction advisory fees and related expenses) paid to the Investors and/or its Affiliates. The Board shall, fairly and appropriately, and in good faith, adjust the calculation of EBITDA to reflect, to the extent not contemplated in the management plan, the following: acquisitions, divestitures, major capital programs, any stock option and other stock-based compensation charges, any costs or expenses incurred by the Company in connection with any litigation matters subject to potential indemnification by Ahold under the terms of the Stock Purchase Agreement and related documents, fees or expenses related to any equity offering or repayment or refinancing of indebtedness approved by the Board, any other any restructuring charges or extraordinary or unusual fees, expenses or losses approved by the Board, which approval shall not be unreasonably withheld, any LIFO adjustments, and, in 2007, any incremental one-time costs attributable to the separation of the Company from the Ahold consolidated group. The Board's determination of such adjustment shall be in good faith and based on the Company's accounting as set forth in its books and records and on the financial plan of the Company pursuant to which the Annual EBITDA Targets were originally established.

Annual EBITDA Targets and Cumulative EBITDA Targets will be equitably adjusted by the Board for any acquisitions, divestitures or major capital investment programs not contemplated in management's base case, to the extent permitted under U.S. generally accepted accounting principles and applicable law ("GAAP").

Revised October 8, 2007

13

<u>Appendix I</u>

- <u>Examples:</u>

→ Company does not achieve the Annual Performance Target for FY 2007. In FY 2008, a Qualified Public Offering occurs wherein the Investors achieve Liquidity on 40% of the Investors' New Stock. Upon such event, the 20% of the Performance Options that could have, but did not, become vested if the Company had achieved the Annual Performance Target for FY 2007, becomes vested. Because the QPO Catch-up Vesting is only available to provide for catch-up vesting in respect of any previously completed fiscal years, if the Company does not achieve the Annual Performance Target for FY 2008 or the Cumulative Performance Target for FY 2008, no vesting will occur under this method with respect to the Performance Options that might otherwise have become vested in respect of FY 2008.

→ Company does not achieve the Annual Performance Target for either of FY 2007 or FY 2008 (nor does it achieve the Cumulative Annual Performance Target for FY 2008). In FY 2009, a Qualified Public Offering occurs wherein the Investors achieve Liquidity on 40% of the Investors' New Stock. Upon such event, the 20% of the Performance Options that could have, but did not, become vested if the Company had achieved the Annual Performance Target for each of FY 2007 and FY 2008 (or the Cumulative Annual Performance Target for FY 2008), becomes vested, such that the Performance Options will be 40% vested as of the date of such event. If the Company then achieves either the Annual Performance Target or the Cumulative Annual Performance Target for FY 2009, the 20% of the Performance Options that is due to be vested in respect of FY 2009 will become vested in the ordinary course.

14

## SECTION 83(b) ELECTION FORM

OCTOBER 19, 2007

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Internal Revenue Service Center

_____

_____

Re: Election Under §83(b) of the Internal Revenue Code

Dear Sir:

The undersigned hereby elects under Section 83(b) of the Internal Revenue Code to include in the taxpayer's gross income for the taxable year in which the property described below was transferred, the excess (if any), of the fair market value of such property at the time of its transfer, over the amount (if any) paid for such property. Pursuant to Treas. Reg. § 1.83-2(e) the following information is submitted:

1.    Name of taxpayer: Phillip Roszak

      Address of taxpayer: 14815 S. 14Th PL Phoenix, AZ 85048

      Taxpayer's Identification Number: 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

2.    Property with respect to which the election is being made: 20,000 shares of common stock of USF Holding Corp. ("USF").

3.    Date transferred: October 19, 2007.

4.    Taxable year for which this election is being made: Calendar year 2007.

5.    Nature of the restriction or restrictions to which the property is subject:

      While the shares described in Paragraph 2 are held by the undersigned, such shares shall be subject to restrictions on transfer and to the right of USF to repurchase such shares at an agreed upon price, which price may be lower than the fair market value of the shares upon certain types of terminations of the undersigned's employment with USF or any of its subsidiaries (including U.S. Foodservice, Inc.), which transfer restrictions and right of repurchase shall lapse upon the later to occur of certain events.

6.    Fair market value of the property at the time of transfer: $ 5.00 per share.

7.    Amount paid for the property: $ 5.00 per share.

8.    A copy of this election has been furnished to Dave Esler at U.S. Foodservice, Inc.

Very truly yours,

_____
(Signature of Taxpayer)



## Non-Solicitation and Non-Disclosure Agreement

### Standard – Salary Grades 16-19

WHEREAS, U.S. FOODSERVICE, INC., (the "**Company**" as defined in Section 2(a) herein) and Employee acknowledge and agree that it is in their mutual best interest to enter into a non-solicitation and non-disclosure agreement with the same terms and conditions as set forth herein; and

WHEREAS, Employee's employment by the Company, the ability to participate in the Company's 2007 Stock Incentive Plan for Key Employees of USF Holding Corp. and its Affiliates, or the ability to participate in other similar Company sponsored programs, is contingent upon Employee's execution of this Agreement.

NOW, THEREFORE, in consideration of employment with the Company, and for other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, Employee and the Company knowingly and voluntarily agree to be legally bound by the following terms.

1.     **Employee's Representations and Acknowledgments**.

    (a)   **Consideration.**   In consideration for Employee's agreement to enter into this Agreement and to be bound by its terms, Employee has received employment or continued employment, the ability to participate in the Company's 2007 Stock Incentive Plan for Key Employees of USF Holding Corp. and its Affiliates, the ability to participate in other similar Company sponsored programs, or other good and valuable consideration.

    (b)   **Confidential Information and Goodwill**.  Solely as a result of employment with the Company, Employee is given access to, becomes familiar with, and acquires knowledge of the Company, its Customers, employees, operations, pricing methods, delivery schedules, sources of supply, financial information, and other Confidential Information (as defined in Section 2 herein) of the Company and its Customers. Employee recognizes that Employee is, on behalf of the Company, a primary contact with the Company's Customers, and will develop close relationships with, gain special knowledge of, and promote and develop the loyalty of said Customers. The Company's Confidential Information, the goodwill of its Customers, and its relationship with its employees have been and will continue to be developed through the Company's investment of substantial time, effort and money. Employee recognizes that disclosure or use of Confidential Information for any purpose, including competition with the Company, would be greatly prejudicial and detrimental to the Company and would cause it to suffer immediate and irreparable injury. Employee further recognizes that Employee is in a position to unfairly convert the Company's business, customer accounts and goodwill for use by Employee and other Persons in competition with the Company, and that this would be greatly prejudicial and detrimental to the Company, and would cause it to suffer immediate and irreparable injury.

    (c)   **No Other Agreement or Understanding**. Employee represents and warrants that Employee is not a party to any agreement or understanding which would impair Employee's ability to enter into this Agreement or otherwise preclude or restrict Employee's employment with the Company (except as set forth in writing in the Applicant's Non-Solicitation/Non-Competition Representation), and that Employee's execution and delivery of this Agreement and employment with the Company will not violate or constitute a default under any other agreement or understanding to which Employee is bound.

(d) **Agreement Applicable to Other Positions.** If, after executing this Agreement, Employee: (i) is promoted to, assigned to or otherwise assumes one or more positions or functions other than or in addition to Employee's position or functions at the time Employee signed this Agreement, regardless of title, or (ii) is transferred or assigned to or otherwise works for any affiliate, subsidiary or other division or business unit of the Company, the terms of this Agreement, including but not limited to Sections 4, 5, 6, 7, 8, 9 and 10 hereof, shall continue to apply with full force and effect.

(e) **Survival.** Employee acknowledges and understands that unless and until a subsequent written Agreement is signed by all parties to this Agreement that expressly supersedes this Agreement, this Agreement will continue in full force and effect during and after the termination of Employee's employment with the Company.

2. **Definitions.** For the purposes of this Agreement, the following terms shall have the following meanings and interpretations:

(a) **"Company"** means U.S. FOODSERVICE, INC., its parent company, USF Holding Corp., its subsidiaries, and any entity owned or controlled by USF Holding Corp., as well as any other businesses that have been acquired or established in the past, or any businesses that may be acquired or established after the execution of this Agreement, and any successor-in-interest thereto or assignee thereof.

(b) **"Business of the Company"** includes any services or products of the type sold, offered for sale, developed, commenced or planned to be sold by the Company at any time during Employee's employment. Currently, Business of the Company includes the food service business, and the sale and distribution of food and related products, equipment, goods and services to restaurants, schools, hospitals, and other institutions or establishments that serve food.

(c) **"Person(s)"** mean all individuals, partnerships, corporations, limited liability companies, firms, businesses, organizations and other entities.

(d) **"Customer(s)"** means all Person(s) that: (i) have purchased the Company's services or products; or (ii) have had any "contact" (as defined in Section 6(a) herein) with the Company for the purpose of the Company selling or the Person purchasing the Company's services or products, regardless of whether said Person has placed an order for such services or products; or (iii) are controlling or are controlled by any Person described in Subsection 2(d)(i) or (ii) above. These terms include group purchasing organizations and food service brokers. These terms also include prospective customers. These terms also include, but are not limited to, any individuals involved in making purchasing decisions at or for any Customer entities, even if the management, ownership, or name of such Customer entities has changed.

(e) **"Confidential Information"**

(1) "Confidential Information" means all trade secrets and all other confidential and proprietary information of the Company, including, but not limited to: Customer identities, including but not limited to the names, job titles and telephone numbers of the principal contact(s) of each Customer; Customer lists or other documents containing identity information; Customer documents, routes, books, files, purchases and accounts; route lists of sales employees; pricing, margins, sales allowances, discounts and pricing policies; invoices; marketing and product information; order guides or histories; sales data for any employee, product, Customer or territory; sales and delivery schedules; credit terms, policies and information, including payment records; information on Customer preferences; promotional programs; financial information of the Company or its Customers; the terms and formats of the Company's contracts and agreements with Customers, vendors and suppliers; information pertaining to the Company's methods of operation, processes, strategies and techniques, including strategies for identifying and satisfying the needs of specific Customers and types of Customers; information relating to employees of the Company, including but not limited to their identities, home and business telephone, mobile and pager numbers, and addresses, Customers served by other employees, and performance of employees.

(2)     The definition of "Confidential Information" is intended to have the broadest meaning as permitted by law and extends beyond the definition of "trade secrets" as set forth in the Uniform Trade Secrets Act.

3.     **Preservation of At Will Employment Relationship.**  Employee agrees that no provision in this Agreement shall be construed to create an express or implied employment contract or a promise of employment for any specific period of time.  Employee further acknowledges and agrees that Employee's employment with the Company is "at will" (unless Employee entered into a written employment contract expressly providing that his/her employment is not at will and signed by an officer of U.S. Foodservice, Inc. who is authorized to do so) and can be terminated at any time by the Company or Employee, with or without reason, with or without notice, and with or without cause.

4.     **Non-Disclosure of Confidential Information.**  At no time, either during or after the termination of employment, shall Employee directly or indirectly obtain, disclose, reveal or use for Employee or any Person, or aid others in obtaining, disclosing, revealing or using any Confidential Information of the Company, other than as may be required in the performance of duties for and as authorized by the Company.  All Confidential Information is and shall remain the sole property of the Company.  Without limiting the foregoing, it is expressly understood and agreed that the Employee shall not, at any time during or after the termination of employment with the Company, directly or indirectly utilize any Confidential Information to attempt to persuade or solicit any Customer of the Company to cease to do business or to reduce the amount of business which any Customer of the Company has customarily done or contemplates doing with the Company or to initiate or expand its business with a competitor of the Company.  It shall be a violation of this provision to obtain or use Confidential Information obtained from other current or former Company employees, except as set forth in this Section 4.  The Company understands that under the current laws of certain states, restrictions on the use or disclosure of confidential information must be of a finite duration.  Accordingly, the parties agree that should the law of such a state be applied to this Agreement, the restrictions on the use or disclosure of Confidential Information that is not a trade secret (the restriction on the use or disclosure of which shall be unlimited by time) shall apply only for a period of three (3) years from the termination of Employee's employment with the Company, which period Employee acknowledges to be reasonable under the circumstances at the time of execution of the Agreement.

5.     **Return of Company Property and Confidential Information.**  All records, files, customer order guides, pricelists, photo/videographic materials, software, keys, equipment, credit cards or other tangible material, and all other documents, including but not limited to Confidential Information, relating to the Business of the Company (collectively "**Property**") that Employee receives, acquires, produces or has access to during employment (irrespective, in all cases, of the medium in which any information is stored), are the exclusive property of the Company.  Upon the termination of Employee's employment, Employee shall return to the Company all Property of the Company and all copies thereof in Employee's possession or control (regardless of how such Property or Confidential Information is obtained or maintained).

6.     **Non-Solicitation of Customers**.  During Employee's employment with the Company and for the one (1) year period following the termination thereof (the "Restricted Period"), Employee shall not (as an employee, agent, servant, owner, partner, consultant, independent contractor, representative, stockholder or in any other capacity) directly or indirectly, for Employee or any other Person (other than the Company), with respect to the Business of the Company, solicit, market, service, sell to or contact, or attempt to solicit, market, service, sell to or contact, any Customer of the Company with whom Employee had any "contact" (as defined in Section 6(a) herein) or about whom Employee used or received or saw or created or had access to any Confidential Information at any time during the eighteen (18) month period prior to the termination of Employee's employment.  This prohibition applies whether or not the Customer is currently buying from the Company at the time of Employee's termination of employment, and whether or not the management or ownership of the Customer changes during the restriction period.

(a)     For the purposes of this Agreement, "contact" with a Customer during Employee's employment or during the Restricted Period includes, but is not limited to: (i) sales to a Customer; (ii) solicitations of, meetings with, or visits to a Customer for the purpose of selling it any food or related products of the type sold by the Company, whether or not these resulted in sales; (iii) participation in the supervision or management of any of the accounts of a Customer,

or in the setting of prices or credit terms or margins for or with respect to a Customer, or in developing strategies or decisions affecting a Customer; or (iv) using or receiving or seeing or creating or having access to any Confidential Information of or relating to a Customer.

(b)  The prohibition against indirectly soliciting, marketing, servicing, selling to or contacting, or attempting to solicit, market, service, sell to or contact any Customer as set forth in Section 6 above means that Employee shall not, with respect to the Business of the Company:  provide information to any Person (other than the Company) regarding any such Customer; introduce any Person (other than the Company) to any such Customer; advise, suggest to or encourage any such Customer that it should do business with any Person (other than the Company); "switch" or "swap" sales, solicitation, or service responsibility for any Customer with any employee of any Person competitive with or engaged in the Business of the Company; participate in the supervision or management of any of the accounts of any such Customer; participate in the supervision or management of any employee of any Person, where such employee has Contact with or plans to have Contact any such Customer; participate in the setting of prices, credit terms or margins for any such Customer; participate in the strategies and decisions affecting any such Customer; receive any personal benefit (present or future) in the event a Customer should do any business with any Person (other than the Company); or in any way, state or imply to any such Customer that doing business with any Person (other than the Company) during the Restricted Period will inure to Employee's present or future benefit.

7.  <u>**Non-Solicitation of Company Employees.**</u>  During Employee's employment and for the one (1) year period following the termination thereof, Employee will not, directly or indirectly, on behalf of Employee or for any other Person (other than the Company), entice, induce, cause, encourage or solicit, or attempt to hire, entice, induce, cause, encourage or solicit any employee of the Company (i) to leave the Company's employ; or (ii)  to become employed by any Person competitive with or engaged in the Business of the Company.

8.  <u>**Non-Impairment of Common Law.**</u>  Nothing in this Agreement shall abrogate or reduce any duties or obligations Employee has to the Company under statutory or common law, including but not limited to fiduciary duties, the duty of undivided loyalty to the Company, and the duty not to engage in tortious interference with the Company's actual or prospective business relationships.

9.  <u>**Reasonable and Necessary; Severability; Enforceability; Non-Waiver.**</u>  It is the parties' intention that this Agreement shall be enforceable to the fullest extent allowed by law.  The parties have entered into this Agreement in the belief that its provisions, and in particular the provisions of Sections 4, 5, 6, 7, 8, 9 and 10 are valid, reasonable, enforceable and necessary to protect the Company's Confidential Information, goodwill, and business interests.  If any one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to time, duration, scope, activity or subject, it shall be construed by limiting and reducing it so as to be enforceable to the fullest extent permitted under then-applicable law.  Further, if any one or more of the provisions contained in this Agreement shall, under existing or hereafter enunciated law, be held to be invalid, illegal or unenforceable, such invalidity, illegality or unenforceability shall not affect any other provisions of this Agreement. The Company's failure to act upon any breach of this Agreement or waiver of any breach of this Agreement shall not constitute, nor shall it be construed as, a waiver of any preceding or succeeding breach, and no waiver by the Company of any right hereunder shall be construed as a waiver of any other right.

10.  <u>**Waiver of Jury Trial.**</u>  Any action, lawsuit, demand, claim or counterclaim shall be resolved by a judge alone, and both parties hereby expressly waive and forever disclaim the right to a trial before a civil jury.

11.  <u>**Termination of Employment.**</u>  Employee understands and agrees that the obligations and restrictions imposed under this Agreement shall apply regardless of whether the termination of Employee's employment is voluntary or involuntary or is with or without cause, reason or notice.

12.  <u>**Withholding of Monies Due.**</u>  To the extent permitted by law, Employee authorizes the Company to deduct from any wages or other amounts due Employee, including remuneration, compensation, bonus, commission, and/or fringe benefit provided in return for services provided by Employee, including from the final paycheck or any

other payment due Employee upon termination, all monetary obligations of any type (including but not limited to the value of any Company Property and any debts or obligations to the Company) that are owed by Employee to the Company.

13. **Notification.** With respect to each Person engaged in the Business of the Company for whom Employee provides services, whether or not in exchange for compensation in any capacity during his/her employment with the Company and for a one (1) year period following the termination of Employee's employment with the Company, Employee shall provide the Company with the following: the name, address, telephone number, and principal contact of the Person; a description of the business of and services rendered by said Person; and the nature of services to be provided by Employee on behalf of said Person. Employee shall provide any such Person with a copy of this Agreement. Employee consents to the Company's right, at any time, to notify such Person of this Agreement, as well as any alleged violations thereof.

14. **Non-Disparagement.** During and after employment with the Company, Employee shall not divulge, disclose or communicate to others, in any manner whatsoever, information or statements that disparage or are intended to disparage the Company or its business reputation.

15. **Remedies for Breach.** Employee agrees that any breach of this Agreement by Employee will cause the Company to suffer immediate and irreparable injury, for which there is no adequate remedy at law. In the event of a breach or threatened breach of any of the terms of this Agreement, the Company shall be entitled to seek and obtain enforcement of this Agreement in a court of competent jurisdiction by means of a decree of specific performance, an injunction without posting a bond or the requirement of any other guarantee, and any other form of equitable relief. Employee consents to the entry of such an order. This provision is in addition to and does not replace any other remedies the Company may have at law or in equity, including the right to receive monetary damages. Employee shall reimburse the Company for all reasonable attorneys' fees and costs incurred by the Company in enforcing this Agreement.

16. **Other Agreements.** This Agreement supersedes all prior oral understandings, oral representations, and oral agreements ever made relating to non-solicitation of customers, non-solicitation of employees, and non-disclosure of confidential information. In the event Employee executed other written agreements relating to this subject matter with the Company, and/or in the event Employee enters into other written agreements from time to time that contain provisions similar to the provisions contained herein, all such provisions shall be interpreted to provide the Company with cumulative rights and remedies and the benefits and protections provided to the Company under each such agreement shall be given full force and effect. No amendment, waiver or revocation of this Agreement shall be effective unless set forth in writing expressly stating the amendment, waiver or revocation and signed by an authorized officer of the Company.

17. **Acknowledgement of Understanding.** Employee acknowledges that Employee: has read this Agreement in its entirety and understands all of its terms and conditions; is entering into this Agreement voluntarily, without coercion from any source; and agrees to abide by all of the terms and conditions of this Agreement.

18. **Successors and Assigns.** Employee expressly agrees that this Agreement, including the rights and obligations hereunder (including all rights of enforcement), may be transferred and/or assigned by the Company without the further consent of Employee (a) from the Company to any of its present or future subsidiaries, affiliates, divisions or business units, (b) from any present or future Company subsidiary, affiliate, division or business unit to another, and (c) from the Company or any present or future Company subsidiary, affiliate, division or business unit to any Person or Persons that acquire(s) all or substantially all of the stock or assets of the Company or any present or future Company subsidiary, affiliate, division or business unit that employs Employee at the time of such acquisition, and Employee shall continue to owe the transferee entity all obligations described in this Agreement. In the event of a transfer of this Agreement or change in the entity by which Employee is employed, "Confidential Information" shall include such information both of the Company and of such successor or transferee entity, and "Customer" shall include customers of the Company and of any successors or assigns.

19. **Section Headings.** The headings of sections contained in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit, extend or describe the scope of this Agreement or the intent of any provision hereof.

Employee, intending to be legally bound, hereby signs this Agreement whereupon this Agreement enters into full force and effect.

_Phil Roszak_
Employee Signature, L.S. (under seal)

_10/19/07_
Date

_Phil Roszak_
Employee Name Printed

U.S. FOODSERVICE, INC.

By: _____

_____
Signature, L.S. (under seal)

_____
Date

_____
Printed Name

_____
Title

19.    **Section Headings.**  The headings of sections contained in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit, extend or describe the scope of this Agreement or the intent of any provision hereof.

Employee, intending to be legally bound, hereby signs this Agreement whereupon this Agreement enters into full force and effect.

_____

Employee Signature, L.S. (under seal)

_____

Date

_____

Employee Name Printed

U.S. FOODSERVICE, INC.

By:    _____

.Signature, L.S. (under seal)

_____10-19-07_____

Date

Printed Name    David B. Eberhardt
                Executive Vice President, General
                Counsel & Secretary

_____

Title