## STOCK OPTION AGREEMENT

THIS AGREEMENT, dated as of December 21, 2007 (the "Grant Date") is made by and between USF Holding Corp., a Delaware corporation (hereinafter referred to as the "Company"), and the individual whose name is set forth on the signature page hereof, who is an employee of the Company or a Subsidiary or Affiliate of the Company, hereinafter referred to as the "Optionee". Any capitalized terms herein not otherwise defined in Article I shall have the meaning set forth in the 2007 Stock Incentive Plan for Key Employees of USF Holding Corp. and its Affiliates (the "Plan").

WHEREAS, the Company wishes to carry out the Plan, the terms of which are hereby incorporated by reference and made a part of this Agreement; and

WHEREAS, the Compensation Committee of the Board of the Company (or, if no such committee is appointed, the Board) (the "Committee") has determined that it would be to the advantage and best interest of the Company and its shareholders to grant the Option provided for herein to the Optionee as an incentive for increased efforts during his term of office with the Company or its Subsidiaries or Affiliates, and has advised the Company thereof and instructed the undersigned officers to issue said Option;

NOW, THEREFORE, in consideration of the mutual covenants herein contained and other good and valuable consideration, receipt of which is hereby acknowledged, the parties hereto do hereby agree as follows:

## ARTICLE I

## DEFINITIONS

Whenever the following terms are used in this Agreement, they shall have the meaning specified below unless the context clearly indicates to the contrary.

Section 1.1.  Aggregate Investment

"Aggregate Investment" shall mean the total amount of all equity securities of the Company held by the Investors, directly and indirectly (taking into account any adjustment as a result of any stock dividend, split, reverse split, combination, recapitalization, liquidation, reclassification, merger, consolidation or otherwise).

Section 1.2.  Base Price

"Base Price" shall mean the effective per share price paid by the Investors in the Merger (e.g. $5.00, as adjusted).

Section 1.3.  Cause

"Cause" shall mean "Cause" as such term may be defined in any employment agreement or other severance agreement in effect at the time of termination of employment (or as previously in effect immediately prior to any expiration of such agreement due to a Company nonrenewal of the agreement term) between the Optionee and the Company or any of its Subsidiaries or Affiliates, or, if there is no such employment or severance agreement, "Cause" shall mean, with respect to an Optionee: (i) willful and continued failure to perform his or her material duties with respect to the Company or it

subsidiaries which continues beyond ten business days after a written demand for substantial performance is delivered to the Optionee by the Company (the "Cure Period"); (ii) a willful and material breach of the Optionee's Management Stockholder's Agreement or other agreements, if any, which continues beyond the Cure Period (to the extent that, in the Board's reasonable judgment, such breach can be cured); (iii) any act involving fraud or material dishonesty in connection with the business of the Company; (iv) a material violation of the Company's Code of Conduct; (v) attendance at work in a state of intoxication or otherwise being found in possession at his place of work of any prohibited drug or substance, possession of which constitutes to a criminal offense; (vi) assault or other unlawful act of violence; or (vii) conviction of, or a plea of *nolo contendere* to, any felony whatsoever or any misdemeanor that would preclude employment under the Company's hiring policy.

Section 1.4.  Closing Date

"Closing Date" shall have the same meaning as that term is defined in the Merger Agreement.

Section 1.5.  Fiscal Year

"Fiscal Year" shall mean each of the 2007, 2008, 2009, 2010, and 2011 fiscal years of the Company.

Section 1.6.  Good Reason

"Good Reason" shall mean "Good Reason" as such term may be defined in any employment agreement or other severance agreement in effect at the time of termination of employment (or as previously in effect immediately prior to any expiration of such agreement due to a Company nonrenewal of the agreement term) between the Optionee and the Company or any of its Subsidiaries or Affiliates.

Section 1.7.  Investor IRR

"Investor IRR" shall mean, on any given date, a pretax compounded annual internal rate of return realized by the Investors after the Closing Date on any Shares held by the Investors. On a per Share, fully diluted basis (including all Shares subject to all outstanding options granted to any persons under the Plan), based on the Aggregate Investment; provided, however, that (a) any calculation of Investor IRR will, for purposes of Section 3.1(b), be calculated solely with respect to that portion of the Aggregate Investment actually sold or otherwise disposed of in the applicable transaction, and (b) in any event, Investor IRR will not be calculated taking into account the receipt by the Investors or any of their Affiliates of any management, monitoring, transaction or other fees (including transaction advisory fees and related expenses) payable to such parties by the Company.

Section 1.8.  Investor Return

"Investor Return" shall mean, on any date, as determined on a cumulative, fully diluted per Share basis (including all Shares subject to all outstanding options granted to any persons under the Plan), all cash and marketable securities received by the Investors after the Closing Date on any Share held by the Investors as proceeds in any sale or other disposition of such Share, and any extraordinary cash dividends paid on such Share; provided, however, that any calculations of Investor Return will, for purposes of: (a) Section 3.1(b), also include all cash and marketable securities ultimately received by the Investors after the Closing Date as proceeds from any extraordinary dividend and the sale or other disposition of any illiquid property (e.g., equity securities of another corporation or debt securities)

2

received in exchange for or in respect of a Share, which for such purposes shall be deemed received on the date such illiquid property is received; (b) Section 3.1(b), be calculated solely with respect to that portion of the Aggregate Investment actually sold or otherwise disposed of; and (c) Section 3.1(c)(ii), also include the fair market value of any illiquid property received in exchange for or in respect of a Share.

Section 1.9.   Liquidity

"Liquidity" shall mean (A) on or prior to December 31, 2011, the Investors achieve an Investor IRR of at least 25% *and* (ii) the Investors earn an Investor Return of at least 3.0 times the Aggregate Investment, *or* (B) after December 31, 2011, the Investors achieve an Investor IRR of at least 20% *and* (ii) the Investors earn an Investor Return of at least 3.0 times the Base Price on the Aggregate Investment.

Section 1.10.   Management Stockholder's Agreement

"Management Stockholder's Agreement" shall mean that certain Management Stockholder's Agreement between the Optionee and the Company.

Section 1.11.   Option

"Option" shall mean the aggregate of the Time Option and the Performance Option granted under Section 2.1 of this Agreement.

Section 1.12.   Performance Option

"Performance Option" shall mean the right and option to purchase, on the terms and conditions set forth herein, all or any part of an aggregate of the number of shares of Common Stock set forth on the signature page hereof opposite the term Performance Option.

Section 1.13.   Permanent Disability

"Permanent Disability" shall mean "Disability" as such term is defined in any employment agreement between Optionee and the Company or any of its Subsidiaries (or as previously in effect immediately prior to any expiration of such agreement due to a Company nonrenewal of the agreement term), or, if there is no such employment agreement, "Disability" as defined in the long-term disability plan of the Company (or Subsidiary sponsoring such plan).

Section 1.14.   Qualified Public Offering

"Qualified Public Offering" shall mean, after a Public Offering of Holdings, the Investors sell, in one transaction or a series of transactions, an aggregate of at least 35% of the Aggregate Investment.

Section 1.15.   Secretary

"Secretary" shall mean the Secretary of the Company.

3

Section 1.16.   Stock Purchase Agreement

"Stock Purchase Agreement" shall mean the Stock Purchase Agreement by and between Restore Acquisition Corp., Ahold U.S.A., Inc. and Koninklijke Ahold N.V., dated May 2, 2007.

Section 1.17.   Time Option

"Time Option" shall mean the right and option to purchase, on the terms and conditions set forth herein, all or any part of an aggregate of the number of shares of Common Stock set forth on the signature page hereof opposite the term Time Option.

## ARTICLE II

## GRANT OF OPTIONS

Section 2.1.   - Grant of Options

For good and valuable consideration, on and as of the date hereof, the Company irrevocably grants to the Optionee the following Stock Options:  (a) the Time Option and (b) the Performance Option, in each case on the terms and conditions set forth in this Agreement.

Section 2.2.   - Exercise Price

Subject to Section 2.4, the exercise price of the shares of Common Stock covered by the Option (the "Exercise Price") shall be as set forth on the signature page hereof, which shall be the Fair Market Value.

Section 2.3.   - No Guarantee of Employment

Nothing in this Agreement or in the Plan shall confer upon the Optionee any right to continue in the employ of the Company or any Service Recipient or shall interfere with or restrict in any way the rights of the Company and its Service Recipients, which are hereby expressly reserved, to terminate the employment of the Optionee at any time for any reason whatsoever, with or without cause.

Section 2.4.   - Adjustments to Option

The Option shall be subject to the adjustment provisions of Sections 8 and 9 of the Plan, provided, however, that in the event of the payment of an extraordinary dividend by the Company to its stockholders, then; first, the Exercise Prices of the Option shall be equitably reduced with respect to the amount of the dividend paid, but only to the extent the Committee determines it to be permitted without material adverse effect on Optionee under applicable tax laws; and, if such reduction cannot be fully effected due to such tax laws and it will not have material adverse tax consequences to the Optionee, second, the Board shall make an equitable provision as to any further actions to be taken with respect to the Option.

4

ARTICLE III

PERIOD OF EXERCISABILITY

Section 3.1.    - Commencement of Exercisability

(a)    So long as the Optionee continues to be employed by the Company or any other Service Recipients, the Option shall become exercisable pursuant to the following schedules:

(i)    *Time Option.* The Time Option shall become vested and exercisable with respect to 20% of the Shares subject to such Option on the last day of each of the five Fiscal Years ending after the Closing Date, beginning with the Fiscal Year in which the Closing Date occurs (e.g., the first 20% installment of vesting will occur on December 31, 2007).

(ii)    *Performance Option.* The Performance Option shall be eligible to become vested and exercisable as to 20% of the Shares subject to such Option on the last day of each of the five Fiscal Years ending after the Closing Date, beginning with the Fiscal Year in which the Closing Date occurs, if the Company, on a consolidated basis, achieves its annual EBITDA targets as set forth in Schedule A attached hereto (each an "Annual EBITDA Target") for the given Fiscal Year. This vesting method is hereby referred to as the "Primary Vesting Method." Notwithstanding the foregoing, in the event that an Annual EBITDA Target is not achieved in a particular Fiscal Year, then that portion of the Performance Option that was eligible to vest but failed to vest due to the Company's failure to achieve its EBITDA Target shall nevertheless vest and become exercisable at the end of any subsequent Fiscal Years if the cumulative EBITDA Target (each a "Cumulative EBITDA Target") set forth on Schedule A attached hereto is achieved on a cumulative basis at the end of such subsequent Fiscal Year. This secondary vesting method is hereby referred to as the "Missed Year Catch-up Vesting."

(b)    In addition to the foregoing, if, after a Qualified Public Offering, the Investors sell, in one transaction or a series of related transactions, and/or receive extraordinary cash dividends on, sufficient Shares such that the Investors achieve Liquidity on any percentage of the Aggregate Investment that is in excess of the percentage of the Performance Options that could have become vested pursuant to the Primary Vesting Method or the Missed Year Catch-up Vesting in the Fiscal Year that immediately precedes the Fiscal Year in which such transaction or series of transactions occurs, then the Performance Option shall become vested, to the extent not already vested, up to the same percentage of Performance Option that could have become vested in respect of any previously completed fiscal years pursuant to either the Primary Vesting Method or the Missed Year Catch-up Vesting. This vesting method is hereby referred to as the "QPO Catch-up Vesting". See Appendix I for examples hereof.

(c)    Notwithstanding the foregoing, upon the occurrence of a Change in Control:

(i)    the Time Option shall become immediately exercisable as to 100% of the shares of Common Stock subject to such Option immediately prior to a Change in Control (but only to the extent such Option has not otherwise terminated or become exercisable); and

(ii)    the Performance Option shall become immediately exercisable as to 100% of the shares of Common Stock subject to such Option immediately prior to a Change in Control (but only to the extent such Option has not otherwise terminated or become exercisable) if as a result of the Change in Control, the Investors achieve Liquidity on the entire Aggregate Investment.

(d)    In the event that Optionee's employment terminates due to the Optionee's death or Permanent Disability, a pro rata portion of the Time Options that would have vested on the December

5

31 that first occurs after the date of such termination of employment will vest and a pro rata portion of the Performance Options will also vest, but only if and to the extent that the Performance Option would have vested under Section 3.1 above if the Optionee had remained employed with the Company, as of the December 31 that first occurs after the date of such termination of employment. In each case, such pro rata portion will be determined based on the number of days the Optionee worked during the year in which the termination occurred relative to 365 days. Such Performance Options will expire 30 days after notice to Optionee of the amount of Optionee's pro rata vesting (if any), or if earlier, according to Section 3.2 of this Agreement.

(e)     Notwithstanding the foregoing, except as otherwise provided in Section 3.1(d) above, of the Agreement, no Option shall become exercisable as to any additional shares of Common Stock following the termination of employment of the Optionee for any reason and any Option, which is unexercisable as of the Optionee's termination of employment, shall immediately expire without payment therefor.

Section 3.2.  – Expiration of Option

The Optionee may not exercise the Option to any extent after the first to occur of the following events:

(a)     The tenth anniversary of the Closing Date, so long as the Optionee remains employed with the Company or any Service Recipient through such date;

(b)     The first anniversary of the date of the Optionee's termination of employment with the Company and all Service Recipients, if the Optionee's employment is terminated by reason of death or Permanent Disability (unless earlier terminated as provided in Section 3.2(g) below);

(c)     Immediately upon the date of the Optionee's termination of employment by the Company and all Service Recipients for Cause;

(d)     Thirty (30) days after the date of the Optionee's termination of employment with the Company and all Service Recipients by the Optionee (except due to death or Permanent Disability or a termination for Good Reason (if such a termination is provided for in the Optionee's individual employment or other severance agreement, as such term may be defined therein));

(e)     One hundred and eighty (180) days after the date of an Optionee's termination of employment by the Company and all Service Recipients without Cause (other than due to Permanent Disability);

(f)     One hundred and eighty (180) days after the date of an Optionee's termination of employment with the Company and all Service Recipients by the Optionee for Good Reason (if such a termination is provided for in the Optionee's individual employment or other severance agreement);

(g)     The date the Option is terminated pursuant to Section 5 or 6 of the Management Stockholder's Agreement; or

(h)     At the discretion of the Company consistent with any determination by the Committee pursuant to Section 9 of the Plan.

For the purposes of this Section 3.2, if an Optionee's employment with the Company and all Service Recipients is terminated without Cause by the Company, for Good Reason by an Optionee (if

095371-0002-11214-NY01.2693043.2

such a termination is provided for in the Optionee's individual employment or other severance agreement), or due to an Optionee's death or Permanent Disability after the end of any Fiscal Year, but prior to the date the Company determines whether or not the applicable Annual EBITDA Target and/or Cumulative EBITDA Target has been achieved, the Performance Option that could vest in respect of such Fiscal Year will remain outstanding until 30 days after notice to Optionee of such determination and effect on the vesting of such Performance Option, such that, if such determination results in the Performance Option vesting in respect of such Fiscal Year, the Optionee shall have such 30-day period to exercise such Performance Option, which will otherwise expire at the close of business on the last day of such period.

## ARTICLE IV

### EXERCISE OF OPTION

Section 4.1.  – <u>Person Eligible to Exercise</u>

During the lifetime of the Optionee, only the Optionee (or his or her duly authorized legal representative) may exercise an Option or any portion thereof. After the death of the Optionee, any exercisable portion of an Option may, prior to the time when an Option becomes unexercisable under Section 3.2, be exercised by his personal representative or by any person empowered to do so under the Optionee's will or under the then applicable laws of descent and distribution.

Section 4.2.  – <u>Partial Exercise</u>

Any exercisable portion of an Option or the entire Option, if then wholly exercisable, may be exercised in whole or in part at any time prior to the time when the Option or portion thereof becomes unexercisable under Section 3.2; provided, however, that any partial exercise shall be for whole shares of Common Stock only.

Section 4.3.  – <u>Manner of Exercise</u>

An Option, or any exercisable portion thereof, may be exercised solely by delivering to the Secretary or his office all of the following prior to the time when the Option or such portion becomes unexercisable under Section 3.2:

(a)     Notice in writing signed by the Optionee or the other person then entitled to exercise the Option or portion thereof, stating that the Option or portion thereof is thereby exercised, such notice complying with all applicable rules established by the Committee;

(b)     (i) Full payment (in cash or by check or by a combination thereof) for the Shares with respect to which such Option or portion thereof is exercised or (ii) indication that the Optionee elects to have the number of Shares that would otherwise be issued to the Optionee reduced by a number of Shares having an equivalent Fair Market Value to the payment that would otherwise be made by Optionee to the Company pursuant to clause (i) of this subsection (b);

(c)     Full payment (in cash or by check or by a combination thereof) to satisfy the minimum withholding tax obligation with respect to which such Option or portion thereof is exercised, except as provided under Section 4.3(f);

7

(d)     A bona fide written representation and agreement, in a form satisfactory to the Committee, signed by the Optionee or other person then entitled to exercise such Option or portion thereof, stating that the shares of Common Stock are being acquired for his own account, for investment and without any present intention of distributing or reselling said shares or any of them except as may be permitted under the Securities Act of 1933, as amended (the "Act"), and then applicable rules and regulations thereunder, and that the Optionee or other person then entitled to exercise such Option or portion thereof will indemnify the Company against and hold it free and harmless from any loss, damage, expense or liability resulting to the Company if any sale or distribution of the shares by such person is contrary to the representation and agreement referred to above; provided, however, that the Committee may, in its reasonable discretion, take whatever additional actions it deems reasonably necessary to ensure the observance and performance of such representation and agreement and to effect compliance with the Act and any other federal or state securities laws or regulations; and

(e)     In the event the Option or portion thereof shall be exercised pursuant to Section 4.1 by any person or persons other than the Optionee, appropriate proof of the right of such person or persons to exercise the option.

(f)     In the event there has not occurred a Public Offering of the Company and an Optionee's employment with the Company and all Service Recipients is terminated without Cause by the Company, for Good Reason by an Optionee (if such a termination is provided for in an Optionee's employment or other severance arrangement), or due to an Optionee's death or Permanent Disability, the Optionee will, to the extent it does not materially adversely impact the short-term liquidity needs of the Company, be allowed to pay any minimum tax withholding due upon any exercise of a vested Option out of the Shares otherwise deliverable upon exercise (using the Fair Market Value on the date of exercise to determine the number of Shares to be withheld in respect of such minimum tax withholding due).

(g)     Once a Public Offering of the Company has occurred, an Optionee may use a Regulation T, Sarbanes-Oxley-compliant program which shall be established by the Company to sell Shares to pay the exercise price and the minimum taxes due upon exercise of any then vested Options subject to any limitations on transfer imposed under applicable securities laws or any underwriter.

Without limiting the generality of the foregoing, the Committee may require an opinion of counsel acceptable to it to the effect that any subsequent transfer of shares acquired on exercise of an Option does not violate the Act, and may issue stop-transfer orders covering such shares. Share certificates evidencing stock issued on exercise of this Option shall bear an appropriate legend referring to the provisions of subsection (d) above and the agreements herein. The written representation and agreement referred to in subsection (d) above shall, however, not be required if the shares to be issued pursuant to such exercise have been registered under the Act, and such registration is then effective in respect of such shares.

Section 4.4.   – Conditions to Issuance of Stock Certificates

The shares of stock deliverable upon the exercise of an Option, or any portion thereof, may be either previously authorized but unissued shares or issued shares, which have then been reacquired by the Company. Such shares shall be fully paid and nonassessable. The Company shall not be required to issue or deliver any certificate or certificates for shares of stock purchased (if certified, or if not certified, register the issuance of such shares on its books and records) upon the exercise of an Option or portion thereof prior to fulfillment of all of the following conditions:

(a)     The obtaining of approval or other clearance from any state or federal governmental agency which the Committee shall, in its reasonable and good faith discretion, determine to be necessary or advisable;

8

(b)     The execution by the Optionee of the Management Stockholder's Agreement and a Sale Participation Agreement; and

(c)     The lapse of such reasonable period of time following the exercise of the Option as the Committee may from time to time establish for reasons of administrative convenience or as may otherwise be required by applicable law.

Section 4.5. – Rights as Stockholder

Except as otherwise provided in Section 2.4 of this Agreement, the holder of an Option shall not be, nor have any of the rights or privileges of, a stockholder of the Company in respect of any shares purchasable upon the exercise of the Option or any portion thereof unless and until certificates representing such shares shall have been issued by the Company to such holder.

ARTICLE V

MISCELLANEOUS

Section 5.1. – Administration

The Committee shall have the power to interpret the Plan and this Agreement and to adopt such rules for the administration, interpretation and application of the Plan as are consistent therewith and to interpret or revoke any such rules. All actions taken and all interpretations and determinations made by the Committee shall be final and binding upon the Optionee, the Company and all other interested persons. No member of the Committee shall be personally liable for any action, determination or interpretation made in good faith with respect to the Plan or the Option. In its absolute discretion, the Board may at any time and from time to time exercise any and all rights and duties of the Committee under the Plan and this Agreement.

Section 5.2. – Option Not Transferable

Neither the Option nor any interest or right therein or part thereof shall be liable for the debts, contracts or engagements of the Optionee or his successors in interest or shall be subject to disposition by transfer, alienation, anticipation, pledge, encumbrance, assignment or any other means whether such disposition be voluntary or involuntary or by operation of law by judgment, levy, attachment, garnishment or any other legal or equitable proceedings (including bankruptcy), and any attempted disposition thereof shall be null and void and of no effect; provided, however, that this Section 5.2 shall not prevent transfers by will or by the applicable laws of descent and distribution.

Section 5.3. – Notices

Any notice to be given under the terms of this Agreement to the Company shall be addressed to the Company in care of its Secretary, and any notice to be given to the Optionee shall be addressed to him at the address given beneath his signature hereto. By a notice given pursuant to this Section 5.3, either party may hereafter designate a different address for notices to be given to him. Any notice, which is required to be given to the Optionee, shall, if the Optionee is then deceased, be given to the Optionee's personal representative if such representative has previously informed the Company of his status and address by written notice under this Section 5.3. Any notice shall have been deemed duly given when (i) delivered in person, (ii) enclosed in a properly sealed envelope or wrapper addressed as aforesaid, three business days after which it is deposited (with postage prepaid) in a post office or branch post office regularly maintained by the United States Postal Service, or (iii) enclosed in a properly sealed

095371-0002-11214-NY01.2693043.2

envelope or wrapper addressed as aforesaid, the first business day following the day after which it is deposited (with fees prepaid) in an office (and not a drop box) regularly maintained by FedEx, UPS, or comparable non-public overnight national courier.

Section 5.4. – Titles; Pronouns

Titles are provided herein for convenience only and are not to serve as a basis for interpretation or construction of this Agreement. The masculine pronoun shall include the feminine and neuter, and the singular the plural, where the context so indicates.

Section 5.5. – Applicability of Plan, Management Stockholder's Agreement and Sale Participation Agreement

The Option and the shares of Common Stock issued to the Optionee upon exercise of the Option shall be subject to all of the terms and provisions of the Plan, the Management Stockholder's Agreement and a Sale Participation Agreement, to the extent applicable to the Option and such Shares.

Section 5.6. – Entire Agreement; Amendment

Subject to Section 10 of the Plan, this Agreement may be amended only by a writing executed by the parties hereto, which specifically states that it is amending this Agreement. This Agreement constitutes the entire agreement among the parties with respect to any agreements regarding any equity-based incentive awards by the Company and supersedes all prior and contemporaneous agreements (including any change in control, executive retention, employment or other agreements regarding the vesting of any equity-based awards, or payment of cash or Shares in respect of any equity-based awards upon a termination of employment), discussions, understandings and negotiations, whether written or oral, with respect to any of the foregoing.

Section 5.7. – Governing Law

The laws of the State of Delaware shall govern the interpretation, validity and performance of the terms of this Agreement regardless of the law that might be applied under principles of conflicts of laws.

Section 5.8. – Arbitration

In the event of any controversy among the parties hereto arising out of, or relating to, this Agreement which cannot be settled amicably by the parties, such controversy shall be finally, exclusively and conclusively settled by mandatory arbitration conducted expeditiously in accordance with the American Arbitration Association rules, by a single independent arbitrator. Such arbitration process shall take place within New York, New York. The decision of the arbitrator shall be final and binding upon all parties hereto and shall be rendered pursuant to a written decision, which contains a detailed recital of the arbitrator's reasoning, subject to enforcement of the arbitration award hereunder or for vacation or modification thereof as provided under the Federal Arbitration Act, Title 9 U.S. Code Chapter 1. Judgment upon the award rendered may be entered in any court having jurisdiction thereof. The Company shall pay the arbitrator's fees and all other costs of such arbitration. Each party shall bear its own legal fees and expenses, unless otherwise determined by the arbitrator.

*[Signatures on next page.]*

10

IN WITNESS WHEREOF, this Agreement has been executed and delivered by the parties hereto.

USF HOLDING CORP.

By: _____

Its: _____
     David B. Eberhardt
     Executive Vice President, General
     Counsel & Secretary

[Signature Page to Stock Option Agreement]

11

**Option Grants**:

Aggregate number of shares of Common Stock
for which the **Time Option** granted hereunder is
exercisable (100% of number of shares):          **7,500**

Aggregate number of shares of Common Stock
for which the **Performance Option**
granted hereunder is exercisable (100% of the
number of shares):                               **7,500**

**Exercise Price of all options**:               $5.00 per share

**Grant Date**:                                  December 21, 2007

OPTIONEE:

Phillip G. Roszak
14815 S 14th Place
Phoenix, AZ 85048

[Signature Page to Stock Option Agreement]

### Schedule A
### Annual and Cumulative EBITDA Targets

The Annual and Cumulative EBITDA Targets are based on the Company's achievement of the following EBITDA targets for the following Fiscal Years:

| Fiscal Year | Annual Performance Target | Cumulative Performance Target |
|---|---|---|
| 2007 | $570.5 million [1] | $570.5 million |
| 2008 | $707.1 million | $1,277.6 million |
| 2009 | $819.0 million | $2,096.6 million |
| 2010 | $907.8 million | $3,004.4 million |
| 2011 | $998.8 million | $4,003.1 million |

Note (1): Assumes $588mm of reported U.S. GAAP EBITDA - $10mm of Real Estate gain - $7.5mm of 6 months of MAC Relief = $570.5mm.

"EBITDA" shall mean earnings before interest, taxes, depreciation and amortization plus transaction, management and/or similar fees (including any transaction advisory fees and related expenses) paid to the Investors and/or its Affiliates. The Board shall, fairly and appropriately, and in good faith, adjust the calculation of EBITDA to reflect, to the extent not contemplated in the management plan, the following: acquisitions, divestitures, major capital programs, any stock option and other stock-based compensation charges, any costs or expenses incurred by the Company in connection with any litigation matters subject to potential indemnification by Ahold under the terms of the Stock Purchase Agreement and related documents, fees or expenses related to any equity offering or repayment or refinancing of indebtedness approved by the Board, any other any restructuring charges or extraordinary or unusual fees, expenses or losses approved by the Board, which approval shall not be unreasonably withheld, any LIFO adjustments, and, in 2007, any incremental one-time costs attributable to the separation of the Company from the Ahold consolidated group. The Board's determination of such adjustment shall be in good faith and based on the Company's accounting as set forth in its books and records and on the financial plan of the Company pursuant to which the Annual EBITDA Targets were originally established.

Annual EBITDA Targets and Cumulative EBITDA Targets will be equitably adjusted by the Board for any acquisitions, divestitures or major capital investment programs not contemplated in management's base case, to the extent permitted under U.S. generally accepted accounting principles and applicable law ("GAAP").

<u>Appendix I</u>

- <u>Examples</u>:

  → Company does not achieve the Annual Performance Target for FY 2007. In FY 2008, a Qualified Public Offering occurs wherein the Investors achieve Liquidity on 40% of the Investors' New Stock. Upon such event, the 20% of the Performance Options that could have, but did not, become vested if the Company had achieved the Annual Performance Target for FY 2007, becomes vested. Because the QPO Catch-up Vesting is only available to provide for catch-up vesting in respect of any previously completed fiscal years, if the Company does not achieve the Annual Performance Target for FY 2008 or the Cumulative Performance Target for FY 2008, no vesting will occur under this method with respect to the Performance Options that might otherwise have become vested in respect of FY 2008.

  → Company does not achieve the Annual Performance Target for either of FY 2007 or FY 2008 (nor does it achieve the Cumulative Annual Performance Target for FY 2008). In FY 2009, a Qualified Public Offering occurs wherein the Investors achieve Liquidity on 40% of the Investors' New Stock. Upon such event, the 20% of the Performance Options that could have, but did not, become vested if the Company had achieved the Annual Performance Target for each of FY 2007 and FY 2008 (or the Cumulative Annual Performance Target for FY 2008), becomes vested, such that the Performance Options will be 40% vested as of the date of such event. If the Company then achieves either the Annual Performance Target or the Cumulative Annual Performance Target for FY 2009, the 20% of the Performance Options that is due to be vested in respect of FY 2009 will become vested in the ordinary course.

14

## SUBSCRIPTION AGREEMENT

This Subscription Agreement (this "Agreement") is entered into as of December 21, 2007 (the "Effective Date") among USF Holding Corp., a Delaware corporation (the "Company") and the undersigned person (the "Management Stockholder") (the Company and the Management Stockholder being hereinafter collectively referred to as the "Parties"). All capitalized terms not immediately defined are hereinafter defined in Section 6(b) of this Agreement.

WHEREAS, the Management Stockholder has been selected by the Company (i) to purchase shares of Common Stock, par value $0.01 per share (the "Common Stock"), from the Company for cash (the "Purchased Stock"); and (ii) to receive options to purchase shares of Common Stock (the "Options") pursuant to the terms set forth below and the terms of the 2007 Stock Incentive Plan for Key Employees of USF Holding Corp. and its Affiliates (the "Option Plan") and the Stock Option Agreement, dated as of the date hereof, entered into by and between the Company and the Management Stockholder (the "Option Agreement"); and

WHEREAS, prior to the date hereof, the Management Stockholder was granted options to purchase Common Stock (the "Prior Options") and, in connection therewith, the Management Stockholder entered into a Management Stockholder's Agreement with the Company (a "Management Stockholder's Agreement") and a Sale Participation Agreement (as defined herein).

NOW THEREFORE, to implement the foregoing and in consideration of the mutual agreements contained herein, the Parties agree as follows:

1. Issuance of Purchased Shares; Options.

(a) Subject to the terms and conditions hereinafter set forth, the Management Stockholder hereby subscribes for and shall purchase, as of the Effective Date, and the Company shall issue and deliver to the Management Stockholder as of the Effective Date, the number of shares of Purchased Stock at a per share purchase price (such price, with respect to the shares of Purchased Stock, or the price per share paid by the Management Stockholder with respect to any shares of Common Stock purchased after the date hereof, as applicable, the "Base Price"), in each case as set forth on Schedule I hereto, which per share purchase price is equal to the effective per share purchase price paid by the Investors (as defined herein) for the shares of Common Stock of the Company in connection with the Acquisition.

(b) Subject to the terms and conditions hereinafter set forth and as set forth in the Option Plan and the Option Agreement, as of the Effective Date the Company is granting to the Management Stockholder Options to acquire the number of shares of Common Stock as set forth on Schedule I hereto, at an initial per share exercise price equal to the Base Price, and the Parties shall execute and deliver to each other copies of the Option Agreement concurrently with the issuance of the Options.

(c) The Company shall have no obligation to sell any Purchased Stock to any person who (i) is a resident or citizen of a state or other jurisdiction in which the sale of the Common Stock to him or her would constitute a violation of the securities or "blue sky" laws

of such jurisdiction or (ii) is not an employee or director of the Company or its subsidiaries as of the Effective Date.

2. <u>Management Stockholder's Representations, Warranties and Agreements</u>.

(a) The Management Stockholder acknowledges that he or she has been advised that (i) the shares of the Purchased Stock and the Common Stock to be issued upon exercise of any Options ("<u>Option Stock</u>" and, together with the Purchased Stock, the "<u>Stock</u>") are characterized as "restricted securities" under the Act inasmuch as they are being acquired from the Company in a transaction not involving a Public Offering and that the Stock may be resold without registration under the Act only in certain limited circumstances, (ii) a restrictive legend in the form heretofore set forth shall be placed on the certificates (if any) representing the Stock and (iii) a notation shall be made in the appropriate records of the Company indicating that the Stock is subject to restrictions on transfer and appropriate stop transfer restrictions will be issued to the Company's transfer agent with respect to the Stock.

(b) The Management Stockholder represents and warrants that (i) with respect to the Purchased Stock and Option Stock, the Management Stockholder has received and reviewed the available information relating to such Stock, including having received and reviewed the documents related thereto, certain of which documents set forth the rights, preferences and restrictions relating to the Options and the Stock underlying the Options and (ii) the Management Stockholder has been given the opportunity to obtain any additional information or documents and to ask questions and receive answers about such information, the Company and the business and prospects of the Company which the Management Stockholder deems necessary to evaluate the merits and risks related to the Management Stockholder's investment in the Stock and to verify the information contained in the information received as indicated in this Section 2(b), and the Management Stockholder has relied solely on such information.

2

(c) The Management Stockholder further represents and warrants that (i) the Management Stockholder's financial condition is such that the Management Stockholder can afford to bear the economic risk of holding the Stock for an indefinite period of time and has adequate means for providing for the Management Stockholder's current needs and personal contingencies, (ii) the Management Stockholder can afford to suffer a complete loss of his or her investment in the Stock, (iii) the Management Stockholder understands and has taken cognizance of all risk factors known or made available to the Management Stockholder related to the purchase of the Stock, (iv) the Management Stockholder's knowledge and experience in financial and business matters are such that the Management Stockholder is capable of evaluating the merits and risks of the Management Stockholder's purchase of the Stock as contemplated by this Agreement and (v) with respect to the Purchased Stock, such Purchased Stock is being acquired by the Management Stockholder for his or her own account, not as nominee or agent, and not with a view to the resale or distribution of any part thereof in violation of the Act, and the Management Stockholder has no present intention of selling or otherwise distributing the Purchased Stock in violation of the Act.

(d) For the avoidance of doubt, the Stock shall constitute "Stock" for purposes of the Management Stockholders Agreement.

(e) The certificate (or certificates) representing the Stock, if any, shall bear the following legend:

"THE SHARES REPRESENTED BY THIS CERTIFICATE MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED OF UNLESS SUCH TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION COMPLIES WITH THE PROVISIONS OF THE MANAGEMENT STOCKHOLDER'S AGREEMENT BETWEEN USF HOLDING CORP. (THE "COMPANY") AND THE MANAGEMENT STOCKHOLDER NAMED ON THE FACE HEREOF AND THE SALE PARTICIPATION AGREEMENT AMONG SUCH MANAGEMENT STOCKHOLDER AND CLAYTON, DUBILIER & RICE FUND VII, L.P., CLAYTON, DUBILIER & RICE FUND VII (CO-INVESTMENT), L.P., CD&R PARALLEL FUND VII, L.P., CDR USF CO-INVESTOR L.P., CDR USF CO-INVESTOR NO. 2, L.P., KKR 2006 FUND L.P., KKR PEI INVESTMENTS, L.P., KKR PARTNERS III, L.P. AND OPERF CO-INVESTMENT LLC, IN EACH CASE DATED AS OF OCTOBER 19, 2007 (COPIES OF WHICH ARE ON FILE WITH THE SECRETARY OF THE COMPANY) AND ALL APPLICABLE FEDERAL AND STATE SECURITIES LAWS."

3

3. <u>The Company's Representations and Warranties and Covenants</u>. The Company represents and warrants to the Management Stockholder that (i) this Agreement has been duly authorized, executed and delivered by the Company and is enforceable against the Company in accordance with its terms and (ii) the Stock, when issued and delivered in accordance with the terms hereof and the other agreements contemplated hereby, will be duly and validly issued, fully paid and nonassessable.

4. <u>Definitions</u>.

(a) *Definitions*. All capitalized terms used in this Agreement and not defined herein shall have such meaning as such terms are defined in the Option Plan. Terms used herein and as listed below shall be defined as follows:

"<u>Act</u>" shall mean the Securities Act of 1933, as amended, and the rules and regulations in effect thereunder.

"<u>Agreement</u>" shall have the meaning set forth in the introductory paragraph.

"<u>Base Price</u>" shall have the meaning set forth in Section 1(a) hereof.

"<u>Common Stock</u>" shall have the meaning set forth in the first recital.

"<u>Company</u>" shall have the meaning set forth in the introductory paragraph.

"<u>Investors</u>" shall mean Clayton, Dubilier & Rice Fund VII, L.P., Clayton, Dubilier & Rice Fund VII (Co-Investment), L.P., CD&R Parallel Fund VII, L.P., CDR USF Co-Investor L.P., CDR USF Co-Investor No. 2, L.P., KKR 2006 Fund L.P., KKR PEI Investments, L.P., KKR Partners III, L.P. and OPERF Co-Investment LLC.

"<u>Management Stockholder</u>" shall have the meaning set forth in the introductory paragraph.

"<u>Management Stockholder's Agreement</u>" shall have the meaning set forth in the second recital.

"<u>Options</u>" shall have the meaning set forth in the first recital.

"<u>Option Plan</u>" shall have the meaning set forth in the first recital.

"<u>Option Stock</u>" shall have the meaning set forth in Section 2(a) hereof.

"<u>Parties</u>" shall have the meaning set forth in the introductory paragraph.

"<u>Person</u>" shall mean "person," as such term is used for purposes of Section 13(d) or 14(d) of the Exchange Act.

"<u>Public Offering</u>" shall mean the sale of shares of Common Stock to the public subsequent to the date hereof pursuant to a registration statement under the Act which has been declared effective by the SEC (other than a registration statement on Form S-4, S-8 or any other similar form).

"<u>Purchased Stock</u>" shall have the meaning set forth in the first recital.

4

"Sale Participation Agreement" shall mean that certain sale participation agreement entered into by and between the Management Stockholder and the Investors dated as of the date hereof.

"Stock" shall have the meaning set forth in Section 2(a) hereof.

5. Covenant Regarding 83(b) Election. Except as the Company may otherwise agree in writing, the Management Stockholder hereby covenants and agrees that the Management Stockholder will make an election provided pursuant to Treasury Regulation Section 1.83-2 in the form attached as Schedule II hereto with respect to the Purchased Stock and the Option Stock acquired on exercise of any Options; and the Management Stockholder further covenants and agrees that he or she will furnish the Company with copies of the forms of election the Management Stockholder files within thirty (30) days after the date of purchase of the Purchased Stock, and within thirty (30) days after each exercise of the Management Stockholder's Options and with evidence that each such election has been filed in a timely manner.

6. Management Stockholder's Employment by the Company. Nothing contained in this Agreement (i) obligates the Company or any subsidiary or Affiliate of the Company to employ the Management Stockholder in any capacity whatsoever or (ii) prohibits or restricts the Company (or any such subsidiary or Affiliate) from terminating the employment of the Management Stockholder at any time or for any reason whatsoever, with or without Cause, and the Management Stockholder hereby acknowledges and agrees that neither the Company nor any other Person has made any representations or promises whatsoever to the Management Stockholder concerning the Management Stockholder's employment or continued employment by the Company or any subsidiary or Affiliate of the Company.

7. Binding Effect. The provisions of this Agreement shall be binding upon and accrue to the benefit of the parties hereto and their respective heirs, legal representatives, successors and assigns. No provision of this Agreement is intended to or shall confer upon any Person other than the Parties any rights or remedies hereunder or with respect hereto.

8. Amendment. This Agreement may be amended by the Company at any time upon notice to the Management Stockholder thereof.

9. Closing. Except as otherwise provided herein, the closing of each purchase and sale of shares of Stock pursuant to this Agreement shall take place at the principal office of the Company on the tenth business day following delivery of the notice by either Party to the other of its exercise of the right to purchase or sell such Stock hereunder.

10. Applicable Law; Jurisdiction; Arbitration; Legal Fees.

(a) The laws of the State of Delaware applicable to contracts executed and to be performed entirely in such state shall govern the interpretation, validity and performance of the terms of this Agreement.

(b) In the event of any controversy among the parties hereto arising out of, or relating to, this Agreement which cannot be settled amicably by the parties, such controversy shall be finally, exclusively and conclusively settled by mandatory arbitration conducted expeditiously in accordance with the American Arbitration Association rules by a single

5

independent arbitrator. Such arbitration process shall take place in New York, New York. The Company shall pay all fees and costs of such arbitration. The decision of the arbitrator shall be final and binding upon all parties hereto and shall be rendered pursuant to a written decision, which contains a detailed recital of the arbitrator's reasoning, subject to enforcement of the arbitration award hereunder or for vacation or modification thereof as provided under the Federal Arbitration Act, Title 9 U.S. Code Chapter 1. Judgment upon the award rendered may be entered in any court having jurisdiction thereof.

(c) In the event of any arbitration or other disputes with regard to this Agreement or any other document or agreement referred to herein, each Party shall pay its own legal fees and expenses, unless otherwise determined by the arbitrator.

11. Miscellaneous.

(a) In this Agreement all references to "dollars" or "$" are to United States dollars and the masculine pronoun shall include the feminine and neuter, and the singular the plural, where the context so indicates.

12. If any provision of this Agreement shall be declared illegal, void or unenforceable by any court of competent jurisdiction, the other provisions shall not be affected, but shall remain in full force and effect.

13. Notices. All notices and other communications provided for herein shall be in writing. Any notice or other communication hereunder shall be deemed duly given (i) upon electronic confirmation of facsimile, (ii) one business day following the date sent when sent by overnight delivery and (iii) five (5) business days following the date mailed when mailed by registered or certified mail return receipt requested and postage prepaid, in each case as follows:

(a) If to the Company, to it at the following address:

USF Holding Corp.
c/o U.S. Foodservice, Inc.
9755 Patuxent Woods Drive
Columbia, Maryland 21046
Attention: David Eberhardt
Fax: (410) 309-6465

with a copy (which shall not constitute notice) to:

Kohlberg Kravis Roberts & Co. L.P.
2800 Sand Hill Road, Suite 94025
Menlo Park, California 94025
Attention: Michael Calbert
Fax: (650) 233-6548

and

Clayton, Dubilier & Rice, Inc.
375 Park Avenue
18th Floor
New York, New York 10152

6

Attention: Richard J. Schnall
Fax: (212) 407-5252

with a copy (which shall not constitute notice) to:

Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, New York 10017
Attention: Marni Lerner, Esq.
Fax: (212) 455-2502

and

Debevoise & Plimpton LLP
919 Third Avenue
New York, New York 10022
Attention: Franci J. Blassberg, Esq.
Fax: (212) 909-7531

If to the Management Stockholder, to the Management Stockholder at the address set forth below under the Management Stockholder's signature; or at such other address as either party shall have specified by notice in writing to the other.

[*Signatures on next page.*]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

USF HOLDING CORP.

By: _____

Name: _____

Title: _____

David B. Eberhardt
Executive Vice President, General
Counsel & Secretary

MANAGEMENT STOCKHOLDER

_____

Name: _____

Address: _____

*[Signature page to Subscription Agreement]*

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

USF HOLDING CORP.

By: _____

     Name:

     Title:

MANAGEMENT STOCKHOLDER

*Phillip G. Roszak*

Name:   Phillip G. Roszak
Address: 14815 S 14th Place
          Phoenix, AZ, 85048

[Signature Page to Subscription Agreement]

Management Stockholder: Phillip G. Roszak

PURCHASED STOCK

Number of shares of Purchased Stock: **15,000**

Base Price: $5.00

OPTIONS

Number of shares of Common Stock underlying Options: **15,000**



## SECTION 83(b) ELECTION FORM

*December 21, 2007*

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Internal Revenue Service Center

FRESNO, CA    93888

Re:  Election Under §83(b) of the Internal Revenue Code

Dear Sir or Madam:

The undersigned hereby elects under Section 83(b) of the Internal Revenue Code to include in the taxpayer's gross income for the taxable year in which the property described below was transferred, the excess (if any), of the fair market value of such property at the time of its transfer, over the amount (if any) paid for such property.  Pursuant to Treas. Reg. § 1.83-2(e) the following information is submitted:

1.    Name of taxpayer:    **Phillip G. Roszak**

       Address of taxpayer:    **14815 S. 14Th Place**

       **Phoenix, AZ 85048**

       Taxpayer's Identification Number:  **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**

2.    Property with respect to which the election is being made:  **15,000** shares of common stock of USF Holding Corp. ("USF").

3.    Date transferred:  December 21, 2007.

4.    Taxable year for which this election is being made:  Calendar year 2007.

5.    Nature of the restriction or restrictions to which the property is subject:

       While the shares described in Paragraph 2 are held by the undersigned, such shares shall be subject to restrictions on transfer and to the right of USF to repurchase such shares at an agreed upon price, which price may be lower than the fair market value of the shares upon certain types of terminations of the undersigned's employment with USF or any of its subsidiaries (including US Foodservice), which transfer restrictions and right of repurchase shall lapse upon certain events.

6.    Fair market value of the property at the time of transfer: $5.00 per share.

7.    Amount paid for the property: $5.00 per share.

8.    A copy of this election has been furnished to David Eberhardt at U.S. Foodservice.

Very truly yours,

*Phillip G. Roszak*

(Signature of Taxpayer)



## Omnibus Signature Page

**Name of Management Stockholder:**     Phillip G Roszak

**Address:**     14815 S 14th Place
Phoenix, AZ 85048

Do you wish to purchase shares of common stock of USF Holding Corp. pursuant to the Management Stockholder's Agreement?

☒ Yes
☐ No

If yes, please indicate your intention to purchase the dollar value of shares of USF Holding Corp. common stock indicated by checking one of the following boxes:
(*NOTE: Shares purchased with this amount will be rounded down to the nearest whole share*)

### Option A Investment Level

| | Investment Level | USF Share Price | Investment Shares | Multiplier | Total Investment Options | Time-Vested Investment Options | Performance-Vested Investment Options |
|---|---|---|---|---|---|---|---|
| ☐ | $12500 | $5.00 | 2500 | 1x | 2500 | 1250 | 1250 |

### Option B Investment Level

| | Investment Level | USF Share Price | Investment Shares | Multiplier | Total Investment Options | Time-Vested Investment Options | Performance-Vested Investment Options |
|---|---|---|---|---|---|---|---|
| ☒ | $25000 | $5.00 | 5000 | 1x | 5000 | 2500 | 2500 |

IN WITNESS WHEREOF, I hereby agree to be a party to each of the following agreements as a "Management Stockholder", "Optionee" or "Participant", as applicable, as of the date of such agreements:

1. Subscription Agreement with USF Holding Corp.

2. Stock Option Agreement with USF Holding Corp.

Signature:

_Phillip A. Rozak_

Dated as of: _5/26/11_



# Non-Solicitation and Non-Disclosure Agreement

### Standard – Salary Grades 16-19

U.S. Foodservice, Inc., (the "Company" as defined below) and Employee, for good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, knowingly and voluntarily agree as follows:

1.     **Employee's Representations and Acknowledgments.**

      (a)     **Consideration.**  In consideration for Employee's agreement to enter into this Non-Solicitation and Non-Disclosure Agreement (the "**Agreement**") and to be bound by its terms, Employee has received employment or continued employment, the ability to participate in the Company's 2007 Stock Incentive Plan for Key Employees of USF Holding Corp. and its Affiliates, the ability to participate in the Company's Points of Focus program, the ability to participate in other similar Company sponsored programs, and/or other good and valuable consideration.

      (b)     **Confidential Information and Goodwill.**  Solely as a result of employment with the Company, Employee is given access to information relating to the Company and its customers, including Confidential Information. Employee recognizes that Employee, on behalf of the Company, will develop close relationships with, gain special knowledge of, and promote and develop the loyalty of said customers. The Company's Confidential Information, the goodwill of its customers, and its relationship with its employees have been and will continue to be developed through the Company's investment of substantial time, effort and money.  Employee further recognizes that Employee is in a position to unfairly convert the Company's business, customer accounts and goodwill of customers and employees for use by Employee and other Persons in competition with the Company, and that this would cause the Company to suffer immediate and irreparable injury.

      (c)     **No Other Agreement or Understanding.**  Employee represents and warrants that Employee is not a party to any agreement or understanding which would impair Employee's ability to enter into this Agreement or otherwise preclude or restrict Employee's employment with the Company (except as set forth in writing in the Applicant's Non-Solicitation/Non-Competition Representation), and that Employee's execution of this Agreement and employment with the Company will not violate any other agreement or understanding to which Employee is bound.

      (d)     **Survival.**  If, after executing this Agreement, Employee: (i) is promoted to, assigned to or otherwise assumes one or more positions or functions other than or in addition to Employee's position or functions at the time Employee signed this Agreement, regardless of title, or (ii) is transferred or assigned to or otherwise works for any affiliate, subsidiary or other division or business unit of the Company, the terms of this Agreement shall continue to apply with full force and effect.  Employee acknowledges and understands that unless and until a subsequent written Agreement is signed by all parties to this Agreement that expressly supersedes this Agreement, this Agreement will continue in full force and effect.

      (e)     **Termination of Employment.**  Employee understands and agrees that the obligations and restrictions imposed under this Agreement shall apply after the termination of employment, regardless of whether such termination is voluntary or involuntary, or is with or without cause or notice.

2.     **Definitions.**  For the purposes of this Agreement, the following terms shall have the following meanings:

(a) "**Associate**" means an employee of the Company.

(b) "**Company**" means U.S. Foodservice, Inc., its subsidiaries, its parent company USF Holding Corp., any entity owned or controlled by USF Holding Corp. or U.S. Foodservice, Inc., as well as any other businesses that U.S. Foodservice, Inc., may acquire or establish after the execution of this Agreement and any successors and assigns.

(c) "**Business of the Company**" is the foodservice distribution business, including the sale and distribution of food and related products, equipment, goods and services to restaurants, schools, hospitals, and other institutions or establishments that serve food.

(d) "**Person(s)**" mean all individuals, partnerships, corporations, limited liability companies, firms, businesses, and other entities, other than the Company.

(e) "**Confidential Information**" means any information (in whatever form and whether or not recorded in any media) relating to the Business of the Company (whether constituting a trade secret or not) and including, but not limited to, customer lists or other documents containing the names and/or job titles of the principal contact(s) of each customer; customer documents, routing arrangements, files, purchases and account history; route lists of sales employees; pricing, margins, sales allowances, discounts, incentives and pricing policies; invoices; marketing and product information; order guides or histories; sales data for any employee, product, customer or territory; sales and delivery schedules; credit terms, policies and information, including payment records; information on customer preferences; promotional programs; financial information of the Company or its customers; the terms, conditions and structures of the Company's contracts and agreements with customers, vendors and suppliers; information pertaining to the Company's methods of operation, processes, strategies and techniques, including strategies for identifying and satisfying the needs of specific customers and types of customers; and lists containing personal information about other employees of the Company, including but not limited to their home and business telephone, mobile and pager numbers, addresses, compensation terms, customers served by such employees, and job performance; which (i) is or has been disclosed to Employee (or of which Employee became aware) as a consequence of or through his or her relationship to the Company, (ii) has value to the Company or would be of value (actual or potential) to a competitor of the Company, and (iii) is not generally known, or readily available by lawful means, to the public (including compiled information that is not publicly available in such a consolidated form). Confidential Information shall not include any information that has been voluntarily disclosed to the public by the Company (except where such public disclosure has been made by Employee without authorization) or that has been independently developed and disclosed by others, or that otherwise has entered the public domain through lawful means.

(f) "**Pre-Termination Period**" means the eighteen (18) month period immediately prior to the termination of Employee's employment with the Company.

3. **Preservation of At-Will Employment Relationship.** Employee agrees that no provision in this Agreement shall be construed to create an express or implied employment contract or a promise of employment for any specific period of time. Employee further acknowledges and agrees that Employee's employment with the Company is "at will" (unless Employee entered into a written employment contract expressly providing that his/her employment is not at will and signed by an officer of U.S. Foodservice, Inc. who is authorized to do so) and can be terminated at any time by the Company or Employee, with or without reason, with or without notice, and with or without cause.

4. **Non-Disclosure of Confidential Information.** At no time, either during or after the termination of employment, shall Employee directly or indirectly obtain, disclose or use for Employee or any Person, or aid others in obtaining, disclosing or using any Confidential Information of the Company, other than as may be required in the performance of duties for and as authorized by the Company. All Confidential Information is and shall remain the sole property of the Company. The Company understands that under the current laws of certain states, restrictions on the use or disclosure of confidential information must be of a finite duration. Accordingly, the parties agree that should the law of such a state be applied to this Agreement, the restrictions on the use or disclosure of Confidential Information that is

not a trade secret (the restriction on the use or disclosure of which shall be unlimited by time) shall apply only for a period of two (2) years from the termination of Employee's employment with the Company, which period Employee acknowledges to be reasonable under the circumstances at the time of execution of the Agreement.

5. **Return of Company Property and Confidential Information.** All records, files, customer order guides, pricelists, photo/videographic materials, computers, cell phones, personal data assistants, software, keys, equipment, credit cards or other tangible material, and all other documents, including but not limited to Confidential Information, Employee receives, acquires, produces or has access to as a result of his or her employment with the Company (regardless of the medium in which any information is stored) (collectively "Property"), are the exclusive property of the Company. Upon the termination of Employee's employment, Employee shall return to the Company all Property of the Company and all copies thereof in Employee's possession or control.

6. **Non-Solicitation of Restricted Customers**. (a) For the one (1) year period following the termination of Employee's employment with the Company, Employee shall not, directly or indirectly, (for Employee or any other Person, whether as an employee, owner, consultant, independent contractor, or in any other capacity) for the purpose of providing products or services competitive with those offered by the Company, solicit, market, service, contact, sell to or attempt to sell to any Person(s):

    (1)    to whom Employee sold products or services on behalf of the Company at any time during the Pre-Termination Period, including sales performed while Employee was in training or providing vacation or leave coverage for another Associate; or

    (2)    to whom the Company sold products or services and with whom Employee had contact on behalf of the Company in connection with such sale at any time during the Pre-Termination Period; or

    (3)    to whom the Company sold products or services at any time during the Pre-Termination Period and which sale was made through any Associate whom Employee directly or indirectly managed or supervised (at any level of management or supervision); or

    (4)    with regard to whom, at any time during the Pre-Termination Period, Employee (or any Associate whom Employee directly or indirectly managed or supervised, at any level of management or supervision): (i) participated in the preparation of a written sales proposal or bid containing Confidential Information to such Person on behalf of the Company; (ii) participated in the setting of prices, margins, or credit terms for such Person(s) on behalf of the Company; or (iii) used or received or created or reviewed any Confidential Information relating to such Person(s) on behalf of the Company; or

    (5)    who is, or functions as, a food broker or contract management company or group purchasing organization or otherwise represents one or more customers or negotiates on their behalf, and to whom or through whom Employee or any Associate whom Employee directly or indirectly managed or supervised (at any level of management or supervision) sold products or services on behalf of the Company at any time during the Pre-Termination Period.

    (b)    For the one (1) year period following the termination of Employee's employment with the Company, Employee shall not, directly or indirectly, (for Employee or any other Person, whether as an employee, owner, consultant, independent contractor, or in any other capacity) for the purpose of providing products or services competitive with those offered by the Company, solicit, market, service, contact, sell to or attempt to sell to any Person who is controlled by or who controls the Person(s) identified in Section 6(a). A **"Restricted Customer"** is that and are those Person(s) identified in Section 6(a) and 6(b) herein.

    (c)    Examples of indirect solicitation, marketing, servicing, contacting, selling to or attempting to sell to, include but are not limited to, providing Confidential Information to a Person(s) regarding a Restricted Customer; advising or encouraging a Restricted Customer to reduce or cease doing business with the Company or to do business

3

with a Person that provides products or services competitive with the Company; switching or swapping sales, solicitation, or service responsibility for a Restricted Customer with an employee of a Person that is competitive with the Company; participating in the supervision or management of any Person or employee of such Person, regardless of other intervening levels of management or supervision, with regard to a Restricted Customer; participating in the setting of prices, credit terms or margins for a Restricted Customer; participating in developing and executing marketing and sales strategies and decisions affecting a Restricted Customer; and receiving any personal benefit (present or future) in the event a Restricted Customer should do any business with a Person.

7. **Non-Solicitation of Company Employees.** For a period of one (1) year following Employee's termination of employment with the Company, Employee will not, directly or indirectly, on behalf Employee or for any other Person, entice, induce, encourage or solicit or attempt to entice, induce, encourage or solicit any individual then employed by the Company and with whom the Employee had work-related dealings as a co-employee of the Company to leave such employment with the Company (this provision is not intended to restrict communications addressed to the general public, such as advertising to fill open positions) nor will the Employee hire any such individual for any other Person during the same one-year period following the Employee's termination.

8. **Non-Impairment of Common Law.** Nothing in this Agreement shall relieve Employee of any duties or obligations Employee has to the Company under statutory or common law, which include but are not limited to: fiduciary duties, the duty of loyalty, and the duty not to tortiously interfere with business relationships.

9. **Reasonable and Necessary; Severability; Enforceability; Non-Waiver.** The terms and provisions of this Agreement are severable and if any term or provision is held to be unenforceable, it shall be enforced to the maximum extent allowable under the law and reformed or severed to the minimum extent necessary to render it or the Agreement enforceable. Any such alteration shall not affect the validity and enforceability of any other term or provision. Employee acknowledges that the obligations contained in this Agreement are not indivisible to any extent but are fully divisible and reformable or severable as legally necessary whether through alteration of a word, clause or sentence. The Company's failure to act upon any breach of this Agreement or waiver of any such breach shall not constitute a waiver of any preceding or succeeding breach, or of any other right.

10. **Waiver of Jury Trial.** Any action, lawsuit, demand, claim or counterclaim over this Agreement or any of its terms shall be resolved by a judge alone, and both parties hereby expressly waive and forever disclaim the right to a trial before a civil jury.

11. **Notification.** If, within the one (1) year after the termination of Employee's employment, the Employee provides services as an employee, independent contractor or consultant, owner or in any other capacity, whether or not for compensation, to any Person that offers products or services competitive with those provided by the Company, then Employee shall promptly provide the Company with the following information about such Person: the name, address and telephone number of the location to which Employee is assigned, and his or her job title. Employee shall promptly provide any such Person with a copy of this Agreement, and employee consents to the Company's right, at any time, to notify such Person of this Agreement, as well as the details of any alleged violations thereof.

12. **Non-Disparagement.** During and after employment with the Company, Employee shall not divulge, disclose or communicate to others, in any manner whatsoever, information or statements that disparage or are intended to disparage the Company or its business reputation.

13. **Remedies for Breach.** Employee agrees that any breach of this Agreement by Employee will cause the Company to suffer immediate and irreparable injury, for which there is no adequate remedy at law. In the event of a breach or threatened breach of any of the terms of this Agreement, Employee agrees the Company shall be entitled to seek and obtain enforcement of this Agreement by means of a decree of specific performance, a temporary restraining order, a preliminary or permanent injunction, and any other remedies at law or equity which may be available, including the right to receive monetary damages. Employee shall reimburse the Company for all reasonable attorneys' fees and costs incurred by the Company in enforcing this Agreement.

4

14. **Other Agreements**. In the event Employee executed other written agreements relating to this subject matter with the Company, and/or in the event Employee enters into other written agreements that contain provisions similar to the provisions contained herein, all such provisions shall be interpreted to provide the Company with cumulative rights and remedies and the benefits and protections provided to the Company under each such agreement shall be given full force and effect. No amendment, waiver or revocation of this Agreement shall be effective unless set forth in writing expressly stating the amendment, waiver or revocation and signed by an authorized officer of the Company.

15. **Successors and Assigns**. Employee expressly agrees that this Agreement, including the rights and obligations hereunder, may be transferred and/or assigned by the Company without the further consent of Employee, and that this Agreement is for the benefit of and may be enforced by the Company, its present and future successors, assigns, subsidiaries, affiliates, and purchasers, but is not assignable by Employee.

16. **Governing Law**. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware, without regard to its choice or conflicts of laws rules.

17. **Section Headings**. The headings of sections contained in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit, extend or describe the scope of this Agreement or the intent of any provision hereof.

---

Employee, intending to be legally bound, hereby acknowledges that he or she: has read this Agreement in its entirety and understands all of its terms and conditions; is entering into this Agreement voluntarily, without coercion from any source; and agrees to abide by all of the terms and conditions of this Agreement. Employee further represents that any questions regarding this Agreement have been answered by the Company to the satisfaction of the Employee.

---

U.S. FOODSERVICE, INC.

By: _____

Signature, L.S. (under seal)

May 27, 2011

Date

Juliette Pryor

Printed Name

EVP, General Counsel and Chief Ethics Officer

Title

**EMPLOYEE**

_____

Employee Signature, L.S. (under seal)

Printed Name: _Phillip G. Roszak_

Title: _VP Financial Systems_
Date: _5/26/11_

# USF HOLDING CORP.

May 13, 2011

Dear Phillip G Roszak:

As you know, because you are a key contributor to U.S. Foodservice, Inc.'s continued success, USF Holding Corp. (the "Company"),U.S. Foodservice, Inc.'s parent, which is an entity controlled by investment funds affiliated with Clayton, Dubilier & Rice, LLC and Kohlberg Kravis Roberts & Co. L.P., is offering you the opportunity to make a personal investment in the Company, allowing you to share in the potential rewards of the combined efforts of our team, of which you are a valuable member.

You are being given the opportunity to invest in the Company through the purchase of shares of common stock of the Company ("Common Stock") and the receipt of options to purchase shares of Common Stock ("Options"). In considering your decision to invest, it is important to recognize that highly leveraged companies, such as the Company, bring with them a number of investment risks. You are urged to read carefully the provided Confidential Information Memorandum and the annexes thereto (including each of the agreements described in the memorandum) (the "Offering Memorandum") as well as the consolidated financial statements of U.S. Foodservice, Inc. and the notes thereto that have separately been provided to you before deciding whether to invest. The Offering Memorandum was prepared to describe the shares of Common Stock and Options being offered to you and the agreements to which you will become a party as a condition to such investment, as well as to inform you of the risks inherent in our business and in the investment you are considering.

Included with this letter is:

- The Offering Memorandum.

- Certain information and related documents relating to the "Section 83(b) election" you will be required to make if you elect to purchase any shares of Common Stock. Please review this information carefully and complete as instructed.

- An "omnibus signature page" (the "Omnibus Signature Page"), which will constitute your signature page to one or more of the following applicable forms of which are included with this letter is: (1) the Management Stockholder's Agreement, (2) the Sale Participation Agreement, (3) the Subscription Agreement, and/or (4) the Stock Option Agreement.

- A Non-Solicitation and Non-Disclosure Agreement.

If you choose to invest, you may invest at one of two investment levels:

- Option A Investment Level: $12500

- Option B Investment Level: $25000

For your convenience, if you choose to invest, the following is a checklist to which you can refer in respect of your investment:

### Option A Investment Level
- Your investment opportunity in shares of Common Stock is equal to $12500 (the "Purchase Price"), which would result in the purchase by you of 2500 shares of Common Stock at a purchase price of $5.00 per share. Please note that, should you choose to participate in the investment opportunity, you will not be permitted to invest more or less than such amount.

- If you choose to make an investment in the amount set forth in the paragraph above, you will be granted "time" and "performance" Options to purchase an aggregate of 2500 shares of Common Stock (based on a multiplier of 1x the number of shares of Common Stock you have elected to purchase) for an exercise price of $5.00 per share.

### Option B Investment Level
- Your investment opportunity in shares of Common Stock is equal to $25000 (the "Purchase Price"), which would result in the purchase by you of 5000 shares of Common Stock at a purchase price of $5.00 per share. Please note that, should you choose to participate in the investment opportunity, you will not be permitted to invest more or less than such amount.

- If you choose to make an investment in the amount set forth in the paragraph above, you will be granted "time" and "performance" Options to purchase an aggregate of 5000 shares of Common Stock (based on a multiplier of 1x the number of shares of Common Stock you have elected to purchase) for an exercise price of $5.00 per share.

To purchase shares of Common Stock, you must make payment of the Purchase Price by including a check for such amount made payable to **USF Holding Corp.** when delivering your signed documents to the Company as required below.

     In order to participate in this offering, the following documents must be executed and returned **by no later than Friday, May 27, 2011** to Linas Orentas, Director, Compensation, 9399 West Higgins Road, Suite 500, Rosemont, Illinois, 60018 (for your convenience an addressed, postage-paid envelope is included in this package):

- The completed Omnibus Signature Page;

- The completed Non-Solicitation and Non-Disclosure Agreement; and

- The check made payable to **USF Holding Corp.** for the Purchase Price amount.

     Please do not hesitate to contact either Dave Esler (phone: 847.720.8367; email: David.Esler@usfood.com), Juliette Pryor (phone: 847.720.8013; email: Juliette.Pryor@usfood.com) or Linas Orentas (phone: 847.720.8032; email: Linas.Orentas@usfood.com) promptly if you have any questions regarding your investment, including the amounts indicated in this letter and in the related documents included herewith.



## Omnibus Signature Page

**Name of Management Stockholder:**    Phillip G Roszak

**Address:**    14815 S 14th Place
Phoenix, AZ 85048

---

Do you wish to purchase shares of common stock of USF Holding Corp. pursuant to the Management Stockholder's Agreement?

❏ Yes
❏ No

---

If yes, please indicate your intention to purchase the dollar value of shares of USF Holding Corp. common stock indicated by checking one of the following boxes:
(*NOTE: Shares purchased with this amount will be rounded down to the nearest whole share*)

### Option A Investment Level

| | Investment Level | USF Share Price | Investment Shares | Multiplier | Total Investment Options | Time-Vested Investment Options | Performance-Vested Investment Options |
|---|---|---|---|---|---|---|---|
| ❏ | $12500 | $5.00 | 2500 | 1x | 2500 | 1250 | 1250 |

### Option B Investment Level

| | Investment Level | USF Share Price | Investment Shares | Multiplier | Total Investment Options | Time-Vested Investment Options | Performance-Vested Investment Options |
|---|---|---|---|---|---|---|---|
| ❏ | $25000 | $5.00 | 5000 | 1x | 5000 | 2500 | 2500 |

IN WITNESS WHEREOF, I hereby agree to be a party to each of the following agreements as a "Management Stockholder", "Optionee" or "Participant", as applicable, as of the date of such agreements:

1. Subscription Agreement with USF Holding Corp.

2. Stock Option Agreement with USF Holding Corp.

Signature:

_____

Dated as of: _____

## SUBSCRIPTION AGREEMENT

This Subscription Agreement (this "Agreement") is entered into as of May 27, 2011 (the "Effective Date") among USF Holding Corp., a Delaware corporation (the "Company") and the undersigned person (the "Management Stockholder") (the Company and the Management Stockholder being hereinafter collectively referred to as the "Parties"). All capitalized terms not immediately defined are hereinafter defined in Section 6(b) of this Agreement.

WHEREAS, the Management Stockholder has been selected by the Company (i) to purchase additional shares of Common Stock, par value $0.01 per share (the "Common Stock"), from the Company for cash (the "Purchased Stock"); and (ii) to receive additional options to purchase shares of Common Stock (the "Options") pursuant to the terms set forth below and the terms of the 2007 Stock Incentive Plan for Key Employees of USF Holding Corp. and its Affiliates (the "Option Plan") and the Stock Option Agreement, dated as of the date hereof, entered into by and between the Company and the Management Stockholder (the "Option Agreement"); and

WHEREAS, prior to the date hereof, the Management Stockholder purchased shares of Common Stock and received options to purchase Common Stock (the "Prior Investment") and, in connection therewith, the Management Stockholder entered into a Management Stockholder's Agreement with the Company (a "Management Stockholder's Agreement") and a Sale Participation Agreement (as defined herein).

NOW THEREFORE, to implement the foregoing and in consideration of the mutual agreements contained herein, the Parties agree as follows:

1. Issuance of Purchased Shares; Options.

(a) Subject to the terms and conditions hereinafter set forth, the Management Stockholder hereby subscribes for and shall purchase, as of the Effective Date, and the Company shall issue and deliver to the Management Stockholder as of the Effective Date, the number of shares of Purchased Stock at a per share purchase price (such price, with respect to the shares of Purchased Stock, or the price per share paid by the Management Stockholder with respect to any shares of Common Stock purchased after the date hereof, as applicable, the "Base Price"), in each case as set forth on Schedule I hereto.

(b) Subject to the terms and conditions hereinafter set forth and as set forth in the Option Plan and the Option Agreement, as of the Effective Date the Company is granting to the Management Stockholder Options to acquire the number of shares of Common Stock as set forth on Schedule I hereto, at an initial per share exercise price equal to the Base Price, and the Parties shall execute and deliver to each other copies of the Option Agreement concurrently with the issuance of the Options.

(c) The Company shall have no obligation to sell any Purchased Stock to any person who (i) is a resident or citizen of a state or other jurisdiction in which the sale of the Common Stock to him or her would constitute a violation of the securities or "blue sky" laws of

such jurisdiction or (ii) is not an employee or director of the Company or its subsidiaries as of the Effective Date.

2.  Management Stockholder's Representations, Warranties and Agreements.

(a) The Management Stockholder acknowledges that he or she has been advised that (i) the shares of the Purchased Stock and the Common Stock to be issued upon exercise of any Options ("Option Stock" and, together with the Purchased Stock, the "Stock") are characterized as "restricted securities" under the Act inasmuch as they are being acquired from the Company in a transaction not involving a Public Offering and that the Stock may be resold without registration under the Act only in certain limited circumstances, (ii) a restrictive legend in the form heretofore set forth shall be placed on the certificates (if any) representing the Stock and (iii) a notation shall be made in the appropriate records of the Company indicating that the Stock is subject to restrictions on transfer and appropriate stop transfer restrictions will be issued to the Company's transfer agent with respect to the Stock.

(b) The Management Stockholder represents and warrants that (i) with respect to the Purchased Stock and Option Stock, the Management Stockholder has received and reviewed the available information relating to such Stock, including having received and reviewed the documents related thereto, certain of which documents set forth the rights, preferences and restrictions relating to the Options and the Stock underlying the Options and (ii) the Management Stockholder has been given the opportunity to obtain any additional information or documents and to ask questions and receive answers about such information, the Company and the business and prospects of the Company which the Management Stockholder deems necessary to evaluate the merits and risks related to the Management Stockholder's investment in the Stock and to verify the information contained in the information received as indicated in this Section 2(b), and the Management Stockholder has relied solely on such information.

(c) The Management Stockholder further represents and warrants that (i) the Management Stockholder's financial condition is such that the Management Stockholder can afford to bear the economic risk of holding the Stock for an indefinite period of time and has adequate means for providing for the Management Stockholder's current needs and personal contingencies, (ii) the Management Stockholder can afford to suffer a complete loss of his or her investment in the Stock, (iii) the Management Stockholder understands and has taken cognizance of all risk factors known or made available to the Management Stockholder related to the purchase of the Stock, (iv) the Management Stockholder's knowledge and experience in financial and business matters are such that the Management Stockholder is capable of evaluating the merits and risks of the Management Stockholder's purchase of the Stock as contemplated by this Agreement and (v) with respect to the Purchased Stock, such Purchased Stock is being acquired by the Management Stockholder for his or her own account, not as nominee or agent, and not with a view to the resale or distribution of any part thereof in violation of the Act, and the Management Stockholder has no present intention of selling or otherwise distributing the Purchased Stock in violation of the Act.

(d) For the avoidance of doubt, the Stock shall constitute "Stock" for purposes of the Management Stockholders Agreement.

(e) The certificate (or certificates) representing the Stock, if any, shall bear the following legend:

"THE SHARES REPRESENTED BY THIS CERTIFICATE MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED OF UNLESS SUCH TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION COMPLIES WITH THE PROVISIONS OF THE MANAGEMENT STOCKHOLDER'S AGREEMENT BETWEEN USF HOLDING CORP. (THE "COMPANY") AND THE MANAGEMENT STOCKHOLDER NAMED ON THE FACE HEREOF AND THE SALE PARTICIPATION AGREEMENT AMONG SUCH MANAGEMENT STOCKHOLDER AND CLAYTON, DUBILIER & RICE FUND VII, L.P., CLAYTON, DUBILIER & RICE FUND VII (CO-INVESTMENT), L.P., CD&R PARALLEL FUND VII, L.P., CDR USF CO-INVESTOR L.P., CDR USF CO-INVESTOR NO. 2, L.P., KKR 2006 FUND L.P., KKR PEI INVESTMENTS, L.P., KKR PARTNERS III, L.P. AND OPERF CO-INVESTMENT LLC, IN EACH CASE DATED AS OF _____ ___, _____ (COPIES OF WHICH ARE ON FILE WITH THE SECRETARY OF THE COMPANY) AND ALL APPLICABLE FEDERAL AND STATE SECURITIES LAWS."

3. <u>The Company's Representations and Warranties and Covenants</u>. The Company represents and warrants to the Management Stockholder that (i) this Agreement has been duly authorized, executed and delivered by the Company and is enforceable against the Company in accordance with its terms and (ii) the Stock, when issued and delivered in accordance with the terms hereof and the other agreements contemplated hereby, will be duly and validly issued, fully paid and nonassessable.

4. <u>Definitions</u>.

(a) *Definitions*. All capitalized terms used in this Agreement and not defined herein shall have such meaning as such terms are defined in the Option Plan. Terms used herein and as listed below shall be defined as follows:

"<u>Act</u>" shall mean the Securities Act of 1933, as amended, and the rules and regulations in effect thereunder.

"<u>Agreement</u>" shall have the meaning set forth in the introductory paragraph.

"<u>Base Price</u>" shall have the meaning set forth in Section 1(a) hereof.

"<u>Common Stock</u>" shall have the meaning set forth in the first recital.

"<u>Company</u>" shall have the meaning set forth in the introductory paragraph.

"Investors" shall mean Clayton, Dubilier & Rice Fund VII, L.P., Clayton, Dubilier & Rice Fund VII (Co-Investment), L.P., CD&R Parallel Fund VII, L.P., CDR USF Co-Investor L.P., CDR USF Co-Investor No. 2, L.P., KKR 2006 Fund L.P., KKR PEI Investments, L.P., KKR Partners III, L.P. and OPERF Co-Investment LLC.

"Management Stockholder" shall have the meaning set forth in the introductory paragraph.

"Management Stockholder's Agreement" shall have the meaning set forth in the second recital.

"Options" shall have the meaning set forth in the first recital.

"Option Plan" shall have the meaning set forth in the first recital.

"Option Stock" shall have the meaning set forth in Section 2(a) hereof.

"Parties" shall have the meaning set forth in the introductory paragraph.

"Person" shall mean "person," as such term is used for purposes of Section 13(d) or 14(d) of the Exchange Act.

"Public Offering" shall mean the sale of shares of Common Stock to the public subsequent to the date hereof pursuant to a registration statement under the Act which has been declared effective by the SEC (other than a registration statement on Form S-4, S-8 or any other similar form).

"Purchased Stock" shall have the meaning set forth in the first recital.

"Sale Participation Agreement" shall mean that certain sale participation agreement entered into by and between the Management Stockholder and the Investors.

"Stock" shall have the meaning set forth in Section 2(a) hereof.

5.   Covenant Regarding 83(b) Election.  Except as the Company may otherwise agree in writing, the Management Stockholder hereby covenants and agrees that the Management Stockholder will make an election provided pursuant to Treasury Regulation Section 1.83-2 in the form attached as Schedule II hereto with respect to the Purchased Stock and the Option Stock acquired on exercise of any Options; and the Management Stockholder further covenants and agrees that he or she will furnish the Company with copies of the forms of election the Management Stockholder files within thirty (30) days after the date of purchase of the Purchased Stock, and within thirty (30) days after each exercise of the Management Stockholder's Options and with evidence that each such election has been filed in a timely manner.

6.   Management Stockholder's Employment by the Company.  Nothing contained in this Agreement (i) obligates the Company or any subsidiary or Affiliate of the Company to employ the Management Stockholder in any capacity whatsoever or (ii) prohibits or restricts the

Company (or any such subsidiary or Affiliate) from terminating the employment of the Management Stockholder at any time or for any reason whatsoever, with or without Cause, and the Management Stockholder hereby acknowledges and agrees that neither the Company nor any other Person has made any representations or promises whatsoever to the Management Stockholder concerning the Management Stockholder's employment or continued employment by the Company or any subsidiary or Affiliate of the Company.

7.  <u>Binding Effect</u>.  The provisions of this Agreement shall be binding upon and accrue to the benefit of the parties hereto and their respective heirs, legal representatives, successors and assigns.  No provision of this Agreement is intended to or shall confer upon any Person other than the Parties any rights or remedies hereunder or with respect hereto.

8.  <u>Amendment</u>.  This Agreement may be amended by the Company at any time upon notice to the Management Stockholder thereof.

9.  <u>Closing</u>.  Except as otherwise provided herein, the closing of each purchase and sale of shares of Stock pursuant to this Agreement shall take place at the principal office of the Company on the tenth business day following delivery of the notice by either Party to the other of its exercise of the right to purchase or sell such Stock hereunder.

10. <u>Applicable Law; Jurisdiction; Arbitration; Legal Fees</u>.

(a)  The laws of the State of Delaware applicable to contracts executed and to be performed entirely in such state shall govern the interpretation, validity and performance of the terms of this Agreement.

(b)  In the event of any controversy among the parties hereto arising out of, or relating to, this Agreement which cannot be settled amicably by the parties, such controversy shall be finally, exclusively and conclusively settled by mandatory arbitration conducted expeditiously in accordance with the American Arbitration Association rules by a single independent arbitrator.  Such arbitration process shall take place in New York, New York.  The Company shall pay all fees and costs of such arbitration.  The decision of the arbitrator shall be final and binding upon all parties hereto and shall be rendered pursuant to a written decision, which contains a detailed recital of the arbitrator's reasoning, subject to enforcement of the arbitration award hereunder or for vacation or modification thereof as provided under the Federal Arbitration Act, Title 9 U.S. Code Chapter 1.  Judgment upon the award rendered may be entered in any court having jurisdiction thereof.

(c)  In the event of any arbitration or other disputes with regard to this Agreement or any other document or agreement referred to herein, each Party shall pay its own legal fees and expenses, unless otherwise determined by the arbitrator.

11. <u>Miscellaneous</u>.

(a)  In this Agreement all references to "dollars" or "$" are to United States dollars and the masculine pronoun shall include the feminine and neuter, and the singular the plural, where the context so indicates.

12. If any provision of this Agreement shall be declared illegal, void or unenforceable by any court of competent jurisdiction, the other provisions shall not be affected, but shall remain in full force and effect.

13. <u>Notices</u>.  All notices and other communications provided for herein shall be in writing.  Any notice or other communication hereunder shall be deemed duly given (i) upon electronic confirmation of facsimile, (ii) one business day following the date sent when sent by overnight delivery and (iii) five (5) business days following the date mailed when mailed by registered or certified mail return receipt requested and postage prepaid, in each case as follows:

(a) If to the Company, to it at the following address:

USF Holding Corp.
c/o U.S. Foodservice, Inc.
9399 West Higgins Road, Suite 500
Rosemont, Illinois  60018
Attention:  Juliette Pryor
Fax:  847-720-8099

with a copy (which shall not constitute notice) to:

Kohlberg Kravis Roberts & Co. L.P.
2800 Sand Hill Road, Suite 94025
Menlo Park, California  94025
Attention:  Michael Calbert
Fax: (650) 233-6548

and

Clayton, Dubilier & Rice, Inc.
375 Park Avenue
18th Floor
New York, New York 10152
Attention: Richard J. Schnall
Fax: (212) 407-5252

with a copy (which shall not constitute notice) to:

Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, New York 10017
Attention: Marni Lerner, Esq.
Fax: (212) 455-2502

and

Debevoise & Plimpton LLP
919 Third Avenue
New York, New York 10022
Attention: Franci J. Blassberg, Esq.
Fax: (212) 909-7531

If to the Management Stockholder, to the Management Stockholder at the address set forth below under the Management Stockholder's signature; or at such other address as either party shall have specified by notice in writing to the other.

[*Signatures on next page*.]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

USF HOLDING CORP.

By:

Name:      Juliette Pryor
Title:      Executive Vice President General
        Counsel & Chief Ethics Officer

MANAGEMENT STOCKHOLDER

_____

Name:      Phillip G Roszak
Address:
14815 S 14th Place
Phoenix, AZ 85048

**<u>Schedule I</u>**

Management Stockholder:                             Phillip G Roszak

<u>PURCHASED STOCK</u>

Number of shares of Purchased Stock:          [Investment Shares as stated on Omnibus Signature Page]

Base Price:                                  $5.00

<u>OPTIONS</u>

Number of shares of Common Stock underlying Options:    [Investment Options as stated on Omnibus Signature Page]

## STOCK OPTION AGREEMENT

THIS AGREEMENT, dated as of May 27, 2011 (the "Grant Date") is made by and between USF Holding Corp., a Delaware corporation (hereinafter referred to as the "Company"), and the individual whose name is set forth on the signature page hereof, who is an employee of the Company or a Subsidiary or Affiliate of the Company, hereinafter referred to as the "Optionee".  Any capitalized terms herein not otherwise defined in Article I shall have the meaning set forth in the 2007 Stock Incentive Plan for Key Employees of USF Holding Corp. and its Affiliates (the "Plan").

WHEREAS, the Company wishes to carry out the Plan, the terms of which are hereby incorporated by reference and made a part of this Agreement; and

WHEREAS, the Compensation Committee of the Board of the Company (or, if no such committee is appointed, the Board) (the "Committee") has determined that it would be to the advantage and best interest of the Company and its shareholders to grant the Option provided for herein to the Optionee as an incentive for increased efforts during his term of office with the Company or its Subsidiaries or Affiliates, and has advised the Company thereof and instructed the undersigned officers to issue said Option;

NOW, THEREFORE, in consideration of the mutual covenants herein contained and other good and valuable consideration, receipt of which is hereby acknowledged, the parties hereto do hereby agree as follows:

ARTICLE I

DEFINITIONS

Whenever the following terms are used in this Agreement, they shall have the meaning specified below unless the context clearly indicates to the contrary.

Section 1.1.   Aggregate Investment

"Aggregate Investment" shall mean the total amount of all equity securities of the Company held by the Investors, directly and indirectly (taking into account any adjustment as a result of any stock dividend, split, reverse split, combination, recapitalization, liquidation, reclassification, merger, consolidation or otherwise).

Section 1.2.   Base Price

"Base Price" shall mean the effective per share price paid by the Investors in the Merger (e.g. $5.00, as adjusted).

Section 1.3.    Cause

"Cause" shall mean "Cause" as such term may be defined in any employment agreement or other severance agreement in effect at the time of termination of employment (or as previously in effect immediately prior to any expiration of such agreement due to a Company nonrenewal of the agreement term) between the Optionee and the Company or any of its Subsidiaries or Affiliates, or, if there is no such employment or severance agreement, "Cause" shall mean, with respect to an Optionee: (i) willful and continued failure to perform his or her material duties with respect to the Company or it subsidiaries which continues beyond ten business days after a written demand for substantial performance is delivered to the Optionee by the Company (the "Cure Period"); (ii) a willful and material breach of the Optionee's Management Stockholder's Agreement or other agreements, if any, which continues beyond the Cure Period (to the extent that, in the Board's reasonable judgment, such breach can be cured); (iii) any act involving fraud or material dishonesty in connection with the business of the Company; (iv) a material violation of the Company's Code of Conduct; (v) attendance at work in a state of intoxication or otherwise being found in possession at his place of work of any prohibited drug or substance, possession of which constitutes to a criminal offense; (vi) assault or other unlawful act of violence; or (vii) conviction of, or a plea of nolo contendere to, any felony whatsoever or any misdemeanor that would preclude employment under the Company's hiring policy.

Section 1.4.    <u>Closing Date</u>

"Closing Date" shall mean July 3, 2007.

Section 1.5.    <u>Fiscal Year</u>

"Fiscal Year" shall mean each of the 2011, 2012, 2013, 2014 and 2015 fiscal years of the Company.

Section 1.6.    <u>Good Reason</u>

"Good Reason" shall mean "Good Reason" as such term may be defined in any employment agreement or other severance agreement in effect at the time of termination of employment (or as previously in effect immediately prior to any expiration of such agreement due to a Company nonrenewal of the agreement term) between the Optionee and the Company or any of its Subsidiaries or Affiliates.

Section 1.7.    <u>Investor IRR</u>

"Investor IRR" shall mean, on any given date, a pretax compounded annual internal rate of return realized by the Investors after the Closing Date on any Shares held by the Investors on a per Share, fully diluted basis (including all Shares subject to all outstanding options granted to any persons under the Plan), based on the Aggregate Investment; provided, however, that (a) any calculation of Investor IRR will, for purposes of Section 3.1(b), be calculated solely with respect to that portion of the Aggregate Investment actually sold or otherwise disposed of in the applicable transaction, and (b) in any event, Investor IRR will not be calculated taking into account the receipt by the Investors or any of their Affiliates of any management, monitoring,

transaction or other fees (including transaction advisory fees and related expenses) payable to such parties by the Company.

Section 1.8.  Investor Return

"Investor Return" shall mean, on any date, as determined on a cumulative, fully diluted per Share basis (including all Shares subject to all outstanding options granted to any persons under the Plan), all cash and marketable securities received by the Investors after the Closing Date on any Share held by the Investors as proceeds in any sale or other disposition of such Share, and any extraordinary cash dividends paid on such Share; provided, however, that any calculations of Investor Return will, for purposes of: (a) Section 3.1(b), also include all cash and marketable securities ultimately received by the Investors after the Closing Date as proceeds from any extraordinary dividend and the sale or other disposition of any illiquid property (e.g., equity securities of another corporation or debt securities) received in exchange for or in respect of a Share, which for such purposes shall be deemed received on the date such illiquid property is received; (b) Section 3.1(b), be calculated solely with respect to that portion of the Aggregate Investment actually sold or otherwise disposed of; and (c) Section 3.1(c)(ii) and (iii), also include the fair market value of any illiquid property received in exchange for or in respect of a Share.

Section 1.9.  Liquidity

"Liquidity" shall mean (A) on or prior to December 31, 2011, the Investors achieve an Investor IRR of at least 25% and (ii) the Investors earn an Investor Return of at least 3.0 times the Aggregate Investment, or (B) after December 31, 2011, the Investors achieve an Investor IRR of at least 20% and (ii) the Investors earn an Investor Return of at least 3.0 times the Base Price on the Aggregate Investment.

Section 1.10.  Management Stockholder's Agreement

"Management Stockholder's Agreement" shall mean that certain Management Stockholder's Agreement between the Optionee and the Company.

Section 1.11.  Option

"Option" shall mean the aggregate of the Time Option and the Performance Option granted under Section 2.1 of this Agreement.

Section 1.12.  Performance Option

"Performance Option" shall mean the right and option to purchase, on the terms and conditions set forth herein, all or any part of an aggregate of the number of shares of Common Stock set forth on the signature page hereof opposite the term Performance Option.

Section 1.13.  Permanent Disability

"Permanent Disability" shall mean "Disability" as such term is defined in any

employment agreement between Optionee and the Company or any of its Subsidiaries (or as previously in effect immediately prior to any expiration of such agreement due to a Company nonrenewal of the agreement term), or, if there is no such employment agreement, "Disability" as defined in the long-term disability plan of the Company (or Subsidiary sponsoring such plan).

Section 1.14.   Qualified Public Offering

"Qualified Public Offering" shall mean, after a Public Offering of Holdings, the Investors sell, in one transaction or a series of transactions, an aggregate of at least 35% of the Aggregate Investment.

Section 1.15.   Secretary

"Secretary" shall mean the Secretary of the Company.

Section 1.16.   Stock Purchase Agreement

"Stock Purchase Agreement" shall mean the Stock Purchase Agreement by and between Restore Acquisition Corp., Ahold U.S.A., Inc. and Koninklijke Ahold N.V., dated May 2, 2007.

Section 1.17.   Time Option

"Time Option" shall mean the right and option to purchase, on the terms and conditions set forth herein, all or any part of an aggregate of the number of shares of Common Stock set forth on the signature page hereof opposite the term Time Option.

ARTICLE II

GRANT OF OPTIONS

Section 2.1.   Grant of Options

For good and valuable consideration, on and as of the date hereof, the Company irrevocably grants to the Optionee the following Stock Options:  (a) the Time Option and (b) the Performance Option, in each case on the terms and conditions set forth in this Agreement.

Section 2.2.   Exercise Price

Subject to Section 2.4, the exercise price of the shares of Common Stock covered by the Option (the "Exercise Price") shall be as set forth on the signature page hereof, which is  the Fair Market Value on the Grant Date.

Section 2.3.   No Guarantee of Employment

Nothing in this Agreement or in the Plan shall confer upon the Optionee any right to continue in the employ of the Company or any Service Recipient or shall interfere with or restrict

in any way the rights of the Company and its Service Recipients, which are hereby expressly reserved, to terminate the employment of the Optionee at any time for any reason whatsoever, with or without cause.

Section 2.4.    Adjustments to Option

The Option shall be subject to the adjustment provisions of Sections 8 and 9 of the Plan, provided, however, that in the event of the payment of an extraordinary dividend by the Company to its stockholders, then; first, the Exercise Prices of the Option shall be equitably reduced with respect to the amount of the dividend paid, but only to the extent the Committee determines it to be permitted without material adverse effect on Optionee under applicable tax laws; and, if such reduction cannot be fully effected due to such tax laws and it will not have material adverse tax consequences to the Optionee, second, the Board shall make an equitable provision as to any further actions to be taken with respect to the Option.

ARTICLE III

PERIOD OF EXERCISABILITY

Section 3.1.    Commencement of Exercisability

(a)    So long as the Optionee continues to be employed by the Company or any other Service Recipients, the Option shall become exercisable pursuant to the following schedules:

(i)    *Time Option*.  The Time Option shall become vested and exercisable with respect to 20% of the Shares subject to such Option on the last day of each of the five Fiscal Years that end after the Grant Date, beginning with the Fiscal Year in which the Grant Date occurs (e.g., the first 20% installment of vesting will occur on the last day of the 2011 Fiscal Year).

(ii)    *Performance Option*.

(A)    The Performance Option shall be eligible to become vested and exercisable as to 20% of the Shares subject to such Option on the last day of each of the five Fiscal Years ending after the Grant Date (e.g., the first 20% installment of vesting will be eligible to occur on the last day of the 2011 Fiscal Year), if the Company, on a consolidated basis, achieves its annual EBITDA targets as set forth in Schedule A attached hereto (each an "Annual EBITDA Target") for the given Fiscal Year.  This annual vesting method is hereby referred to as the "Primary Vesting Method."

(B)    In addition to the foregoing, in the event that an Annual EBITDA Target is not achieved in a particular Fiscal Year, but the cumulative EBITDA target set forth on Schedule A attached hereto (each, a "Cumulative EBITDA Target") for such particular Fiscal Year is achieved, then 20% of the Shares subject to the Performance Option shall become vested and exercisable on the last day of such Fiscal Year. This vesting method is hereby referred to as the "Secondary Vesting Method."

(C)     Notwithstanding any of the foregoing, in the event that neither the Annual EBITDA Target nor the Cumulative EBITDA Target is achieved in a particular Fiscal Year, then that portion of the Performance Option that was eligible to vest but failed to vest due to the Company's failure to achieve either its Annual EBITDA Target or its Cumulative EBITDA Target in such particular Fiscal Year shall nevertheless vest and become exercisable, if the Company achieves its Cumulative EBITDA Target in any subsequent Fiscal Year, at the end of such subsequent Fiscal Year. This vesting method is hereby referred to as the "Missed Year Catch-up Vesting."  See Appendix I for examples of the Primary Vesting Method, Secondary Vesting Method and the Missed Year Catch-up Vesting.

(b)     In addition to the foregoing, if, after a Qualified Public Offering, the Investors sell, in one transaction or a series of related transactions, and/or receive extraordinary cash dividends on, sufficient Shares such that the Investors achieve Liquidity on any percentage of the Aggregate Investment that is in excess of the percentage of the Performance Options that could have become vested pursuant to the Primary Vesting Method, Secondary Vesting Method or the Missed Year Catch-up Vesting in the Fiscal Year that immediately precedes the Fiscal Year in which such transaction or series of transactions occurs, then the Performance Option shall become vested, to the extent not already vested, up to the same percentage of Performance Option that could have become vested in respect of any previously completed fiscal years pursuant to either the Primary Vesting Method, Secondary Vesting Method or the Missed Year Catch-up Vesting.  This vesting method is hereby referred to as the "QPO Catch-up Vesting". See Appendix I for examples hereof.

(c)     Notwithstanding the foregoing, upon the occurrence of a Change in Control:

(i)     The Time Option shall become immediately exercisable as to 100% of the shares of Common Stock subject to such Option immediately prior to a Change in Control (but only to the extent such Option has not otherwise terminated or become exercisable); and

(ii)     The Performance Option shall become immediately exercisable as to 100% of the shares of Common Stock subject to such Option immediately prior to a Change in Control (but only to the extent such Option has not otherwise terminated or become exercisable) if as a result of the Change in Control, the Investors achieve Liquidity on the entire Aggregate Investment; and

(iii)     In the event that within six months prior to any Change in Control, the Optionee's employment is terminated by the Company without Cause or the Optionee's employment is terminated by the Optionee for Good Reason (if such a termination is provided for in the Optionee's individual employment or other severance agreement with the Company), the Time Option and Performance Option will remain outstanding until the earlier to occur of (x) the expiration of such six-month period, if no Change in Control has occurred by such time and (y) the Change in Control, and if such Change in Control occurs, (i) all unvested Time Options will vest upon such Change in Control, and

(ii) all unvested Performance Options will vest upon such Change in Control, but only if and to the extent that the applicable Liquidity targets referenced in Section 3.1(c)(ii) above are achieved.  In addition, the Optionee shall receive a payment at the closing of the Change in Control equal to the excess, if any, of the price per Share paid to the Investors in the Change in Control transaction in respect of the Aggregate Investment over the price paid to the Optionee at or after such termination for all Shares and vested Options purchased by the Company under the Management Stockholder's Agreement within the six months prior to the Change in Control.

(d)      In the event that Optionee's employment terminates due to the Optionee's death or Permanent Disability, a pro rata portion of the Time Options that would have vested on the December 31 that first occurs after the date of such termination of employment will vest and a pro rata portion of the Performance Options will also vest, but only if and to the extent that the Performance Option would have vested under Section 3.1 above if the Optionee had remained employed with the Company, as of the December 31 that first occurs after the date of such termination of employment.  In each case, such pro rata portion will be determined based on the number of days the Optionee worked during the year in which the termination occurred relative to 365 days. Such Performance Options will expire 30 days after notice to Optionee of the amount of Optionee's pro rata vesting (if any), or if earlier, according to Section 3.2 of this Agreement.

(e)      Notwithstanding the foregoing, except as otherwise provided in Section 3.1(c)(iii) or (d) above, of the Agreement, no Option shall become exercisable as to any additional shares of Common Stock following the termination of employment of the Optionee for any reason and any Option, which is unexercisable as of the Optionee's termination of employment, shall immediately expire without payment therefor.

Section 3.2.   <u>Expiration of Option</u>

The Optionee may not exercise the Option to any extent after the first to occur of the following events:

(a)      The tenth anniversary of the Grant Date, so long as the Optionee remains employed with the Company or any Service Recipient through such date;

(b)      The first anniversary of the date of the Optionee's termination of employment with the Company and all Service Recipients, if the Optionee's employment is terminated by reason of death or Permanent Disability (unless earlier terminated as provided in Section 3.2(g) below);

(c)      Immediately upon the date of the Optionee's termination of employment by the Company and all Service Recipients for Cause;

(d)      Thirty (30) days after the date of the Optionee's termination of employment with the Company and all Service Recipients by the Optionee (except due to death or Permanent Disability or a termination for Good Reason (if such a termination is provided for in the

Optionee's individual employment or other severance agreement, as such term may be defined therein));

(e)     One hundred and eighty (180) days after the date of an Optionee's termination of employment by the Company and all Service Recipients without Cause (other than due to Permanent Disability);

(f)     One hundred and eighty (180) days after the date of an Optionee's termination of employment with the Company and all Service Recipients by the Optionee for Good Reason (if such a termination is provided for in the Optionee's individual employment or other severance agreement);

(g)     The date the Option is terminated pursuant to Section 5 or 6 of the Management Stockholder's Agreement; or

(h)     At the discretion of the Company consistent with any determination by the Committee pursuant to Section 9 of the Plan.

For the purposes of this Section 3.2, if an Optionee's employment with the Company and all Service Recipients is terminated without Cause by the Company, for Good Reason by an Optionee (if such a termination is provided for in the Optionee's individual employment or other severance agreement), or due to an Optionee's death or Permanent Disability after the end of any Fiscal Year, but prior to the date the Company determines whether or not the applicable Annual EBITDA Target and/or Cumulative EBITDA Target has been achieved, the Performance Option that could vest in respect of such Fiscal Year will remain outstanding until 30 days after notice to Optionee of such determination and effect on the vesting of such Performance Option, such that, if such determination results in the Performance Option vesting in respect of such Fiscal Year, the Optionee shall have such 30-day period to exercise such Performance Option, which will otherwise expire at the close of business on the last day of such period.

ARTICLE IV

EXERCISE OF OPTION

Section 4.1.   Person Eligible to Exercise

During the lifetime of the Optionee, only the Optionee (or his or her duly authorized legal representative) may exercise an Option or any portion thereof.  After the death of the Optionee, any exercisable portion of an Option may, prior to the time when an Option becomes unexercisable under Section 3.2, be exercised by his personal representative or by any person empowered to do so under the Optionee's will or under the then applicable laws of descent and distribution.

Section 4.2.   Partial Exercise

Any exercisable portion of an Option or the entire Option, if then wholly exercisable,

may be exercised in whole or in part at any time prior to the time when the Option or portion thereof becomes unexercisable under Section 3.2; provided, however, that any partial exercise shall be for whole shares of Common Stock only.

Section 4.3.   Manner of Exercise

An Option, or any exercisable portion thereof, may be exercised solely by delivering to the Secretary or his office all of the following prior to the time when the Option or such portion becomes unexercisable under Section 3.2:

(a)   Notice in writing signed by the Optionee or the other person then entitled to exercise the Option or portion thereof, stating that the Option or portion thereof is thereby exercised, such notice complying with all applicable rules established by the Committee;

(b)   (i) Full payment (in cash or by check or by a combination thereof) for the Shares with respect to which such Option or portion thereof is exercised or (ii) indication that the Optionee elects to have the number of Shares that would otherwise be issued to the Optionee reduced by a number of Shares having an equivalent Fair Market Value to the payment that would otherwise be made by Optionee to the Company pursuant to clause (i) of this subsection (b);

(c)   Full payment (in cash or by check or by a combination thereof) to satisfy the minimum withholding tax obligation with respect to which such Option or portion thereof is exercised, except as provided under Section 4.3(f);

(d)   A bona fide written representation and agreement, in a form satisfactory to the Committee, signed by the Optionee or other person then entitled to exercise such Option or portion thereof, stating that the shares of Common Stock are being acquired for his own account, for investment and without any present intention of distributing or reselling said shares or any of them except as may be permitted under the Securities Act of 1933, as amended (the "Act"), and then applicable rules and regulations thereunder, and that the Optionee or other person then entitled to exercise such Option or portion thereof will indemnify the Company against and hold it free and harmless from any loss, damage, expense or liability resulting to the Company if any sale or distribution of the shares by such person is contrary to the representation and agreement referred to above; provided, however, that the Committee may, in its reasonable discretion, take whatever additional actions it deems reasonably necessary to ensure the observance and performance of such representation and agreement and to effect compliance with the Act and any other federal or state securities laws or regulations; and

(e)   In the event the Option or portion thereof shall be exercised pursuant to Section 4.1 by any person or persons other than the Optionee, appropriate proof of the right of such person or persons to exercise the option.

(f)   In the event there has not occurred a Public Offering of the Company and an Optionee's employment with the Company and all Service Recipients is terminated without Cause by the Company, for Good Reason by an Optionee (if such a termination is provided for in

an Optionee's employment or other severance arrangement), or due to an Optionee's death or Permanent Disability, the Optionee will, to the extent it does not materially adversely impact the short-term liquidity needs of the Company, be allowed to pay any minimum tax withholding due upon any exercise of a vested Option out of the Shares otherwise deliverable upon exercise (using the Fair Market Value on the date of exercise to determine the number of Shares to be withheld in respect of such minimum tax withholding due).

      (g)     Once a Public Offering of the Company has occurred, an Optionee may use a Regulation T, Sarbanes-Oxley-compliant program which shall be established by the Company to sell Shares to pay the exercise price and the minimum taxes due upon exercise of any then vested Options subject to any limitations on transfer imposed under applicable securities laws or any underwriter.

Without limiting the generality of the foregoing, the Committee may require an opinion of counsel acceptable to it to the effect that any subsequent transfer of shares acquired on exercise of an Option does not violate the Act, and may issue stop-transfer orders covering such shares. Share certificates evidencing stock issued on exercise of this Option shall bear an appropriate legend referring to the provisions of subsection (d) above and the agreements herein. The written representation and agreement referred to in subsection (d) above shall, however, not be required if the shares to be issued pursuant to such exercise have been registered under the Act, and such registration is then effective in respect of such shares.

      Section 4.4.   Conditions to Issuance of Stock Certificates

      The shares of stock deliverable upon the exercise of an Option, or any portion thereof, may be either previously authorized but unissued shares or issued shares, which have then been reacquired by the Company.  Such shares shall be fully paid and nonassessable.  The Company shall not be required to issue or deliver any certificate or certificates for shares of stock purchased (if certified, or if not certified, register the issuance of such shares on its books and records) upon the exercise of an Option or portion thereof prior to fulfillment of all of the following conditions:

      (a)     The obtaining of approval or other clearance from any state or federal governmental agency which the Committee shall, in its reasonable and good faith discretion, determine to be necessary or advisable;

      (b)     The execution by the Optionee of the Management Stockholder's Agreement and a Sale Participation Agreement; and

      (c)     The lapse of such reasonable period of time following the exercise of the Option as the Committee may from time to time establish for reasons of administrative convenience or as may otherwise be required by applicable law.

      Section 4.5.  Rights as Stockholder

      Except as otherwise provided in Section 2.4 of this Agreement, the holder of an Option

shall not be, nor have any of the rights or privileges of, a stockholder of the Company in respect of any shares purchasable upon the exercise of the Option or any portion thereof unless and until certificates representing such shares shall have been issued by the Company to such holder.

ARTICLE V

MISCELLANEOUS

Section 5.1.   Administration

The Committee shall have the power to interpret the Plan and this Agreement and to adopt such rules for the administration, interpretation and application of the Plan as are consistent therewith and to interpret or revoke any such rules.  All actions taken and all interpretations and determinations made by the Committee shall be final and binding upon the Optionee, the Company and all other interested persons. No member of the Committee shall be personally liable for any action, determination or interpretation made in good faith with respect to the Plan or the Option.  In its absolute discretion, the Board may at any time and from time to time exercise any and all rights and duties of the Committee under the Plan and this Agreement.

Section 5.2.   Option Not Transferable

Neither the Option nor any interest or right therein or part thereof shall be liable for the debts, contracts or engagements of the Optionee or his successors in interest or shall be subject to disposition by transfer, alienation, anticipation, pledge, encumbrance, assignment or any other means whether such disposition be voluntary or involuntary or by operation of law by judgment, levy, attachment, garnishment or any other legal or equitable proceedings (including bankruptcy), and any attempted disposition thereof shall be null and void and of no effect; provided, however, that this Section 5.2 shall not prevent transfers by will or by the applicable laws of descent and distribution.

Section 5.3.   Notices

Any notice to be given under the terms of this Agreement to the Company shall be addressed to the Company in care of its Secretary, and any notice to be given to the Optionee shall be addressed to him at the address given beneath his signature hereto.  By a notice given pursuant to this Section 5.3, either party may hereafter designate a different address for notices to be given to him.  Any notice, which is required to be given to the Optionee, shall, if the Optionee is then deceased, be given to the Optionee's personal representative if such representative has previously informed the Company of his status and address by written notice under this Section 5.3.  Any notice shall have been deemed duly given when (i) delivered in person, (ii) enclosed in a properly sealed envelope or wrapper addressed as aforesaid, three business days after which it is deposited (with postage prepaid) in a post office or branch post office regularly maintained by the United States Postal Service, or (iii) enclosed in a properly sealed envelope or wrapper addressed as aforesaid, the first business day following the day after which it is deposited (with fees prepaid) in an office (and not a drop box) regularly maintained by FedEx, UPS, or comparable non-public overnight national courier.

Section 5.4.    Titles; Pronouns

Titles are provided herein for convenience only and are not to serve as a basis for interpretation or construction of this Agreement.  The masculine pronoun shall include the feminine and neuter, and the singular the plural, where the context so indicates.

Section 5.5.    Applicability of Plan, Management Stockholder's Agreement and Sale Participation Agreement

The Option and the shares of Common Stock issued to the Optionee upon exercise of the Option shall be subject to all of the terms and provisions of the Plan, the Management Stockholder's Agreement and a Sale Participation Agreement, to the extent applicable to the Option and such Shares.

Section 5.6.    Entire Agreement; Amendment

Subject to Section 10 of the Plan, this Agreement may be amended only by a writing executed by the parties hereto, which specifically states that it is amending this Agreement.  This Agreement constitutes the entire agreement among the parties with respect to any agreements regarding any option awards by the Company and supersedes all prior and contemporaneous agreements (including any change in control, executive retention, employment or other agreements regarding the vesting of any option awards, or payment of cash or Shares in respect of any option awards upon a termination of employment), discussions, understandings and negotiations, whether written or oral, with respect to any of the foregoing.

Section 5.7.    Governing Law

The laws of the State of Delaware shall govern the interpretation, validity and performance of the terms of this Agreement regardless of the law that might be applied under principles of conflicts of laws.

Section 5.8.    Arbitration

In the event of any controversy among the parties hereto arising out of, or relating to, this Agreement which cannot be settled amicably by the parties, such controversy shall be finally, exclusively and conclusively settled by mandatory arbitration conducted expeditiously in accordance with the American Arbitration Association rules, by a single independent arbitrator. Such arbitration process shall take place within New York, New York.  The decision of the arbitrator shall be final and binding upon all parties hereto and shall be rendered pursuant to a written decision, which contains a detailed recital of the arbitrator's reasoning, subject to enforcement of the arbitration award hereunder or for vacation or modification thereof as provided under the Federal Arbitration Act, Title 9 U.S. Code Chapter 1.  Judgment upon the award rendered may be entered in any court having jurisdiction thereof.  The Company shall pay the arbitrator's fees and all other costs of such arbitration. Each party shall bear its own legal fees and expenses, unless otherwise determined by the arbitrator.

*[Signatures on next page.]*

IN WITNESS WHEREOF, this Agreement has been executed and delivered by the parties hereto.

USF HOLDING CORP.

By:

Name:       Juliette Pryor
Title:       Executive Vice President General
            Counsel & Chief Ethics Officer

**Option Grants**:

Aggregate number of shares of Common Stock for which the **Time Option** granted hereunder is exercisable (100% of number of shares):

[Time-Vested Investment Options as stated on Omnibus Signature Page]

Aggregate number of shares of Common Stock for which the **Performance Option** granted hereunder is exercisable (100% of the number of shares):

[Performance-Vested Investment Options as stated on Omnibus Signature Page]

**Exercise Price of all Options:**        $5.00 per share

**Grant Date**:        May 27, 2011

**Optionee:**        Phillip G Roszak

**Address:**        14815 S 14th Place
Phoenix, AZ 85048

**[Signature Page of Stock Option Agreement]**

**Schedule A**
**Annual and Cumulative EBITDA Targets**

The Annual and Cumulative EBITDA Targets are based on the Company's achievement of the following EBITDA targets for the following Fiscal Years:

| Fiscal Year | Annual Performance Target | Cumulative Performance Target |
|---|---|---|
| 2011 | $805 million | $805 million |
| 2012 | $910 million | $1,715 million |
| 2013 | $1,005 million | $2,720 million |
| 2014 | $1,085 million | $3,805 million |
| 2015 | $1,170 million | $4,975 million |

"EBITDA" shall mean earnings before interest, taxes, depreciation and amortization plus transaction, management and/or similar fees (including any transaction advisory fees and related expenses) paid to the Investors and/or its Affiliates. The Board shall, fairly and appropriately, and in good faith, adjust the calculation of EBITDA to reflect, to the extent not contemplated in the management plan, the following: acquisitions, divestitures, major capital programs, any stock option and other stock-based compensation charges, any costs or expenses incurred by the Company in connection with any litigation matters subject to potential indemnification by Ahold under the terms of the Stock Purchase Agreement and related documents, fees or expenses related to any equity offering or repayment or refinancing of indebtedness approved by the Board, any other any restructuring charges or extraordinary or unusual fees, expenses or losses approved by the Board, which approval shall not be unreasonably withheld, and any LIFO adjustments. The Board's determination of such adjustment shall be in good faith and based on the Company's accounting as set forth in its books and records and on the financial plan of the Company pursuant to which the Annual EBITDA Targets were originally established.

Annual EBITDA Targets and Cumulative EBITDA Targets will be equitably adjusted by the Board for any acquisitions, divestitures or major capital investment programs not contemplated in management's base case, to the extent permitted under U.S. generally accepted accounting principles and applicable law ("GAAP").

**Appendix I**

- Examples:

    → *Primary Vesting Method.* Company achieves the Annual Performance Target for FY 2011. The 20% of the Performance Options eligible to vest in respect of FY 2011 becomes immediately vested pursuant to the Primary Vesting Method.

    → *Secondary Vesting Method.* Company does not achieve the Annual Performance Target for FY 2011, but it does achieve the Cumulative EBITDA Target for FY 2012. The 20% of the Performance Options eligible to vest in respect of FY 2011 becomes immediately vested pursuant to the Secondary Vesting Method.

    → *Missed Year Catch-up Vesting.* Company does not achieve the Annual Performance Target for FY 2011 or the Cumulative EBITDA Target for FY 2011, so the 20% of the Performance Options eligible to vest in respect of FY 2011 (the "FY 2011 Options") does not become immediately vested. Company achieves the Annual Performance Target for FY 2012 but does not achieve the Cumulative EBITDA Target for FY 2012, so the 20% of the Performance Options eligible to vest in respect of FY 2012 become immediately vested pursuant to the Primary Vesting Method, but the FY 2011 Performance Options remain unvested. Company achieves the Annual Performance Target for FY 2013 and the Cumulative EBITDA Target for FY 2013, so the 20% of the Performance Options eligible to vest in respect of FY 2013 becomes vested pursuant to the Primary Vesting Method, and the FY 2011 Performance Options becomes vested pursuant to the Missed Year Catch-up Vesting.

    → *QPO Catch-up Vesting—Example 1.* Company does not achieve the Annual Performance Target or the Cumulative Performance Target for FY 2011. In FY 2012, a Qualified Public Offering occurs wherein the Investors achieve Liquidity on 40% of the Investors' New Stock. Upon such event, the 20% of the Performance Options that could have, but did not, become vested if the Company had achieved the Annual Performance Target or the Cumulative Performance Target for FY 2011, becomes vested. Because the QPO Catch-up Vesting is only available to provide for catch-up vesting in respect of any previously completed fiscal years, if the Company does not achieve the Annual Performance Target or the Cumulative Performance Target for FY 2012, no vesting will occur under this method with respect to the Performance Options that might otherwise have become vested in respect of FY 2012.

    → *QPO Catch-up Vesting- Example 2.* Company does not achieve the Annual Performance Target or the Cumulative Performance Target for either of FY 2011 or FY 2012. In FY 2013, a Qualified Public Offering occurs wherein the Investors achieve Liquidity on 40% of the Investors' New Stock. Upon such event, the 20% of the Performance Options that could have, but did not, become vested if the Company had achieved the Annual Performance Target or the Cumulative Performance Target for each of FY 2011 and FY 2012, becomes vested, such that the Performance Options will be 40% vested as of the date of such event. If the Company then achieves either the Annual Performance Target or the Cumulative Annual Performance Target for FY 2013, the 20% of the Performance Options that is due to be vested in respect of FY 2013 will become vested in the ordinary course.

**SECTION 83(b) ELECTION FORM**

_____, 2011

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Internal Revenue Service Center
_____
_____

Re:  Election Under §83(b) of the Internal Revenue Code

Attention Internal Revenue Service Representative:

The undersigned hereby elects under Section 83(b) of the Internal Revenue Code to include in the taxpayer's gross income for the taxable year in which the property described below was transferred, the excess (if any), of the fair market value of such property at the time of its transfer, over the amount (if any) paid for such property.  Pursuant to Treas. Reg. § 1.83-2(e) the following information is submitted:

1. Name of taxpayer:                Phillip G Roszak
   Address of taxpayer:             14815 S 14th Place
                                    Phoenix, AZ 85048

   Taxpayer's Identification Number:        _____

2. Property with respect to which the election is being made: _____ shares of common stock of USF Holding Corp. ("USF").

3. Date transferred:                May 27, 2011

4. Taxable year for which this election is being made:  Calendar year 2011.

5. Nature of the restriction or restrictions to which the property is subject:

   While the shares are held by the undersigned, such shares shall be subject to restrictions on transfer and to the right of USF to repurchase such shares at an agreed upon price, which price may be lower than the fair market value of the shares upon certain types of terminations of the undersigned's employment with USF or any of its subsidiaries (including US Foodservice), which transfer restrictions and right of repurchase shall lapse upon certain events.

6. Fair market value of the property at the time of transfer: $5.00 per share.

7. Amount paid for the property: $5.00 per share.

Very truly yours,


_____
(Signature of Taxpayer)

**Instructions for Completing Section 83(b) Election Form**

Each U.S. Foodservice employee participating in the Management Equity Plan investment offering opportunity must complete a Section 83(b) Election Form under the Internal Revenue Code **and file** it with the Internal Revenue Service. This election is referenced in Section 10 of the Management Stockholder's Agreement.

The 83(b) Election allows you to recognize the fair market value of the shares of common stock of USF Holding Corp. as ordinary income as of the date they are acquired by you (May 27, 2011), with any future appreciation/loss recognized as a capital gain/loss.

The failure to make an 83(b) Election would result in the taxation at ordinary income rates on the excess, if any, of the fair market value of the stock over the price paid for the stock. This taxation would occur when the stock becomes free of any forfeiture or transfer restrictions.

Follow these important instructions for filing a Section 83(b) Election:

1. The law requires that you deliver this election to the Internal Revenue Service no later than thirty (30) days after the date you acquire the shares – there are NO exceptions to this rule.

2. The election is deemed delivered when it is postmarked by the U.S. Postal Service, so it is suggested that the election be sent via U.S. certified mail, return receipt requested, so that you can have a record of the timely filing of this election.

3. The 83(b) Election form must be sent to the same Internal Revenue Service office to which you will file your 2011 Federal Income Tax Return.

4. The 83(b) Election form has been pre-populated with much of the required information (e.g., your name, your mailing address, the number of shares of common stock, the date the stock was acquired, the taxable year for which this election is being made, the fair market value of the stock and the amount paid for the stock).

   You must complete this form by entering:

   a. The date you are completing the form;
   b. The address of the Internal Revenue Service Center to which you are mailing the form;
   c. Your taxpayer I.D. (which is normally your social security number); and
   d. The number of investment shares you purchased.

   A "sample" of a completed form is attached.

5. Be certain that you sign the form.

6. Retain a copy of the form for your files – you will be required to attach a copy of the form to your 2011 Federal Income Tax Return when it is filed in 2012.

## SECTION 83(b) ELECTION FORM

_____ June 2, 2011



CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Internal Revenue Service Center
230 S. Dearborn Street
Chicago, IL 60604

Re:  Election Under §83(b) of the Internal Revenue Code

Attention Internal Revenue Service Representative:

The undersigned hereby elects under Section 83(b) of the Internal Revenue Code to include in the taxpayer's gross income for the taxable year in which the property described below was transferred, the excess (if any), of the fair market value of such property at the time of its transfer, over the amount (if any) paid for such property.  Pursuant to Treas. Reg. § 1.83-2(e) the following information is submitted:

1.     Name of taxpayer:            Jane Q Public
         Address of taxpayer:         9421 Higgins Road
                                          Rosemont, IL 60018

         Taxpayer's Identification Number:     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

2.     Property with respect to which the election is being made: ____5,000____ shares of common stock of USF Holding Corp. ("USF").

3.     Date transferred:            May 27, 2011

4.     Taxable year for which this election is being made:  Calendar year 2011.

5.     Nature of the restriction or restrictions to which the property is subject:

         While the shares are held by the undersigned, such shares shall be subject to restrictions on transfer and to the right of USF to repurchase such shares at an agreed upon price, which price may be lower than the fair market value of the shares upon certain types of terminations of the undersigned's employment with USF or any of its subsidiaries (including US Foodservice), which transfer restrictions and right of repurchase shall lapse upon certain events.

6.     Fair market value of the property at the time of transfer: $5.00 per share.

7.     Amount paid for the property: $5.00 per share.

                          Very truly yours,

                          Jane Q. Public
                          (Signature of Taxpayer)