22. <u>Consideration Period.</u> You know and understand the contents of this Separation Agreement and its binding effect, and you are hereby advised to consult with an attorney prior to signing this Agreement. You voluntarily and knowingly agree to the terms of this Separation Agreement, You acknowledge that you have been advised that you have twenty-one (21) days to consider this Separation Agreement. In the event that you execute this Separation Agreement prior to the expiration of the 21-day period, you hereby waive the balance of said period. If you do not sign this Separation Agreement within the 21-day period, you understand that it will become null and void.

23. <u>Revocation Period.</u> You will have seven (7) days following the date on which you execute this Separation Agreement to revoke this Separation Agreement, and this Separation Agreement shall not become effective or enforceable until such revocation period has expired. Any revocation within this period shall be submitted in writing and personally delivered or mailed to Juliette Pryor, Executive Vice President, General Counsel and Chief Compliance Officer, US Foods, 9399 West Higgins Road, Rosemont, Illinois 60018, and post-marked, where applicable, within seven (7) days of the date following execution of this Separation Agreement. No Separation Payment or other benefits will be paid or provided until after such seven (7) day revocation period has expired and this Separation Agreement has become effective. If this Separation Agreement is revoked by you then you shall forfeit all of your Separation Payment and/or other benefits, and the Company shall not be required to provide you with any such payments, benefits or other consideration.

24. <u>Counterparts.</u> This Separation Agreement may be executed in counterparts, and each counterpart, when executed, shall have the efficacy of a signed original. Photographic and facsimiled copies of such signed counterparts may be used in lieu of the originals for any purpose.

25. <u>Effective Date.</u> The Effective Date of this Agreement shall be the latest of the date that is fully executed by the Parties, the expiration of the seven-day revocation period set forth in Paragraph 23, the certification of the return of all Company property in Paragraph 9, complete production of the records and data by Quest as described in Paragraph 14, and the completion of the interview required by Paragraph 15.

PLEASE READ THIS AGREEMENT CAREFULLY. EXCEPT AS OTHERWISE PROVIDED HEREIN, IT CONTAINS A **RELEASE** OF ALL KNOWN AND UNKNOWN CLAIMS.

YOU AGREE THAT YOU RECEIVED VALUABLE CONSIDERATION IN EXCHANGE FOR ENTERING INTO THIS AGREEMENT AND THAT THE COMPANY HEREBY ADVISES YOU TO CONSULT AN ATTORNEY PRIOR TO SIGNING THIS AGREEMENT. YOU HAVE BEEN PROVIDED 21 DAYS WITHIN WHICH TO CONSIDER WHETHER YOU SHOULD SIGN THIS AGREEMENT AND WAIVE AND RELEASE ALL CLAIMS AND RIGHTS INCLUDING BUT NOT LIMITED TO THOSE ARISING UNDER THE FEDERAL AGE DISCRIMINATION IN EMPLOYMENT ACT. YOU SHALL HAVE SEVEN (7) DAYS WITHIN WHICH TO REVOKE THIS AGREEMENT AND THIS

AGREEMENT SHALL NOT BECOME EFFECTIVE OR ENFORCEABLE UNTIL THAT REVOCATION PERIOD HAS EXPIRED.

YOU PROMISE THAT NO REPRESENTATIONS OR INDUCEMENTS HAVE BEEN MADE TO YOU EXCEPT AS SET FORTH HEREIN, AND THAT YOU HAVE SIGNED THE SAME KNOWINGLY AND VOLUNTARILY.

     If the terms of this Separation Agreement are acceptable to you, please sign and date this Separation Agreement and return it to the undersigned.

US FOODS, INC.

By: _____

    Name

    Juliette Pryor

Date: 05 February 2013

Agreed and accepted on this

_____ day of _____, 2013

Signature:_____

     Michael J. Noble

AGREEMENT SHALL NOT BECOME EFFECTIVE OR ENFORCEABLE UNTIL THAT REVOCATION PERIOD HAS EXPIRED.

YOU PROMISE THAT NO REPRESENTATIONS OR INDUCEMENTS HAVE BEEN MADE TO YOU EXCEPT AS SET FORTH HEREIN, AND THAT YOU HAVE SIGNED THE SAME KNOWINGLY AND VOLUNTARILY.

If the terms of this Separation Agreement are acceptable to you, please sign and date this Separation Agreement and return it to the undersigned.

US FOODS, INC.

By: _____

Name
Juliette Pryor

Date:_____

Agreed and accepted on this

5th day of _February_, 2013

Signature: _Michael J. Noble_
Michael J. Noble

# Exhibit B



3200 N. Central Avenue, 20th Floor, Phoenix, AZ 85012

jaburgwilk.com

**Kraig J. Marton**

kjm@jaburgwilk.com
602.248.1017 - Direct Phone
602.248.0522 - Main Fax

June 5, 2013

Via Email - KristyAllison@adr.org

Kristy Allison
Manager of ADR Services
AMERICAN ARBITRATION ASSOCIATION
950 Waren Avenue
East Providence, RI  02914

David L. Allen
Shawdy Banihashemi
Mark D. Bogard
Neal H. Bookspan
Mervyn T. Braude
Kelly Brown
Roger L. Cohen
Beth S. Cohn
Jennifer R. Erickson
David N. Farren
Lauren L. Garner
Renee Gerstman
Laurence B. Hirsch
Amy M. Horwitz
Ronald M. Horwitz
Gary J. Jaburg
Janessa E. Koenig
Michelle M. Lauer
Michelle C. Lombino
Valerie L. Marciano
Kraig J. Marton
Nate D. Meyer
Mitchell Reichman
Laura A. Rogal
Kathi M. Sandweiss
Jeffrey A. Silence
Maria Crimi Speth
Bridget O'Brien Swartz
Susan E. Wells
Lawrence E. Wilk
Nichole H. Wilk

Adam S. Kunz
*Of Counsel*

Re:     13 166 01022 13
US Foods, Inc. and Michael Noble and Phillip Roszak

**RESPONDENT MICHAEL NOBLE'S:**
**(1) RESPONSE TO DEMAND FOR ARBITRATION,**
**(2) ANSWER TO CLAIMS SUBMITTED FOR ARBITRATION,**
**(3) EXPLANATION OF VENUE, AND**
**(4) CROSS-DEMAND FOR ARBITRATION**

Dear  Ms. Allison:

This firm represents Respondent Michael Noble ("Noble").  By this letter we (1) respond to the Demand for Arbitration filed by US Foods, Inc. ("US Foods"), (2) answer the claims submitted for arbitration by US Foods; (3) Explain why venue of any arbitration must be in Chicago and not New York; and (4) make a cross-demand for arbitration.

Noble agrees that this matter is subject to a mandatory arbitration agreement. The applicable arbitration agreement, however, is *not* the purported November 16, 2007, agreement that US Foods asserts in its demand – attaching an *un*signed copy of the alleged agreement – but is a fully executed *post*-employment Confidential Separation Agreement and Release signed and dated February 5, 2013 (the "Settlement Agreement").   That Settlement Agreement requires a cash payment to Noble of $675,000 – he giving up $175,000 in equity in order to settle the matter – and releases any and all claims US Foods has or may have against Noble, including the claims made by US Foods in its Demand for Arbitration.  A true and correct copy of the Settlement Agreement is attached as **Exhibit A** to this Response.[1]

---

[1]  You should note that, although the Settlement Agreement is confidential (see Ex. A ¶8), US Foods has violated that confidentiality by filing it in connection with a concurrent federal court lawsuit pending in the Northern District of Illinois, titled *US Foods, Inc. v. Michael J. Noble, et al.*, Civil Action No. 1:13-cv-03640 (the "Concurrent Lawsuit").  Noble need not submit the Agreement to this tribunal under seal because US Foods has already made it a public record in breach of the parties' agreement.

Noble objects to and opposes US Foods's Demand for Arbitration as contrary to the terms of the parties' Settlement Agreement in the following respects:

1. Litigation or arbitration of any and all claims US Foods has submitted to this tribunal is foreclosed by the parties' Settlement Agreement, which includes a full release by US Foods of any and all such claims arising out or related to Noble's former employment with the company (Ex. A ¶7);

2. Any arbitration of matters arising out or related to the parties' Settlement Agreement must occur in Chicago, Illinois (Ex. A ¶20), *not* New York City, as US Food's Demand for Arbitration requests;

3. The scope of any such arbitration – including whether and to what extent the claims made by US Foods in this matter are foreclosed by the parties' Settlement Agreement – should be determined by the Chicago, Illinois, arbitrator assigned to this matter; and

4. Noble makes a Cross-Demand for Arbitration pursuant to the parties' applicable Settlement Agreement, seeking to enforce the agreement and immediate payment of the $675,000 US Foods agreed to pay him pursuant to the agreement, together with interest, costs, fees and expenses.

## ALL CLAIMS MADE BY US FOODS IN ITS DEMAND FOR ARBITRATION ARE FORECLOSED BY THE PARTIES' SETTLEMENT AGREEMENT.

US Foods's Demand for Arbitration is an attempted end-run around the parties' February 5, 2013, Settlement Agreement by trying to arbitrate the very claims against Noble it has expressly agreed to release. The Settlement Agreement clearly states:

The Company releases you [Noble], as well as your heirs, executors, administrators, and assigns, from any and all claims, debts, rights, demands, judgments, obligations, causes of action, liabilities, costs and expenses, known or unknown, in law or in equity, arising out of or related to your employment with the Company. . . . [Inapplicable exceptions omitted.]

(Ex. A at 3, ¶7). US Foods's arbitration demand ignores that and instead relies on a purported, unexecuted November 16, 2007, "Management Stockholder's Agreement" that Noble allegedly signed (the "Shareholder Agreement").

The Shareholder Agreement, if there was one, however, has limited applicability because it only applies, if at all, to disputes related to the $500,000 Noble paid for US Foods stock. It provides in Section 17 that: "In the event of any controversy among the parties hereto arising out of, or relating to, *this Agreement* which cannot be settled amicably by the parties, such controversy shall be finally, exclusively and conclusively settled by mandatory arbitration conducted expeditiously in accordance with the American Arbitration Association rules by a single independent arbitrator." (Emphasis ours). The Shareholder Agreement reflects its scope in the Whereas Clause, where it is made clear that it deals solely with the purchase of stock and issues related to that stock. US Foods, however, wants to use this

JABURG WILK
Attorneys at Law

Kristy Allison
June 5, 2013
Page 3

provision to arbitrate unrelated employment claims, such as alleged "Violation of the CFAA" (Count 1), alleged breaches of fiduciary duty and duty of loyalty (Count 2), and a "civil conspiracy" (Count 5), none of which has anything remotely to do with the shares of stock Noble had purchased.

Regardless, once US Foods and Noble entered into the Settlement Agreement in 2013, that agreement superseded any such earlier agreement.

### A.    The Settlement Agreement is a Fully Executed, Valid and Binding Agreement.

US Foods terminated Noble for exposing an affair that it candidly admits its CEO, John Lederer ("Lederer") was having with the owner of a US Foods vendor that supplied event planning services to the company.  (See Demand for Arbitration at 7-8, ¶23).  Lederer was caught "red-handed" and has finally confessed to the transgression.  (Id.).  Despite US Foods's negotiation of a full settlement and release of all claims concerning the matter, however, he is apparently out to get his revenge by ignoring the Settlement Agreement and staging a sneak attack in both the Illinois District Court and this tribunal.

US Foods dramatically calls Noble's discovery and threatened disclosure of Lederer's clandestine affair with the owner of a US Foods vendor an illegal "conspiracy and a scheme to threaten and embarrass" Lederer and the economic viability of the company by "abusing, misusing and destroying" company property" and by breaching his fiduciary duties to the company. (See, e.g., Demand for Arbitration at 3-4, ¶¶ 8-9).  To the contrary, as US Foods well knows, Noble is the classic "whistle-blower" who suspected and reported potentially illegal or inappropriate misconduct – here, a CEO who is sleeping with the owner of a vendor who is able to sell services to the company at higher-than-market prices because of the relationship – and is promptly terminated for doing so.  "Blowing the whistle" on such shenanigans is not a crime or breach of duty, but is valued, protected and encouraged by the law. *See Smith v. Delaware State University*, 47 A.3d 472, 476 (Del.Supr. 2012) (Delaware Whistleblower Act "serves a valuable function by protecting employees who report violations of law for the benefit of the public" and, "[b]y protecting these employees, the statute encourages such reporting and promotes public health and safety"); *see also Murcott v. Best Western Intern., Inc*., 198 Ariz. 349, 357, ¶¶ 39-42, 9 P.3d 1088, 1096 (App. 2000). [2]

Noble protested his termination on this basis and demanded re-payment of his stock purchases and damages.  The parties, through their counsel, negotiated and resolved the dispute on January 11, 2013, when Noble accepted the terms of US Foods' settlement offer.  A true and correct copy of the letter confirming this sent by Noble's counsel, Kraig J. Marton, to US Foods's counsel, Juliette Prior, dated January 11, 2013, is attached as **Exhibit B** to this Response.  Counsel exchanged drafts of the Settlement Agreement and, when all was acceptable to both parties, Noble and US Foods exchanged signature pages on February 5, 2013.  True and correct copies of the confirming emails exchanged between counsel on that date are attached as **Exhibit C** to this Response.

---

[2]   Delaware law is cited because the parties' Settlement Agreement provides that it applies to interpret its provisions.  (Ex. A at 6, ¶20).  Arizona law is also cited here as well because it may also apply in the state where the whistle-blowing at issue occurred.

JABURG

Attorneys at Law

Kristy Allison
June 5, 2013
Page 4

In the Settlement Agreement, Noble agreed to do three things before he would be entitled to the agreed on $675,000 ($500,000 of which is simply the return of his own money): (1) He agreed that the private investigator he had hired, Quest Consultants ("Quest") give its file to US Foods (Ex. A at 5, ¶14); (2) He agreed to return any company property in his possession or control to US Foods (Id. at 3-4, ¶9); and (3) He agreed to be interviewed by US Foods's counsel about the matters leading up to his termination (Id. at 15, ¶15). He did all of those things, including flying to Chicago to be interviewed by US Foods's counsel. A true and correct copy of Mr. Marton's email confirming this sent to Ms. Prior on March 6, 2013, is attached as **Exhibit D** to this Response.

US Foods, however, then balked at Noble's request for payment. It claimed that, among other things, he had not returned all of the company emails in his possession or control because, as he testified during his interview, he had wisely deleted those emails from his computer after they had been located, downloaded and saved on the "thumb drive" storage device he gave to US Foods. The emails obviously had been returned, as promised, and had not been "lost" or "destroyed" by deleting them from Noble's computer after downloading and saving them on the storage devise given to US Foods. A true and correct copy of Mr. Marton's email explaining this and denying other allegations made by US Foods with regard to Quest's document production sent to Ms. Prior on March 13, 2013, is attached as **Exhibit E** to this Response. US Foods clearly was looking for some excuse, regardless of merit, to breach the parties' Settlement Agreement.

Subsequent efforts to satisfy US Foods and secure its compliance with the parties' Settlement Agreement were stalled by the company's legal counsel. True and correct copies of Mr. Marton's letters confirming these efforts sent to the company's legal counsel are dated March 26, 2013, attached as **Exhibit F**, April 10, 2013, attached as **Exhibit G**, April 16, 2013, attached as **Exhibit H**, May 2, 2013, attached as **Exhibit I**, and May 10, 2013, attached as **Exhibit J** to this Response.

Suddenly, without forewarning, Noble's received a certified delivery of US Foods's Northern District of Illinois lawsuit and the Demand for Arbitration in this tribunal. Both proceedings ignore the parties' Settlement Agreement, as if it didn't exist. It does exist. It is fully executed and is attached as **Exhibit A** to this Response.

**B. US Food's Unfounded Complaints Do Not Undo the Settlement Agreement.**

US Foods in its Demand for Arbitration acknowledges the Settlement Agreement, but casually tosses it aside in a single, unexplained allegation that "[t]he separation and release agreement never became effective because Respondent Noble failed to comply with his obligations under agreement." (Demand for Arbitration at 13, ¶45). As demonstrated above, however, Noble has fully performed all three of the obligations required of him by the Settlement Agreement. And even if he had not done that, the Settlement Agreement is a valid, binding and enforceable contract.

Noble's obligations to have Quest give its file to US Foods, to return company property in his possession or control and to be interviewed by US Foods's counsel are not stated to be conditions precedent to the validity and enforceability of the Settlement Agreement. (See Ex. A at 5, ¶14, 3-4, ¶9, and 15, ¶15). A contract term must be clearly stated as such before a court will construe the term as a condition precedent. *See Realty Associates of Sedona v. Valley Nat. Bank of Arizona*, 153 Ariz. 514,

JABURG*WILK
Attorneys at Law

Kristy Allison
June 5, 2013
Page 5

519, 738 P.2d 1121, 1126 (App. 1986) (noting that "[c]onditions precedent are not favored and the courts are not inclined to construe a contractual provision as a condition precedent unless such construction is plainly and unambiguously required by the language of the contract"); *Commonwealth Const. Co. v. Cornerstone Fellowship Baptist Church, Inc.*, 2006 WL 2567916, 21 (Del.Super. 2006) (explaining that "a condition precedent is not a favorable result when interpreting a contract," but that, "where the contract language is clear and unambiguous, the Court must give that language its plain meaning"); *see also PAMI-LEMB I Inc. v. EMB-NHC, L.L.C.*, 857 A.2d 998, 1014 (Del.Ch. 2004), *citing Pacific Coast Eng'g Co. v. Merritt-Chapman & Scott Corp.*, 411 F.2d 889, 895-96 (9th Cir. 1969) (repudiation of a contract occurs when a party is "not asserting a good faith interpretation of the contract terms" and yet has "persistently demanded an unwarranted condition precedent to its required performance").

Thus, regardless of whether US Foods is right or, we believe, provably wrong, its complaints that Noble has not completed the tasks assigned to him by the Settlement Agreement do not prevent the agreement from being a valid and enforceable contract. US Foods does not have a "no contract" claim. At best, even if it is absolutely right about everything it claims Noble has not done, it has a breach of contract claim that must be arbitrated in accordance with the agreement.

## C. The Shareholder Agreement Does Not Apply.

US Foods's Demand for Arbitration relies on and alleges breaches of the Shareholder Agreement. That agreement, however, ended when he was terminated, as expressly stated in the parties' Settlement Agreement. (See Ex. A at 1, ¶1 – "Your employment with the Company terminated effective December 1, 2012 . . . ."). As also expressly stated in the parties' Settlement Agreement, all benefits that Noble was entitled to receive pursuant to the Shareholder Agreement were terminated at that time. (See id. at 2, ¶3 – "You acknowledge that, except as expressly provided in this Separation Agreement, you will not receive any additional compensation or benefits, including salary, stock or equity rights or payments, bonus, or severance benefits from the Company."). The only post-termination benefits that US Foods was entitled to receive under the Shareholder Agreement – essentially post-employment restrictive covenants – were either modified or incorporated by specific reference. (See, e.g., id. at 4, ¶10 – "You agree that you remain bound by . . . [listing specific covenants in prior agreements]"). If there be any doubt, all such prior agreements were expressly disclaimed and superseded. (See id. at 6, ¶10 – "This Separation Agreement . . . supersedes any and all prior agreements . . . ."). And, of course, all claims and issues pertaining to the parties' prior employment relationship were subject to the full release and waiver included in the Settlement Agreement. (See id. at 2, 4, ¶4, and 3, 4, ¶7).

The Shareholder Agreement is dead and buried. It has no relevance to the matters alleged by US Foods in its Demand for Arbitration and should not be considered in determining the venue or scope of arbitration or the matters presented for arbitration. The parties' Settlement Agreement has, by its terms, replaced and superseded that agreement and is the *only* relevant document to determine those issues. *See, e.g.*, *Blades v. Wisehart*, 2010 WL 4638603, 6 (Del.Ch. 2010) (rejecting a liability argument that, the Court found, "flew in the face of the plain language of the March 2008 Agreement that plainly superseded the December 2007 Agreement").

JABURG·WILK
Attorneys at Law

Kristy Allison
June 5, 2013
Page 6

## ANY ARBITRATION OF US FOODS'S CLAIMS MUST OCCUR
## IN CHICAGO, ILLINOIS, NOT NEW YORK CITY.

US Foods demands arbitration of its claims against Noble in New York City in accordance with the Shareholder Agreement. (Demand for Arbitration at 4-5, ¶¶ 11-12). The Shareholder Agreement, however, is dead and buried and irrelevant.

The parties' Settlement Agreement, however, the *only* relevant document to determine those issues, also contains a mandatory arbitration provision which provides that any "controversy or claim arising out of or relating to this Agreement or the breach therefor" shall be arbitrated in Chicago, Illinois. (Ex. A at 6, ¶20). US Foods's claims against Noble in its Demand for Arbitration are such a controversy or claim arising out of or relating to the Settlement Agreement. Chicago, Illinois, then is where any arbitration of those claims should occur.

## THE SCOPE OF ANY SUCH ARBITRATION – INCLUDING WHETHER AND TO
## WHAT EXTENT US FOODS' CLAIMS ARE FORECLOSED BY THE PARTIES'
## SETTLEMENT AGREEMENT – SHOULD BE DETERMINED BY THE CHICAGO,
## ILLINOIS, ARBITRATOR ASSIGNED TO THIS MATTER.

The scope of any arbitration between the parties is a matter that should be determined, in the first instance, by the arbitrator pursuant to both the Federal Arbitration Act (FAA) and AAA rules. *See* AAA Rule 6(a)("The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement"); *Moses H. Cone Memorial Hosp. v. Mercury Const.*, 460 U.S. 1, 25, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983) ("[the FAA] establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration"); *Medtronic AVE Inc. v. Cordis Corp.*, 2004 WL 1557328, 3 (3rd Cir. 2004) (noting the "long line of cases that hold that arbitrability is ultimately a question for the arbitrator to resolve); *see also New Castle County v. U.S. Fire Ins. Co.*, 728 F.Supp. 318, 321 (D.Del. 1989) (noting the Supreme Court in *Moses* requires that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration"). If there were any doubt, the recent of case *Nitro-Lift v Howard*, __ U.S. __. 133 S.Ct. 500, 504 (2012) should resolve that doubt as the Supreme Court clearly, once again stated that the arbitrator decides such matters ("it is for the arbitrator to decide in the first instance whether the covenants not to compete are valid").

Thus, for all of the foregoing reasons, all the scope of arbitration – including whether and to what extent the claims made by US Foods in this matter are foreclosed by the parties' Settlement Agreement – should be determined by the Chicago. Illinois, arbitrator assigned to this matter in accordance with the parties' Settlement Agreement. (See Ex. A at 6, ¶20).

## NOBLE'S ANSWER TO US FOODS'S CLAIMS

As a precaution, and without waiving the foregoing response and objections to US Foods's Demand for Arbitration, Noble answers all claims made against him by US Foods in its Demand for Arbitration consistently with the facts set forth above, unequivocally *denying* any and all liability for

JABURG WILK
Attorneys at Law

Kristy Allison
June 5, 2013
Page 7

computer fraud (Count I), breach of fiduciary duty (Count II), breach of contract (Count IV), or civil conspiracy (Count V). [3]

## NOBLE CROSS-DEMANDS ARBITRATION PURSUANT TO THE PARTIES' SETTLEMENT AGREEMENT.

Finally, as we said at the outset, Noble agrees that the dispute between the parties should be submitted for arbitration. The applicable arbitration agreement, however, is the parties' Settlement Agreement rather than the Shareholder Agreement on which US Foods bases its demand. The Settlement Agreement states:

> The parties shall use good faith efforts to resolve any controversy or claim arising out of or related to this Agreement or the breach thereof. If, despite their good faith efforts, the parties are unable to resolve such controversy or claim, then such controversy or claim shall be resolved by arbitration in Chicago, Illinois, with one (1) arbitrator, in accordance with the National Rules for resolution of Employment Disputes of the American Arbitration Association, and judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. . . . .

(Ex. A at 6, ¶20). Noble therefore makes a formal cross-demand for arbitration of the parties' dispute pursuant to this mandatory provision in their agreement and request that an arbitrator duly appointed to the mater in Chicago, Illinois, as the agreement specifies, determine all such matters and related issues, including, as set forth here, whether and to what extent the claims made by US Foods in this matter are foreclosed by the Settlement Agreement. Again, US Foods's claims against Noble in its Demand for Arbitration are a controversy or claim arising out of or relating to the Settlement Agreement that must be arbitrated pursuant to that agreement.

Noble specifically states that he has fully complied with his obligations under the Settlement Agreement and that he is entitled to not only the $675,000 set forth there, but also all fees, costs, expenses and interest as contemplated in the agreement and as allowed by applicable law.

## CONCLUSION

For all of the foregoing reasons, we ask that you: (1) *deny* US Foods's Demand for Arbitration as based on an arbitration agreement that has been foreclosed and superseded by the parties' Settlement Agreement and which does not apply anyway; (2) *re-assign* this matter for AAA arbitration in Chicago, Illinois, in accordance with the parties' Settlement Agreement; (3) *permit* the arbitrator assigned to the matter in Chicago, Illinois, to determine all such matters and related issues – including whether and to what extent the claims made by US Foods in this matter are foreclosed by the Settlement Agreement; and (4) *grant* Noble's Cross-Demand for Arbitration and award him his $675,000 plus interest, costs fees and expenses.

---

[3] Count III was apparently omitted from the demand.

JABURG WILK
Attorneys at Law

Kristy Allison
June 5, 2013
Page 8


Sincerely,

**JABURG & WILK, P.C.**

Kraig J. Marton


KJM:dnf

cc:     Connie N. Bertram, Esq.
        Philip J. Nathanson, Esq.

Attachments:

Exhibit A:  February 5, 2103, Settlement Agreement

Exhibit B:  Copy of the letter sent by Kraig J. Marton to Juliette Prior dated January 11, 2013

Exhibit C:  Copies of emails and signature pages exchanged by Kraig J. Marton to Juliette Prior dated February 5, 2013

Exhibit D:  Copy of Kraig J. Mr. Marton email confirming completion of contract performance sent to Juliette Prior dated March 6, 2013

Exhibit E:  Copy of Kraig J. Marton email to Juliette Prior regarding Quest document production dated March 13, 2013

Exhibit F:  Copy of email sent by Kraig J. Marton to Juliette Prior dated March 26, 2013

Exhibit G: Copy of email sent by Kraig J. Marton to Juliette Prior dated April 10, 2013

Exhibit H: Copy of email sent by Kraig J. Marton to Juliette Prior dated April 16, 2013

Exhibit I: Copy of email sent by Kraig J. Marton to Juliette Prior dated May 2, 2013

Exhibit J: Copy of email sent by Kraig J. Marton to Juliette Prior dated May 10, 2013

# Exhibit A



February 4, 2013

Michael J. Noble
4717 E Quartz Mountain Road
Paradise Valley, AZ 85253-3202

## CONFIDENTIAL SEPARATION AGREEMENT AND RELEASE

Dear Mr. Noble:

This letter (hereinafter, the "Separation Agreement") confirms the terms related to the termination of your employment with US Foods, Inc. ("US Foods" or the "Company").

1. Termination. Your employment with the Company terminated effective December 11, 2012 (your "Termination Date"). Since your Termination Date, a dispute has arisen concerning the Company's obligation to repurchase stock and options in the Company held by you on your Termination Date and to pay severance and a bonus to you. Without admitting any liability or fault, the Company and you have agreed to the following terms to resolve these and all other disputes and claims between you and the Company.

2. Settlement Payment. In consideration of the promises and other good and valuable consideration set forth herein, if you sign and do not revoke this Separation Agreement, the Company agrees to pay you $175,000 (the "Settlement Payment").

    a. The parties agree that $100,000 of the payment represents the appreciation on the value of the 100,000 shares of Company stock purchased by you in 2007 and $75,000 of the payment is for the repurchase of that number of shares of vested stock options held by you as of the Termination Date determined by the Company to have a value of $75,000. All remaining vested stock options held by you as of the Termination Date shall expire and have no value.

    b. The Company agrees to repurchase your stock for a total of $600,000. $500,000 of that amount represents in the amount you initially paid for the stock. The $100,000 payment referenced above represents the appreciation in the value of the stock since you purchased it.

    c.  The Settlement Payment and stock purchase monies, totaling $675,000, will be mailed to your counsel within ten (10) days of the Effective Date of this Agreement.

3.  <u>No Additional Benefits.</u>  Your right to continue qualifying coverage at your own cost pursuant to COBRA (the Consolidated Omnibus Budget Reconciliation Act of 1986, as amended) shall be governed by applicable law and the terms of the Company's plans and programs as has or will be explained to you in separate correspondence. You agree that you are not and will not be entitled to any severance benefits under the Company's Severance Plans. You further agree that you are not entitled to any additional compensation under the Management Stockholder's Agreement, Sale Participation Agreement, or Stock Option Agreement that you signed on November 16, 2007 and that the Settlement Payment satisfies any and all of US Foods' obligations to pay you for stocks and options issued to you pursuant to those agreements or any other agreement. You further agree that any remaining stocks and options you previously held or owned have expired. You acknowledge that it is the Company's position that the Settlement Payment is a payment to which you are not otherwise entitled. You acknowledge that, except as expressly provided in this Separation Agreement, you will not receive any additional compensation or benefits, including salary, stock or equity rights or payments, bonus, or severance benefits from the Company.

4.  <u>Claims Released.</u>  It is also understood that, in exchange for your Separation Payment and other benefits set forth herein, you **<u>release and waive</u>** all claims, causes of action or the like, known or unknown, to the extent permitted by law, that you, your heirs, executors, administrators, and assigns have, had or may have in the future against the Company, and/or any of their respective owners, parents, predecessors, successors, affiliates, and/or subsidiaries, employee benefit plans, employee benefit plan administrators and/or fiduciaries, including each of their current or past directors, officers, agents and employees, and/or anyone else connected with any of the foregoing (collectively, "Released Parties"), with respect to all matters of your employment and separation from employment with the Company, including but not limited to, all allegations, claims, and violations related to severance, any reductions-in-force, notice of termination, the payment of your salary and benefits and all claims arising under the following, in each case as amended: the Age Discrimination in Employment Act of 1967, as amended by the Older Workers Benefit Protection Act of 1990; Title VII of the Civil Rights Act of 1964; the Civil Rights Act of 1991; the Equal Pay Act of 1963; the Americans with Disabilities Act of 1990; the Family and Medical Leave Act of 1993; the Civil Rights Act of 1866; the Worker Adjustment and Retraining Notification Act; the Employee Retirement Income Security Act of 1974; any applicable Executive Order Programs; the Fair Labor Standards Act; section 806 of the Sarbanes-Oxley Act of 2002; the False Claims Act and all of the state or local counterparts, or any other federal, state or local statute, constitution or ordinance; or under any public policy, contract or tort, or under any common law, including without limitation for wrongful discharge; or arising under any practices or procedures of the Company; or any claim for breach of contract, infliction of emotional distress, defamation, or any claim for costs, fees or other expenses, including attorneys' fees and expenses, incurred in these matters.

5. <u>Pursuit of Released Claims and Scope of Release.</u> You agree and covenant not to file any suit, action, arbitration, or complaint against the Released Parties, and not to assist in any such action in any court, administrative or private proceeding with regard to any claim, demand, liability or obligation arising out of any alleged act or omission of US Foods, your employment with US Foods or your separation therefrom. You further represent that no claims, complaints, charges, arbitrations, or other proceedings are pending in any court, administrative agency or department, commission or other forum relating directly or indirectly to the conduct of US Foods or your employment with US Foods.

6. <u>Unreleased Claims.</u> You understand that this Agreement is a full and final release applying to all known and unknown or unanticipated injuries or damages of any kind arising from those matters released herein. You expressly and knowingly waive all rights you may have under any law that is intended to protect you from waiving unknown claims. You understand that this release and waiver does not waive or release your right to unemployment benefits or worker's compensation in accordance with applicable law, claims that arise based on acts or occurrences after the Effective Date, your right to enforce this Separation Agreement, vested retirement savings benefits, and your right to file a charge with the Equal Employment Opportunity Commission ("EEOC"). You are, however, waiving your right to recover money in connection with any such EEOC charge. You are also waiving your right to recover money in connection with a charge filed by any other individual or by the EEOC or other federal or state agency.

7. <u>Release of Claims Against Employee.</u> The Company releases you, as well as your heirs, executors, administrators, and assigns, from any and all claims, debts, rights, demands, judgments, obligations, causes of action, liabilities, costs and expenses, known or unknown, in law or in equity, arising out of or related to your employment with the Company. Notwithstanding anything to the contrary in the subsection above, the Company's release of Employee does not apply to nor prohibit any claims by the Company unknown to the General Counsel of the Company as of the Effective Date of this Agreement. The Parties' releases also do not prohibit claims by any Party to enforce the terms of this Agreement.

8. <u>Confidentiality.</u> You agree that, except as hereinafter provided, you will keep the negotiations leading to and the terms, conditions and existence of this Separation Agreement in strict confidence and shall not disclose them to anyone except: (a) to your attorney and bona fide tax and financial advisors (only if they agree in writing to be bound by and to comply with the provisions of this Agreement); (b) your spouse (only if she agrees in writing to be bound by and to comply with the provisions of this paragraph); or (c) pursuant to compulsory legal process or a court order. If there is any proceeding to enforce the terms of this Agreement, this Agreement shall be filed under seal, pursuant to the rules and provisions of the court in which the proceeding is filed. If you receive a subpoena or other request to produce this Agreement, or to provide or produce testimony or documents subject to this Paragraph, you will immediately notify in writing the General Counsel of US Foods.

9. <u>Return of Company Property.</u> You certify that you have returned to the Company all property, documents and data of the Company or relating to your work for the Company

("Company Data") in your possession, custody or control, including without limitation, all keys and access cards, badges, credit and telephone cards, telephones, pagers, all computers and computer related equipment (i.e. hardware, software, diskettes, electronic storage devices, etc), all passwords, access codes and other information necessary to access any computer, communications device or electronic database, and all books, files, documents and electronic data and media. Electronic data should be returned in native format, with all associated metadata intact. You agree, upon the Company's request, to permit a third-party IT technician retained by the Company to inspect all of your personal computers and electronic communications and storage devices to identify and recover any additional Company Data and to undertake the permanent deletion of any Company Data. Said technician will not transmit or disclose to the Company any data on your personal computers and devices that is not Company Data.

10. <u>Other Agreements.</u> You agree that you remain bound by all post-employment restrictions in your previous agreements with US Foods as found in:

- Sections 17 and 22 of the Management Stockholder's Agreement signed by you on November 16, 2007; and

- The provisions of the Non-Solicitation and Non-Disclosure Agreement signed by you on November 16, 2007 that are incorporated by reference into Section 22 of the Management Stockholder's Agreement.

11. <u>Non-Disparagement.</u> You agree not to make any disparaging remarks now, or at any time in the future, about the Released Parties. You further agree that you will not, directly or indirectly, follow, investigate, photograph, videotape, or stalk (in person or through electronic or other means) any of the Releasees. US Foods will instruct John Lederer, Juliette Pryor, Stuart Schuette, David Esler, Al Swanson and Michael Ranchino not to make any statements that disparage or defame you. If US Foods is contacted by your prospective employers, it will provide neutral reference information consistent with Company policy. Nothing in this Agreement shall prohibit you or the Company from providing accurate information to any court or governmental entity; or to any person or organization in response to legal process or otherwise as required by law. You agree that if you violate this provision you forfeit the Settlement Payment given to you as part of this Separation Agreement.

12. <u>Cooperation.</u> You agree to cooperate and assist the Company and the Released Parties in any court, agency, arbitration or other legal matters about which you have knowledge relevant to the matter. You acknowledge and agree that such assistance may include, but will not be limited to, providing complete and truthful background information regarding any matter on which you previously worked, aiding in the drafting of declarations and similar documents, executing declarations and similar documents, testifying or otherwise appearing at investigation interviews, depositions, arbitrations or court hearings and preparation for the above-described or similar activities as requested by the Company or required by legal process. The Company will use its best efforts to ensure that any assistance requested will be arranged so that it does not unreasonably interfere with your other employment or family commitments. The Company will reimburse you for the

reasonable expenses that you incur in complying with this cooperation obligation, as long as they are approved in writing in advance by the General Counsel. Nothing in this Paragraph is intended to cause you to make a false statement or testify untruthfully in any legal proceeding, and you agree not to do so.

13. <u>Disgorgement.</u>  You agree and understand that if you materially breach Paragraphs 8, 9, 10, 11 or 12, the Company may recover from you the Settlement Payment as liquidated damages, as well as its reasonable attorneys' fees and costs and any other damages or remedies allowed by law.

14. <u>Quest Consultants.</u>  You will authorize and direct Quest Consultants International, Ltd. ("Quest") to provide all information related to the project for which you hired Quest including, but not limited to, all communications with you, all surveillance reports, all video and audio recordings, all pictures, and all supporting documentation and work product and all US Foods documents and data. US Foods agrees to reimburse Quest for the reasonable copying costs that it incurs in producing the information required by this Paragraph. This Agreement will not be effective until Quest complies with your directive and produces all documents and data subject to this Paragraph.

15. <u>Interview.</u>  You agree that you will be interviewed by US Foods and/or its designated counsel in Chicago, Illinois, but not in Rosemont. US Foods will pay for your reasonable food, travel, and lodging expenses for traveling to and attending the interview. The interview will cover the following topics: the anonymous letters to US Foods postmarked September 20, 2012 and November 9, 2012; your participation in the preparation and sending of those letters; the allegations contained in the letters; the surveillance referenced in that letter and otherwise performed by Quest or by or at the request of you or any other current or former employee of US Foods; the retention and payment of Quest; the topics addressed in the December 12, 2012 letter from Juliette Pryor to you and the December 18, 2012 letter from your counsel, Kraig J. Marton, to Juliette Pryor of US Foods; and any allegations by you regarding US Foods' pricing on its contracts with or purchases by the federal government, including whether US Foods instructs its vendors to increase the amount of their invoices to amounts greater than actual true prices paid to the vendor, whether such invoices are then submitted to the US government or other governmental entities, and any and all subjects related to the above topics. The interview may be recorded and/or transcribed at the Company's discretion. Your counsel may be present at the interview. You understand that you have an obligation to provide truthful, complete, responsive and accurate statements in response to counsel's questions. You will also provide information to either support or rescind your implied allegations related to US Foods' pricing practices under its government contracts. The Settlement Payment will not be made until you have complied with this Paragraph by appearing for the interview and by completely and truthfully answering questions about the above topics for such time as required by the person conducting the interview, but not more than eight (8) hours. US Foods will have the option of requiring you to sign a sworn statement summarizing all or a portion of your statements during the interview.

16. <u>Entire Agreement.</u> This Separation Agreement contains the entire understanding between you and the Company regarding the subject matters set forth herein, and supersedes any and all other prior agreements, understandings, discussions, and negotiations whether written or oral between you and the Company, except the Other Agreements referenced in Paragraph 10. This Separation Agreement cannot be changed except in a writing signed by you and an authorized representative of the Company. You acknowledge that neither the Company nor any representative of the Company has made any representation or promise to you other than as set forth herein.

17. <u>Construction.</u> Each party and its counsel have reviewed this Separation Agreement and have been provided the opportunity to review this Separation Agreement and accordingly, the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Separation Agreement. Instead, the language of all parts of this Separation Agreement shall be construed as a whole, and according to their fair meaning, and not strictly for or against either party.

18. <u>Severability.</u> If any provision in this Separation Agreement is found to be unenforceable, all other provisions will remain fully enforceable. The covenants set forth in this Separation Agreement shall be considered and construed as separate and independent covenants. Should any part or provision of any provision of this Separation Agreement be held invalid, void or unenforceable in any court of competent jurisdiction, such invalidity, voidness or unenforceability shall not render invalid, void or unenforceable any other part or provision of this Separation Agreement.

19. <u>Interpretation,</u> This Agreement shall be construed as a whole according to its fair meaning. It shall not be construed strictly for or against you or the Company. Unless the context indicates otherwise, the singular or plural number shall be deemed to include the other. Captions are intended solely for convenience of reference and shall not be used in the interpretation of this Agreement.

20. <u>Choice of Law/Dispute Resolution.</u> The terms of this Agreement shall be interpreted under the laws of the State of Delaware. The parties shall use good faith efforts to resolve any controversy or claim arising out of, or relating to this Agreement or the breach thereof. If, despite their good faith efforts, the parties are unable to resolve such controversy or claim, then such controversy or claim shall be resolved by arbitration in Chicago, Illinois, with one (1) arbitrator, in accordance with the National Rules for Resolution of Employment Disputes of the American Arbitration Association, and judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. The arbitrator shall have the discretion to award reasonable attorneys' fees, costs and expenses, including fees and costs of the arbitrator and the arbitration, to the prevailing party.

21. <u>Non-Admission of Liability.</u> This Separation Agreement does not constitute an admission of any liability or wrongdoing on the part of any party, and each party expressly denies same.

22. <u>Consideration Period.</u> You know and understand the contents of this Separation Agreement and its binding effect, and you are hereby advised to consult with an attorney prior to signing this Agreement. You voluntarily and knowingly agree to the terms of this Separation Agreement, You acknowledge that you have been advised that you have twenty-one (21) days to consider this Separation Agreement. In the event that you execute this Separation Agreement prior to the expiration of the 21-day period, you hereby waive the balance of said period. If you do not sign this Separation Agreement within the 21-day period, you understand that it will become null and void.

23. <u>Revocation Period.</u> You will have seven (7) days following the date on which you execute this Separation Agreement to revoke this Separation Agreement, and this Separation Agreement shall not become effective or enforceable until such revocation period has expired. Any revocation within this period shall be submitted in writing and personally delivered or mailed to Juliette Pryor, Executive Vice President, General Counsel and Chief Compliance Officer, US Foods, 9399 West Higgins Road, Rosemont, Illinois 60018, and post-marked, where applicable, within seven (7) days of the date following execution of this Separation Agreement. No Separation Payment or other benefits will be paid or provided until after such seven (7) day revocation period has expired and this Separation Agreement has become effective. If this Separation Agreement is revoked by you then you shall forfeit all of your Separation Payment and/or other benefits, and the Company shall not be required to provide you with any such payments, benefits or other consideration.

24. <u>Counterparts.</u> This Separation Agreement may be executed in counterparts, and each counterpart, when executed, shall have the efficacy of a signed original. Photographic and facsimiled copies of such signed counterparts may be used in lieu of the originals for any purpose.

25. <u>Effective Date.</u> The Effective Date of this Agreement shall be the latest of the date that is fully executed by the Parties, the expiration of the seven-day revocation period set forth in Paragraph 23, the certification of the return of all Company property in Paragraph 9, complete production of the records and data by Quest as described in Paragraph 14, and the completion of the interview required by Paragraph 15.


PLEASE READ THIS AGREEMENT CAREFULLY. EXCEPT AS OTHERWISE PROVIDED HEREIN, IT CONTAINS A **RELEASE** OF ALL KNOWN AND UNKNOWN CLAIMS.

YOU AGREE THAT YOU RECEIVED VALUABLE CONSIDERATION IN EXCHANGE FOR ENTERING INTO THIS AGREEMENT AND THAT THE COMPANY HEREBY ADVISES YOU TO CONSULT AN ATTORNEY PRIOR TO SIGNING THIS AGREEMENT. YOU HAVE BEEN PROVIDED 21 DAYS WITHIN WHICH TO CONSIDER WHETHER YOU SHOULD SIGN THIS AGREEMENT AND WAIVE AND RELEASE ALL CLAIMS AND RIGHTS INCLUDING BUT NOT LIMITED TO THOSE ARISING UNDER THE FEDERAL AGE DISCRIMINATION IN EMPLOYMENT ACT. YOU SHALL HAVE SEVEN (7) DAYS WITHIN WHICH TO REVOKE THIS AGREEMENT AND THIS

AGREEMENT SHALL NOT BECOME EFFECTIVE OR ENFORCEABLE UNTIL THAT REVOCATION PERIOD HAS EXPIRED.

YOU PROMISE THAT NO REPRESENTATIONS OR INDUCEMENTS HAVE BEEN MADE TO YOU EXCEPT AS SET FORTH HEREIN, AND THAT YOU HAVE SIGNED THE SAME KNOWINGLY AND VOLUNTARILY.

      If the terms of this Separation Agreement are acceptable to you, please sign and date this Separation Agreement and return it to the undersigned.

US FOODS, INC.

By: _____
    Name
    Juliette Pryor

Date: _05 February 2013_

Agreed and accepted on this

_____ day of _____, 2013

Signature:_____
    Michael J. Noble

AGREEMENT SHALL NOT BECOME EFFECTIVE OR ENFORCEABLE UNTIL THAT
REVOCATION PERIOD HAS EXPIRED.

YOU PROMISE THAT NO REPRESENTATIONS OR INDUCEMENTS HAVE BEEN
MADE TO YOU EXCEPT AS SET FORTH HEREIN, AND THAT YOU HAVE SIGNED
THE SAME KNOWINGLY AND VOLUNTARILY.

       If the terms of this Separation Agreement are acceptable to you, please sign and date this
Separation Agreement and return it to the undersigned.

US FOODS, INC.

By: _____
        Name
        Juliette Pryor

Date:_____

Agreed and accepted on this

5th day of February, 2013

Signature: *Michael J. Noble*
        Michael J. Noble

Page 8 of 8

# Exhibit B



3200 N. Central Avenue, 20th Floor, Phoenix, AZ 85012

jaburgwilk.com

**Kraig J. Marton**

kjm@jaburgwilk.com
602.248.1017 - Direct Phone
602.297.5017 - Direct Fax

January 11, 2013

*Via E-Mail [j.Pryor@USfoods.com] and US Mail*

Juliette Pryor
Executive Vice President
General Counsel and Chief Compliance Officer
US Foods
9399 West Higgins Road, Suite 500
Rosemont, Illinois 60018

    *Re:   Michael J. Noble*

Dear Ms. Pryor:

    Mike Noble has authorized me to accept your offer. Here are the terms of the offer I believe you made, together with some clarification about those terms as you and I had discussed:

    1.  US Foods will pay Michael the sum of $175,000, and all of it will be treated as capital gain. We propose that the first $100,000 be paid as appreciation on the stock (@ $6.00) and the $75,000 be determined by agreeing that the numbers of options needed to total this amount are vested and then purchased by US Foods;

    2.  The parties will exchange full and complete mutual releases. While Michael is agreeable to a full release to US Foods, he must receive a mutual release especially in light of your suggestion that US Foods has claims against him;

    3.  Mike will direct Quest Investigations to provide their entire file to US Foods, including all communications they had with him. If Quest has any charge for the production, US Foods will pay it;

    4.  Mike will agree to submit to an interview with US Food's outside counsel concerning all of the issues raised in my litigation hold letter. He will also answer all questions about how he came to suspect the conduct of the CEO. Mike will also explain in that interview why he expressed concerns about US Foods pricing policies, and will explain how he issued various certifications in light of those concerns. If the interview is to take place outside of Arizona, US Foods will pay Mike's food, travel and lodging expenses. Mike may be represented by counsel at the interview;

    5.  Mike will return or destroy all US Foods confidential documents including anything stored electronically, and he will insure that my law office does so, too;

    6.  The terms of settlement are to be confidential;

JABURG|WILK
Attorneys at Law

Juliette Pryor
January 11, 2013
Page 2

     7. There will be a nondisparagement clause, but it must be mutual. US Foods must undertake to state nothing about Mike other than to confirm his position, dates of employment and pay.

     Assuming I have correctly understood the bullet points, you will prepare the first draft of the documentation needed to accomplish the above terms. We look forward to a prompt resolution.

                         Very truly yours,

                         **JABURG & WILK, P.C.**

                         Kraig J. Marton

KJM:kmr

# Exhibit C

| | |
|---|---|
| **From:** | Kraig J. Marton |
| **Sent:** | Tuesday, February 05, 2013 11:02 AM |
| **To:** | 'Pryor, Juliette' |
| **Cc:** | Michael J. Noble [mn5967@yahoo.com]; Kimberly M. Rogers |
| **Subject:** | RE: Revised AGreement |
| **Attachments:** | Noble Release Agreement FINAL.pdf |

Juliette,

Mike Noble has determined to accept this last version and an executed copy is attached. Could you please now send us an executed copy, too, so Mike can get started with his obligations under this agreement?.

Also, Mike and I can be in Chicago on Thursday, February 14, ready for an interview at 9 am. Please confirm the date and tell us where..

Kraig J. Marton
Jaburg & Wilk, P.C.
3200 North Central #2000
Phoenix, AZ 85012

602 248 1017 (DID)
602 297 5017 (Direct Fax)
www.jaburgwilk.com

NOTICE: this email may be between attorney and client, and, as such, is intended to be private, privileged and confidential. If you have received this transmission in error, please reply that you have received it mistakenly, and destroy the original email and any attachments. Thank you.

---

**From:** Pryor, Juliette [mailto:Juliette.Pryor@usfoods.com]
**Sent:** Monday, February 04, 2013 12:58 PM
**To:** Kraig J. Marton
**Subject:** Revised AGreement

Per my voicemail, please see attached revised document. We reject further edits to paragraphs 15 and 20. I've attached a redline and clean version of the agreement. Please have Mike sign this version. Thanks, Juliette

**Juliette Pryor** | General Counsel and Chief Compliance Officer
9399 W. Higgins Road | Suite 500 | Rosemont, IL 60018
**O 847.720.8013 | F 480.293.2705**
juliette.pryor@usfoods.com

# US Foods
**KEEPING KITCHENS COOKING™**

*************************************************************

This e-mail message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

This email message and any attachments are for the sole use of the intended recipient(s) and may contain information that is proprietary to US Foods, Inc. and/or its subsidiaries or otherwise confidential or legally privileged. If you have received this message in error, please notify the sender by reply, and delete all copies of this message and any attachments. If you are the intended recipient you may use the information contained in this message and any files attached to this message only as authorized by US Foods, Inc. Files attached to this message may only be transmitted using secure systems and appropriate means of encryption, and must be secured using the same level password and security protection with which the file was provided to you. Any unauthorized use, dissemination or disclosure of this message or its attachments is strictly prohibited.

| | |
|---|---|
| **From:** | Pryor, Juliette <Juliette.Pryor@usfoods.com> |
| **Sent:** | Tuesday, February 05, 2013 4:02 PM |
| **To:** | Kraig J. Marton |
| **Subject:** | Executed Agreement |
| **Attachments:** | Noble Executed Separation and Release Agreement.pdf |

Kraig:

Attached please find the executed agreement. We will conduct the interview on Thursday, February 14, 2013 at 9:30 am at the offices of Kaye Scholer, located at 3 First National Plaza, 70 W. Madison, Suite 4200, Chicago, IL. When you arrive please ask for Z Scott.

Juliette

**Juliette Pryor** | General Counsel and Chief Compliance Officer
9399 W. Higgins Road | Suite 500 | Rosemont, IL 60018
**O 847.720.8013 | F 480.293.2705**
juliette.pryor@usfoods.com

## US Foods
**KEEPING KITCHENS COOKING™**
**************************************************************
This e-mail message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

This email message and any attachments are for the sole use of the intended recipient(s) and may contain information that is proprietary to US Foods, Inc. and/or its subsidiaries or otherwise confidential or legally privileged. If you have received this message in error, please notify the sender by reply, and delete all copies of this message and any attachments. If you are the intended recipient you may use the information contained in this message and any files attached to this message only as authorized by US Foods, Inc. Files attached to this message may only be transmitted using secure systems and appropriate means of encryption, and must be secured using the same level password and security protection with which the file was provided to you. Any unauthorized use, dissemination or disclosure of this message or its attachments is strictly prohibited.

# Exhibit D

**From:** Jackson, Paula L <Paula.Jackson@usfoods.com>
**Sent:** Wednesday, March 06, 2013 12:28 PM
**To:** Kraig J. Marton
**Subject:** RE: Today is the Effective Date for Mike Noble

Kraig

I was able to open the file. Thank you! Paula

**From:** Kraig J. Marton [mailto:kjm@jaburgwilk.com]
**Sent:** Wednesday, March 06, 2013 1:22 PM
**To:** Jackson, Paula L
**Cc:** Michael J. Noble [mn5967@yahoo.com]; Pryor, Juliette
**Subject:** RE: Today is the Effective Date for Mike Noble

Paula,

Were you able to open the attached? It is just a big PDF, and we had no problem opening it here. Just in case, I am resending it as an attachment here.

Kraig

**From:** Pryor, Juliette [mailto:Juliette.Pryor@usfoods.com]
**Sent:** Wednesday, March 06, 2013 11:36 AM
**To:** Kraig J. Marton
**Cc:** Michael J. Noble [mn5967@yahoo.com]; Jackson, Paula L
**Subject:** Re: Today is the Effective Date for Mike Noble

File can't be opened. Please contact my assistant Paula to resolve.

**Juliette Pryor** | General Counsel and Chief Compliance Officer
9399 W. Higgins Road | Suite 500 | Rosemont, IL 60018
**O 847.720.8013 | F 480.293.2705**
juliette.pryor@usfoods.com

**US Foods**
**KEEPING KITCHENS COOKING™**
*****************************************************************
This e-mail message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

On Mar 6, 2013, at 11:44 AM, "Kraig J. Marton" <kjm@jaburgwilk.com> wrote:

Juliette,

As you know, paragraph 14 of Mike Noble's Agreement provides:

1

You will authorize and direct Quest Consultants International, Ltd. ("Quest") to provide all information related to the project for which you hired Quest including, but not limited to, all communications with you, all surveillance reports, all video and audio recordings, all pictures, and all supporting documentation and work product and all US Foods documents and data.

Mike did just that, and the documents have now been provided by Quest. They are attached as one PDF file. Quest has represented to me and to Mike that this is their entire file. They did not keep a copy of the video, but you have that already.

Therefore, Mike has now fully complied with all of the obligations necessary for payment. In terms of the Agreement, today is the "effective date".

Paragraph 25 of the Agreements reads:

25. Effective Date. The Effective Date of this Agreement shall be the latest of the date that is fully executed by the Parties, the expiration of the seven-day revocation period set forth in Paragraph 23, the certification of the return of all Company property in Paragraph 9, complete production of the records and data by Quest as described in Paragraph 14, and the completion of the interview required by Paragraph 15.

As you well know, Mike (1) did not revoke within the time allowed: (2) certified that he returned all company property and provided you with a written certification in person in Chicago on February 15; (3) today has seen to the complete production of Quest's records and data; and (4) appeared for the interview on February 15, and answered all questions asked of him. That means that the "Effective Date" is today. It also means that under paragraph 2(c) "The Settlement Payment and stock purchase monies, totaling $675,000, will be mailed to your counsel within ten (10) days of the Effective Date".

We therefore look forward to your sending the Settlement payment by no later than March 16. When you mail it, could you also email me to expect it?

Thank you for your continued cooperation.

Kraig J. Marton
Jaburg & Wilk, P.C.
3200 North Central #2000
Phoenix, AZ 85012

602 248 1017 (DID)
602 297 5017 (Direct Fax)
www.jaburgwilk.com<http://www.jaburgwilk.com/>

NOTICE: this email may be between attorney and client, and, as such, is intended to be private, privileged and confidential. If you have received this transmission in error, please reply that you have received it mistakenly, and destroy the original email and any attachments. Thank you.

<Flosi File.pdf>

This email message and any attachments are for the sole use of the intended recipient(s) and may contain information that is proprietary to US Foods, Inc. and/or its subsidiaries or otherwise confidential or legally privileged. If you have received this message in error, please notify the sender by reply, and delete all copies of

this message and any attachments. If you are the intended recipient you may use the information contained in this message and any files attached to this message only as authorized by US Foods, Inc. Files attached to this message may only be transmitted using secure systems and appropriate means of encryption, and must be secured using the same level password and security protection with which the file was provided to you. Any unauthorized use, dissemination or disclosure of this message or its attachments is strictly prohibited.

This email message and any attachments are for the sole use of the intended recipient(s) and may contain information that is proprietary to US Foods, Inc. and/or its subsidiaries or otherwise confidential or legally privileged. If you have received this message in error, please notify the sender by reply, and delete all copies of this message and any attachments. If you are the intended recipient you may use the information contained in this message and any files attached to this message only as authorized by US Foods, Inc. Files attached to this message may only be transmitted using secure systems and appropriate means of encryption, and must be secured using the same level password and security protection with which the file was provided to you. Any unauthorized use, dissemination or disclosure of this message or its attachments is strictly prohibited.

# Exhibit E

| | |
|---|---|
| **From:** | Kraig J. Marton |
| **Sent:** | Wednesday, March 13, 2013 11:37 AM |
| **To:** | 'Pryor, Juliette' |
| **Cc:** | Michael J. Noble [mn5967@yahoo.com] |
| **Subject:** | RE: Today is the Effective Date for Mike Noble |

Juliette,

This position is disappointing and wrong.

Mike and I attended a day long interview in Chicago on February 15 and you never said a word to us about some claimed lack of compliance (other than about the Quest material which was not available). As I explained in my 3/6 email below, Mike has fully complied with his obligations as of March 6, and March 6 is and was the "Effective Date".

You are wrong in claiming that "Several conditions of the agreement have not been met."

You first cite paragraph 9 and claim Mike must have US Foods documents because Quest had some and because Mike did not give you anything with metadata. However, please review the very first sentence of paragraph 9: "You certify that you have returned to the Company all property, documents and data of the Company or relating to your work for the Company ("Company Data") in your possession, custody or control". In his interview, Mike gave you that certification - even in writing. He provided you with the documents he had and he explained that he had deleted others. He answered all of the questions asked of him about company documents, and clearly said he had no others. He can't give you something he does not have. Further, Quest's possession of company documents months before does not prove Mike has any now.

Yes, the inspection of Mike's electronically stored information has not yet been completed, but there are two problems with your reasoning. First, the agreement is very clear in saying that the inspection is NOT a condition of payment. Read the plain language of paragraph 25 ("Effective Date"). Second, US Foods is the one delaying that matter. The Agreement was signed February 5. When we had head nothing from you about an inspection, on February 25 I emailed you and said "I want it a matter of record that Mike stands ready, willing and able to provide his computer and peripherals for inspection." The first time we heard from you was in an email on March 6 where you asked Mike to sign a release to Kroll and to do other things he is not obligated to do. I will be addressing that matter separately, but the completion of that inspection is absolutely not a condition of payment to Mike.

Finally, you suggest that Quest may not have produced everything. However, Quest has represented that it did. It did not keep any copy of the video nor does it have any photographs other than the ones produced. It did produce its entire file. Again we can not produce something that does not exist.

Mike has been saying that US Foods administration will do everything it can to avoid paying him what it agreed to pay him. I have not believed that. But the delays and excuses since his interview are beginning to make me wonder if he is not correct.

We expect payment to be sent on or before March 16, and we will be commencing arbitration proceedings immediately thereafter if this does not occur.

Kraig J. Marton
Jaburg & Wilk, P.C.
3200 North Central #2000
Phoenix, AZ 85012

602 248 1017 (DID)
602 297 5017 (Direct Fax)
www.jaburgwilk.com

1

NOTICE: this email may be between attorney and client, and, as such, is intended to be private, privileged and confidential. If you have received this transmission in error, please reply that you have received it mistakenly, and destroy the original email and any attachments. Thank you.

**From:** Pryor, Juliette [mailto:Juliette.Pryor@usfoods.com]
**Sent:** Wednesday, March 06, 2013 6:04 PM
**To:** Kraig J. Marton
**Subject:** RE: Today is the Effective Date for Mike Noble

Kraig:

We do not consider today to be the Effective Date of Mr. Noble's agreement with US Foods. Several conditions of the agreement have not been met. First, Paragraph 9 requires that US Foods' "[e]lectronic data . . . be returned in native format, with all associated metadata intact." We have not yet seen any such electronic data from Mr. Noble. It is evident from the documents produced by Quest, the review of Mr. Noble's US Food email account and company computer, and the statements of witnesses that Mr. Noble has company documents in his possession.

For instance, Mr. Noble attached two emails to Quest copies of a US Foods lease, an Excel spreadsheet and other documents and information of US Foods. In addition, witnesses and Mr. Noble himself described extensive communications with Mr. Noble on his personal email account concerning the travel plans of US Foods' executives and other company information. None of those documents or data has been returned to US Foods. In addition, Mr. Noble has not produced or returned the communications and reports of Quest, including the "soft" copies of the investigation and observation reports Quest provided to Mr. Noble, which incorporate and describe company information.

Second, Paragraph 9 requires Mr. Noble to allow a third-party IT technician to inspect all of his "personal computers and electronic communications and storage devices." The parties still need to coordinate and complete this inspection.

Third, Paragraph 14 requires that Quest produce specified "documents and data" to US Foods. Although US Foods has not had sufficient time to determine whether the information you have provided satisfies Paragraph 14, our preliminary review has identified documents that have not been produced by Quest. For instance, on July 9, 2012, Mr. Noble provided an Excel spreadsheet to Quest. Although Mr. Noble provided the email transmitting the spreadsheet and the password for it, neither Quest nor Mr. Noble produce the spreadsheet. Also, it appears that Quest has not produced any pictures from its surveillance of Mr. Lederer, other than the two pictures included in its reports, or any of its surveillance notes.

Please let us know when Mr. Noble will provide the data (and associated metadata) and when we can conduct the inspection of his computers and devices. We would like to conduct this review next week. We are in the process of reviewing the information from Quest and determining whether the continuation of Mr. Noble's interview needs to be arranged. I look forward to coordinating with you further concerning the completion of these tasks.

Juliette

**Juliette Pryor** | General Counsel and Chief Compliance Officer
9399 W. Higgins Road | Suite 500 | Rosemont, IL 60018
**O 847.720.8013 | F 480.293.2705**
juliette.pryor@usfoods.com

## US Foods
**KEEPING KITCHENS COOKING™**
********************************************************
This e-mail message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

# Exhibit F

3200 N. Central Avenue, 20th Floor, Phoenix, AZ 85012



jaburgwilk.com

**Kraig J. Marton**

kjm@jaburgwilk.com
602.248.1017 - Direct Phone
602.297.5017 - Direct Fax

March 26, 2013

*Via E-Mail [j.Pryor@USfoods.com]*

Juliette Pryor
Executive Vice President
General Counsel and Chief Compliance Officer
US Foods
9399 West Higgins Road, Suite 500
Rosemont, Illinois 60018

      Re:    *Michael J. Noble*
              *The "effective date" has passed and it is time to pay*

Dear Ms. Pryor:

The Agreement between US Foods and our client, Mike Noble, requires that we "use good faith efforts to resolve any controversy." (Para. 20). While Mike Noble has already made more than good faith efforts, we will make one more attempt to resolve the issues through this letter. Failing that, we will be proceeding to arbitration as described in the agreement.

In your email of 3/18/2013 4:39 PM., you state the following:

The simple point is that, once Quest makes a complete production and Mr. Noble complies with his obligation to have an IT technician preserve and delete Company Data from his computer and devices, US Foods will pay him pursuant to the terms of the Agreement. All we need to do at this point is work together on these last steps.

Although we have already communicated about these matters, I will try, yet again, to explain why you are mistaken:

**1.**     *Quest has produced its files.* It is not clear whether you had seen Lee Flosi's email to you of March 15, 2013 1:30 PM when you wrote your email three days later. Attached is another copy of the Flosi declaration and that email. Please note what Mr. Flosi swore under oath. Indeed, Flosi's declaration almost verbatim tracks the language of Para 14 of the Agreement. Specifically, Flosi swears that Mike Noble:

asked us to provide a copy of all information related to the project for which he hired Quest, including, but not limited to, all communications with him, all surveillance reports, all video and audio recordings, all pictures, and all US Foods documents and data.

**JABURG|WILK**
Attorneys at Law

Juliette Pryor
March 26, 2013
Page 2

Flosi goes on to swear:

> 5. I have made a diligence search of Quest files and hereby certify that I have done exactly that. I previously supplied this information to Mr. Noble and his attorney.

Flosi had expressed concern to me about his internal administrative file. He did not want to go to the trouble of locating internal billing records and the internal administrative materials that Quest keeps for every client, and I told him that he need not produce those matters if they were purely internal and not part of the investigation. He therefore signed the declaration you have.

It is flat wrong to delay payment when you have had the entire Quest file since I sent it to you on 3/6/2013 10:43 AM. But if there were any doubt, once you obtained a certification from Lee Flosi on March 15, this issue has been absolutely and fully addressed.

**2.    *The inspection of Noble's computers is not a condition precedent.*** We have communicated about this before. Yes, Mike has an obligation to allow his computers to be inspected, but no, that is not a condition precedent that would allow you to delay payment.

The agreement makes it clear that the inspection is NOT a condition of payment. Read the plain language of paragraph 25 ('Effective Date'). A number of conditions are set forth in that paragraph that do need to be accomplished before Mike is paid, but inspection is not one of them. No other reading of the agreement is possible. We have already provided documents and otherwise fully complied with every single condition listed in Para. 25, and that is why it is time to pay Mike now. .

**3.    *Mike will allow an inspection as agreed.*** Although the inspection can not be a reason to delay payment, we will still discuss it here. Our doing so, however, should not be construed to be an admission that you can withhold payment until the inspection has been completed.

Mike has and had every intention of allowing the inspection described in paragraph 9. However, we can not agree to the inspection as first proposed in your email dated Wed 3/6/2013 8:15 AM. Attached to that email was Kroll's "Authorization and Release" that you wanted Mike to sign. That document is unacceptable for many reasons. First, we did not agree to release the computer vendor, and will not sign any such release. The vendor should be held to the same standard of care as any vendor without any release. Second, the form you provided does not protect Mike's right to privacy. The vendor should be limited in what it can look at. Also, the vendor should be prohibited from sending you anything until Mike has had a reasonable opportunity to review it and agree that it belongs to you. Finally, the form should be prepared in the form of an agreement rather than an authorization, since the vendor must agree to do the things set forth.

We are in the process of revising the Kroll form, and a redlined version and acceptable revised version will be forthcoming. Mike will sign this revised version for Kroll or for any other vendor, if they agree to sign it too. Incidentally, you indicate you may change vendors. We don't are who you use, Kroll or others, as long as they are a credible and experienced company that does that kind of work..

JABURG|WILK
Attorneys at Law

Juliette Pryor
March 26, 2013
Page 3

I will not debate whether the delay in completing this inspection is your fault or Mike's but I again make it a matter of record that as soon as you obtain a vendor who will agree in writing to address Mike's concerns, he will immediately make all of his computers, etc available as agreed.

**4.** *It is time to pay Mike his $675,000.* We ask that you pay Mike what he is owed, now. Mike Noble has fully complied with all conditions precedent and it is time to complete that aspect of his dealings with US Foods.

Very truly yours,

**JABURG & WILK, P.C.**

Kraig J. Marton

KJM:kmr

cc: Mike Noble

Enc:   Flosi email and Declaration

# Exhibit G



3200 N. Central Avenue, 20th Floor, Phoenix, AZ 85012

jaburgwilk.com

**Kraig J. Marton**

kjm@jaburgwilk.com
602.248.1017 - Direct Phone
602.297.5017 - Direct Fax

April 10, 2013

*Via E-Mail [cbertraum@proskauer.com]*

Connie N. Bertram
Proskauer/Rose, LLP
1001 Pennsylvania Avenue, NW
Suite 400 South
Washington, DC 2004-2533

David L. Allen
Mark D. Bogard
Neal H. Bookspan
Mervyn T. Braude
Kelly Brown
Roger L. Cohen
Beth S. Cohn
Jennifer R. Erickson
David N. Farren
Lauren L. Garner
Renee Gerstman
Laurence B. Hirsch
Amy M. Horwitz
Ronald M. Horwitz
Gary J. Jaburg
Janessa E. Koenig
Michelle M. Lauer
Michelle C. Lombino
Valerie L. Marciano
Kraig J. Marton
Nate D. Meyer
Mitchell Reichman
Scott J. Richardson
Laura A. Rogal
Kathi M. Sandweiss
Jeffrey A. Silence
Maria Crimi Speth
Bridget O'Brien Swartz
Susan E. Wells
Lawrence E. Wilk
Nichole H. Wilk


Adam S. Kunz
*Of Counsel*

Re:     *Michael Noble – US Foods*

Dear Ms. Bertram:

The purpose this letter is to follow-up our conversation of earlier today. We talked about each of the issues that we had discussed April 5 in the context of my letter sent to you earlier today. Here is how I believe we left matters:

*Quest production*. I offered to make Lee Flosi available for a telephonic interview tomorrow at 11 AM but you said you were not available until later. You also were not sure whether you would be interviewing Flosi. Please immediately advise as to who will be interviewing him, if anyone, and provide alternate times and dates if tomorrow at 11 AM will not work. He can be available at various times on Monday, as can I.

You had asked about evidence of payment to Quest of their investigation. As for proof of payment to Quest, Mike Noble provided me with the attached documents – a cancelled check made payable to Quest as well as proof that he wired the initial $5000 retainer to them. These sums total the invoice you already have.

*IT Inspection.* You did not provide me with the name of an IT vendor or with a proposed protocol. You indicate you have drafted a protocol but it has not yet been approved by US foods. You intend to have a protocol in the name of an IT vendor to me well before we speak again this Friday.

You asked whether Mike has deleted any US Foods documents from his computer since his interview. Mike authorized me to make the following statement on his behalf:

"I have no memory of the deleting any US foods documents since the interview. I do not believe I have deleted any."

16829-1\KJM\KJM\1071006.3

JABURG | WILK
Attorneys at Law

Connie N. Bertram
April 10, 2013
Page 2

*Conflict of interest issues.* You raised the issue of Mike's relationship with ICG as set forth in your April 3 letter. We do not agree that this is an issue at all, and we don't feel obligated to even address it. However, you asked me for documentation that proves that the ICG child support payments predated US Foods and I said we need to determine whether we will produce those documents. I can tell you that the documents attest to the fact that the payments predate US Foods and have been made since early 2002. Since you raised the matter, I asked that you provide a copy of whatever certifications Mike signed related to conflicts of interest as well as US Food's policies related to such Certifications, and you said you would check to see if US Foods has them and whether they will be produced.

When we speak this Friday I hope we are both able to address the remaining loose ends. Again, participation in this exercise of providing more documents and information to US Foods should not be considered a waiver of our right to claim that US Foods is already in breach.

Very truly yours,

JABURG & WILK, P.C.

Kraig J. Marton

KJM:kmr

Enc: Cancelled check to Quest and Wire authorization

cc: Michael Noble

16829-1\KJM\KJM\1071006.3

# Exhibit H



3200 N. Central Avenue, 20th Floor, Phoenix, AZ 85012

jaburgwilk.com

**Kraig J. Marton**

kjm@jaburgwilk.com
602.248.1017 - Direct Phone
602.297.5017 - Direct Fax

April 16, 2013

***Via E-Mail [cbertraum@proskauer.com]***

Connie N. Bertram
Proskauer/Rose, LLP
1001 Pennsylvania Avenue, NW
Suite 400 South
Washington, DC 2004-2533

David L. Allen
Mark D. Bogard
Neal H. Bookspan
Mervyn T. Braude
Kelly Brown
Roger L. Cohen
Beth S. Cohn
Jennifer R. Erickson
David N. Farren
Lauren L. Garner
Renee Gerstman
Laurence B. Hirsch
Amy M. Horwitz
Ronald M. Horwitz
Gary J. Jaburg
Janessa E. Koenig
Michelle M. Lauer
Michelle C. Lombino
Valerie L. Marciano
Kraig J. Marton
Nate D. Meyer
Mitchell Reichman
Scott J. Richardson
Laura A. Rogal
Kathi M. Sandweiss
Jeffrey A. Silence
Maria Crimi Speth
Bridget O'Brien Swartz
Susan E. Wells
Lawrence E. Wilk
Nichole H. Wilk


Adam S. Kunz
*Of Counsel*

Re:     *Michael Noble -- U.S. Foods*

Dear Ms. Bertram:

We had a prearranged time to speak on Friday April 12 (8:00 a.m. MST) but when I called, your staff said you were running behind so we rescheduled to a set time on Monday April 15 (1:00 p.m. MST). I called you then, and you were not available then, either[1]. I understand that such things happen but I still await your call. We are particularly troubled that you and U.S. Foods still have not provided the identity of an acceptable IT vendor. And while you did send me a draft protocol late last Friday, we have still to discuss many of its provisions.

You and U.S. Foods have taken the position that the "Effective Date" of the Noble agreement cannot occur until Mike's computer and peripherals have been imaged. We did not agree with that interpretation, but rather than debate that issue, we agreed to proceed with the imaging. The problem is that for that process to be completed, U.S. Foods must identify a vendor and agree on a protocol. Neither you nor your client has done that.

Let me remind you of some dates. The Separation Agreement was signed on February 5, and Mike submitted to an interview in Chicago on February 15. After we provided the Quest file, we initially took the position that the "Effective Date" was March 6, 2013. However, both you and Juliette Pryor disagreed and claimed, in part, that the inspection contemplated in paragraph 9 must be completed before the Effective Date provision applies. We decided to acquiesce with your interpretation rather than fight about it, but these delays show the problem with your interpretation.

By email dated February 25, I was already complaining to Ms. Pryor about her delay in completing the IT inspection. I reminded her that Mike stood ready,

---

[1] I know we called 17 minutes after the scheduled time, but we only received a voice message that you could not take the call. I left a message to call me back, but you did not do so.

JABURG|WILK
Attorneys at Law

Connie N. Bertram
April 16, 2013
Page 2

willing and able to allow an inspection, but that US Foods had not named a vendor. Ms. Pryor finally named a vendor (Kroll) by email on March 6, but we rejected Kroll's protocol because it required Mike to sign a full release and it allowed Kroll and U.S. Foods unfettered access to Mike's ESI. Pryor withdrew Kroll soon thereafter.

However U.S. Foods has yet to name another vendor. This reflects one reason why we did not feel that an IT inspection is necessary for the "Effective Date" -- resolution of this issue is entirely in the control of U.S. Foods.

When you and I last spoke (on April 10), you said you have a possible vendor, but you have yet to provide the name. You also owe me a call as there remain significant problems with the protocol you sent me and we need to discuss it.

To be specific, please: (1) name a vendor; and (2) contact me to discuss the protocol you submitted. If I am not available, my staff will set a time that works on your calendar and mine.

Very truly yours,

JABURG & WILK, P.C.

Kraig J. Marton

KJM:kmr

cc: Michael Noble

# Exhibit I



3200 N. Central Avenue, 20th Floor, Phoenix, AZ 85012

jaburgwilk.com

**Kraig J. Marton**

kjm@jaburgwilk.com
602.248.1017 - Direct Phone
602.297.5017 - Direct Fax

May 2, 2013

*Via E-Mail [cbertraum@proskauer.com]*

Connie N. Bertram
Proskauer/Rose, LLP
1001 Pennsylvania Avenue, NW
Suite 400 South
Washington, DC 2004-2533

David L. Allen
Mark D. Bogard
Neal H. Bookspan
Mervyn T. Braude
Kelly Brown
Roger L. Cohen
Beth S. Cohn
Jennifer R. Erickson
David N. Farren
Lauren L. Garner
Renee Gerstman
Laurence B. Hirsch
Amy M. Horwitz
Ronald M. Horwitz
Gary J. Jaburg
Janessa E. Koenig
Michelle M. Lauer
Michelle C. Lombino
Valerie L. Marciano
Kraig J. Marton
Nate D. Meyer
Mitchell Reichman
Scott J. Richardson
Laura A. Rogal
Kathi M. Sandweiss
Jeffrey A. Silence
Maria Crimi Speth
Bridget O'Brien Swartz
Susan E. Wells
Lawrence E. Wilk
Nichole H. Wilk


Adam S. Kunz
*Of Counsel*

Re:    *Michael Noble – U.S. Foods*

Dear Ms. Bertram:

The purpose of this letter is in to respond to yours of April 29, to address our discussion of April 30, and to set forth certain matters related to the ongoing dispute between Mr. Noble and your client, US Foods.

Let me start with the issues raised in your April 29 letter:

1.    *Production of Quest documents.* You are flat wrong in claiming there is any "deficiency" in Quest's production. By email dated March 15, Lee Flosi sent his entire file together with a formal declaration to Juliette Pryor. That should have ended further discussion. However because Flosi did not want to send internal information unrelated to Quest's investigation, US Foods somehow contends there is some deficiency.

Without waiving our position that there has been a full and complete production already accomplished, we agreed to allow Flosi to be interviewed. In our prior conversations I made this clear and I also provided you with specific dates when he would be available. I did this on two separate conversations. Rather than accomplishing the interview on any of the offered dates, another US Foods attorney, Ms. Z Scott, contacted Flosi directly even though I had made it clear to you that there would only be a telephonic interview and I would be participating. In our April 30 conversation, you indicated it was your "error in communication", and Ms. Scott has since contacted me. As I informed you and I will be informing her, Flosi will present himself for a telephonic interview as long as I am participating in the interview. However, our agreement to allow this interview is without waiver of our position that there was already a full and complete production on March 15.

2.    *ICG child-support payments.* In your letter, you accurately reflected the conditions under which we will provide the referred to documents. Since you do

**JABURG|WILK**
Attorneys at Law

Connie N. Bertram
May 2, 2013
Page 2

not agree to our conditions for production, the referred to documents will not be produced. However as an officer of the court, and as an attorney, I again avow to you that I have in my possession a canceled ICG check that predates Mr. Noble's employment with US Foods as well as a ledger reflecting continuous child support payments from early 2002, again long before Mr. Noble's employment with US Foods. All of this was explained to US Foods when it interviewed ICG's principal, Mike Makings. Accordingly we have nothing further to discuss on this topic.

> 3. *IT protocol.* You have either misstated or misunderstood our prior conversations. I did not "agree" on April 19 that your draft protocol was "consistent" with what we had talked about but instead told you that Mike Noble has "lots" of problems with it.

> Further, the intent of the Separation Agreement, as you should know, was to identify and recover Company Data that Mr. Noble may or may not have on his electronic devices. The intent, was not to permit US Foods to seriously violate Mr. Noble's privacy in order to purse some investigation.

> It is ironic that US Foods is beginning to "suspect That Mr. Noble has no intentions of allowing US Foods to complete the inspection". Mr. Noble suspects that US Foods does not intend to pay him ever and is doing everything it can to delay, and when it can no longer delay it will simply refuse to pay until an arbitrator forces them to do so.

> Regardless, we as attorney have an obligation to at least try to resolve the disputes and that is why I have been working with you. We are trying to comply with US Food's continued requests, even though we do not agree with them.

> As for a protocol, we continue to agree that a signed protocol is necessary and that it needs to be completed. Accordingly I have now enclosed suggested changes to your protocol, redlined. While they should be self-explanatory, I am more than willing to discuss them. Please contact my office and set a time when you can discuss these changes so we can finalize this matter.

Very truly yours,

**JABURG & WILK, P.C.**

Kraig J. Marton

KJM:kmr

cc: Michael Noble

Enc: IT protocol with redlined changes

# Exhibit J



3200 N. Central Avenue, 20th Floor, Phoenix, AZ 85012

jaburgwilk.com

**Kraig J. Marton**

kjm@jaburgwilk.com
602.248.1017 - Direct Phone
602.297.5017 - Direct Fax

May 10, 2013

***Via E-Mail [cbertraum@proskauer.com]***

Connie N. Bertram
Proskauer/Rose, LLP
1001 Pennsylvania Avenue, NW
Suite 400 South
Washington, DC 2004-2533

David L. Allen
Mark D. Bogard
Neal H. Bookspan
Mervyn T. Braude
Kelly Brown
Roger L. Cohen
Beth S. Cohn
Jennifer R. Erickson
David N. Farren
Lauren L. Garner
Renee Gerstman
Laurence B. Hirsch
Amy M. Horwitz
Ronald M. Horwitz
Gary J. Jaburg
Janessa E. Koenig
Michelle M. Lauer
Michelle C. Lombino
Valerie L. Marciano
Kraig J. Marton
Nate D. Meyer
Mitchell Reichman
Scott J. Richardson
Laura A. Rogal
Kathi M. Sandweiss
Jeffrey A. Silence
Maria Crimi Speth
Bridget O'Brien Swartz
Susan E. Wells
Lawrence E. Wilk
Nichole H. Wilk


Adam S. Kunz
*Of Counsel*

Re:     *Michael Noble – U.S. Foods*

Dear Ms. Bertram:

The purpose of this letter is to respond to yours of May 9 and to address the surprising position you assert that that if Mr. Noble does not respond to your May 9 letter by today that you "will consider Mr. Noble in breach" because we suggested changes to a protocol that you do not agree with. Let me start with a little history about this protocol. Here are some dates to consider:

February 4, 2012: the parties enter into a "Confidential Settlement Agreement and Release" which states that Noble agrees:

> upon the Company's request, to permit a third-party IT technician retained by the Company to inspect all of your personal computers and electronic communications and storage devices to identify and recover any additional Company Data and to undertake the permanent deletion of any Company Data. Said technician will not transmit or disclose to the Company any data on your personal computers and devices that is not Company Data.

February 25, 2013: having heard no request for any inspection from US Foods, I email Ms. Pryor and say:

> We have not heard from you with respect to having an IT person view Mike's computer, etc. I note that the Agreement does not say you can withhold payment because that issue is not completed, but I want it a matter of record that Mike stands ready, willing and able to provide his computer and peripherals for inspection.

JABURG|WILK
Attorneys at Law

Connie N. Bertram
May 10, 2013
Page 2

**March 6, 2013**: Ms. Pryor provides a protocol for a company called Kroll, and says this in her accompanying email: "Please review and execute the attached form. Also, please advise availability for the computer sweep next week. Thanks, JP". Two comments about this: (1) it took US Foods over a month to even suggest this voluntary review; and (2) that protocol was seriously flawed, so much so that after I reviewed concerns about it, Ms. Pryor withdrew Kroll entirely.

**April 3, 2013**: you first appear (from our standpoint) and send the first of your letters. In your April 3 letter you claim many things, including this about the protocol:

> US Foods has invoked its right under Paragraph 9 to conduct a third-party inspection of Mr. Noble's personal computers and electronic communications. Despite several attempts on US Foods' part, that inspection has not yet occurred. Until that inspection is completed, Mr. Noble will be unable to certify in compliance with that Paragraph that all Company Data has been returned to US Foods. Because Mr. Noble's certification is inaccurate and incomplete and because the third-party inspection has not been completed, Paragraph 9 of the Agreement has not been satisfied.

What is ironic is that although you claim Mike does not get paid until this IT inspection is completed, it was by then just about two months since the Settlement was reached and still no acceptable protocol or even the identity of an IT provider was being provided to Mr. Noble.

**April 12, 2013:** by email you provide me with a proposed protocol but you did not provide the identity of a proposed provider.

**April 16, 2013**: I wrote you a letter that stated, in part: "When you and I last spoke (on April 10), you said you have a possible vendor, but you have yet to provide the name. You also owe me a call as there remain significant problems with the protocol you sent me and we need to discuss it. To be specific, please: (1) name a vendor; and (2) contact me to discuss the protocol you submitted. If I am not available, my staff will set a time that works on your calendar and mine."

**April 19, 2013**: you finally provide the identity of a proposed provider, James Vaughn, of Intelligent Discovery Solutions, Inc.

**April 23, 2013**: we had a prearranged call scheduled for this day, but you could not make it. We tried to connect on April 24 and April 25, but were not able to connect then either. My goal, in part, was to talk to you about the protocol and problems with it.

**April 29, 2013**: you write a letter complaining that I had not yet provided you with our suggested revisions to the protocol. However, as you know, I had been trying to schedule a phone conversation with you about the protocol issues and we had been unable to connect.

JABURG|WILK
Attorneys at Law

Connie N. Bertram
May 10, 2013
Page 3

    May 2, 2013: I email you a letter and our proposed revisions to the protocol. I also had my staff schedule a call with you for today (May 10), and you sent me a calendar invitation where you agreed to speak this morning.

    May 9, 2013: you email me your letter complaining about our changes to the protocol, and state that those revisions "are inconsistent with the parties' Release Agreement and are entirely unacceptable." You then list five bullet point issues you have with our revisions, and end your letter with this astonishing statement:

> We will provide [Noble] one last and final opportunity to provide an acceptable protocol for the retrieval, review and return of US Foods' data. If we do not receive such a protocol by 5:00 p.m. EDT on Friday, May 10, we will consider Mr. Noble in breach of this additional provision of the Release Agreement.

    May 10, 2013: Just before our scheduled phone conference set for today, you send me an email that says: "I need to cancel the call that Jessica scheduled while I was out of town for my hearing earlier this week. I have a conflict that has arisen. In any event, I do not believe that it will be productive for us to talk until we receive an appropriate protocol from you today."

### *Conclusions about US Foods actions concerning this protocol:*

The above state of affairs leads to the following conclusions:

    1.    US Foods does not really care about the protocol, it just wants an excuse not to pay Mike Noble. If this protocol was so important why did it take over a month to even start on it, and so many delays since then to complete it, almost entirely caused by US Foods?

    2.    US Foods, not Noble, has delayed resolution of the protocol issues. This appears intentional, as US Foods also takes the position (wrongly) that it does not need to pay Noble what it owes him until the IT inspection has been completed.

    3.    You don't really want to negotiate or even discuss an acceptable protocol. It is ironic and unfortunate that you refuse to talk to me *at all*, and instead tell me we have to submit another protocol, when you have a protocol in your hands that Noble will sign. What is particularly ironic is that we proposed revisions to *every single paragraph* of the protocol you wrote, including the Exhibit A. In response you state our revisions are "entirely unacceptable." But you only point out issues with four of the 15 paragraphs and with a portion of the exhibit A.

    4.    The settlement agreement provides that "the parties shall use good faith efforts to resolve any controversy." You refuse to talk to me and on May 9 you provide exactly one day to address your concerns. Your declaration of a breach is disingenuous, and your conduct does not reflect good faith.

JABURG|WILK
Attorneys at Law

Connie N. Bertram
May 10, 2013
Page 4

        While it is tempting to proceed directly to arbitration, we will still address your concerns. I would have preferred to discuss them by phone, but you demand that I address them immediately and in writing, and I do so here, based on the five bullet points in your May 9 letter:

        Your concern: "The protocol states that the 'Effective Date' of the Release Agreement will occur on the delivery of Mr. Noble's devices to the IT technician."

        Response: we are willing to discuss removing this provision, and leaving the definition as it appears in the Settlement Agreement

        Your concern: "Paragraph 5 of the draft protocol requires the IT technician to delete all Noble Data, other than Searched Noble Data. The Noble Data should be preserved until the parties resolve their disputes concerning the production of documents by Mr. Noble."

        Response: Your position makes no sense. Under your definition and under ours, "Noble data" means ALL data copied from all of Noble's devices. There is no reason to preserve a mirror image of all of that data, since the protocol contemplates that the IT technician will preserve the results of its searches that may contain company data, called "Searched Noble Data." Everything else is Mr. Noble's data.

        Your concern: "The logging process required by Paragraph 6 places an undue burden on the IT technician and excessive costs on US Foods. In addition, the log does not provide information sufficient for US Foods to determine whether to challenge Mr. Noble's designation of individual documents."

        Response: We do not agree. The information on the log is information we regularly see on such logs and is readily available. I don't understand the difficulty to the technician of extracting that information and putting it on a log. We also feel that the information in the log will be sufficient. However, we are willing to discuss the protocol provisions about the log, but believe that what we have proposed is reasonable.

        Your concern: "Paragraph 7, which gives Mr. Noble the authority to "deem" any document non-Company Data, is inappropriate. US Foods - not Mr. Noble - should review the data identified through the search process (after an appropriate screening for privilege) to identify what constitutes Company Data."

        Response: You misread paragraph 7. It contemplates that after the IT technician gets "hits" then he will prepare a log and give the log to us together with the data listed on the log. Noble and I will review the data to see if any is company data. We will either agree that it is Company data – in which case the IT technician sends it to you and if you agree, the technician will insure it is permanently deleted off Mike's devices. If it is not company data we will refuse to allow the IT technician to provide it to you and we will so state on the log. This general protocol is common. This is not about Noble deciding what is company property, it is about Noble's privacy being protected, as US Foods is not entitled to every document just because it has a keyword and there is a "hit" on it. In your terms, this is the "screening process."

JABURG|WILK
Attorneys at Law.

Connie N. Bertram
May 10, 2013
Page 5

Your concern: "The restrictions and modifications to the search terms are inappropriate. For instance, by requiring specified names to also be included in a communication or document with another search name, the name searches are nullified"

Response: One might also claim that the search terms you suggest are inappropriate. For instance, the term 7/26/2012 will presumably hit every email sent or received that day as well as every document created or saved that day. There is no way that such matters would be "US Foods Company data".

In sum, there are areas in the protocol we are willing to address, but the idea of rejecting all of our revisions is not the way we are willing to do that. Instead, I propose we do what I had hoped to do today —speak about the areas where we differ and see if common ground can be reached. If you still feel that further discussion will be of no benefit please advise and we can look at other alternatives. If you feel that we may be able to address our differences, please have your staff call mine and set a time when we can speak.

*One other issue: Production of Quest documents.* As you know, by email dated March 15, Lee Flosi sent his entire file together with a formal declaration to Juliette Pryor. You claimed this was not sufficient and so we allowed US Foods to interview Mr. Flosi, but without waving our position that there was full compliance on that issue, on March 15. Mr. Flosi was interviewed yesterday by Ms. Z Scott and the interview was tape recorded. He answered all questions asked of him for almost an hour. He confirmed that he sent his entire investigative file and he confirmed the accuracy of his declaration. This should end the issue about Noble's compliance with the Quest issue (paragraph 14). Please advise if you disagree.

Please contact my office and set a time when you can discuss these changes so we can finalize this matter.

Very truly yours,

**JABURG & WILK, P.C.**

Kraig J. Marton

KJM:kmr

cc: Michael Noble