## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

US FOODS, INC.,                         )
                                        )
      Plaintiff,                      )
                                        )
    v.                              )    Civil Action No. 1:13-cv-03640
                                        )
MICHAEL J. NOBLE, et al.,               )
                                        )
      Defendants.                     )
_____ )

## SECOND DECLARATION OF CONNIE N. BERTRAM

I, Connie N. Bertram, do hereby declare and swear as follows:

1.     I represent US Foods, Inc. ("US Foods") in the above-captioned matter.  I submit this declaration in support of Plaintiff's Motion for Expedited Relief ("Motion").  I previously provided a declaration in support of Plaintiff's Motion on June 3, 2013.

2.     Attached hereto as Exhibit I are true and correct copies of cited excerpts from the transcript of Mr. Noble's February 14, 2013 interview.

3.     Attached hereto as Exhibit J is a true and correct copy of Mr. Noble's February 12, 2013 certification.

4.     Attached hereto as Exhibit K is a true and correct copy of US Foods' Acceptable Use Policy.

5.     Attached hereto as Exhibit L is a true and correct copy of US Foods' Demand for Arbitration, filed with the American Arbitration Association on May 15, 2013.

6.     Attached hereto as Exhibit M are true and correct copies of correspondence dated (1) April 12, 2013; (2) April 29, 2013; and (3) May 2, 2013, respectively, between US Foods and counsel for Mr. Noble concerning the IT protocol for the computer forensics review.

7.     Attached hereto as Exhibit N is a true and correct copy of the Motion to Compel Arbitration or in the Alternative Motion to Dismiss filed by US Foods in <u>Roszak v. U.S. Foodservice, Inc. et al.</u>, No. 2:13-cv-01009-SRB (D. Ariz. May 22, 2013).

I hereby declare under the penalty of perjury under the laws of the United States of America (and pursuant to 28 U.S.C. § 1746) that the foregoing is true and correct. This declaration is executed this 11th day of June, 2013.

_Connie N. Bertram_/DSD

Connie N. Bertram

# EXHIBIT I

# In The Matter Of:

*The interview of*
*Michael Noble*

*February 14, 2013*

*Marzullo Reporting Agency*
*345 North LaSalle, 1605*
*Chicago, IL 60654*
*(312) 321-9365*

Original File pm2-14-13.txt
Min-U-Script® with Word Index

This Page Intentionally Left Blank

The Interview of
Michael Noble

February 14, 2013

---

**Page 1**

1

2

3  ------------------------------------- )
          )
4  IN THE:  THE INTERVIEW OF MICHAEL NOBLE )
          )
5  ------------------------------------)

6

7          The report of interview of MICHAEL NOBLE in the

8  above-entitled matter, taken before PAMELA A. MARZULLO, a

9  Certified Shorthand Reporter and Notary Public in and for

10  the County of Cook and State of Illinois, at Three First

11  National Plaza, Suite 4200, Chicago, Illinois, on February

12  14th, 2013, at the hour of 8:00 o'clock a.m.

13

14

15

16

17

18

19

20

21

22

23

24

MARZULLO REPORTING AGENCY  (312) 321-9365

---

**Page 2**

1
2  PRESENT:
       JABURG, WILK
3       BY:  MR. KRAIG J. MARTON
       3200 North Central Avenue
       20th Floor
4       Phoenix, Arizona   85012

5          on behalf of Michael Nobel;

6  KAYE SCHOLER, LLP.
       BY:  MS. Z. SCOTT and MS. LAUREN SCHRERO
7       Three First National Plaza
       Suite 4100
8       Chicago, Illinois   60602

9          and

10  US FOODS
       BY:  MS. JULIETTE PRYOR
11       9399 West Higgins Road
       Suite 500
12       Rosemont, Illinois   60018

13          on behalf of US Foods.

14

15

16

17

18

19

20

21

22

23

24

MARZULLO REPORTING AGENCY  (312) 321-9365

---

**Page 3**

1                I N D E X

2  WITNESS:                                    PAGE

3  MICHAEL NOBLE

4       Questions by Ms. Scott               4

5             E X H I B I T S

6  EXHIBIT                                     PAGE

7       1                                      16
       2                                      75
8       3                                      79
       4                                      87
9       5                                      89
       6 and 7                                93
10       8                                     105
       9                                     115
11       10 and 11                            125
       12                                     130
12       13                                     131
       14                                     133
13       15                                     135
       16                                     136
14       17                                     139
       18                                     148
15       19 and 20                            151

16

17

18

19

20

21

22

23

24

MARZULLO REPORTING AGENCY  (312) 321-9365

---

**Page 4**

1    MICHAEL NOBLE,

2  called in for an interview herein, was questioned and

3  answered as follows:

4    QUESTIONS BY

5  BY MS. SCOTT:

6  Q.  First of all, I want to say good morning.

7    We are here pursuant to the agreement between Mr.

8  Noble and the company.  I know you've had ample time

9  to go over that agreement with him and the

10  parameters of our discussion today.

11    We will attempt to move expeditiously with

12  our questions.  This isn't designed to harass or you

13  know upset anyone.  At any point, Mr. Noble, if you

14  would like to speak to your counsel outside the

15  room, we have a private room for you to consult with

16  that.

17  A.  I appreciate that.

18  Q.  We'll give you time to do that.  We are

19  going to time our discussion today, so we'll make

20  sure we follow the parameters of the agreement.

21    One concern we did have we don't have the

22  documents from Quest.  While I understand that you

23  brought documents here from your own private file,

24  one of the important parts of the agreement is that

MARZULLO REPORTING AGENCY  (312) 321-9365

---

Page 49

1  discussed.  You know, there was nothing remarkable
2  it.
3     So, I don't remember exactly, but telecom
4  was being discussed, you know, for another iteration
5  around reimbursement of what should be reimbursed to
6  employees, what should be the policy around it, and
7  the conversation somehow went to this capability.
8     This is kind of where, you know, my mind
9  went to Kindle somehow.  I thought that Kindle had a
10  relationship with some executive.  I wasn't sure
11  who, because of the nature of the way they were
12  getting business and maintaining the business.
13     That led to, "Let's look at some of these
14  phone reports."  So we picked Lederer's.  What
15  jumped out at me was the number of calls to a 312
16  number on a daily basis, you know, early morning,
17  late at night, weekends, that type of thing.
18     So, I went out and figured out, you know,
19  who that person was.
20  Q.  How did you do that?
21  A.  There's a service I paid 7 or $8 for, put
22  the phone number in.  It was on the Internet.
23  Q.  Were you -- was your focus, at the time
24  that you were examining Lederer's phone records,

Page 50

1  just an examination of phone records, or looking for
2  a connection to Kindle?
3  A.  I think it was a little bit of both.  I
4  didn't think that there would be anything.
5  Q.  So, but you were also -- were you looking
6  at what John was up to, to figure out from his phone
7  records?
8  A.  Not really.  I didn't really care.
9  Q.  But you weren't examining his phone
10  records?
11  A.  We did, yes.
12  Q.  Was this -- did you also -- I'm going to
13  ask you among the things that you looked at, in
14  addition to his phone records, did you also look at
15  his E-mail?
16  A.  No.
17  Q.  Did Phil go into his personal E-mail?
18  A.  No.
19  Q.  Did he go into his company E-mail?
20  A.  No.
21  Q.  Did you then also look at look at his --
22  at any other aspect of his life that touched the
23  business?
24  A.  No.

Page 51

1  Q.  Like his expense reports, or did you look
2  at any of that?
3  A.  I had seen his expense reports from time
4  to time just through -- just normal reviews, but not
5  in particular.
6  Q.  So, is anyone helping you with this phone
7  record examination?  You got to have numbers that
8  are repeat, you have to know times.
9     Somebody physically gave you a copy of the
10  records, or gave you a summary of the phone numbers,
11  or what?
12  A.  Phil was able to download it in an Excel
13  spreadsheet.
14  Q.  The phone numbers at work?
15  A.  Right, then I think he just sorted it by
16  frequency.
17  Q.  Where is this record, the Excel
18  spreadsheet that he gave to you, where is it?
19  A.  He had it on his screen.
20  Q.  Did he give you a copy of it?
21  A.  I believe so.
22  Q.  And what did you do with your copy?
23  A.  I would have deleted it.
24  Q.  You deleted it?  You have no further

Page 52

1  record of this?
2  A.  No.
3  Q.  It's all gone?  When did you delete it?
4  A.  When did I delete it?
5  Q.  Yes.
6  A.  I don't know.  It could have been
7  yesterday or prior.
8  Q.  It's been within the last --
9  A.  Six months.
10  Q.  Okay.
11  A.  I had no need for it, after I found what I
12  found out.
13  Q.  So, Phil Roszak prepares a spreadsheet for
14  you?
15  A.  Uh-huh.
16  Q.  He gives us a copy of it.  Do you give it
17  to anyone else?
18  A.  I believe I sent it to Flosi.
19  Q.  Okay.  Flosi would have been one
20  recipient.
21     Anyone else inside or outside of the
22  company?
23  A.  Not that I recall.
24     MS. PRYOR: Can we recap what was on the

Page 113

1 Q. Did you share that with her in a
2 face-to-face conversation?
3 A. I don't remember.
4 Q. Once you came to Rosemont, met with him,
5 talked to Juliette and left, did you tell her what
6 happened?
7 A. Yes.
8 Q. How did you tell her what happened, you
9 had a telephone conversation with her?
10 A. I think she called me, and she wanted to
11 -- and she informed me that she had been asked to
12 come to Rosemont the next day, as I recall, what she
13 should she do. I think I told her, "Do whatever you
14 want."
15 Q. You didn't tell her at all what to say?
16 A. No. What was the point? That's for you
17 to answer.
18 Q. Before you came to your meeting in
19 Rosemont, did you go into your computer systems at
20 all and download information, copy information,
21 erase information?
22 A. Before I came to Rosemont?
23 Q. Yes.
24 A. No.

MARZULLO REPORTING AGENCY (312) 321-9365

Page 114

1 Q. After you left Rosemont, did you do that?
2 Did you go into your computer system and
3 erase information?
4 A. After I left the meeting with you and
5 Juliette?
6 Q. Yes.
7 A. No. I had no access, nor did I try.
8 Q. Do you know whether Phil downloaded
9 information or erased information?
10 A. No clue.
11 Q. Or kept a company computer?
12 A. I know that he was supposed to come the
13 next day, the next day, too. He decided that he was
14 going to resign instead, and I do know that he was
15 supposed to provide his laptop to some law firm. I
16 presume he did.
17 Q. Do you know whether or not he accessed
18 company information, downloaded company information,
19 erased company information?
20 A. No clue, not that I'm aware of.
21 Q. Are you familiar with the term "drop box"
22 in terms of documents?
23 MR. MARTON: What was that?
24

MARZULLO REPORTING AGENCY (312) 321-9365

Page 115

1 BY MS. SCOTT:
2 Q. Drop box?
3 A. Do I know what a drop box is?
4 Q. Yes, drop box.
5 A. Yes.
6 Q. Did Phil share any documents with you that
7 he had placed in or used a drop box for?
8 A. No. That is where you would set up, like,
9 a mutual E-mail account where you both access.
10 MR. MARTON: It's not really E-mail.
11 THE WITNESS: However they do it.
12 MR. MARTON: Cloud.
13 BY MS. SCOTT:
14 Q. I'll show you this document. It is an
15 E-mail from you to Phil -- from Phil to you. It's
16 dated July.
17 (Said document was marked as
18 Exhibit No. 9 for
19 identification.)
20 BY MS. SCOTT:
21 Q. At the bottom where you are talking about
22 -- you're asking Phil to send you requested data to
23 the E-mail address we talked about.
24 A. Hold on. I'm trying to catch up what this

MARZULLO REPORTING AGENCY (312) 321-9365

Page 116

1 is. Okay, go ahead.
2 Q. So --
3 A. This would have been my personal E-mail
4 account.
5 Q. And you're asking him to E-mail to send
6 some data to you?
7 A. It would probably have been the phone
8 report.
9 Q. This is what we're talking about?
10 A. I'm not sure. I would have to go look.
11 Q. If you were looking, what would you be
12 looking for?
13 A. Just look for the E-mail from will Phil on
14 July 9th.
15 Q. Would that E-mail have -- do you still
16 have a copy of that?
17 A. I don't know.
18 Q. Before you came here today, did you go
19 through --
20 MR. MARTON: Just one second.
21 BY MS. SCOTT:
22 Q. But if this E-mail, indeed, references the
23 spreadsheet of John Lederer's phone call history,
24 then that would be information that came from US

MARZULLO REPORTING AGENCY (312) 321-9365

The interview of
Michael Noble

February 14, 2013

Page 117

1 Foods files; is that right?
2 A. Yes.
3 Q. And that would be information that you are
4 required to give us back, right?
5 A. Yes.
6 Q. Did you do a search of your personal
7 E-mail account?
8 A. I did.
9 Q. To look for -- looking at all of your
10 Roszak E-mails?
11 A. I didn't do Roszak. Now that I see this,
12 I should have, but I didn't. It wasn't Intentional.
13 I went to all E-mails that came from US Foods from
14 me, and I erased them all, deleted them all, but I'm
15 more than happy --
16 Q. To look for Roszak?
17 A. Yes, I'm not trying to keep anything.
18 Q. Now, let's go back to -- maybe we should
19 stop for lunch.
20 A. We can keep going right through lunch.
21    MS. PRYOR: I think we should take a break for
22 lunch, even if you only want to take a 30-minute
23 break, so we could stop the time.
24

MARZULLO REPORTING AGENCY (312) 321-9365

Page 118

1    (Recess taken.)
2    BY MS. SCOTT:
3 Q. I just have a couple followup questions,
4 and then we're going to move to another area.
5    I want to go back to something you said
6 earlier about Kindle. You said that Kindle had
7 gotten on your radar before you discovered the
8 connection between John and Colette May; is that
9 right?
10 A. Yes.
11 Q. And the reason it was on your radar is
12 because of some cost-cutting measures, or you were
13 looking at pricing, or what?
14 A. A combination of all those.
15 Q. And did anyone bring it to your attention,
16 or did you discover this on own your? Did anyone
17 highlight it for you?
18 A. It was brought to my -- it was a result
19 of, you know, the whole process more generically,
20 "Let's go back at the marketing, let's go look who's
21 got the big areas to spend. Let's go talk to the
22 people that own or are managing the areas of spend,
23 and see if we can put it out to bid."
24 Q. Now, once it was brought to your

MARZULLO REPORTING AGENCY (312) 321-9365

Page 119

1 attention, you mentioned that you were -- some
2 people said to you, "This was an untouchable area of
3 the company"; is that what I understand to be
4 correct?
5 A. Right.
6 Q. Specifically, do you recall who told you
7 that?
8 A. I think I heard it, as I mentioned before,
9 from some people in merchandising, I think Jody
10 Wilmes, somehow. I think Jennifer said that she had
11 contacted people.
12    I think I remember she said she talked to
13 this guy Steve Horan, and then there were other
14 people in marketing. I don't recall the names.
15 They were newer people.
16 Q. Okay.
17 A. Eric Cronert was a name I remember.
18 Q. He mentioned this can't be touched?
19 A. Right.
20 Q. Sacred cow?
21 A. You're going 18 months, two years, in my
22 memory bank.
23 Q. It could be a hard trip to take sometimes.
24    We talked a little bit about the phone

MARZULLO REPORTING AGENCY (312) 321-9365

Page 120

1 record retrieval. I mean, how are employees' phone
2 records input into your system, personal cell phone
3 records; do you know?
4 A. There isn't any personal cell phone
5 records. This is all company-paid cell phones.
6 Q. Company-paid cell phones?
7 A. Correct.
8 Q. So, as far as you know, John Lederer has a
9 company-issued cell phone that he uses?
10 A. He does have one.
11 Q. Okay.
12 A. He had one.
13 Q. He had one. Whose idea was it to look at
14 his cell phone records to see if you could find a
15 connection somewhere?
16 A. Probably mutual. I don't remember
17 exactly.
18 Q. Just so I'm clear, when you were looking
19 into the company's systems for information about
20 John, it stopped with the cell phone; is that
21 correct?
22 A. Correct.
23 Q. No one looked at his personal E-mail?
24 A. No.

MARZULLO REPORTING AGENCY (312) 321-9365

Page 133

1   with the credit card company.
2     I don't remember what the whole deal was
3   about.
4   Q.   I would like to show you one last message
5   dated November 5th last year.
6       (Said document was marked as
7       Exhibit No. 14 for
8       identification.)
9     BY MS. SCOTT:
10  Q.   Do you know what that's about?
11  A.   I don't recall.  I mean, it could be about
12  what was going on.  It could be about something
13  else.  I honestly don't remember.
14  Q.   So, tell me have you intervened Mike's
15  behalf, to make sure that he keeps business, gets
16  business?
17  A.   No, he's on his own.
18  Q.   Have you kept him aware, up to date, on
19  the discussions, the criticisms of your former
20  colleagues about his business or processing?
21  A.   If there was an issue regarding one of the
22  applications they were involved with, I typically
23  would let him know.
24  Q.   Is this -- would you have expected your

Page 134

1   people, who were directly accountable for that
2   process, to also communicate with him?
3   A.   Yes.
4   Q.   Do you think that any of the
5   communications that you had to him, with him, or
6   through him, or about him and his business, were
7   helpful to him in keeping the business?
8   A.   I don't know if I would characterize it
9   that way.  I would say it was helpful towards
10  getting to delivering whatever solution we were
11  trying to collaborate between IT, the business and
12  him.
13      It wasn't something that was -- remember,
14  I had a stake in getting things done and getting
15  processes improved.
16  Q.   When you told him what you were doing, in
17  regard to the private investigator, was he
18  encouraging to you?
19  A.   I don't remember.
20  Q.   There came a time when you -- I just want
21  to ask you again about your communications off of
22  the US Foods E-mail system when you and Ms. Steinke
23  were communicating on private E-mail addresses; is
24  that right, using private E-mail addresses?

Page 135

1   A.   I kind of lost you there a little bit.
2   Q.   You recall the time when you were using --
3   toward the end of your time with US Foods, when you
4   were communicating with Jennifer Steinke, using her
5   personal E-mail address as opposed to her US Foods
6   E-mail address?
7   A.   I may have, I don't know.  As I told you
8   before, I didn't pay attention to every E-mail,
9   where it came from.
10  Q.   You don't recall her directing you to use
11  her personal E-mail?
12  A.   She could have.  I'm not sure.  I mean, if
13  you got some E-mail there with a line item that's
14  what it says, then, yes.  I don't know.  I don't
15  remember.
16      (Said document was marked as
17      Exhibit No. 15 for
18      identification.)
19    BY MS. SCOTT:
20  Q.   I'm going to show you an E-mail.  It talks
21  about a leadership briefing, and it's dated in April
22  of last year.
23      You are forwarding an E-mail to an
24  individual named Jerome Prahl, P-r-a-h-l.  Who is

Page 136

1   that?
2   A.   I was staying at my father-in-law's for
3   that trip, and so I was letting him know when I was
4   going to be there.
5   Q.   Jerome Prahl is your father-in-law?
6   A.   Uh-huh.
7       (Said document was marked as
8       Exhibit No. 16 for
9       identification.)
10    BY MS. SCOTT:
11  Q.   I'm going to show you an E-mail that you
12  forwarded to -- it's from February of last year to
13  Jerry Prahl and Jodi Noble.
14  A.   Okay.
15  Q.   Why did you forward this to your wife and
16  your father-in-law?
17  A.   Because I was pleased that we were doing
18  it, and it had been just general things that I had
19  talked to either Jerry or Jodi about, in terms of my
20  ideas for the company, in terms of improving our
21  capabilities.
22  Q.   So, it was just an FYI?
23  A.   Yes.  I mean, you see where all this stuff
24  you're talking about two years ago, this is always

Page 137

1   happening. I also had those conversations. Jerry
2   is interesting.
3   Q.  I'm going to go back just a little to ICG.
4   Who owns ICG?
5   A.  Mike Makings.
6   Q.  Is he the owner? Does he have any
7   business parters?
8   A.  I'm not fully aware of what the structure
9   of his ownership is.
10  Q.  Do you have any interest in it?
11  A.  None.
12  Q.  I don't want to have to go like through
13  specific line and verse of your prior interviews, in
14  connection with this; but suffice it to say, you
15  were asked questions about your knowledge of
16  letters, your knowledge of people being interested
17  in travel.
18      You were not truthful; is that right?
19  A.  You can make that observation if you like.
20  Q.  I'm asking you.
21  A.  I don't know if I want to answer that
22  question.
23      MR. MARTON: You aren't under oath, so I'm not
24  concerned.

Page 138

1       BY MS. SCOTT:
2   Q.  In one interview you are shown a copy of
3   the Best Buy audit report that was enclosed with a
4   letter. You said you had never seen the report
5   before.
6       That wasn't true, was it?
7   A.  No, of course not.
8   Q.  And those are the things I'm talking about
9   when you were asked questions in your prior --
10  A.  Yes, you are right.
11  Q.  Let me ask you a couple questions about
12  Shane Guilliams. He reported to you; is that right?
13      Did Shane Guilliams come to you and tell
14  you Jennifer Steinke had been the subject of an HR
15  investigation about her delivery of travel
16  information to you?
17  A.  No.
18  Q.  Did he tell you that?
19  A.  No.
20  Q.  Did you give Jennifer Steinke any
21  direction whatsoever regarding how to conceal from
22  the company her delivery of executive travel
23  information to you? Did you give her any direction?
24  A.  I don't recall.

Page 139

1   Q.  You don't recall telling her to use her
2   private E-mail at all?
3   A.  I'm not saying I didn't, but I don't
4   remember. I mean, I probably would have, but I
5   don't remember for sure. I don't know dates, times.
6   Q.  Do you recall putting any pressure on her
7   to give you the information?
8   A.  I didn't put pressure on her.
9   Q.  Do you think she was in any way abusing
10  her access to that information?
11  A.  In my opinion, no.
12      (Said document was marked as
13      Exhibit No. 17 for
14      identification.)
15      BY MS. SCOTT:
16  Q.  I'm going to show you E-mail from
17  September of last year.
18  A.  Okay.
19  Q.  Do you recall those messages at all?
20  A.  Uh-huh.
21  Q.  Was there anything about those messages
22  that stood out now, in terms of John's whereabouts?
23  A.  No. I mean, no, not really.
24  Q.  If John was going to be in -- taking a

Page 140

1   meeting on the 26th, that means he couldn't have
2   gone to the President's Cup; is that right?
3   A.  Yes.
4   Q.  Is that when you found out he was not
5   going to the President's Cup?
6   A.  Gosh, I don't know.
7   Q.  Do you recall having Jennifer Steinke call
8   around to confirm whether he was going to be
9   traveling with Colette May to the President's Cup?
10  A.  Yes, I do.
11  Q.  Do you recall her coming back and later
12  telling you that he was not going?
13  A.  I don't know if she was the first with one
14  to tell me. It might have been Al. I'm not sure.
15  Q.  Did you specifically direct Jennifer to
16  find out when he was traveling and who he was
17  traveling with?
18  A.  Yeah, I think so, yes.
19  Q.  Did she ask you any questions about why
20  you wanted to know his traveling companion?
21  A.  No.
22  Q.  You know Jennifer Steinke, right?
23  A.  Uh-huh.
24  Q.  She's not the kind of person who would not

Page 141

1   make -- ask a second question, is she?
2      Does she strike you as somebody who would
3   ask a second question?
4   A.  No, she doesn't, okay; but with hindsight,
5   okay, as I stated to you earlier, you know, I didn't
6   know she knew, but I believe she did know.
7      So, she wasn't pushing back.  It wasn't my
8   intent for her to know.
9   Q.  Do you recall an E-mail when Lee Flosi was
10  giving you his Rome resume, telling you how good he
11  was?
12  A.  Yes.
13  Q.  He could do the job?
14  A.  Right.  Why would I have needed -- why
15  would I need anything on Rome?  Think about what I
16  was trying to do.  I had what I needed.
17     The reason I believe Rome came up was, and
18  I was interested, is that the timing of the letter,
19  okay, as you recall, was September 26th.  Okay?
20     So, I wanted Juliette to get it or have a
21  week, or as many days as possible, without him
22  there.  So, it had nothing to do with wanting to
23  know where John was and following him around in
24  Rome.

MARZULLO REPORTING AGENCY  (312) 321-9365

Page 142

1      I mean, there was no need for that, or I
2   got what I had needed on July 6, or whenever it was.
3   Q.  The second letter was the timing of your
4   disclosure was right in the middle of another US
5   Foods event, when you mentioned that you were going
6   to disclose on a certain day, there was going to be
7   a huge meeting in Chicago; is that right?
8   A.  I didn't know that at the time.
9   Q.  That wasn't intentional?
10  A.  No.
11  Q.  The only thing is we don't have -- is
12  there anything that you would think Quest would have
13  in its files, did you give them any piece of paper
14  or documents, or was all the information you
15  provided to them orally?
16  A.  I think Lee got some of the phone records.
17  I did not give him any pieces of paper, that I
18  recall.  I think that's all he got.
19  Q.  You don't think that you gave him -- you
20  think you may have E-mailed him some documents?
21  A.  Only the phone records, as I recall.
22  Q.  The phone record spreadsheet you E-mailed
23  that to him?
24  A.  Right, I think so.

MARZULLO REPORTING AGENCY  (312) 321-9365

Page 143

1   Q.  You would have E-mailed that from your
2   personal E-mail?
3   A.  Yes.
4   Q.  Did you check your personal E-mail to see
5   if it was there?
6   A.  I deleted everything.
7   Q.  You went through and said "Lee Flosi" and
8   you deleted it?
9   A.  I did.  Now that I saw this other way of
10  doing it, I'll make sure I double check.  I have no
11  reason to keep it.
12  Q.  So, as far as you know, the only document
13  that you delivered to him would have been the phone
14  summary spreadsheet?
15  A.  Yes, and maybe a document with what I
16  thought was John's address on it, and --
17  Q.  But that would have been the lease?
18  A.  Yes, the only other document that I recall
19  would be the engagement letter.
20  Q.  Your engagement between?
21  A.  Yes, that I had to sign.
22  Q.  Between the two of you?
23  A.  Right.
24  Q.  Was there ever a time, I think I asked you

MARZULLO REPORTING AGENCY  (312) 321-9365

Page 144

1   this, when you talked to Lee either, getting a
2   report from him or giving him information where you
3   were not the only participant in that conversation?
4   A.  Never.
5   Q.  It was just the two of you?
6   A.  Correct.
7   Q.  In terms of payment for his services, they
8   came only from you, no one contributed?
9   A.  No.
10     MS. SCOTT: Can we have one break before we
11  wrap up?  I think we're done.
12     (Recess taken.)
13     BY MS. SCOTT:
14  Q.  Let me ask you since you left US Foods, do
15  you have ongoing interactions with Phil Roszak?
16  A.  Yes.
17  Q.  Okay.  Does he know you're here today?
18  A.  No.
19  Q.  What about Jennifer Steinke after you
20  left?
21  A.  Limited.
22  Q.  Limited?  It was limited to what?  Tell us
23  about that.
24  A.  A few phone conversations.  I have taken

MARZULLO REPORTING AGENCY  (312) 321-9365

Page 149

1 Q. The question is: It's May, the dates that
2 are on here are the dates for John Lederer's trip to
3 San Francisco?
4 A. Actually, I think these are the dates for
5 a golf tournament that Phil went to in Wisconsin at
6 North Shore Country Club.
7 Q. Okay.
8 A. There is a North Shore. It is up in,
9 like, I don't know, Milwaukee or some place. That's
10 my recollection of this.
11 MS. PRYOR: Do you know if he went on that trip
12 on that same weekend?
13 THE WITNESS: I think so.
14 MR. MARTON: We have a few things to say on the
15 record while we're here.
16 MS. SCOTT: Okay.
17 MR. MARTON: First of all, as is obvious, Mike
18 is here to answer questions; and from all I've
19 heard, you furnished all questions you have, unless
20 there are other questions, once you get the Quest
21 file.
22 We agreed if you wish to have a telephonic
23 conference, just contact me. Are there any other
24 questions you want him to answer today?

Page 150

1 MS. SCOTT: Not at this moment.
2 MR. MARTON: Okay. Second, one of our
3 obligations is for Mike to provide with Metadata all
4 the E-mails he could find.
5 THE WITNESS: And any other files.
6 MR. MARTON: And any files. I wanted the court
7 reporter to mark a certification of Mike Noble where
8 he certifies that he searched his records, and you
9 have with you a pink file that you're going to give
10 them, a thumb drive he's going to give, that has the
11 Metadata, if you will, the electronic things he
12 found earlier today.
13 You asked about an E-mail that Mike didn't
14 have and couldn't recall. He checked his files. He
15 must have deleted it. You can ask him any question
16 you want. He must have deleted it some time ago.
17 I also have a certification from a
18 paralegal in my office to make sure that we are
19 returning any US Foods documents we have.
20 So, I'll ask the court reporter to mark
21 them, and you can then have them, or however you
22 handle the exhibits, and I'll hand you a folder that
23 has all US Foods document, there weren't many, from
24 my file.

Page 151

1 So, we no longer have any, nor did we keep
2 copies, of the exhibits you marked today. I looked
3 at them, but I don't have them. So, my
4 representation to you is that with this thumb drive,
5 this is it.
6 (Said documents were marked as
7 Exhibit No. 19 and 20 for
8 identification.)
9 THE WITNESS: And I had some random stuff in my
10 car, in my desk. I remembered I had this. I'm sure
11 it doesn't work.
12 MR. MARTON: It is the American Express card.
13 So, we handed you a thumb drive, and another folder
14 from Mike, all the documents he was able to
15 receivable.
16 So, you're welcome to ask Mike more
17 questions, but it is our statement on the record we
18 have fully complied with the obligations.
19 THE WITNESS: It's pretty random stuff. Most
20 of it is pretty old.
21 MR. MARTON: Paragraph 9 that requires us to
22 provide to you all of the documents that we have.
23 So, that is all I have to say.
24 Well, do you have questions you want to

Page 152

1 ask Mike by way of followup to satisfy yourself with
2 what he's done, or how he's done it, or the basis
3 for the certifications that he and I put in the
4 record?
5 MS. SCOTT: If you could just summarize for us
6 what process you followed to collect the documents.
7 THE WITNESS: I searched various areas in my
8 home and my car for any documents that I had laying
9 around in piles that were hard copy, and put them
10 altogether, and they are in that file. That's all I
11 could find.
12 It's really random stuff, and then with
13 respect to what's on that --
14 MR. MARTON: Thumb drive.
15 THE WITNESS: -- thumb drive, I went to my
16 documents in the home computer, and there weren't
17 that many, honestly, and there was some random, you
18 know, spreadsheets from cash flow statements, or
19 they could have been, you know, my budget
20 information or some random Powerpoints that, you
21 know, probably some stuff I did when I did meetings
22 at home or prepared something, and it ended up
23 staying on my computer.
24 But I put everything I could find, and I

**Marzullo Reporting Agency**
**(312) 321-9365**

Min-U-Script®

The interview of
Michael Noble

February 14, 2013

Page 153

1   deleted all of them.
2       BY MS. SCOTT:
3   Q.  Did any of the documents that are in the
4   file that you've given us, the accordion file, or on
5   the thumb drive, have anything to do with the
6   matters that we've discussed today?
7   A.  Not that I'm aware of, but I wouldn't bet,
8   you know, I wouldn't bet my life on it.  Not that
9   I'm aware of.
10      MR. MARTON: I'll make this offer if after you
11  look at the thumb drive, if there is some document
12  that you want to ask us about, whenever we schedule
13  the call, we'll be glad to answer them.
14      I do want to note the court reporter will
15  keep a copy of all exhibits, along with the
16  transcript, in the event that I order it is that
17  normal process here?
18      MS. PRYOR: When should we expect that we'll
19  hear from Lee Flosi?  When is he back in the
20  country.
21      MR. MARTON: Did he tell you that, Mike?
22      THE WITNESS: His E-mail was very
23  disappointing.  He promised me last week he would do
24  this, and he didn't.

MARZULLO REPORTING AGENCY  (312) 321-9365

Page 154

1       I seem to remember it was an extended
2   period like March 5th.  So, this was my note to
3   Mr. Flosi, "Lee, please see below the first
4   paragraph taken directly from my agreement with US
5   Foods, and you have my authorization to comply with
6   the data requested outlined below."
7       The second is from my lawyer, Kraig
8   Marton, with clarifying instructions, and a request
9   that he is CCed on the information provided.  "Let
10  me know if you have any questions."
11      He responded with, "Mike and Kraig, this
12  could not have come at a worse time." I had called
13  him.  "As I had noted in our phone call, I am
14  leaving Friday morning for a four-week trip to the
15  Far East, and will not be back in my office until
16  3-5-13.  I cannot possibly comply with this request
17  due to other activities I must deal with prior to my
18  Friday departure.  Please advise US foods and assure
19  them that this matter will receive prompt attention
20  upon my return."
21      If you would like to see this E-mail, I
22  would be glad to send it to you.  Upon receipt of
23  that E-mail, I called him.  I said, "Hey, Lee, you
24  can't have that big of a file.  There isn't that

MARZULLO REPORTING AGENCY  (312) 321-9365

Page 155

1   much stuff.  Can't you pull it together?"
2       This was like on a Wednesday.  This is
3   dated February 6th, which I believe was a Wednesday.
4   He indicated that he would do what he could.
5       And then you followed up with an E-mail
6   the next day, Thursday, and said, "Hey, thanks.
7   Mike tells me you are going to make efforts to get
8   this done.  We appreciate whatever you sent to
9   Juliette send to me."
10      We haven't heard anything from him since.
11  I tried to call there yesterday, and see if I could
12  get an admin or Bob, whatever his name is; and I did
13  not get anywhere with the receptionist, and Bob
14  Scigalski did not call me back; but I don't think
15  based upon these response here, that there's going
16  to be any question he'll provide the information.
17      MS. SCOTT: Once he gets back, he'll give us
18  the documents.
19      MS. PRYOR: Mike, you have a home computer
20  that's an PC or a Mac?
21      THE WITNESS: It is just an HP?  Just one.
22      MS. PRYOR: Just one?
23      THE WITNESS: Uh-huh.
24      MS. PRYOR: Do you have an iPad?  The other

MARZULLO REPORTING AGENCY  (312) 321-9365

Page 156

1   thing we were supposed to do is we're going to have
2   a third party IT person.  We'll be glad to get that
3   arranged.
4       MR. MARTON: That's fine.
5       MS. PRYOR: I guess that's it.
6       THE WITNESS: If you think of it, E-mail me.
7       MS. PRYOR: We'll follow up.
8   (WHICH WERE ALL THE PROCEEDINGS HAD.)

MARZULLO REPORTING AGENCY  (312) 321-9365

Marzullo Reporting Agency
(312) 321-9365

Page 157

```
 1   STATE OF ILLINOIS )
                      )  SS:
 2   COUNTY OF C O O K )

 3

 4        PAMELA A. MARZULLO, C.S.R., being first duly sworn,

 5   says that she is a court reporter doing business in the city

 6   of Chicago; that she reported in shorthand the proceedings

 7   had at the Proceedings of said cause; that the foregoing is

 8   a true and correct transcript of her shorthand notes, so

 9   taken as aforesaid, and contains all the proceedings of said

10   interview.

11                              _____
                                PAMELA A. MARZULLO
12                              License No. 084-001624

13

14   SUBSCRIBED AND SWORN TO
     before me this _____ day
15   of _____ 2013.

16   _____
     Notary Public
17

18

19

20

21

22

23

24

          MARZULLO REPORTING AGENCY  (312) 321-9365
```

# EXHIBIT J

## Certification of Michael J. Noble

Michael J. Noble, upon his oath states and declares as follows:

1.  I entered into a Confidential Separation Agreement and Release with my prior employer, U.S. Foods, Inc.

2.  I have certain obligations under paragraph 9 of that Agreement.

3.  I hereby certify that I have fully complied with paragraph 9 of that agreement. Specifically, I have returned to U.S. Foods:

    > All property, documents and data of the Company or relating to [my] work for the Company ("Company Data") in [my] possession, custody or control, including without limitation, all keys and access cards, badges, credit and telephone cards, telephones, pagers, all computers and computer related equipment (i.e. hardware, software, diskettes, electronic storage devices, etc), all passwords, access codes and other information necessary to access any computer, communications device or electronic database, and all books, files, documents and electronic data and media.

4.  I certify, under penalty of perjury under the laws of the United States of America that the foregoing is true and correct[1].

Executed on this 12th day of February, 2013

Michel J. Noble

**EXHIBIT**

---

[1] This declaration complies with 28 USC § 1746.

16829-1/KJM/KJM/1053063_v1

# EXHIBIT K

# US Foods Acceptable Use Policy

The purpose of this Acceptable Use Policy ("the Policy") is to define the responsibilities of associates of US Foods or contract personnel with respect to information security and the appropriate use of the Company's electronic communications, including its computer systems. Electronic communications include but are not limited to electronic mail, voice mail, the Internet, electronic paging, and telephonic communications systems, as well as any communication over the Company's computer system, including personal computers, laptop computers, personal data assistants (such as Palm Pilots or Blackberries), printers, scanners, modems, and fax machines. This Policy applies to all users of the Company's electronic communications.

US Foods may periodically supplement or modify this Policy and will endeavor to keep all associates and contract personnel informed of updates. There may be times when US Foods makes exceptions to the guidelines set forth in this Policy for business reasons, and any associate who has questions about this Policy, or who determines that there are business reasons that justify a deviation from this Policy, should contact Information Security immediately.

- Any question as to the appropriateness of any use of electronic communications should be addressed to the VP of Human Resources.

*Any associate or contract personnel who violate this Policy may be subject to disciplinary action, up to and including termination from employment.*

**General Usage Guidelines:** All electronic communications systems and all communications and information transmitted by, received from, or stored in these systems are the property of US Foods and, as such, are to be used primarily for job-related purposes. While US Foods recognizes that its associates may occasionally use its electronic communications systems for personal reasons, such use must be limited and comply fully with the terms of this Policy. Excessive personal use or use that interferes with job performance will not be tolerated.

**Prohibited Uses:** The use of foul, obscene, or harassing language or imagery when sending messages through US Foods' electronic communications systems is prohibited. Associates or contract personnel who receive inappropriate messages should report this to their supervisor or to Human Resources. Associates or contract personnel may not use US Foods' electronic communications systems, including the Internet and Web browsers, to send, display, download, or print potentially offensive messages, including pornographic or sexually explicit material, racial or ethnic slurs, derogatory gender-specific comments, or any other materials that refer inappropriately to age, sexual orientation, religious beliefs, national origin, gender, disability, or any other characteristic protected by law.

Internet sites "visited" electronically from the Company's computer resources, including Company equipment accessed from a user's home, identify the Company as the

originator of each message or "visit." Accordingly, any use of the Company's electronic resources to visit sites that could negatively impact the Company's reputation and image is unacceptable.

Associates or contract personnel are prohibited from posting or publishing statements regarding the Company's business or operations on any public media, including but not limited to electronic bulletin boards and web-based "chat rooms," unless such messages have first been reviewed and authorized by an officer of the Company. Participation (including during off-hours) in pirated software ("warez") bulletin boards and similar activities is also prohibited. Users may not place Company material on any publicly accessible Internet computer that supports anonymous File Transfer Protocol ("FTP") or similar service, unless the posting of these materials has been approved by a member of management of US Foods. In addition, Telnet and other remote control or shell service is prohibited without specific permission from Information Security. Telecommunications and Security, and its use will be monitored by department managers. Any questions regarding FTP access or Telnet service should be directed to the Information Systems Information Security (ISIS) group.

Associates or contract personnel should retrieve and read only those messages or data that are directed to their attention; associates or contract personnel may not access information or messages that they are not authorized to receive.

The Company's computer resources may not be used to send or receive copyrighted materials, trade secrets, proprietary or confidential information, or similar materials without authorization from a member of management of US Foods.

**Security; User-id and Passwords:** Maintaining the security of the Company's electronic communications systems and the corporate information stored on those systems is paramount. Accordingly, many of US Foods' electronic communications systems require users to have a user-id and a personal password. A user may not divulge his or her user-id or password to anyone, unless prior authorization is received from Information Security. Passwords are not, however, designed to provide privacy to Associates regarding their personal use of any electronic communications resources or their personal messages, data or documents stored on the Company's systems. Once a user has logged on to a computer, the user should not leave the computer unattended. If a user must leave the computer for any reason, they should log off the computer or lock the workstation with a password. If an associate or contract personnel suspects that his or her password has been compromised, the associate or contract personnel should contact their supervisor and take immediate steps to change the compromised password. The Company reserves the right to override any such password at any time, at its sole discretion, without notice to the Associate or contract personnel.

**Usage May Be Monitored:** To ensure compliance with this Policy and other US Foods policies, respond to lawful subpoenas or court orders, investigate alleged or suspected misconduct, locate information, or for any other reasonable and appropriate business purpose, authorized representatives of US Foods will periodically monitor the use of its communications systems, including e-mail and Internet use, in accordance with applicable state and federal law. Associates or contract personnel using US Foods's electronic communications systems should expect that all data and messages, including information that may have been deleted from the system, may be available for review by the Company. *Associates or contract personnel do not have any right of privacy in any information sent, received, or transmitted over the Company's electronic communications systems.* The fact that passwords or other encrypting devices may be required by some or all of US Foods' communications systems does not create any privacy interest in the contents of those systems.

**Computer Software and Hardware:** Only authorized software, purchased by and licensed to US Foods, may be installed on US Foods-owned and/or leased computers. Associates or contract personnel may not install personal copies of software on any US Foods computer, including laptop computers and Company-provided personal data assistants. Likewise, US Foods owned and leased software is not to be copied or removed from US Foods facilities without written authorization from USF-IT. USF-IT is responsible for the acquisition of all general-use computer hardware and software, including public domain and shareware. If an associate purchases equipment without consent from USF-IT, the associate is responsible for paying that expense. In addition, all computers are subject to checks for viruses. Associates or contract personnel are not authorized to bypass or cancel a virus scan.

**Remote Access:** Remote access to US Foods computer systems is granted for authorized business purposes only. Approval of US Foods management and USF-IT is mandatory in order to gain access to this privilege.

**Data:** All data residing on or derived from US Foods computers is a corporate asset, including but not limited to computer printed reports, data stored on magnetic disk, optical disk, magnetic tape, or microfiche. US Foods data may be used for authorized business purposes only. Copied data requires the same security protection as original data. Unauthorized copying is not permitted. The transport of sensitive data from US Foods premises requires proper authorization from the data owner, and the data must be returned to the data owner or USF-IT.

Limited amounts of company information may be downloaded to non-Company equipment only when necessary to enable the associate or contract personnel to complete current work projects and all such information must be deleted upon completion of the project. Confidential or proprietary information downloaded to non-Company equipment must be password protected or otherwise encrypted. Prior to disposing of a non-Company personal computer or other personal electronic communication device, all Company information must be deleted.

US Foods Acceptable Use Policy

**Work Made for Hire:** All work produced on US Foods' computers and other electronic communications systems shall be "works made for hire" for the purpose of copyright laws.  Any patent or other proprietary rights in such work shall inure to the benefit of US Foods, and to the extent that such rights may be declared the right of an associate, all such rights are hereby assigned to US Foods.

US Foods Acceptable Use Policy

<u>ACKNOWLEDGEMENT</u>

      I have read the US Foods Acceptable Use Policy.  I understand that the US Foods electronic communications system, as well as all information transmitted, received or stored in this system, is the property of US Foods.  I also understand that such systems are to be used primarily for job-related, not personal, purposes, and that I have no expectation of privacy in connection with the use of this equipment or the transmission, receipt, or storage of information in such systems.

      I further understand and agree not to use a code, access a file, or retrieve any stored communication unless authorized.   I acknowledge and consent to US Foods' monitoring of my use of this equipment at any time at its discretion.


_____    _____   _____
Name of Associate (print)          Signature of Associate               Date


_____    _____   _____
Name of HR Representative (print)   Signature of HR Representative    Date


**OR**


_____    _____   _____
Name of Contract Personnel (print)  Signature of Contract Personnel   Date


_____    _____   _____
Name of US Foods Manager (print)   Signature of US Foods Manager    Date

# EXHIBIT L

In the Matter of the Arbitration between

US FOODS, INC.,

> Claimant,

> v.

MICHAEL J. NOBLE and PHILLIP G.
ROSZAK,

> Respondents.

## DEMAND FOR ARBITRATION

COMES NOW Claimant US FOODS, INC. ("US Foods" or the "Company"), by and through its attorneys, Proskauer Rose, LLP, and submits the following Request for Arbitration to Respondents MICHAEL J. NOBLE ("Respondent Noble") and Phillip G. Roszak ("Respondent Roszak") (collectively, "Respondents"):

## INTRODUCTION

1.      This Request for Arbitration arises out of Respondents' actions to threaten the economic status of US Foods, to engage in a civil conspiracy, to misappropriate confidential Company information, and to engage in acts to attempt to intimidate, embarrass, threaten and publicly expose to ridicule John Lederer ("Lederer"), the Chief Executive Officer ("CEO") of US Foods. Respondents engaged in this illegal conduct because their jobs as senior executives at US Foods were in jeopardy due to their poor performance. Respondents wrongly concluded that Lederer was engaged in improper conduct in his dealings with an executive of a vendor ("Vendor Executive") that provided event planning services to US Foods. Lederer and Vendor Executive had a personal relationship starting in early 2012. The relationship was consensual,

appropriate and fully disclosed to the Company. Respondents believed that by accusing the CEO of improper conduct and threatening him and the Company, they would secure Lederer's termination, save their own jobs and, perhaps, enrich themselves.

2.      Respondents and their co-conspirators hired a private investigation firm based in Chicago, Illinois ("Private Investigator"), which conducted secret surveillance of the CEO. Respondents and their co-conspirators, acting in concert with Private Investigator, misappropriated confidential business information from the Company, some of which was used to identify and track the residence, travel and whereabouts of the CEO. Private Investigator, using the property, information and data wrongfully obtained by Respondents from the Company, conducted background checks and secret surveillance of the CEO's private and personal relationship with Vendor Executive. Respondents and their co-conspirators used the fruits of Private Investigator's surveillance to threaten and intimidate the CEO by acts that included sending anonymous threatening letters to the Company.

3.      The Company launched a confidential and privileged investigation of the anonymous letters. Rather than participate in an interview regarding his involvement and knowledge, Respondent Roszak tendered his resignation. When the Company properly demanded that he return his Company computer, Respondent Roszak initially refused and retained possession of the computer until the next day. During the period that he retained unauthorized possession of the computer, Roszak used data-wiping software to delete approximately 20,000 files from his Company computer.

4.      Although Noble participated in interviews by the Company, he provided false and misleading information to the Company concerning his involvement in and knowledge of the scheme and his violations of the Company's Code of Conduct. In addition, like Roszak, he

deleted Company data and email communications and other relevant evidence, even after the Company issued a preservation notice to him.

5.     Through these actions, Respondents breached their contractual and fiduciary duties to the Company, engaged in a civil conspiracy, and misappropriated confidential business information belonging to the Company, all as set forth in more detail in this Demand.

## NATURE OF THE CASE

6.     Respondent Michael J. Noble worked for US Foods from 2005 until December 2012, when he was terminated for cause by the Company.  Most recently he served as US Foods' Senior Vice President of Shared Services.  As a Senior Vice President, Noble's responsibilities included supervising various back office functions at the Company's Shared Service Center. Noble worked in Phoenix, Arizona and reported to executives in and frequently attended meetings and other functions at the Company's headquarters in Rosemont, Illinois.

7.     Respondent Phillip G. Roszak worked for US Foods from 1998 until December 10, 2012, when he tendered his resignation from the Company after being asked to attend an investigative interview at its headquarters.  Prior to tendering his resignation, Respondent Roszak was Vice President of Financial and Support Office Systems in Phoenix, Arizona.  His duties and responsibilities in this position included managing various back office IT systems and applications.  Among the systems for which Respondent Roszak was responsible was a telecommunications system for managing company cell phones.  Respondent Roszak reported to executives in and frequently attended meetings and other functions at the Company's headquarters in Rosemont, Illinois.

8.     Throughout 2012, Respondents participated in a conspiracy and scheme to threaten the professional career and status of the CEO and the economic viability of the

Company by violating the trust that had been placed in them by the Company and its executives and by abusing, misusing, and destroying Company property, assets and data, breaching their contractual obligations, and breaching their fiduciary duties and duty of loyalty. Respondents also engaged in a concerted pattern of conduct designed to conceal their actions from the Company, including refusing to participate in or providing false information during a confidential, internal investigation concerning their misconduct and deleting relevant data on their Company-issued and personal computers. In addition to their own wrongful conduct, Respondents also encouraged and induced other employees of US Foods to breach their fiduciary duties and duties of loyalty to the Company.

9.      This is an action against Respondents for their violations of their contractual obligations, their duties of loyalty and their fiduciary duties, and for participation in a conspiracy to harm the Company and its CEO, Lederer. This is also an action against Respondents for violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.*

## JURISDICTION

10.     This dispute is properly subjected to arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. § 2, which provides that ". . . an agreement in writing to submit to arbitration an existing controversy arising out of such a contract [involving commerce] . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."

11.     On October 19, 2007 Claimant entered into a Management Stockholder's Agreement with Respondent Roszak ("Roszak Management Stockholder's Agreement") (Exhibit A). Paragraph 17(b) of that Agreement provides that:

> In the event of any controversy among the parties hereto arising
> out of, or relating to, this Agreement which cannot be settled

- 4 -

amicably by the parties, such controversy shall be finally, exclusively and conclusively settled by mandatory arbitration conducted expeditiously in accordance with the American Arbitration Association rules by a single independent arbitrator. Such arbitration process shall take place in New York, New York. [US Foods] shall pay all fees and costs of such arbitration. The decision of the arbitrator shall be final and binding upon all parties hereto and shall be rendered pursuant to a written decision, which contains a detailed recital of the arbitrator's reasoning, subject to enforcement of the arbitration award hereunder or for vacation or modification thereof as provided under the Federal Arbitration Act, Title 9 U.S. Code Chapter 1. Judgment upon the award rendered may be entered in any court having jurisdiction thereof.

12.     On November 16, 2007, Claimant entered into a Management Stockholder's agreement with Respondent Noble ("Noble Management Stockholder's Agreement") (Exhibit B). Paragraph 17(b) of the Noble Management Stockholder's Agreement is identical to paragraph 17(b) in the Roszak Management Stockholder's Agreement. Noble and Roszak entered into other agreements with Claimant that include identical arbitration provisions. See Exhibits A, B.

13.     The Management Stockholder's Agreements provide that the "laws of the State of Delaware applicable to contracts executed and to be performed entirely in such state shall govern the interpretation, validity and performance of the terms of this Agreement."

## THE PARTIES

14.     US Foods is a foodservice distributor incorporated in Delaware with its principal place of business in Rosemont, Illinois, a suburb of Chicago.

15.     Respondent Noble is a citizen of Arizona who resides in Paradise Valley, Arizona.

16.     Respondent Roszak is a citizen of Arizona who resides in Scottsdale, Arizona.

## FACTS

### US Foods and Its Code of Conduct

17.　　US Foods is the second-largest foodservice distribution company in the country. It employs about 25,000 associates in more than 60 locations across the United States.

18.　　In connection with their employment by the Company, Respondents were bound by and subject to various fiduciary obligations, including the duty of loyalty and good faith. They were also subject to the US Foods' Code of Conduct ("the Code"). The Code, among other things:

> a.　prohibits associates from disclosing and misusing US Foods' information, resources or property;
>
> b.　protects "proprietary information" from unauthorized disclosure and use; and
>
> c.　requires prompt reporting of actual or suspected violations of the Code.

19.　　US Foods employees are required to provide an annual certification concerning whether they are aware of any misconduct or any conflicts of interest that may violate the Code. Neither Respondent ever identified any misconduct that may violate the Code in his annual certifications.

20.　　On November 16, 2007 Respondent Noble entered into a "Management Stockholder's Agreement" with USF Holding Corp. ("Noble Management Stockholder's Agreement") (Exhibit B). Also, on November 16, 2007, Respondent Noble signed a Non-Solicitation and Non-Disclosure Agreement ("Noble Restrictive Covenant Agreement") with US Foods (Exhibit B). The Noble Restrictive Covenant Agreement was explicitly made a part of the Noble Management Stockholder's Agreement. These agreements contained restrictions on

Noble's use and disclosure of confidential information of the Company and required him to return all Company property and information upon termination.

21.     On October 19, 2007, Respondent Roszak entered into a "Management Stockholder's Agreement" with USF Holding Corp. ("Roszak Management Stockholder's Agreement") (Exhibit A).  On October 19, 2007, Respondent Roszak signed a Non-Solicitation and Non-Disclosure Agreements ("Roszak 2007 Restrictive Covenant Agreement") with US Foods (Exhibit A).  The Roszak 2007 Restrictive Covenant Agreement was explicitly made a part of the Roszak Management Stockholder's Agreement.  On May 26, 2011, Respondent Roszak signed an additional Non-Solicitation and Non-Disclosure Agreement ("Roszak 2011 Restrictive Covenant Agreement") with US Foods (Exhibit A).  These agreements imposed restrictions on Roszak's use and disclosure of confidential information of the Company and required him to return all Company property and information upon termination.

22.     US Foods' Employee Handbook ("Handbook") also contains extensive policies concerning the use of US Foods' information technology systems and the disclosure and use of data stored in them and confidential and proprietary Company documents and data.  Among other things, the Handbook notifies employees that they may not use the Company's Information Technology or communications resources to, among other things, deliver threatening or harassing messages or do anything illegal; send derogatory comments about co-workers, clients, competitors, subcontractors, and other specified individuals and entities; or disclose proprietary information or Company secrets.

### Lederer Properly Discloses His Relationship With Vendor Executive

23.     In or around 2011, US Foods retained Event Producer to organize and produce corporate events and coordinate corporate communications.  Event Producer had been

recommended to a US Foods' executive by another executive in the food industry. Lederer did not have any involvement in the selection of or negotiations with Event Producer. He did not know Vendor Executive before Event Producer was retained by US Foods.

24.     After US Foods engaged Event Producer, Lederer met and began a relationship with Vendor Executive. Lederer disclosed the relationship to senior executives of US Foods. Lederer is not responsible for any vendor procurement.

### "Project Mayflower":  Noble and Others Plot To Harm US Foods and Lederer

25.     US Foods' office in Phoenix, Arizona houses the Company's information technology and finance operations. The employees based in Phoenix report to executives in US Foods' headquarters in Rosemont, Illinois. Respondents were based in this Phoenix office, but reported to and frequently attended meetings in Rosemont.

26.     At all times relevant to the events described in this Demand, Respondent Roszak knew and was aware that US Foods executives were not satisfied with his performance or the performance of areas for which Roszak was responsible. At various times, Respondent Roszak received direct and indirect negative feedback regarding his performance. Noble was also under scrutiny for poor performance. In addition, areas for which Noble was responsible were under scrutiny by US Foods executives.

27.     Beginning in or about March 2012 and continuing until in or around December 2012, Respondents initiated and participated in a scheme designed to discredit CEO Lederer and threaten the economic viability of the Company. In order to facilitate this scheme, Respondents improperly accessed confidential Company information and abused their access to the Company's databases and other resources to review documents, records and other information regarding the CEO. As a result, Respondents determined that the CEO was in a relationship with

Vendor Executive. Respondents hoped that exposing the relationship would lead to the termination of the CEO.

28.     For example, using his access to confidential Company cell phone records, Respondent Roszak accessed billing records for Lederer's corporate cell phone. When Respondent Roszak and Respondent Noble reviewed the records, they noticed calls to and from the same number. Respondents later determined the number belonged to Vendor Executive. Believing that they had stumbled upon evidence that could lead to Lederer's termination, Respondents engaged in a scheme to investigate and "expose" the relationship between Lederer and Vendor Executive.

29.     During 2012, Respondents removed confidential information from US Foods without authorization and used that information to further their scheme to harm Lederer and US Foods. To conceal their participation in the scheme, Respondents exchanged personal email addresses and transmitted confidential US Foods' information between their personal email accounts and the email accounts of other third parties in violation of Company policy.

30.     Neither Respondent had authorization to access US Foods' computer databases regarding travel plans, flight itineraries and hotel information of other employees. To obtain that information, Respondents induced a subordinate employee ("Employee A") to access those records and provide regular updates concerning Lederer's whereabouts.

31.     Employee A repeatedly accessed and transmitted to Respondent Noble reports during 2012 about Lederer's location, travel status and travel plans. Employee A instructed subordinate employees to obtain information requested by Respondent Noble concerning Lederer's travel plans. Noble's interest for updates became so heightened that Employee A began to refer to Lederer as "Waldo," because Respondent Noble always wanted to know

"where's Waldo?" At various times during the course of the conspiracy, Respondent Noble shared these reports with Respondent Roszak.

32.     By as early as June 2012, Respondent Noble, with the knowledge and concurrence of Respondent Roszak, hired Private Investigator to perform background checks and conduct surveillance on Lederer and Vendor Executive. Upon information and belief, Respondent Roszak offered to pay a portion of the expenses of hiring Private Investigator.

33.     In addition, Respondents, with the assistance of others within and outside of the Company, used their positions with the Company and access to its confidential databases and files to obtain personal and confidential information concerning Lederer, including his home address, travel plans and details, and travel companions. Respondents obtained this confidential information to facilitate their investigation of Lederer and Vendor Executive.

34.     On or about July 19, 2012, Employee A accessed, at Respondent Noble's direction, and sent to Respondent Noble, information regarding Lederer's travel itinerary for late July. Employee A, at the urging of Respondents, contacted Lederer's administrative assistant to confirm and verify Lederer's travel plans and destination. Respondents suspected that Vendor Executive planned to accompany Lederer on this trip. To confirm this suspicion, Respondent Roszak telephoned United Airlines and asked whether Lederer and Vendor Executive could be seated together on the return flight, solely for the purpose of confirming that Lederer and Vendor Executive were traveling together. Upon information and belief, Respondent Roszak never revealed the purpose of his call to the United Airlines representative.

35.     In order to facilitate the surveillance of CEO and Vendor Executive, Respondents forwarded confidential information related to the CEO to Private Investigator. Private Investigator, using confidential and private information of US Foods collected by

- 10 -

Respondents, caused others to follow, photograph, videotape and conduct surveillance of Lederer and Vendor Executive during their July vacation.

36.     Neither Respondent disclosed the retention of Private Investigator to their superiors at US Foods or obtained authorization to transmit confidential information of the Company to Private Investigator.

37.     Respondents plotted to release information garnered through the Private Investigator in a manner and on a date that would be most impactful to US Foods and Lederer.

### Anonymous Letters to US Foods Executives and Owners

38.     Between July and September 2012, Respondents worked together to draft an anonymous letter addressed to the Company's General Counsel and Chief Compliance Officer, and other US Foods representatives.

39.     Upon information and belief, on or about September 20, 2012, Respondent Roszak mailed the letter from Des Plaines, Illinois to US Foods' corporate address in Rosemont to the attention of the Company's General Counsel and other US Foods executives. The letter claimed that Vendor Executive was engaged in "a close and intimate relationship" with US Foods' CEO. This fact had been disclosed to the Company months before by Lederer. The anonymous letter, which included video and photographic evidence of this "close/intimate relationship" with Vendor Executive, demanded that an investigation be undertaken by US Foods.

40.     Upon information and belief, prior to November 9, 2012, Respondent Roszak mailed a second anonymous letter, dated November 5, 2012, from Rosemont, Illinois to the Company's General Counsel and other executives. This letter threatened the General Counsel specifically and US Foods generally, stating:

[General Counsel], There obviously have been no changes made relative to our last communication regarding [Vendor Executive] and Mr. Lederer in late September. Please be aware that on Monday, December 3, we will make public the previous letter addressed to you, KKR and CD&R, the Post Ranch video and the surveillance report. We will post the above to various social media, (Facebook, YouTube, Twitter, etc.). Also, we will provide the same to the general press and industry trade publications.

This threatening communication was intended to produce fear of brand, reputation and economic harm against the Company and the immediate termination of CEO Lederer. As a result of the anonymous letters, protective measures were undertaken to insure the safety of US Foods executives.

### Respondents' Efforts To Conceal Their Scheme

41.    Respondents Noble and Roszak took actions to conceal the true nature of their conduct and their participation of the described scheme and conspiracy, including refusing to cooperate in the Company's internal investigation and destroying Company information.

42.    After he sent the anonymous letters, Noble lied during an internal interview regarding his knowledge of Lederer's relationship with Vendor Executive, the surveillance of Lederer, and his connection to the anonymous letters. Noble's actions had the effect of obstructing US Foods' investigation into the anonymous letters and the allegations raised in them. As a result of this obstruction, US Foods focused its investigation on other third-party witnesses and undertook other costly investigative steps and measures.

43.    In December 2012, US Foods terminated Noble. On the day that it terminated Noble, US Foods sent a letter to Noble reminding him of his obligation immediately to return all Company property, documents and data.

44.    Upon information and belief, it was never Respondent Noble's intention to return US Foods' property and data. After significant negotiations, Respondent Noble and US Foods signed a separation and release agreement. During the course of those negotiations, in

violation of a US Foods' request for preservation, Respondent Noble deleted emails and other documents relevant to US Foods' investigation and potential claims against Noble and Roszak.

45.     The separation and release agreement never became effective because Respondent Noble failed to comply with his obligations under agreement. Respondent Noble returned to US Foods certain documents and certified that he had searched his files and returned all US Foods' property. Respondent Noble, however, has retained US Foods' documents and data, including electronic documents and documents in the possession of third parties within Noble's control.

46.     In addition, during the entire period he was employed at US Foods, on information and belief, Respondent Noble received monthly payments from a former employer, a vendor of US Foods, ostensibly to pay Respondent Noble's monthly child support obligations. These payments violated the Code. Although he had an affirmative obligation to disclose these payments and his violation of the Code, he failed to disclose them to US Foods. Respondent Noble falsely certified each year to US Foods that he had not engaged in and was not aware of any violation of the Code.

47.     US Foods had planned to interview Respondent Roszak on December 11, 2012 about his knowledge of and involvement in the scheme described above. However, rather than attend the scheduled interview, Respondent Roszak tendered his resignation to US Foods late in the afternoon of December 10, 2012.

48.     US Foods demanded the immediate return of its property, including the Company laptop it has issued to Respondent Roszak. Although Roszak initially ignored this demand, he returned the computer the next day. Over 20,000 files on the computer were deleted

immediately prior to its return. Roszak has not returned any other documents or data of the Company.

**COUNT I**
**(Violation of the CFAA by all Respondents)**

49.     US Foods realleges and restates Paragraphs 1-48 as if fully restated herein.

50.     Respondents have violated the CFAA, 18 U.S.C. § 1030(a)(2)(C), by intentionally accessing at least one computer of US Foods used in or affecting interstate commerce or communications, without authorization or by exceeding authorized access to such computer(s), and by obtaining information from US Foods' protected computer(s).

51.     The computer files Respondents accessed without authorization were maintained on US Foods' computers, which are "protected computers" within the meaning of 18 U.S.C. § 1030(e)(2), in that they were used by US Foods to engage in interstate and foreign commerce and communications, including email communications with individuals located in foreign states, and to otherwise conduct US Foods' business across state lines, via the internet.

52.     Respondents were not authorized to access the computer files described above. By accessing and transmitting those files (directly and/or indirectly through the improper and unauthorized inducement of Employee A to act on their behalf), Respondents acted without authorization and contrary to the interests and policies of US Foods.

53.     Respondents kept their unauthorized activities a secret from US Foods and affirmatively misled and intentionally deceived US Foods regarding those activities, as described above.

54.     By engaging in the conduct described above:

a. Respondents intentionally accessed at least one computer without authorization or exceeded their authorized access, and thereby obtained information from a protected computer, in violation of the CFAA, 18 U.S.C. § 1030(a)(2)(C);

b. Respondents knowingly and with the intent to defraud, and in violation of their duty of loyalty and fiduciary duty to US Foods, accessed at least one US Foods' protected computer, without authorization and/or exceeding their authorized access. By means of such conduct, they furthered their intended fraud, including without limitation accessing, obtaining, transmitting, and removing, without authorization, and disclosing to third parties electronic files and information belonging to US Foods, including, but not limited to, files containing its' valuable business information, including confidential, proprietary, and trade secret information, by dishonest methods in violation of the CFAA, 18 U.S.C. § 1030(a)(4);

c. Respondents knowingly caused and commanded the transmission of computer files and information and as a result of such conduct, intentionally and without authorization caused damage in violation of the CFAA, 18 U.S.C. § 1030(a)(5)(A); and

d. Respondents intentionally accessed a protected computer without authorization, and as a result of such conduct, recklessly and/or intentionally caused damage and loss, in violation of the CFAA, 18 U.S.C. §§ 1030(a)(5)(B) & (C).

55. As a result of Respondents' misconduct and violations of the CFAA, US Foods suffered "damage" and/or "loss," as those terms are interpreted under the CFAA, in an amount exceeding $5,000, and is entitled to an award of damages under 18 U.S.C. § 1030(g) for Respondents' multiple breaches of the CFAA. The damage and loss suffered by US Foods includes the cost of reasonably investigating and otherwise responding to the threat to the Company presented by Respondents' violations (including forensic computer investigation and

analysis) as well as impairment of the integrity of US Foods' computers and system, and of the data stored in that system, such as the private travel and scheduling information and other valuable proprietary and confidential information improperly accessed, obtained, transmitted, disclosed, and used by Respondents.

56.     Wherefore, US Foods respectfully requests judgment against Respondents for actual damages and preliminary and permanent injunctive relief, and such other relief as this Arbitrator may deem just and proper.

**COUNT II**
**(Breach of Fiduciary Duty and the Duty of Loyalty against all Respondents)**

57.     US Foods realleges and restates Paragraphs 1-56 as if fully restated herein.

58.     Respondents were in positions of trust at US Foods as Vice President of Financial and Support Office Systems. Respondent Noble was Senior Vice President of Shared Services and Respondent Roszak was Vice President of Financial and Support Office Systems. In those positions, they had significant management responsibilities and access to US Foods' confidential and proprietary information, data, and property. As a result, Respondents owed a fiduciary duty and a duty of loyalty to US Foods.

59.     Respondents' fiduciary duty and duty of loyalty required them to (1) act only in the best interest of US Foods; (2) refrain from taking or using US Foods' property and confidential information without authorization; (3) refrain from encouraging and inducing employees to improperly access and transmit US Foods' property and confidential and proprietary information; (4) return all of US Foods' property and confidential and proprietary information after their employment with US Foods ended; and (5) maintain in its proper state, and refrain from deleting or destroying, all electronic files or other data belonging to US Foods.

60.     Respondents breached their fiduciary duty and duty of loyalty to US Foods by (1) failing to act only in the best interest of US Foods in the course of their employment and engaging in conduct that constituted a conflict of interest; (2) taking and using US Foods' property and confidential information without authorization; (3) encouraging and inducing employees to improperly access and transmit US Foods' property and confidential and proprietary information; (4) failing to return all of US Foods' property and confidential and proprietary information after their employment with US Foods ended; and (5) deleting and destroying electronic files or other data belonging to US Foods.  In furtherance of this scheme and conspiracy, Respondents took efforts to conceal the true nature and purpose of acts committed, including using and transferring Company confidential data and information to personal e-mail accounts, committing and inducing others to commit violations of the Company's Code of Conduct, and encouraging Employee A to provide confidential data and information in violation of the Company's policies and directives.

61.     Respondent Noble further breached his duties by lying and misleading US Foods during his investigative interviews and by deleting data relevant to the investigation. Respondent Roszak further breached his duties by refusing to cooperate with US Foods' investigation and deleting data relevant to the investigation.

62.     Respondents violated and are continuing to violate their fiduciary duty and duty of loyalty by failing or refusing to return US Foods' property.

63.     As a direct and proximate result of Respondents' breach of their fiduciary duty and duty of loyalty, US Foods has suffered and will continue to suffer economic losses and irreparable injuries.

64.     Respondents' breaches of their fiduciary duty and duty of loyalty were willful, malicious, oppressive, and in conscious disregard of US Foods' rights, and US Foods is therefore entitled to an award of punitive damages to punish their wrongful conduct and deter future wrongful conduct.

65.     Wherefore, US Foods respectfully requests this Arbitrator enter a judgment against Respondents for actual damages, punitive damages, and such other relief, including preliminary and permanent injunctive relief, as this Arbitrator may deem just and proper.

## COUNT IV
### (Breach of Contract against Respondent Noble)

66.     US Foods realleges and restates Paragraphs 1-65 as if fully restated herein.

67.     On November 16, 2007 Respondent Noble signed a Management Stockholder's Agreement with US Foods.  Also, on November 16, 2007, Respondent Noble signed a Non-Solicitation and Non-Disclosure Agreement with US Foods.

68.     Respondent Noble received valuable consideration for entering into both the Management Stockholder's Agreement and the Non-Solicitation and Non-Disclosure Agreement.

69.     The Non-Solicitation and Non-Disclosure Agreement provides, among other things, that Respondent Noble shall not disclose confidential information of US Foods and that Respondent Noble shall return all US Foods' property and confidential information upon the termination of his employment.

70.     Respondent Noble breached the non-disclosure provisions of the Non-Solicitation and Non-Disclosure Agreement by providing US Foods' confidential information to third parties.

71.     Respondent Noble also breached the Non-Solicitation and Non-Disclosure Agreement by destroying and/or failing to return US Foods' property and confidential information upon the termination of his employment.

72.     The provisions of the Non-Solicitation and Non-Disclosure Agreement are incorporated by reference into the Management Stockholder's Agreement.  Respondent Noble therefore also breached the Management Stockholder's Agreement.

73.     US Foods has been irreparably injured because of Respondent Noble's breaches of the Non-Solicitation and Non-Disclosure Agreement and the Management Stockholder's Agreement.

74.     Absent the requested injunctive relief, US Foods will be substantially, imminently, and irreparably harmed by Respondent Noble's breaches of the Non-Solicitation and Non-Disclosure Agreement and the Management Stockholder's Agreement.

75.     Wherefore, US Foods respectfully requests this Arbitrator enter an order granting preliminary and permanent injunctive relief and such other relief as this Arbitrator may deem just and proper.

## COUNT V
### (Breach of Contract, Respondent Roszak)

76.     US Foods realleges and restates Paragraphs 1-75 as if fully restated herein.

77.     On October 19, 2007, Respondent Roszak signed a Management Stockholder's Agreement with US Foods.  Also, on October 19, 2007, Respondent Roszak signed a Non-Solicitation and Non-Disclosure Agreement with US Foods.  On May 26, 2011, Respondent Roszak signed an additional Non-Solicitation and Non-Disclosure Agreement.

78.     Respondent Roszak received valuable consideration for entering into both the Management Stockholder's Agreement and the Non-Solicitation and Non-Disclosure Agreements.

79.     The Non-Solicitation and Non-Disclosure Agreements provide, among other things, that Respondent Roszak shall not disclose confidential information of US Foods and that Respondent Roszak shall return all US Foods' property and confidential information upon the termination of his employment.

80.     Respondent Roszak breached the non-disclosure provisions of the Non-Solicitation and Non-Disclosure Agreements by providing US Foods' confidential information to third parties.

81.     The provisions of the Non-Solicitation and Non-Disclosure Agreement entered into by Roszak on October 19, 2007 are incorporated by reference into the Management Stockholder's Agreement.  Respondent Roszak therefore also breached the Management Stockholder's Agreement.

82.     US Foods has been irreparably injured because of Respondent Roszak's breaches of the Non-Solicitation and Non-Disclosure Agreements and the Management Stockholder's Agreement.

83.     Absent the requested injunctive relief, US Foods will be substantially, imminently, and irreparably harmed by Respondent Roszak's breaches of the Non-Solicitation and Non-Disclosure Agreements and the Management Stockholder's Agreement.

84.     Wherefore, US Foods respectfully requests this Court enter an order granting preliminary and permanent injunctive relief and such other relief as the Court may deem just and proper.

## COUNT VI
### (Civil Conspiracy by all Respondents)

85.     US Foods realleges and restates Paragraphs 1-84 as if fully restated herein.

86.     Respondents Noble and Roszak willfully, intentionally, and knowingly agreed and conspired with each other and with others known and unknown to engage in the alleged wrongful conduct described above.

87.     Respondents did the acts alleged pursuant to, and in furtherance of, that agreement and/or common scheme and/or furthered the conspiracy by cooperating, encouraging, ratifying, or adopting the acts of the others.

88.     As a direct and proximate result of the overt acts in furtherance of the conspiracy, US Foods suffered injury, damage, loss, and harm. The wrongful conduct was committed during and in the course of Respondents' conspiracy.

89.     Respondents' intentional agreement with each other and others, known and unknown, to commit, and the commission of, these overt wrongful acts, was willful, malicious, oppressive, and in conscious disregard of US Foods' rights.  Therefore, US Foods is entitled to an award of punitive damages to punish Respondents' wrongful conduct and deter future wrongful conduct.

90.     Wherefore, US Foods respectfully requests judgment against Respondents for actual damages and such other relief, including punitive damages, as this Arbitrator may deem just and proper.

## PRAYER FOR RELIEF

WHEREFORE, US Foods requests that judgment be granted in its favor and against Respondents for:

(a)     That US Foods be awarded compensatory damages in such amounts as shown at hearing (including without limitation the costs, fees and other expenses incurred by US Foods in investigating and responding to Respondents' misconduct), costs and expenses, attorneys' fees, punitive and exemplary damages for Respondents' willful, wanton, and malicious misconduct in such amount as shown at hearing, pre- and post-judgment interest at the highest rate permitted by law, and such further relief as this Arbitrator may deem appropriate.

(b)     The issuance of a preliminary injunction, and a final, permanent injunction against Respondents as follows:

(1)     That Respondents, and all those acting in concert or participation with them, be preliminarily and permanently enjoined from disclosing or utilizing for any purpose US Foods' property or confidential and proprietary information.

(2)     That Respondents, and all those acting in concert and participation with them, be directed immediately to return to US Foods any and all of US Foods' property and confidential, proprietary, and trade secret information in their possession, custody or control.

(3)     Permit US Foods or its agents to inspect Respondents' personal electronic devices, including personal computers, thumb and backup drives, and cellular phones, to identify the property of US Foods in their possession, determine the scope of their misconduct, determine whether US Foods' confidential, proprietary or trade secret information has been provided or disclosed to third parties, and to preserve and then permanently delete all data of US Foods on those devices.

Respectfully submitted,

Connie N. Bertram
Daniel J. Davis
**PROSKAUER ROSE LLP**
1001 Pennsylvania Ave., N.W. Suite 400S
Washington, D.C. 20004
Telephone: (202) 416-6800
Facsimile: (202) 416-6899
cbertram@proskauer.com
ddavis@proskauer.com

May 15, 2013

# EXHIBIT M

## Velez, Rebecca

| | |
|---|---|
| **From:** | Bertram, Connie N. |
| **Sent:** | Friday, April 12, 2013 5:20 PM |
| **To:** | Kraig Marton (kjm@jaburgwilk.com) |
| **Cc:** | Bertram, Connie N.; Aho, Jessica L. |
| **Subject:** | USF Noble |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

| | |
|---|---|
| **Attachments:** | USF_Noble_  Computer Forensic Inspection Protocol.DOC |

I am sorry that we were unable to connect today.  I have attached the draft protocol for the computer forensics review.  Please let me know if you have any questions or revisions.



USF_Noble_
Computer Forensic ..

**Connie N. Bertram**
Partner

Proskauer
1001 Pennsylvania Avenue, NW
Suite 400 South
Washington, DC 20004-2533
d 202.416.6810
f  202.416.6899
cbertram@proskauer.com
http://www.proskauer.com/professionals/connie-bertram/

Follow recent developments concerning government contractor compliance issues at our new blog at
http://www.governmentcontractorcomplianceupdate.com/category/employment-law/

greenspaces
Please consider the environment before printing this email.

CONFIDENTIAL

## COMPUTER FORENSIC INVESTIGATION PROTOCOL

Michael Noble and US Foods, Inc. agree to the following protocol ("Protocol") for Noble's obligation under Paragraph 9 of the parties' Confidential Separation Agreement and Release signed on February 5, 2013 to "permit a third-party IT technician retained by [US Foods] to inspect all of your personal computers and electronic communications and storage devices to identify and recover any additional Company Data and to undertake the permanent deletion of any Company Data."  The Protocol will proceed as follows:

1.      US Foods has selected [add name] ("IT Technician") as the third-party IT technician to perform the steps identified in this Protocol.

2.      IT Technician will make a forensic image of all of Noble's computers and electronic devices with computing and/or storage capabilities, including, but not limited to, all of Noble's computers, iPads or other tablets, phones, thumb drives, external drives and other storage drives. IT Technician will restore to the extent possible all deleted data on these devices.

3.      Noble will also provide IT Technician with the password to personal email accounts, including without limitation his Yahoo account, and to all cloud computing and storage sites to which Noble has access.  IT Technician will make a copy of all emails and other data located on those accounts and sites.  Noble will make his computers, electronic devices and email accounts available to IT Technician no later than [date].  All data and information collected pursuant to Paragraphs 2 and 3 will be referred to as the "Noble Data."

4.      IT Technician will run the search terms in Attachment A on the Noble Data.  The documents and data identified as a result of running these search terms shall be called the "Searched Noble Data."  IT Technician will also conduct a forensic inspection of the images to determine whether data wiping software or other programs have been run or mechanisms have been used to delete data permanently from the devices.

5.      IT Technician shall provide to Noble's counsel a copy of the Searched Noble Data. Noble's counsel shall conduct a review of the Searched Noble Data to identify communications protected by the attorney-client privilege.  Noble's counsel shall provide a privilege log for each attorney-client privileged document that identifies the categories of information required by Rule 26 of the Federal Rules of Civil Procedure for privilege logs.  Noble's counsel will provide the privilege log to US Foods for review by [date].

6.      US Foods will review the privilege log and identify any disputes with any entries on it. The parties will act in good faith to attempt to resolve any disputes regarding whether a log entry complies with Paragraph 5 and/or the communication described in it is privileged.  Any disputes that cannot be resolved by the parties will be submitted to arbitration pursuant to Paragraph 20 of the parties' Separation Agreement.

7.      IT Technician will immediately provide to US Foods the Searched Noble Data with the exception of any documents found on the privilege log.  Theses documents and data shall be called the "Non-Privileged Searched Noble Data."

CONFIDENTIAL

8.      US Foods will review the Non-Privileged Searched Noble Data to identify all documents and data to which it is entitled.  These documents and data shall be called "US Foods Data."

9.      IT Technician will provide US Foods with a copy (including all associated metadata) of the US Foods Data and will permanently delete all US Foods Data from the computers, electronic devices and accounts identified in Paragraphs 2 and 3.


US FOODS, INC.


By: _____
        Juliette Pryor

Date: _____


Agreed and accepted on this

___ day of _____ 2013

Signature: _____
        Michael J. Noble

CONFIDENTIAL

## ATTACHMENT A

3128100343
6wrp582
7/26/2012
7/29/2012
Avant
BCD
BCDMI
Best Buy
Big Sur
CD&R
Chicagostreetstyle.com
Close\Intimate
Collette May
DAV
Ethics
Lee Flosi
Patrick Hanretty
Higgins
ICG
ICG Consulting
Italy
Kindle
KKR
John Lederer
Johan Marzuki
Mayflower
Meridican
mn5967@yahoo.com
Post Ranch Inn
Presidents Cup
Proszak
Quest
Rome
Richard Schulze
SFO
Surveillance
Ventana
Video
Waldo
Robert "Bob" Scigalski
rscigalski@questinvestigations.net
Lflosi@questinvestigations.net
Kraft
Alliant
US Foodservice

US Foods
USF
Juliette Pryor
Phillip Roszak
Shane Guilliams
Terri Shepard
David Esler
Pietro Satriano
Harlan Kowitt
Stephen Down
Stuart Schuette
Steve Guberman
Timothy Beauchamp
Bob Aiken
Tom Lynch
David Schreibman
Sandy Raine
Jennifer Steinke
Allan Swanson
Mike Makings
Lynn Larry
Jason Douglas
"Deloitte" & "US Foods" or "USF"
Financial Services
Vendor Finance
Shared Services

 Proskauer»  Proskauer Rose LLP  1001 Pennsylvania Avenue, NW Suite 400 South  Washington, DC 20004-2533

April 29, 2013

VIA EMAIL AND FIRST CLASS MAIL

Kraig J. Marton
Jaburg Wilk
3200 N. Central Avenue, 20th Floor
Phoenix, AZ 85012

Re:     Michael Noble

Connie N. Bertram
Member of the Firm
d 202.416.6810
f 202.416.6899
cbertram@proskauer.com
www.proskauer.com

Dear Mr. Marton:

I am writing to summarize the history and status of our discussions regarding Mr. Noble's compliance with his obligations under the parties' Confidential Separation Agreement and Release.

1.      *Production of Quest Documents.*  Mr. Noble has not yet complied with his obligations under Paragraph 14 of the Agreement regarding the receipt of a complete production from Quest.  We received on March 15 a production from Quest Consultants and a declaration from Lee Flosi that represented inaccurately that the production was complete.  As you and I have discussed, however, this production is incomplete because it does not include certain of Quest's administrative documents, a fact that you admitted in a March 15 email to Lee Flosi.  Your April 10 letter also acknowledges that the Quest production is missing documents that Flosi claims are "purely administrative" and that Flosi did not retrieve "direct entry records" for the time his investigators spent on the project.  We disagree that these documents are "purely administrative" or not within the scope of documents that must be produced under the terms of the Agreement.

To attempt to resolve this deficiency in Mr. Noble's production, we have agreed that Mr. Flosi will be interviewed by telephone to identify the additional records Quest has in its possession, custody or control related to its investigation as described in Paragraph 14 of the Agreement.  Z Scott will contact Mr. Flosi to schedule the interview.  However, you should understand that, by agreeing to conduct this interview, US Foods is not waiving its right to receive all of the documents that Mr. Noble is required to produce pursuant to the Agreement or to object to the incorrect declaration submitted by Mr. Flosi.

2.      *ICG Payments to Mr. Noble.*  In my April 3 letter, I discussed US Foods' concerns about payments Mr. Noble received from ICG during his employment at US Foods and his failure to disclose those payments to US Foods.  You told me that ICG has made child support payments on Mr. Noble's behalf since 2002, citing cancelled checks and a ledger that ICG had provided to you.  I requested that ICG share the ledger and cancelled checks for the child support payments that ICG made for Mr. Noble.

During our teleconference on April 19, you stated that ICG would agree to provide the ledger and an exemplar of one of the cancelled checks if we enter into an attorneys-eyes-only agreement and agree that the documents cannot be disclosed or used for any purpose.  We are not willing to accept the offered documentation under those terms.

Proskauer≫

Kraig J. Marton
April 29, 2013
Page 2

3.      *IT Protocol.*  I explained in my April 3 letter Mr. Noble's obligation to comply with Paragraph 9 of the Agreement by submitting to a third-party IT inspection of his personal computers and devices. During our conference call on April 10, you outlined a protocol that would be acceptable to US Foods. You suggested that an IT professional image all of Mr. Noble's computers and devices and run a search of key words (which you conceded would be a "long list").  You suggested that you then review the results of the search to identify and log any attorney-client protected documents.  On April 12 I sent you a proposed IT protocol that was based upon the proposal you offered during our discussion on April 10.

During our conversation on April 19, you agreed that my draft protocol is consistent with our discussions on April 10.  You stated however, that your client has "a lot" of concerns with the protocol because he does not trust the Company.  You stated, for instance, that you wanted to withhold communications that Mr. Noble considers private and to limit the definition of "Company Property."  You told me that you would send me proposed revisions to the protocol.  However, despite my email reiterating my request for your revisions, we have not received any revisions since I forwarded the draft to you two weeks ago.  Your reversal in position and failure to provide proposed revisions are leading us to suspect that Mr. Noble has no intentions of allowing US Foods to complete the inspection required by the Agreement.  Hopefully, we can finalize the protocol as soon as possible so we can proceed with the inspection.

Thank you for your assistance with this matter.

Regards,

Connie N. Bertram

cc:      Juliette Pryor



3200 N. Central Avenue, 20th Floor, Phoenix, AZ 85012

jaburgwilk.com

**Kraig J. Marton**

kjm@jaburgwilk.com
**602.248.1017 - Direct Phone**
**602.297.5017 - Direct Fax**

May 2, 2013

***Via E-Mail [cbertraum@proskauer.com]***

Connie N. Bertram
Proskauer/Rose, LLP
1001 Pennsylvania Avenue, NW
Suite 400 South
Washington, DC 2004-2533

Re:     *Michael Noble – U.S. Foods*

Dear Ms. Bertram:

The purpose of this letter is in to respond to yours of April 29, to address our discussion of April 30, and to set forth certain matters related to the ongoing dispute between Mr. Noble and your client, US Foods.

Let me start with the issues raised in your April 29 letter:

1.   *Production of Quest documents*. You are flat wrong in claiming there is any "deficiency" in Quest's production. By email dated March 15, Lee Flosi sent his entire file together with a formal declaration to Juliette Pryor. That should have ended further discussion. However because Flosi did not want to send internal information unrelated to Quest's investigation, US Foods somehow contends there is some deficiency.

Without waiving our position that there has been a full and complete production already accomplished, we agreed to allow Flosi to be interviewed. In our prior conversations I made this clear and I also provided you with specific dates when he would be available.  I did this on two separate conversations.  Rather than accomplishing the interview on any of the offered dates, another US Foods attorney, Ms. Z Scott, contacted Flosi directly even though I had made it clear to you that there would only be a telephonic interview and I would be participating. In our April 30 conversation, you indicated it was your "error in communication", and Ms. Scott has since contacted me. As I informed you and I will be informing her, Flosi will present himself for a telephonic interview as long as I am participating in the interview. However, our agreement to allow this interview is without waiver of our position that there was already a full and complete production on March 15.

2.   *ICG child-support payments*. In your letter, you accurately reflected the conditions under which we will provide the referred to documents.  Since you do

David L. Allen
Mark D. Bogard
Neal H. Bookspan
Mervyn T. Braude
Kelly Brown
Roger L. Cohen
Beth S. Cohn
Jennifer R. Erickson
David N. Farren
Lauren L. Garner
Renee Gerstman
Laurence B. Hirsch
Amy M. Horwitz
Ronald M. Horwitz
Gary J. Jaburg
Janessa E. Koenig
Michelle M. Lauer
Michelle C. Lombino
Valerie L. Marciano
Kraig J. Marton
Nate D. Meyer
Mitchell Reichman
Scott J. Richardson
Laura A. Rogal
Kathi M. Sandweiss
Jeffrey A. Silence
Maria Crimi Speth
Bridget O'Brien Swartz
Susan E. Wells
Lawrence E. Wilk
Nichole H. Wilk


Adam S. Kunz
*Of Counsel*

JABURG · WILK
Attorneys at Law

Connie N. Bertram
May 2, 2013
Page 2

not agree to our conditions for production, the referred to documents will not be produced. However as an officer of the court, and as an attorney, I again avow to you that I have in my possession a canceled ICG check that predates Mr. Noble's employment with US Foods as well as a ledger reflecting continuous child support payments from early 2002, again long before Mr. Noble's employment with US Foods.  All of this was explained to US Foods when it interviewed ICG's principal, Mike Makings. Accordingly we have nothing further to discuss on this topic.

     *3.*    *IT protocol*. You have either misstated or misunderstood our prior conversations. I did not "agree" on April 19 that your draft protocol was "consistent" with what we had talked about but instead told you that Mike Noble has "lots" of problems with it.

     Further, the intent of the Separation Agreement, as you should know, was to identify and recover Company Data that Mr. Noble may or may not have on his electronic devices.  The intent, was not to permit US Foods to seriously violate Mr. Noble's privacy in order to purse some investigation.

     It is ironic that US Foods is beginning to "suspect That Mr. Noble has no intentions of allowing US Foods to complete the inspection". Mr. Noble suspects that US Foods does not intend to pay him ever and is doing everything it can to delay, and when it can no longer delay it will simply refuse to pay until an arbitrator forces them to do so.

     Regardless, we as attorney have an obligation to at least try to resolve the disputes and that is why I have been working with you.  We are trying to comply with US Food's continued requests, even though we do not agree with them.

     As for a protocol, we continue to agree that a signed protocol is necessary and that it needs to be completed. Accordingly I have now enclosed suggested changes to your protocol, redlined. While they should be self-explanatory, I am more than willing to discuss them. Please contact my office and set a time when you can discuss these changes so we can finalize this matter.

     Very truly yours,

     **JABURG & WILK, P.C.**

     Kraig J. Marton

KJM:kmr

cc:  Michael Noble

Enc:  IT protocol with redlined changes

CONFIDENTIAL

## COMPUTER INSPECTION PROTOCOL

Michael Noble and US Foods, Inc. agree to the following protocol ("Protocol") for Noble's obligation under Paragraph 9 of the parties' Confidential Separation Agreement and Release signed on February 5, 2013 to "permit a third-party IT technician retained by [US Foods] to inspect all of your personal computers and electronic communications and storage devices to identify and recover any additional Company Data and to undertake the permanent deletion of any Company Data." The Protocol will proceed as follows:

1.      US Foods has selected [add name] ("IT Technician") as the third-party IT technician to perform the steps identified in this Protocol, and by signing below the IT Technician agrees to comply with the terms of this Protocol.

2.      IT Technician will make a forensic image of all of Noble's computers and electronic devices with computing and/or storage capabilities, including, but not limited to, all of Noble's computers, iPads or other tablets, phones, thumb drives, external drives and other storage drives. Noble represents that the following is an accurate list of all of such devices: (1) workstation, (2) iPad; (3) iPhone.

3.      Noble will also provide IT Technician with the password to his personal email accounts, including without limitation his Yahoo account, and to all cloud computing and storage sites to which Noble has access. Noble represents that the only personal email account he has or has had is mn5967@yahoo.com. IT Technician will make a copy of all emails and other data located on those accounts and sites. Noble will make his computers, electronic devices and email accounts available to IT Technician at Noble's home, no later than [date]. All data and information collected pursuant to Paragraphs 2 and 3 will be referred to as the "**Noble Data.**"

4.      IT Technician will run the search terms listed in Exhibit A on the **Noble Data**, using the guidelines set forth on that Exhibit A. The documents and data that contain those search terms and which are included in Exhibit A's guidelines shall be called the "**Searched Noble Data.**" IT Technician will also conduct a forensic inspection of the images to determine whether any data wiping software or other similar programs have been run or mechanisms have been used to delete data permanently from the devices, and shall provide the results to both US foods and counsel for Noble.

5.      After completing its examination and the searches described on Exhibit A, IT Technician will permanently delete its copy of all remaining **Noble Data,** other than **Searched Noble Data.** IT Technician may preserve all **Searched Noble Data** until directed to dispose of it by the parties or by a duly appointed arbitrator.

6.      After completing the searches contemplated on Exhibit A, IT Technician shall provide to Noble's counsel a copy of the **Searched Noble Data** together with a log, listing each item contained in the **Searched Noble Data.** That log listing will only contain items from searched emails, PowerPoint, Excel or Word files, and: (1) the date the item was created or last accessed, (2) the item's title if available or if no title is available, every other of the first 15 words appearing in the item, and (3) the type of item involved (such as a Word document, PowerPoint). If the item is an email, it shall contain only (1) the date it was sent or received, (2) the names of

CONFIDENTIAL

the sender and all recipients and (3) the subject listed in the email. This listing which contains the above information will be referred to as the **Log**.

7.      Noble and his counsel shall conduct a review of the **Log** and the **Searched Noble Data** to identify any communications that Noble deems to be non-Company Data that should not be provided to US Foods, such as if protected by the attorney-client privilege or not required under the Separation Agreement. Noble's counsel shall indicate on the **Log** which items are to be provided to US Foods and which items are not to be provided to US Foods. Items not to be produced to US Foods shall be called "**Withheld Data**." Noble's counsel shall also note on the **Log** the basis for refusing to allow any **Withheld Data** to be provided to US Foods. Noble's counsel will provide the **Log** with his position on **Withheld Data** to IT Technician and US Foods for review by [date].

8.      US Foods will review the **Log** and identify any disputes it has over any **Withheld Data** and will notify Nobel's counsel of any such dispute within 10 days of receipt of the Log. The parties will act in good faith to attempt to resolve any disputes regarding whether any **Withheld Data** complies with Noble's obligations under the Settlement Agreement. Any disputes that cannot be resolved by the parties will be submitted to arbitration pursuant to Paragraph 20 of the parties' Separation Agreement.

9.      IT Technician will preserve all **Withheld Data**, but will not provide it to US Foods or anyone else other than Noble and/or Noble's counsel. IT Technician will only provide **Withheld Data** to US Foods as directed by a lawfully appointed Arbitrator or with Noble's written permission.

10.     IT Technician will permanently delete its copy of all remaining **Noble Data** other than **Searched Noble Data**.

11.     Upon receipt of the **Log** from Noble's counsel, IT Technician will provide to US Foods the **Searched Noble Data** that the **Log** indicates can be produced to US Foods. The documents and data to be produced to US Foods, as listed on the **Log**, shall be called the "**Produced Searched Noble Data**."

12.     US Foods will review **Produced Searched Noble Data** to identify all documents and data to which it feels it is entitled. These documents and data shall be called "**US Foods Data**." US Foods will provide Noble's counsel with a list describing the **US Foods Data**.

13.     Within 10 day of receiving the list of **US Foods Data**, Noble will give IT Technician access to the computers, electronic devices and accounts identified in Paragraphs 2 and 3 and IT Technician will permanently delete all **US Foods Data** from those computers, electronic devices and accounts. However, if Noble objects to the deletion of any item on that list of **US Foods Data**, IT Technician will preserve a copy but will not return it to Noble unless ordered to do so by an arbitrator or authorized to do so by US Foods.

14.     Both parties agree that the "Effective Date of the Separation Agreement" will occur upon delivery of Mr. Noble's device and information to the IT technician.

CONFIDENTIAL

15.    The parties do not, by entering into this Protocol, intend to change or alter any provision of the Settlement Agreement between Noble and US Foods, but instead have entered into this protocol in order to implement terms of that Settlement Agreement.  This protocol is to be interpreted according to the intent and wording of the Settlement Agreement, and is not intended to change it in any way.

US FOODS, INC.

By:    _____
            Juliette Pryor

Date:    _____

Agreed and accepted on this

____ day of _____ 2013

Signature: _____
                    Michael J. Noble

Agreed and accepted on this

____ day of _____ 2013

Signature: _____
                    IT Technician

CONFIDENTIAL

## Exhibit A

Specific Guidelines for IT Technician's searches:

1. All searches are to use the exact terms appearing below. If two words are listed below, the search would be for the two words and not for either one alone.
2. The initial search, using the following terms, must limited to any item or document saved, created or accessed *on or before December 12, 2012 at noon Central Standard Time*. All resulting items can be listed on the **Log**.
3. A second search may be conducted for items saved, created or accessed AFTER December 12, 2012, but the only items that can be listed on the **Log** that result from this second search are to be emails sent or received that contain one or more of the below terms.
4. No email, memo or communication to or from or that include the following people are to be listed on the **Log**.
   Kraig Marton (kjm@jaburgwilk.com or Kraig@cox.net);
   Laura Rogal (lar@jaburgwilk.com);
   Kim Rogers (kmr@jaburgwilk.com);
   Jessica Van Douser (jlv@jaburgwilk.com); or
   David Allen (dla@jaburgwilk.com)
5. The following terms are to be searched. When an item has an ampersand (&) it means that both terms must appear in the same document. When an item has an asterisk (*) it can only be listed on the **Log** if it contains the listed word as well as one or more of the other search terms listed below that does not have an asterisk. For example, a document that contains 7/26/2012 would not be placed on the log unless it also had one or more of the other below listed search terms.

3128100343
6wrp582
*7/26/2012
*7/29/2012
*Avant
BCD
BCDMI
*Best Buy
*Big Sur
CD&R
Chicagostreetstyle.com
Close\Intimate
Collette May
DAV
*Ethics
Lee Flosi
Patrick Hanretty
Higgins
*ICG

*ICG Consulting
*Italy
Kindle
KKR
John Lederer
Johan Marzuki
Mayflower
Meridican
Post Ranch Inn
Presidents Cup
Proszak
Quest
*Rome
Richard Schulze
*SFO
*Surveillance
*Ventana
*Video
Waldo

CONFIDENTIAL

Robert Scigalski
Bob Scigalski
rscigalski@questinvestigations.net
Lflosi@questinvestigations.net
*Kraft
*Alliant
US Foodservice
US Foods
USF
Juliette Pryor
*Phillip Roszak
*Shane Guilliams
Terri Shepard
David Esler
Pietro Satriano
Harlan Kowitt
Stephen Down
Stuart Schuette
Steve Guberman
Timothy Beauchamp
Bob Aiken
Tom Lynch
David Schreibman
Sandy Raine
*Jennifer Steinke
*Allan Swanson
*Mike Makings
*Lynn Larry
*Jason Douglas
Deloitte & US Foods
Deloitte & USF
Financial Services
Vendor Finance
Shared Services

CONFIDENTIAL

## COMPUTER INSPECTION PROTOCOL

Michael Noble and US Foods, Inc. agree to the following protocol ("Protocol") for Noble's obligation under Paragraph 9 of the parties' Confidential Separation Agreement and Release signed on February 5, 2013 to "permit a third-party IT technician retained by [US Foods] to inspect all of your personal computers and electronic communications and storage devices to identify and recover any additional Company Data and to undertake the permanent deletion of any Company Data." The Protocol will proceed as follows:

1.     US Foods has selected [add name] ("IT Technician") as the third-party IT technician to perform the steps identified in this Protocol, and by signing below the IT Technician agrees to comply with the terms of this Protocol.

2.     IT Technician will make a forensic image of all of Noble's computers and electronic devices with computing and/or storage capabilities, including, but not limited to, all of Noble's computers, iPads or other tablets, phones, thumb drives, external drives and other storage drives. Noble represents that the following is an accurate list of all of such devices: (1) workstation, (2) iPad; (3) iPhone.

3.     Noble will also provide IT Technician with the password to his personal email accounts, including without limitation his Yahoo account, and to all cloud computing and storage sites to which Noble has access. Noble represents that the only personal email account he has or has had is mn5967@yahoo.com. IT Technician will make a copy of all emails and other data located on those accounts and sites. Noble will make his computers, electronic devices and email accounts available to IT Technician at Noble's home, no later than [date]. All data and information collected pursuant to Paragraphs 2 and 3 will be referred to as the "Noble Data."

4.     IT Technician will run the search terms listed in Exhibit A on the Noble Data, using the guidelines set forth on that Exhibit A. The documents and data that contain those search terms and which are included in Exhibit A's guidelines shall be called the "Searched Noble Data." IT Technician will also conduct a forensic inspection of the images to determine whether data wiping software or other similar programs have been run or mechanisms have been used to delete data permanently from the devices, and shall provide the results to both US foods and counsel for Noble.

5.     After completing its examination and the searches described on Exhibit A, IT Technician will permanently delete its copy of all remaining Noble Data, other than Searched Noble Data. IT Technician may preserve all Searched Noble Data until directed to dispose of it by the parties or by a duly appointed arbitrator.

6.     After completing the searches contemplated on Exhibit A, IT Technician shall provide to Noble's counsel a copy of the Searched Noble Data together with a log, listing each item contained in the Searched Noble Data. That log listing will only contain items from searched emails, PowerPoint, Excel or Word files, and: (1) the date the item was created or last accessed, (2) the item's title if available or if no title is available, every other of the first 15 words appearing in the item, and (3) the type of item involved (such as a Word document, PowerPoint). If the item is an email, it shall contain only (1) the date it was sent or received, (2) the names of

1

---

Deleted: FORENSIC INVESTIGATION PROTOCOL

Deleted: .

Deleted: IT Technician will restore to
Deleted: extent possible
Deleted: deleted data on these

Formatted: Font: Bold

Formatted: Font: Bold
Deleted: Attachment
Deleted: .
Deleted: identified as a result of running these
Formatted: Font: Bold
Deleted: .

Formatted: Font: Bold
Deleted: , Noble's

Formatted: DocID

CONFIDENTIAL

the sender and all recipients and (3) the subject listed in the email. This listing which contains the above information will be referred to as the Log.

7.   Noble and his counsel shall conduct a review of the **Log and the Searched Noble Data** to identify any communications that Noble deems to be non-Company Data that should not be provided to US Foods, such as if protected by the attorney-client privilege or not required under the Separation Agreement. Noble's counsel shall indicate on the Log which items are to be provided to US Foods and which items are not to be provided to US Foods. Items not to be produced to US Foods shall be called "**Withheld Data.**" Noble's counsel shall also note on the Log the basis for refusing to allow any **Withheld Data** to be provided to US Foods. Noble's counsel will provide the Log with his position on **Withheld Data** to IT Technician and US Foods for review by [date].

8.   US Foods will review the Log and identify any disputes it has over any **Withheld Data** and will notify Nobel's counsel of any such dispute within 10 days of receipt of the Log. The parties will act in good faith to attempt to resolve any disputes regarding whether any **Withheld Data** complies with Noble's obligations under the Settlement Agreement. Any disputes that cannot be resolved by the parties will be submitted to arbitration pursuant to Paragraph 20 of the parties' Separation Agreement.

9.   IT Technician will preserve all **Withheld Data**, but will not provide it to US Foods or anyone else other than Noble and/or Noble's counsel. IT Technician will only provide **Withheld Data** to US Foods as directed by a lawfully appointed Arbitrator or with Noble's written permission.

10.   IT Technician will permanently delete its copy of all remaining **Noble Data** other than **Searched Noble Data.**

11.   Upon receipt of the **Log** from Noble's counsel, IT Technician will provide to US Foods the **Searched Noble Data** that the **Log** indicates can be produced to US Foods. The documents and data to be produced to US Foods, as listed on the **Log,** shall be called the "**Produced Searched Noble Data.**"

12.   US Foods will review **Produced Searched Noble Data** to identify all documents and data to which it feels it is entitled. These documents and data shall be called "**US Foods Data.**"

12.   US Foods will provide Noble's counsel with a list describing the **US Foods Data.**

13.   Within 10 day of receiving the list of **US Foods Data,** Noble will give IT Technician access to the computers, electronic devices and accounts identified in Paragraphs 2 and 3, and IT Technician will permanently delete all **US Foods Data** from those computers, electronic devices and accounts. However, if Noble objects to the deletion of any item on that list of **US Foods Data,** IT Technician will preserve a copy but will not return it to Noble unless ordered to do so by an arbitrator or authorized to do so by US Foods.

14.   Both parties agree that the "Effective Date of the Separation Agreement" will occur upon delivery of Mr. Noble's device and information to the IT technician.

---

The right margin contains the following revision marker boxes:

- Formatted: Font: Bold
- Deleted: .
- Deleted: provide a privilege log
- Deleted: each attorney-client privileged document that identifies the categories of information required by Rule 26 of the Federal Rules of Civil Procedure for privilege logs.
- Deleted: privilege log
- Deleted: privilege log
- Deleted: with any entries on it.
- Deleted: a log entry
- Deleted: Paragraph 5 and/or the communication described in it is privileged
- Deleted: immediately
- Deleted: the Searched
- Deleted: Data
- Deleted: exception of any documents found
- Deleted: privilege log. Theses documents and data
- Deleted: Non-Privileged
- Formatted: Font: Bold
- Formatted: Bullets and Numbering
- Deleted: the Non-Privileged
- Formatted: Font: Bold
- Formatted: Font: Bold
- Deleted: ¶ IT Technician
- Deleted: US Foods
- Deleted: copy (including all associated metadata) of the
- Formatted: Font: Bold
- Deleted: and will permanently delete all
- Formatted: Font: Bold
- Deleted: from
- Deleted: .
- Formatted: DocID

CONFIDENTIAL

15.     The parties do not, by entering into this Protocol, intend to change or alter any provision of the Settlement Agreement between Noble and US Foods, but instead have entered into this protocol in order to implement terms of that Settlement Agreement. This protocol is to be interpreted according to the intent and wording of the Settlement Agreement, and is not intended to change it in any way.

**Formatted:** No bullets or numbering, Tabs: Not at 0.5"

US FOODS, INC.

By: _____
          Juliette Pryor

Date: _____


Agreed and accepted on this

___ day of _____ 2013

Signature: _____
                Michael J. Noble

Agreed and accepted on this

**Deleted:** ¶
---------- Page Break ----------
**ATTACHMENT**

___ day of _____ 2013

Signature: _____
_____ IT Technician


**Formatted:** DocID

3

16829-1\KJM\KJM\1077031.2

CONFIDENTIAL

## Exhibit A

Specific Guidelines for IT Technician's searches:

1. All searches are to use the exact terms appearing below. If two words are listed below, the search would be for the two words and not for either one alone.
2. The initial search, using the following terms, must limited to any item or document saved, created or accessed *on or before December 12, 2012 at noon Central Standard Time*. All resulting items can be listed on the Log.
3. A second search may be conducted for items saved, created or accessed AFTER December 12, 2012, but the only items that can be listed on the Log that result from this second search are to be emails sent or received that contain one or more of the below terms.
4. No email, memo or communication to or from or that include the following people are to be listed on the Log.
   Kraig Marton (kjm@jaburgwilk.com or Kraig@cox.net);
   Laura Rogal (lar@jaburgwilk.com);
   Kim Rogers (kmr@jaburgwilk.com);
   Jessica Van Douser (jlv@jaburgwilk.com); or
   David Allen (dla@jaburgwilk.com)
5. The following terms are to be searched. When an item has an ampersand (&) it means that both terms must appear in the same document. When an item has an asterisk (*) it can only be listed on the Log if it contains the listed word as well as one or more of the other search terms listed below that does not have an asterisk. For example, a document that contains 7/26/2012 would not be placed on the log unless it also had one or more of the other below listed search terms.

| | |
|---|---|
| 3128100343 | *ICG Consulting |
| 6wrp582 | *Italy |
| *7/26/2012 | Kindle |
| *7/29/2012 | KKR |
| *Avant | John Lederer |
| BCD | Johan Marzuki |
| BCDMI | Mayflower |
| *Best Buy | Meridican |
| *Big Sur | Post Ranch Inn |
| CD&R | Presidents Cup |
| Chicagostreetstyle.com | Proszak |
| Close\Intimate | Quest |
| Collette May | *Rome |
| DAV | Richard Schulze |
| *Ethics | *SFO |
| Lee Flosi | *Surveillance |
| Patrick Hanretty | *Ventana |
| Higgins | *Video |
| *ICG | Waldo |

Deleted: mn5967@yahoo.com¶

Formatted: DocID

4

CONFIDENTIAL

Robert Scigalski · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · [Deleted: "]
Bob Scigalski · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · [Deleted: "]
rscigalski@questinvestigations.net
Lflosi@questinvestigations.net
*Kraft
*Alliant
US Foodservice
US Foods
USF
Juliette Pryor
*Phillip Roszak
*Shane Guilliams
Terri Shepard
David Esler
Pietro Satriano
Harlan Kowitt
Stephen Down
Stuart Schuette
Steve Guberman
Timothy Beauchamp
Bob Aiken
Tom Lynch
David Schreibman
Sandy Raine
*Jennifer Steinke
*Allan Swanson
*Mike Makings
*Lynn Larry
*Jason Douglas
Deloitte & US Foods · · · · · · · · · · · · · · · · · · · · · · · · · · · · [Deleted: "]
Deloitte & USF · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · [Deleted: " & "]
Financial Services · · · · · · · · · · · · · · · · · · · · · · · · · · · · · [Deleted: " or "]
Vendor Finance · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · [Deleted: "]
Shared Services

[Formatted: DocID]

5

# EXHIBIT N

Joshua R. Woodard (#015592)
jwoodard@swlaw.com
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
Telephone: 602.382.6000
Facsimile: 602.382.6070
Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

PHILLIP G. ROSZAK,

             Plaintiff,

v.

U.S. FOODSERVICE, INC. and USF
HOLDING CORP.,

             Defendants.

No. 2:13-cv-01009-SRB

**MOTION TO COMPEL ARBITRATION OR, IN THE ALTERNATIVE, MOTION TO DISMISS**

Pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq*., and Rules 12(b)(1), 12(b)(3), and 12(b)(6) of the Federal Rules of Civil Procedure, Defendants U.S. Foods, Inc. ("US Foods") and USF Holding Corp. ("USF Holding"), collectively referred to herein as the "Defendants," respectfully move for an Order dismissing Plaintiff Phillip G. Roszak's ("Plaintiff's") Complaint and compelling Plaintiff to submit his claims to binding arbitration. In the alternative, Defendants move to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) because it fails to state a claim upon which relief can be granted. This motion is supported by the following memorandum of points and authorities.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

SNELL & WILMER
L.L.P.
PHOENIX

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    PRELIMINARY STATEMENT

Plaintiff brings this action in a misguided attempt to reframe his lawful termination for cause as retaliation for purported whistleblowing activity. Plaintiff asserts three legal claims, each of which is based on his mistaken premise that he was terminated for raising complaints concerning potential violations of internal company policy. Specifically, Plaintiff asserts that (1) Defendants terminated his employment in violation of the Delaware Whistleblowers' Protection Act ("DWPA"); (2) he is owed $100,000 under the terms of his stock agreement with Defendants; and (3) he was damaged due to Defendants' breach of their covenant of good faith and fair dealing.

Plaintiff is required to submit these claims to binding arbitration. Specifically, Plaintiff executed a Management Stockholder's Agreement ("Stock Agreement") with Defendants on October 19, 2007. The Stock Agreement imposes a wide range of obligations on Plaintiff. It also includes an arbitration clause that requires the parties to arbitrate all claims pursuant to, and related to, the Stock Agreement. Plaintiff's claims fall within the scope of the arbitration clause in the Stock Agreement. The Complaint should therefore be dismissed and arbitration ordered.

To the extent the Court concludes that one or more of the claims are not subject to arbitration, the remaining claims should be dismissed for failure to state a claim under Rule 12(b)(6). As a threshold matter, Plaintiff's claim under the DWPA must be dismissed because *none* of the alleged actions occurred in Delaware. Plaintiff's breach of contract and breach of covenant of good faith and fair dealing claims also should be dismissed because Plaintiff has failed to allege a sufficient factual or legal basis for them.

## II.    FACTUAL BACKGROUND

Plaintiff worked for Defendant US Foods as the Vice President of Information Technology in US Foods' Tempe, Arizona office. Compl. ¶ 6. In his capacity as Vice President of Information Technology, Plaintiff ultimately reported to John Lederer, the CEO of US Foods. Id.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

SNELL & WILMER
ATTORNEYS AT LAW
PHOENIX

On October 19, 2007, Plaintiff and Defendants entered into a Management Stockholder's Agreement ("Stock Agreement"). Declaration of Connie N. Bertram ("Bertram Decl."), attached hereto as Exhibit 1, at ¶ 3. Paragraph 17(b) of the Stock Agreement contains an arbitration clause that states that:

> In the event of any controversy among the parties hereto arising out of, or relating to, this [Stock] Agreement which cannot be settled amicably by the parties, such controversy shall be finally, exclusively and conclusively settled by mandatory arbitration conducted expeditiously in accordance with the American Arbitration Association rules by a single independent arbitrator. . . . The decision of the arbitrator shall be final and binding upon all parties hereto and shall be rendered pursuant to a written decision, which contains a detailed recital of the arbitrator's reasoning, subject to enforcement of the arbitration award hereunder or for vacation or modification thereof as provided under the Federal Arbitration Act, Title 9 U.S. Code Chapter 1. Judgment upon the award rendered may be entered in any court having jurisdiction thereof.

Id. Plaintiff entered into other agreements with US Foods that contained an identical arbitration clause. See id.

In December 2012, US Foods placed Plaintiff on administrative leave and subsequently terminated his employment for cause in connection with an internal investigation. Compl., ¶¶ 21, 22. The internal investigation arose out of Plaintiff's and another employee's anonymous threatening letters to the Company purporting to "report" and threatening to publicly disclose an alleged inappropriate relationship between Mr. Lederer and an executive at a US Foods' vendor. Id. ¶¶ 16, 17, 19. As a result of his termination for cause, among other things, Plaintiff is not eligible for appreciation on his stock investment in US Foods. Id. ¶ 22.

US Foods filed a Demand for Arbitration against Plaintiff and Michael Noble on May 15, 2013 based in part on the arbitration clause in Paragraph 17(b) of the Stock Agreement. Consistent with the terms of the arbitration clause, US Foods also filed a complaint for injunctive relief in federal court in the Northern District of Illinois. Exhibit 1, Bertram Decl., at ¶ 4.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

SNELL & WILMER
ATTORNEYS AT LAW
PHOENIX

## III.  ARGUMENT

### A.  The Federal Arbitration Act And Supreme Court Authority Require The Court To Compel Arbitration Of Plaintiff's Claims

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 *et seq.*, requires federal courts to compel the arbitration of any claims covered by an arbitration agreement.  See Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 218 (1985) ("By its terms, the Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed."); Scherk v. Alberto-Culver Co., 417 U.S. 506, 511 (1974) ("[Section] 4 of the Act directs a federal court to order parties to proceed to arbitration if there has been a 'failure, neglect, or refusal' of any party to honor an agreement to arbitrate.").

When considering a motion to compel arbitration, the Court must determine: (1) whether a valid agreement to arbitrate exists; and (2) if so, whether the arbitration agreement encompasses the dispute or claims at issue.  Chiron Corp. v. Ortho Diagnostic Sys., Inc., 207 F.3d 1126, 1130 (9th Cir. 2000).  In answering these questions, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."  Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp., 460 U.S. 1, 24-25 (1983); Comedy Club, Inc. v. Improv West Assocs., 553 F.3d 1277, 1284 (9th Cir. 2009) (an arbitration agreement is presumed enforceable unless it may be said with "positive assurance" that the arbitration clause is "not susceptible of an interpretation" that covers the asserted dispute).  Because both (1) a valid arbitration agreement exists; and (2) that agreement covers the claims brought by the Plaintiff, the Court must compel arbitration pursuant to the FAA.  See 9 U.S.C. § 4.

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

SNELL & WILMER
ATTORNEYS AT LAW
PHOENIX

- 4 -

1. **The Stock Agreement Contains A Valid, Irrevocable, And Enforceable Arbitration Provision That Encompasses Plaintiff's Claims**

Section 2 of the FAA provides that agreements to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The reach of the FAA is broad, requiring courts to enforce arbitration agreements even if the action includes non-arbitrable claims. KPMG LLP v. Cocchi, 132 S. Ct. 23, 24 (2011). In determining whether an agreement to arbitrate is valid, "courts . . . should apply ordinary state-law principles that govern the formation of contracts." Comedy Club, Inc., 553 F.3d at 1285.

Here, the Stock Agreement provides that the "laws of the State of Delaware . . . shall govern the interpretation, validity and performance of the terms of this [Stock] Agreement." Exhibit 1, Bertram Decl., ¶ 3 (Stock Agreement at ¶ 17 (a)). In Delaware, the "basic question that must be answered is 'whether the parties decided in the contract to submit a particular dispute to arbitration.'" SRG Global, Inc. v. Robert Family Holdings, Inc., 2010 WL 4880654, at *6 (Del. Ch. Nov. 30, 2010) (internal citation omitted). If the allegations underlying a claim even "touch matters" covered by the parties' agreement, "then those claims must be arbitrated, whatever the legal labels attached to them." Genesco, Inc. v. T. Kakiuchi & Co., 815 F.2d 840, 846 (2d Cir. 1987) (citation omitted).

In Paragraph 17(b) of the Stock Agreement (Exhibit 1, Bertram Decl., ¶ 3), the parties agreed to submit to "mandatory," "final and binding" arbitration "any controversy among the parties hereto arising out of, or relating to, this Agreement. . . ." Plaintiff's claims clearly "touch matters" covered by the Stock Agreement. First, Plaintiff alleges a breach of the Stock Agreement. Compl. Count II. Clearly, that claim "aris[es] out of" the Stock Agreement and is subject to final and binding arbitration.

Second, Plaintiff alleges of a breach of the covenant of good faith and fair dealing. Compl. Count III. This claim also falls within the scope of the arbitration clause. Plaintiff does not specify which contract this claimed breach relates. In Delaware, however, "[a]n implied covenant of good faith and fair dealings is engrafted upon every

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

SNELL & WILMER
ATTORNEYS AT LAW
PHOENIX

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

1    contract." Gilbert v. El Paso Co., 490 A.2d 1050, 1054 (Del. Ch. 1984). Because, as

2    noted above, each of the agreements Plaintiff signed include the arbitration provision

3    quoted above, this claim undoubtedly "relates to" one or more of those agreements and is

4    subject to arbitration.

5        Third, Plaintiff alleges that Defendants violated the "Delaware Whistleblower

6    Statute 19 Del.C. § 1702(6)(b) and 19 Del.C. § 1703(4)." Compl. Count I. Although the

7    Delaware courts have not analyzed the issue, the Third Circuit has recognized that such

8    claims are arbitrable. See Lape v. Pennsylvania, 157 Fed. App'x 491, 500 (3d Cir. 2005)

9    (holding that an employee who alleged she was terminated in violation of a whistleblower

10   statute had not been deprived of her procedural due process rights under the Fourteenth

11   Amendment when there was an arbitration procedure "available to challenge her

12   discharge"). Plaintiff's allegations supporting the DWPA claim clearly "touch matters"

13   covered by the Stock Agreement. Genesco, Inc., 815 F.2d at 846. The Stock Agreement

14   incorporates a Non-Solicitation and Non-Disclosure Agreement ("Restrictive Covenant

15   Agreement") executed by Plaintiff on October 19, 2007. Exhibit 1, Bertram Decl, ¶ 3

16   (Stock Agreement at ¶ 22). The Restrictive Covenant Agreement imposes duties on

17   Plaintiff to, among other things, not misuse company information or disclose such

18   information to others. Exhibit 1, Bertram Decl, ¶ 3 (Restrictive Covenant Agreement at

19   § 4). The Restrictive Covenant Agreement also requires Plaintiff not to disparage the

20   Company. Id. (Restrictive Covenant Agreement at § 14).

21       The allegations in the Complaint directly relate to Plaintiff's obligations under the

22   Stock Agreement and Restrictive Covenant Agreement. Plaintiff alleges that he, Mr.

23   Noble, "and others" "determined that Lederer had repeatedly contacted Colette May" and

24   that "Lederer had a personal and romantic relationship with May." Compl. ¶ 16. US

25   Foods has alleged in its Demand for Arbitration and in its federal complaint filed in the

26   Northern District of Illinois that Plaintiff and Noble learned of the relationship between

27   Lederer and May by violating their confidentiality and non-disclosure obligations under

28   the Agreement by, among other things, accessing US Foods confidential information

without authority and sharing that information with third parties. Exhibit 1, Bertram Decl., ¶ 4 (US Foods' District Court Complaint, at ¶¶ 2, 8, 31-41). Specifically, US Foods alleges that Plaintiff and Noble gained unauthorized access to, among other things, cell phone records and travel records of US Foods' executives. Id.

The DWPA claim further alleges that Plaintiff and Noble "reported that situation" to US Foods in "late July or August of 2012" and again "six or seven weeks later." Compl. ¶¶ 17, 19. The two "reports" that Plaintiff refers to in the Complaint, however, were, in fact, threatening anonymous letters to US Foods. Exhibit 1, Bertram Decl., ¶ 4 (US Foods' District Court Complaint, at ¶¶ 2, 42-44). Evaluating those facts more than touches upon the provisions in the Stock Agreement and the Restrictive Covenant Agreement – it will require an interpretation of the obligations that Plaintiff had under these agreements and whether he violated them.

In this case, Plaintiff agreed to submit "*any controvers[ies]* . . arising out of or relating to" the agreements to final and binding arbitration. All three of Plaintiff's claims clearly arise out of, or relate to, the agreements and, therefore, are subject to arbitration.

### 2. This Court Should Dismiss Plaintiff's Claims Pending Arbitration

Where, as here, a dispute is subject to arbitration, the district court shall "stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3. The Ninth Circuit, however, has held that courts have discretion under Section 3 of the FAA to dismiss claims that are subject to an arbitration agreement. See Sparling v. Hoffman Constr. Co., 864 F.2d 635, 638 (9th Cir. 1988) (affirming dismissal of claims subject to arbitration). Because Plaintiff's claims are subject to arbitration, the Court should bar Plaintiff from bringing his respective claims in this judicial forum and dismiss these proceedings. Alternatively, Defendants request that the Court stay this action pending the conclusion of arbitration. 9 U.S.C. § 3 ("[T]he court . . . upon being satisfied that the issue . . . is [referable] to arbitration . . . shall on application of one of the parties stay the trial of the action until such arbitration has been

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

SNELL & WILMER
ATTORNEYS AT LAW
PHOENIX

had.").

## B. In The Alternative, Plaintiff's Claims Should Be Dismissed Pursuant To Rule 12(b)(6) For Failure To State A Claim

### 1. Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), a pleading must allege facts sufficient "to raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" will not suffice. Id.; see also Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001). Thus, dismissal is appropriate where the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009); see also Telesaurus VPC, LLC v. Power, 623 F.3d 998, 1003 (9th Cir. 2010) (a plaintiff must "plead factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged") (internal quotation marks and citations omitted). Because Plaintiff cannot satisfy this pleading threshold, the Complaint should be dismissed with prejudice.

### 2. Plaintiff's Claim Under the Delaware Whistleblowers' Protection Act Must Be Dismissed

Count I of the Complaint purports to state a claim for violations of the DWPA. Specifically, Plaintiff alleges that US Foods violated the DWPA by discharging Plaintiff for reporting to the Company certain "violations" of internal company policies. See Compl. ¶¶ 26, 27. Plaintiff's claim fails because Plaintiff has not pleaded, and cannot plead, that any of the protected or retaliatory conduct occurred in the state of Delaware.

Plaintiff's DWPA claim fails because there is no basis for relief under that statute for acts that occur in other states. Curlett v. Madison Indus. Services Team, Ltd., 863 F. Supp. 2d 357 (D. Del. 2012). In Curlett, the plaintiffs, who worked at the defendant's Pennsylvania office, complained about certain transactions involving the defendant and one of its Texas-based vendors and were thereafter terminated. See id. at 358-60. The plaintiffs alleged that their termination was a violation of the DWPA. Id. at 358. The

court held that the DWPA was intended to apply only to interactions between employers and employees within the State of Delaware.  Id. at 361-62 (explaining that the DWPA does not apply to "actions of foreign employers taken outside the State of Delaware").  Because the conduct complained of occurred outside of Delaware, the plaintiffs' DWPA-based claims were dismissed.  Id. at 364.

As in Curlett, none of actions alleged by Plaintiff occurred in Delaware.  Plaintiff lived and worked in Arizona at all times relevant to this action.  Compl. ¶¶ 1, 6.  Although Plaintiff contends that the DWPA applies because his claim "involves the internal affairs of Delaware corporations" (id. ¶ 27), Plaintiff acknowledges that US Foods' principal place of business is in Rosemont, Illinois.  Id. ¶ 2.  Indeed, all of the corporate officers Plaintiff names in the Complaint work in US Foods' Rosemont, Illinois office and all are alleged to have "caused an event to occur in Maricopa County, Arizona out of which Plaintiff's claim arose."  See id. ¶¶ 4, 10, 12-14, 16-21.  Because Plaintiff has not pleaded any actions were taken in Delaware, his DWPA claim must be dismissed.

### 3. Plaintiff Has Failed to State a Plausible Claim for Breach of the "Stock Agreement"

Count II of the Complaint alleges, in a single paragraph and without alleging *any* factual or legal support for the claim, that "[a]s a direct result of the foregoing conduct in which defendant engaged, Plaintiff has been deprived of his stock investment."  Compl. ¶ 29.  Accepting his allegations as true solely for purposes of this Motion, Plaintiff cannot sustain a claim for breach of contract.  Plaintiff alleges earlier in the Complaint that US Foods has communicated to him that it will return his initial investment of $100,000 no later than June 15, 2013, a date that has yet to pass.  Id. ¶ 22.  He does not allege that such a payment is late or that any other breach has occurred.  These bare allegations fail to state a claim for relief.  See Kane v. Bosco, 2010 WL 4879177, at *6 (D. Ariz. 2010) ("[A] pleading may not simply allege a wrong has been committed and demand relief.  The underlying requirement is that a pleading give 'fair notice' of the claim being asserted and the 'grounds upon which it rests.'") (citing Yamaguchi v. U.S. Dep't of Air Force, 109

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

F.3d 1475, 1481 (9th Cir.1997)).

Therefore, Count II of Plaintiff's Complaint should be dismissed.

### 4. Plaintiff Has Failed to State a Plausible Claim for Breach of Covenant of Good Faith and Fair Dealing

Count III of the Complaint asserts a claim for breach of the covenant of good faith and fair dealing. See generally Compl. Count III. Plaintiff, however, fails to plead any of the required elements of such a claim. Plaintiff, for instance, does not plead the basis upon which Defendants owed him such a duty, nor does he plead what specific actions on the part of Defendants constituted the alleged breach of that duty. See, e.g., Overdrive, Inc. v. Baker & Taylor, Inc., 2011 WL 2448209, at * 8 (Del. Ch. June 17, 2011) (dismissing claim for breach of implied covenant of good faith and fair dealing where plaintiff failed to plead any specific contractual obligation or breach of that obligation in support of claim). As such, Count III of Plaintiff's Complaint should be dismissed.

## IV. CONCLUSION

For the reasons stated herein, Defendants respectfully request that the Complaint be dismissed and that the Court order that Plaintiff's claims be arbitrated. In the alternative, Defendants request that the Motion to Dismiss be granted.

DATED this 22nd day of May, 2013.

SNELL & WILMER L.L.P.


By: s/ Joshua R. Woodard
Joshua R. Woodard (#015592)
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
Attorneys for Defendants

- 10 -

I hereby certify that on May 22, 2013, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified below, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

Philip J. Nathanson, Esq.
THE NATHANSON LAW FIRM
8326 E. Hartford Dr. – Suite 101
Scottsdale, AZ  85255
Attorney for Plaintiff

s/ Leslie Boone

17178213