**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

US FOODS, INC.,

        Plaintiff,

v.

MICHAEL J. NOBLE, et al.,

        Defendants.

Civil Action No. 1:13-cv-03640

**MEMORANDUM IN SUPPORT OF DEFENDANT NOBLE'S MOTION TO
DISMISS FOR LACK OF JURISDICTION OR, IN THE ALTERNATIVE,
MOTION TO STAY ALL PROCEEDINGS IN THIS CASE**

## I.      Introduction

Pursuant to Rule 12(b)(1), Fed.R.Civ.P., Defendant Michael J. Noble ("Noble") moves to dismiss the Complaint for lack of subject matter jurisdiction or, in the alternative and pursuant to 9 U.S.C.A. § 3, to stay all further proceedings in this case for two reasons: (1) The Court lacks jurisdiction due to the pending AAA mandatory arbitration of all issues between Noble and Plaintiff US Foods, Inc. ("US Foods"), and (2) because this Court's subject matter jurisdiction is based on diversity, and Plaintiff has not, and cannot, satisfy its burden of proving that the amount in controversy exceeds $75,000, as required by 28 U.S.C. §1332(a).

## II.      Background – The Parties' Dispute and the Feb. 2013 Settlement

Defendant Nobel was a highly paid US Foods executive who was terminated in December 2012 for exposing an affair that the company's CEO, John Lederer ("Lederer"), was

1

having with the owner of a US Foods vendor that supplied high cost event planning services to US Foods. Using a private investigator, Noble caught Lederer "red-handed". He then anonymously disclosed the affair and the business relationship to the company's Compliance Officer and was then fired for his efforts after the company found out it was him.

Noble got a lawyer and threatened to sue US Foods for wrongful discharge and whistleblowing. US Foods asserted claims against Noble as well. The parties negotiated and eventually executed a Confidential Separation Agreement and Release (the "Settlement Agreement"), a copy of which is attached and incorporated as **Exhibit A** to this Motion. US Foods has ignored that agreement by filing this lawsuit and by making the same claims it has released in a demand to arbitrate before the American Arbitration Association.[1]

The Settlement Agreement (**Exhibit A** hereto), contains a full release by US Foods in favor of Noble, in paragraph 7. In settling, Noble agreed to do three things: (1) He agreed that the private investigator he had hired, Quest Consultants ("Quest") give its file to US Foods (Ex. A at 5, ¶14); (2) He agreed to return any company property in his possession or control to US Foods (Id. at 3-4, ¶9); and (3) He agreed to be interviewed by US Foods's counsel about the matters leading up to his termination (Id. at 15, ¶15). He did all of those things, including flying

---

[1] US Foods filed and served its AAA Demand for Arbitration on May 21, 2013, two weeks prior to filing this lawsuit. These and the following facts are set forth and supported in Noble's separate Response to US Foods' Demand for Arbitration with the AAA, a copy of which is attached as **Exhibit B** to this Response. This Court should note that, although the Settlement Agreement is confidential and prohibits both parties from discussing even the "existence" of the Agreement (see Ex. A ¶ 8), US Foods has violated that confidentiality by filing it and disclosing it in this lawsuit without ever bothering to file a motion to seal. Therefore, Noble is filing the Agreement and discussing its terms openly because US Foods has already made it a public record and breached any confidentiality that might otherwise apply.

to Chicago to be interviewed by US Foods's counsel. (A copy of his counsel's email sent to US Food's counsel confirming this is attached as Ex. D to his Response to US Food's Demand for Arbitration, Exhibit B hereto). The Agreement is clear that once Noble has done these things, he was to be paid his $675,000 (Id. at 15, ¶25).

Despite Nobles compliance and the terms of the Settlement Agreement, US Foods continues to refuse to pay the $675,000 settlement, $500,000 of which is money Noble paid for US Foods stock years ago. It has claimed that the Settlement Agreement is "ineffective" because it claims that Noble had not returned all of the company emails in his possession or control. This is nonsense[2] and is explained in Noble's response to the US Foods demand for arbitration, **Exhibit B**. It is further discussed and explained in Noble's recent response to the AAA on the locale to the arbitration, **Exhibit C** hereto, which includes a certification by Noble given last February, together with his interview about it.

This alleged failure to return US Foods property is the apparent basis of the lawsuit filed in this case. In US Food's earlier filed "Motion for Expedited Discovery" it asked for an immediate order allowing discovery now, it also sought an order freezing the use of all of Noble's hard drives and it wanted to require Noble to pay to image his hard drives. In the prayer

---

[2] These emails were returned, as promised, and have not been withheld, "lost" or "destroyed," as US Foods appears to allege. Nor did deleting the emails from his computer in order to ensure that he had completely disgorged himself of them breach the Settlement Agreement. Noble could not have more diligently or faithfully fulfilled his agreement to return all such emails to US Foods. (A copy of Noble's counsel's email sent to US Food explaining this and denying other allegations is attached as Ex. E to his Response to US Food's Demand for Arbitration, Exhibit B hereto. See also the transcript and certifications found at the end of Exhibit C).

for relief in its lawsuit, US Foods seeks a preliminary and permanent injunction that, among other things, enjoins Noble (1) "from disclosing or utilizing for any purpose US Foods ' property or confidential and proprietary information" (2) "immediately to return to US Foods any and all of US Foods' property and confidential, proprietary, and trade secret information" and (3) "Permit US Foods or its agents to inspect Defendants' personal electronic devices, including personal computers, thumb and backup drives, and cellular phones".

US Foods clearly is looking for some excuse, regardless of merit, to breach the parties' Settlement Agreement. Noble spent months trying to satisfy US Foods and secure its compliance with the Settlement Agreement, but it is obvious that US Foods just wants any excuse it can find to avoid paying Noble anything. (Copies of Noble's counsel's emails sent to US Food's counsel confirming these efforts are attached as Exs. F, G, H, I and J to his Response to US Food's Demand for Arbitration, Exhibit B hereto). Having no other excuse to avoid paying Noble what it promised to pay him, US Foods sued him.

### III.  US Foods' issues must be determined by an arbitrator

Although it started an arbitration process, US Foods also seeks preliminary and permanent injunctive relief from this Court. However, US Foods has not demonstrated why an AAA appointed arbitrator cannot provide the same relief it seeks in this lawsuit. The parties' 2013 Settlement Agreement resolves and releases all claims between the parties and includes the following a mandatory arbitration provision:

> The parties shall use good faith efforts to resolve any controversy or claim arising out of or related to this Agreement or the breach thereof. If, despite their good faith efforts, the parties are unable to resolve such controversy or claim, then such controversy or claim

4

> shall be resolved by arbitration in Chicago, Illinois with one (1) arbitrator, in accordance with the National Rules for Resolution of Employment Disputes of the American Arbitration Association,. . . .

(Exhibit A hereto at 6, ¶20).

The AAA's "National Rules for Resolution of Employment Disputes of the American Arbitration Association" ("AAA Rules") specifically provide an arbitrator with the same authority as this Court. See, AAA Rule 32, called "Interim Measures": "At the request of any party, the arbitrator may grant any remedy or relief that would have been available to the parties had the matter been heard in court."

In an effort to avoid the arbitration provisions in the Settlement Agreement, US Foods has argued that the Settlement Agreement allows this Court (rather than an arbitrator) to provide interim relief because the Settlement allegedly carved out US Food's right to seek immediate injunctive relief from a court. US Foods has misread the agreements. Paragraph 10 of the Settlement Agreement (Ex A) says this:

> You agree that you remain bound by all *post-employment restrictions*[3] in your previous agreements with US Foods *as found in*:
> • Sections 17 and 22 of the Management Stockholder's Agreement signed by you on November 16, 2007
> • The provisions of the Non-Solicitation and Non-Disclosure Agreement signed by you on November 16, 2007 that are incorporated by reference into Section 22 of the Management Stockholder's Agreement.

The 2007 Management Shareholder Agreement ("Shareholder Agreement") is attached as **Exhibit D**. Paragraph 17(c) of that Shareholder's Agreement provides for AAA arbitration and does say:

---

[3] Emphasis ours throughout unless otherwise noted.

5

> Notwithstanding the foregoing, the Management Stockholder acknowledges and agrees that the Company, its subsidiaries, the Investors and any of their respective Affiliates *shall be entitled to injunctive* or other relief *in order to enforce the covenant not to compete, covenant not to solicit and/or confidentiality covenants as set forth in Section 22(a) of this Agreement.*

There are a number of reasons why ¶17(C) does not give us Foods the right to ask this Court for relief. First, the sought after injunctive relief is in no way a "post-employment *restriction*" and the 2013 Settlement Agreement says that paragraph 17 only applies to such "restrictions". Having a court (rather than an arbitrator) determine interim measures is not a restriction at all -- it is simply a statement of who will determine the issue of immediate relief. Had US Foods intended to incorporate the arbitration provisions found in paragraph 17 of the Shareholder Agreement into the 2013 Settlement Agreement they should have said so – the 2013 Agreement would then have read that the parties "*incorporate paragraph 17 by reference*" or otherwise clearly stated that the entire ¶17(C) is intended to be binding even if it does not include a post-employment restriction.

Second, the more recent agreement – the 2013 Settlement Agreement – requires the arbitrator to determine interim relief, and it is the most recent expression of the parties' intent.

Third, paragraph 17 does not actually contain any confidentiality clause at all – it instead incorporates other agreements by reference (a "Restrictive Covenant Agreement" and possibly an employment agreement that may or may not exist). It is more than a stretch to argue that a vague reference in the 2013 Settlement Agreement to paragraph 17 in the Shareholders Agreement somehow incorporates other entire contracts by reference.

Moreover, the Settlement Agreement has an "entire agreement" clause and specifically states that it "contains the entire understanding … and supersedes any and all other prior agreements,… except the Other Agreements referenced in Paragraph 10." (Ex A ¶17). Again, paragraph 10 refers to "post-employment restrictions" and the issue of whether a court or arbitrator decides interim relief is not one.

The issues raised by US Foods in this lawsuit belong before an arbitrator.

## IV.    The Court Lacks Jurisdiction when the parties have agreed to arbitrate and the arbitrator can provide the same relief.

"The federal courts are courts of limited jurisdiction, and we have an obligation at each stage of the proceedings to ensure that we have subject matter jurisdiction over the dispute." *Northeastern Rural Elec. Membership Corp. v. Wabash Valley Power Ass'n, Inc.*, 707 F.3d 883, 890 (7th Cir. 2013). The Court lacks subject matter of this case for two reasons: (A) the parties' Settlement Agreement mandates arbitration and/or (2) Plaintiff has not proven that the required amount in controversy necessary to establish diversity jurisdiction exceeds $75,000.

### A.    The Court Lacks Subject Matter Jurisdiction of All Issues.

The parties' Settlement Agreement fully and completely resolves and releases all claims each has, or may have, against the other, whether "known or unknown, in law or in equity," including the document production claims US Foods has raised in this lawsuit. (Ex. A hereto at 6, ¶20). Arbitration, not litigation, of any and all such claims is mandatory. (*Id.*).

Both the Federal Arbitration Act, 9 U.S.C §1, *et seq*. ("FAA") and AAA rules regarding these matters require that the scope of arbitration – here, to be determined by the terms of the Settlement Agreement – is a matter to be determined, in the first instance, by the arbitrator. *See*

7

*Moses H. Cone Memorial Hosp. v. Mercury Const.*, 460 U.S. 1, 25 (1983) ("[the FAA] establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration"); *New Castle County v. U.S. Fire Ins. Co.*, 728 F.Supp. 318, 321 (D.Del. 1989) (same)[4]; *Medtronic AVE Inc. v. Cordis Corp.*, 2004 WL 1557328, 3 (3rd Cir. 2004) (noting the "long line of cases that hold that arbitrability is ultimately a question for the arbitrator to resolve); *see also Nitro-Lift v Howard*, __ U.S. __, 133 S.Ct. 500, 504 (2012) ("it is for the arbitrator to decide in the first instance whether the covenants not to compete are valid").

This Court, therefore, lacks subject matter jurisdiction to determine whether the issues raised by US Foods in its Compliant are arbitrable and must yield to a duly appointed arbitrator to determine such matters. The arbitrator, and not this Court, has the jurisdiction and authority to grant or deny the injunctive relief US Foods has requested in its Complaint.

As noted above, the AAA Rules provide the arbitrator with the same authority as this court as to "interim measures." Federal courts have considered this precise issue and determined that, when an arbitrator has jurisdiction to issue interim relief, a court should decline to do so. In *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716 (9th Cir. 1999), for example, the Ninth Circuit affirmed the District Court's refusal to grant injunctive relief related to a pending arbitration because, as here, the arbitrator had the authority to grant that relief: "Because the district court correctly concluded that all of Simula's claims were arbitrable and the ICC arbitral

---

[4] Paragraph 20 of the Settlement Agreement provides that Delaware law applies, and we also provide applicable federal law since the FAA also applies.

tribunal is authorized to grant the equivalent of an injunction *pendente lite*, it would have been inappropriate for the district court to grant preliminary injunctive relief." 175 F.3d at 726.

A similar AAA rule has been applied in a case closely on point, *Greenpoint Technologies, Inc. v. Peridot Associated S.A.*, 2009 WL 674630 (W.D. Wash. 2009), in which the Court provided the following reasons why it and other courts deny requests for immediate or interim relief when the arbitrator can issue that same relief:

> [O]nce a court determines that all disputes are subject to arbitration pursuant to a binding arbitration clause, it is improper for a district court to grant preliminary relief where provisional relief is available from an arbitral tribunal. See *Simula, Inc. v. Autolive, Inc.*, 175 F.3d 716, 726 (9th Cir.1999) (emphasis added). District courts within the Ninth Circuit have consistently followed this holding. See, e.g., *DHL Info. Servs., Inc. v. Infinite Software Corp.*, 502 F.Supp.2d 1082, 1083 (C.D.Cal.2007) (applying *Simula* to refrain from carving out interim relief issues from the arbitrator); *Ever-Gotesco Res. and Holding, Inc. v. PriceSmart, Inc.*, 192 F.Supp.2d 1040, 1044 (S.D.Cal.2002) (holding that *Simula* requires an arbitral tribunal to grant provisional relief where the parties submit to arbitration); *China Nat'l Metal Prods. Import/Export Co. v. Apex Digital, Inc.*, 155 F.Supp.2d 1174, 1182 (C.D.Cal. 2001) (reversing magistrate judge's issuance of a writ and finding that "*Simula* dictates that the court must respect [an arbitration] agreement and refrain from awarding provisional relief when the parties have provided for another means to obtain such relief").
>
> In the instant case, there can be no dispute that the arbitration clause governs "[a]ny dispute arising out of or in connection with this Agreement," and that such disputes will be "settled under the Rules of the [AAA]." (Dkt. # 13, Ex. A at 29, ¶ 18.3). There is equally no dispute that the Rules of the AAA provide that the arbitral tribunal "may take whatever interim measures it deems necessary, including injunctive relief and measures for the protection or conversion of property." Article 21 of the AAA's International Arbitration Rules. Thus, this case fits squarely within the principles established by *Simula*. No interim relief should be awarded by a court because the parties have clearly agreed to settle their disputes in arbitration, and the arbitration rules provide an avenue for interim relief.

9

2009 WL 674630 at 3; *see also DHL Info. Servs. (Americas), Inc. v. Infinite Software Corp.*, 502 F. Supp. 2d 1082, 1083 (C.D.Cal. 2007) (regarding whether a request for preliminary injunction should be determined by the Court or in arbitration, the Court "defers to arbitration because the parties have agreed that arbitration is appropriate for resolving disputes in this matter, including disputes about preliminary injunctive relief").See, also, *Am. Laser Skincare, LLC v. Morgan*, 13-CV-1256, 2013 WL 1679518 (N.D. Ill. Apr. 17, 2013)("conducting a preliminary injunction hearing and adjudicating the motion in the federal district court would be unnecessarily duplicative [of a pending arbitration] and a waste of resources.") and see, *Tenneco Auto. Operating Co. Inc. v. Hyrad* Corp., 02 C 0728, 2002 WL 1632499 (N.D. Ill. July 23, 2002)("Tenneco is not without an adequate remedy. An arbitrator, under the AAA rules, may grant injunctive relief. The AAA Rule 36 of the Commercial Dispute Resolution Procedures provides in relevant part: '(a) The arbitrator may take whatever interim measures he or she deems necessary, including injunctive relief and measures for the protection or conservation of property and disposition of perishable goods.' The arbitrator is not bound by legal rules, and may grant any appropriate relief. Thus, Tenneco may seek injunctive relief from the arbitrator.)

The issue is not even close. US Foods's requests for equitable, interim relief in this case, in a matter that is clearly subject to mandatory arbitration, are requests that can and should be made to and resolved by an AAA arbitrator. They do not belong here.

Beyond that, if this Court were to decide any issue, even involving injunctive relief, it would be stepping on the arbitrator's toes. For example, if this Court ordered that Noble return any property it would necessary be finding that Noble actually has US Foods property that needs

10

returning.  US Foods would then argue that any injunctive relief given by this Court is binding

on the arbitrator. Again, such matters are for an arbitrator and not for this Court.

## B.  The Court Lacks Diversity Subject Matter Jurisdiction.

There is a second and independent reason why this Court lacks subject matter jurisdiction

of this case.  The underlying basis of the Court's jurisdiction is diversity jurisdiction under 28

U.S.C. §1332(a), which requires that "the matter in controversy exceeds the sum or value of

$75,000, exclusive of interest and costs."

"In actions seeking declaratory or injunctive relief, it is well established that the amount

in controversy is measured by the value of the object of the litigation." *Hunt v. Washington

State Apple Advertising Com'n*, 432 U.S. 333, 347 (1977).  In a suit for injunctive relief such as

this one, the amount in controversy for purposes of diversity jurisdiction is valued from either

the plaintiff's or the defendant's perspective – "what plaintiff stands to gain, or what it would

cost the defendant to meet the plaintiff's demand." *Macken ex rel. Macken v. Jensen*, 333 F.3d

797, 799-800 (7th Cir. 2003).

In a suit to enjoin the retention or use of alleged trade secrets in particular, the value of

the claim is "generally assessed with reference to the right [the plaintiff] seeks to protect and

measured by the extent of the impairment to be prevented by the injunction." *A.F.A. Tours, Inc.

v. Whitchurch*, 937 F.2d 82, 87 (2nd Cir. 1991) (citations omitted).  The Court may look to both

past losses and potential harm.  *Id*.  In doing so, however, the assessed value may not be based

on claims that "are so uncertain that the court cannot reasonably determine whether the amount

of money placed in controversy . . . exceeds [the requisite amount in controversy]." *Morrison v.

11

*Allstate Indem. Co.*, *supra*, 228 F.3d at 1269; *see Dimich v. Med-Pro, Inc.*, 304 F.Supp.2d 517, 519-20 (S.D.N.Y. 2004) (benefits from an injunction must not be "too speculative and immeasurable"); *e.g.*, *Columbia Gas Transmission Corp. v. Meadow Preserve York, LLC*, 2006 WL 1376912, 4 (N.D. Ohio 2006) (plaintiff's vague claim that "[t]he principle relief sought is the protection of [its] interest in the property at issue" was not "sufficiently measurable" to support jurisdiction).

Plaintiff has the burden of providing "to a reasonable probability" that the amount of controversy in this case exceeds $75,000. *Anthony v. Sec. Pac. Fin. Servs., Inc.,* 75 F.3d 311 (7th Cir. 1996) (holding that when a defendant disputes the amount in controversy, Plaintiff must support its assertion with "proof to a reasonable probability") (citing cases).

Plaintiff has failed to meet that burden. It seeks no monetary relief whatsoever from Noble in its Complaint and has made no effort to quantify the value to it or the cost of compliance with the injunctive relief it seeks. *See In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 610 (7th Cir. 1997) (class-action plaintiffs failed to satisfy their burden of proving that the value of the injunction to each of them exceeded $75,000 because they made "[n]o effort to quantify this value or array of values in even the roughest terms"). Plaintiff's complaint states only that the value of the injunction it seeks is "significant." That is both speculative and insufficient as a matter of law to satisfy its burden to prove the value of its claims for jurisdictional purposes. (Id.).

Plaintiff cannot possibly meet that burden because amount in controversy in this case is in fact "zero" due to the mandatory arbitration of all claims and issues in the case. This Court

12

has no jurisdiction to issue any relief of any kind.  Moreover, and even if this Court had such jurisdiction, the value to US Foods of any injunction issued in this case – presumably to prohibit Noble from destroying or using its purported electronic data – cannot be much more than "zero" given that: (a) as demonstrated, Noble has no such data that has not been copied, returned and destroyed in accordance with the parties' Settlement Agreement, and (b) even if Noble had retained such data, UF Foods has not alleged that it has sustained any actual harm.

The value to US Foods of the injunctive relief it seeks in this case, therefore, is "zero," and the cost to Noble of complying with an injunction ordering him to return and refrain from using the data at issue is, likewise, "zero."  "Zero" value means no diversity jurisdiction.

## V.     The Court Should Dismiss or Stay This Case.

This Court should dismiss this case for lack of jurisdiction for either or both of the foregoing reasons.  *See O'Brien v. Duluth, Missabe & Iron Range Ry. Co.*, 1991 WL 233620, 1 -2 (7th Cir. 1994) (affirming District Court's dismissal of claims that were subject to mandatory arbitration); *Central States, Southeast and Southwest Areas Pension Fund v. Howard Martin, Inc.*, 625 F.2d 171, 173 (7th Cir. 1980) (same).

Alternatively, if this Court finds that that it does have jurisdiction, it should stay all further proceedings in this case.  See FAA, 9 U.S.C. §3 (the court "shall on application of one of the parties stay the trial of the action until such arbitration has been had").

## CONCLUSION

US Foods wanted to know what Noble knew, and so it negotiated and signed a Settlement Agreement in order to obtain the right to interview Noble and to obtain all records from his

private investigator. But once it got what it wanted, it is now doing everything it can to refuse to pay Noble the $675,000 it had agreed to pay him. Rather than just paying, as the Settlement Agreement requires, they filed a demand for arbitration seeking money for claims they released, and they filed this lawsuit, seeking to force Noble to pay yet money in fees and costs in order to cost him aggravation and money. This Court should not allow itself to be played as a pawn in US Foods' effort to seek vengeance against an employee who blew the whistle on its CEO.

This Court lacks subject matter jurisdiction because all issues are subject to mandatory arbitration pursuant to the parties' Settlement Agreement and because the $75,000 amount in controversy has not been, and cannot be, met. Noble requests the Court to either dismiss this case for lack of jurisdiction or stay all further proceedings pending the arbitration of all claims.

This Court should also grant Noble full reimbursement of his reasonable attorney fees incurred in having to appear and defend himself in this action. He is entitled to his fees pursuant to the Settlement Agreement. (See Exhibit A hereto at 6, ¶20 – "the arbitrator shall have discretion to award reasonable attorneys' fees, costs, and expenses" to the prevailing party"). The agreement does not state that the *court* may award fees, but by agreeing that the loser must pay and filing this lawsuit, US Foods is nonetheless obligated under that provision. Also, the laws of Delaware apply and authorize courts to award attorney fees "where losing party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Kaung v. Cole Nat. Corp.*, 884 A.2d 500, 506 (Del. 2005). Noble is also entitled to his fees and costs under 28 U.S.C. § 1927 because of US Foods' attempt to circumvent the parties' binding Settlement Agreement is completely unreasonable, and the filing of this lawsuit is vexatious. Noble is also entitled to an

14

award of attorney fees and costs under Fed. R. Civ. P. 11 because Plaintiff needlessly increased the cost of litigation by filing this harassing and frivolous lawsuit.  Noble is also entitled to an award of costs as the prevailing party under Fed. R. Civ. P. 54.

June 13, 2013

Respectfully submitted,

/s/ Kraig J. Marton
Kraig J. Marton
Jeffrey A. Silence
**JABURG & WILK, P.C.**
3200 N. Central Avenue, Suite 2000
Phoenix, AZ  85012
602-248-1000
kjm@jaburgwilk.com
dnf@jaburgwilk.com
jxs@jaburgwilk.com

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that on June 13, 2013, he caused a true and correct copy of this Motion to be served by electronic mail and US Mail on June 14, 2013 on the following:

Patricia Brown Holmes
Linda K. Stevens
SCHIFF HARDIN LLP
233 South Wacker Drive, Suite 6600
Chicago, IL 60606
pholmes@schiffhardin.com

Connie N. Bertram
Daniel J. Davis
PROSKAUER ROSE LLP
1001 Pennsylvania Ave., N.W. Suite 400S
Washington, D.C. 20004
cbertram@proskauer.com
ddavis@proskauer.com

15

Philip J. Nathanson
The Nathanson Law Firm
8326 E. Hartford Dr., Suite 101
Scottsdale, AZ 85255

The Nathanson Law Firm
120 N. LaSalle St. #1040
Chicago, IL 60602
philipj@nathansonlawfirm.com

/s Kimberly Rogers

16

**<u>EXHIBIT A</u>**



February 4, 2013

Michael J. Noble
4717 E Quartz Mountain Road
Paradise Valley, AZ 85253-3202

<u>CONFIDENTIAL SEPARATION AGREEMENT AND RELEASE</u>

Dear Mr. Noble:

  This letter (hereinafter, the "Separation Agreement") confirms the terms related to the termination of your employment with US Foods, Inc. ("US Foods" or the "Company").

1. <u>Termination.</u> Your employment with the Company terminated effective December 11, 2012 (your "Termination Date"). Since your Termination Date, a dispute has arisen concerning the Company's obligation to repurchase stock and options in the Company held by you on your Termination Date and to pay severance and a bonus to you. Without admitting any liability or fault, the Company and you have agreed to the following terms to resolve these and all other disputes and claims between you and the Company.

2. <u>Settlement Payment.</u> In consideration of the promises and other good and valuable consideration set forth herein, if you sign and do not revoke this Separation Agreement, the Company agrees to pay you $175,000 (the "Settlement Payment").

  a. The parties agree that $100,000 of the payment represents the appreciation on the value of the 100,000 shares of Company stock purchased by you in 2007 and $75,000 of the payment is for the repurchase of that number of shares of vested stock options held by you as of the Termination Date determined by the Company to have a value of $75,000. All remaining vested stock options held by you as of the Termination Date shall expire and have no value.

  b. The Company agrees to repurchase your stock for a total of $600,000. $500,000 of that amount represents in the amount you initially paid for the stock. The $100,000 payment referenced above represents the appreciation in the value of the stock since you purchased it.

    c. The Settlement Payment and stock purchase monies, totaling $675,000, will be mailed to your counsel within ten (10) days of the Effective Date of this Agreement.

3. <u>No Additional Benefits.</u> Your right to continue qualifying coverage at your own cost pursuant to COBRA (the Consolidated Omnibus Budget Reconciliation Act of 1986, as amended) shall be governed by applicable law and the terms of the Company's plans and programs as has or will be explained to you in separate correspondence. You agree that you are not and will not be entitled to any severance benefits under the Company's Severance Plans. You further agree that you are not entitled to any additional compensation under the Management Stockholder's Agreement, Sale Participation Agreement, or Stock Option Agreement that you signed on November 16, 2007 and that the Settlement Payment satisfies any and all of US Foods' obligations to pay you for stocks and options issued to you pursuant to those agreements or any other agreement. You further agree that any remaining stocks and options you previously held or owned have expired. You acknowledge that it is the Company's position that the Settlement Payment is a payment to which you are not otherwise entitled. You acknowledge that, except as expressly provided in this Separation Agreement, you will not receive any additional compensation or benefits, including salary, stock or equity rights or payments, bonus, or severance benefits from the Company.

4. <u>Claims Released.</u> It is also understood that, in exchange for your Separation Payment and other benefits set forth herein, you **release and waive** all claims, causes of action or the like, known or unknown, to the extent permitted by law, that you, your heirs, executors, administrators, and assigns have, had or may have in the future against the Company, and/or any of their respective owners, parents, predecessors, successors, affiliates, and/or subsidiaries, employee benefit plans, employee benefit plan administrators and/or fiduciaries, including each of their current or past directors, officers, agents and employees, and/or anyone else connected with any of the foregoing (collectively, "Released Parties"), with respect to all matters of your employment and separation from employment with the Company, including but not limited to, all allegations, claims, and violations related to severance, any reductions-in-force, notice of termination, the payment of your salary and benefits and all claims arising under the following, in each case as amended: the Age Discrimination in Employment Act of 1967, as amended by the Older Workers Benefit Protection Act of 1990; Title VII of the Civil Rights Act of 1964; the Civil Rights Act of 1991; the Equal Pay Act of 1963; the Americans with Disabilities Act of 1990; the Family and Medical Leave Act of 1993; the Civil Rights Act of 1866; the Worker Adjustment and Retraining Notification Act; the Employee Retirement Income Security Act of 1974; any applicable Executive Order Programs; the Fair Labor Standards Act; section 806 of the Sarbanes-Oxley Act of 2002; the False Claims Act and all of the state or local counterparts, or any other federal, state or local statute, constitution or ordinance; or under any public policy, contract or tort, or under any common law, including without limitation for wrongful discharge; or arising under any practices or procedures of the Company; or any claim for breach of contract, infliction of emotional distress, defamation, or any claim for costs, fees or other expenses, including attorneys' fees and expenses, incurred in these matters.

5. <u>Pursuit of Released Claims and Scope of Release.</u>  You agree and covenant not to file any suit, action, arbitration, or complaint against the Released Parties, and not to assist in any such action in any court, administrative or private proceeding with regard to any claim, demand, liability or obligation arising out of any alleged act or omission of US Foods, your employment with US Foods or your separation therefrom.  You further represent that no claims, complaints, charges, arbitrations, or other proceedings are pending in any court, administrative agency or department, commission or other forum relating directly or indirectly to the conduct of US Foods or your employment with US Foods.

6. <u>Unreleased Claims.</u>  You understand that this Agreement is a full and final release applying to all known and unknown or unanticipated injuries or damages of any kind arising from those matters released herein.  You expressly and knowingly waive all rights you may have under any law that is intended to protect you from waiving unknown claims.  You understand that this release and waiver does not waive or release your right to unemployment benefits or worker's compensation in accordance with applicable law, claims that arise based on acts or occurrences after the Effective Date, your right to enforce this Separation Agreement, vested retirement savings benefits, and your right to file a charge with the Equal Employment Opportunity Commission ("EEOC").  You are, however, waiving your right to recover money in connection with any such EEOC charge.  You are also waiving your right to recover money in connection with a charge filed by any other individual or by the EEOC or other federal or state agency.

7. <u>Release of Claims Against Employee.</u>  The Company releases you, as well as your heirs, executors, administrators, and assigns, from any and all claims, debts, rights, demands, judgments, obligations, causes of action, liabilities, costs and expenses, known or unknown, in law or in equity, arising out of or related to your employment with the Company.  Notwithstanding anything to the contrary in the subsection above, the Company's release of Employee does not apply to nor prohibit any claims by the Company unknown to the General Counsel of the Company as of the Effective Date of this Agreement.  The Parties' releases also do not prohibit claims by any Party to enforce the terms of this Agreement.

8. <u>Confidentiality.</u>  You agree that, except as hereinafter provided, you will keep the negotiations leading to and the terms, conditions and existence of this Separation Agreement in strict confidence and shall not disclose them to anyone except: (a) to your attorney and bona fide tax and financial advisors (only if they agree in writing to be bound by and to comply with the provisions of this Agreement); (b) your spouse (only if she agrees in writing to be bound by and to comply with the provisions of this paragraph); or (c) pursuant to compulsory legal process or a court order.  If there is any proceeding to enforce the terms of this Agreement, this Agreement shall be filed under seal, pursuant to the rules and provisions of the court in which the proceeding is filed.  If you receive a subpoena or other request to produce this Agreement, or to provide or produce testimony or documents subject to this Paragraph, you will immediately notify in writing the General Counsel of US Foods.

9. <u>Return of Company Property.</u>  You certify that you have returned to the Company all property, documents and data of the Company or relating to your work for the Company

("Company Data") in your possession, custody or control, including without limitation, all keys and access cards, badges, credit and telephone cards, telephones, pagers, all computers and computer related equipment (i.e. hardware, software, diskettes, electronic storage devices, etc), all passwords, access codes and other information necessary to access any computer, communications device or electronic database, and all books, files, documents and electronic data and media. Electronic data should be returned in native format, with all associated metadata intact. You agree, upon the Company's request, to permit a third-party IT technician retained by the Company to inspect all of your personal computers and electronic communications and storage devices to identify and recover any additional Company Data and to undertake the permanent deletion of any Company Data. Said technician will not transmit or disclose to the Company any data on your personal computers and devices that is not Company Data.

10. <u>Other Agreements.</u> You agree that you remain bound by all post-employment restrictions in your previous agreements with US Foods as found in:

- Sections 17 and 22 of the Management Stockholder's Agreement signed by you on November 16, 2007; and

- The provisions of the Non-Solicitation and Non-Disclosure Agreement signed by you on November 16, 2007 that are incorporated by reference into Section 22 of the Management Stockholder's Agreement.

11. <u>Non-Disparagement.</u> You agree not to make any disparaging remarks now, or at any time in the future, about the Released Parties. You further agree that you will not, directly or indirectly, follow, investigate, photograph, videotape, or stalk (in person or through electronic or other means) any of the Releasees. US Foods will instruct John Lederer, Juliette Pryor, Stuart Schuette, David Esler, Al Swanson and Michael Ranchino not to make any statements that disparage or defame you. If US Foods is contacted by your prospective employers, it will provide neutral reference information consistent with Company policy. Nothing in this Agreement shall prohibit you or the Company from providing accurate information to any court or governmental entity; or to any person or organization in response to legal process or otherwise as required by law. You agree that if you violate this provision you forfeit the Settlement Payment given to you as part of this Separation Agreement.

12. <u>Cooperation.</u> You agree to cooperate and assist the Company and the Released Parties in any court, agency, arbitration or other legal matters about which you have knowledge relevant to the matter. You acknowledge and agree that such assistance may include, but will not be limited to, providing complete and truthful background information regarding any matter on which you previously worked, aiding in the drafting of declarations and similar documents, executing declarations and similar documents, testifying or otherwise appearing at investigation interviews, depositions, arbitrations or court hearings and preparation for the above-described or similar activities as requested by the Company or required by legal process. The Company will use its best efforts to ensure that any assistance requested will be arranged so that it does not unreasonably interfere with your other employment or family commitments. The Company will reimburse you for the

reasonable expenses that you incur in complying with this cooperation obligation, as long as they are approved in writing in advance by the General Counsel. Nothing in this Paragraph is intended to cause you to make a false statement or testify untruthfully in any legal proceeding, and you agree not to do so.

13. <u>Disgorgement</u>. You agree and understand that if you materially breach Paragraphs 8, 9, 10, 11 or 12, the Company may recover from you the Settlement Payment as liquidated damages, as well as its reasonable attorneys' fees and costs and any other damages or remedies allowed by law.

14. <u>Quest Consultants.</u> You will authorize and direct Quest Consultants International, Ltd. ("Quest") to provide all information related to the project for which you hired Quest including, but not limited to, all communications with you, all surveillance reports, all video and audio recordings, all pictures, and all supporting documentation and work product and all US Foods documents and data. US Foods agrees to reimburse Quest for the reasonable copying costs that it incurs in producing the information required by this Paragraph. This Agreement will not be effective until Quest complies with your directive and produces all documents and data subject to this Paragraph.

15. <u>Interview.</u> You agree that you will be interviewed by US Foods and/or its designated counsel in Chicago, Illinois, but not in Rosemont. US Foods will pay for your reasonable food, travel, and lodging expenses for traveling to and attending the interview. The interview will cover the following topics: the anonymous letters to US Foods postmarked September 20, 2012 and November 9, 2012; your participation in the preparation and sending of those letters; the allegations contained in the letters; the surveillance referenced in that letter and otherwise performed by Quest or by or at the request of you or any other current or former employee of US Foods; the retention and payment of Quest; the topics addressed in the December 12, 2012 letter from Juliette Pryor to you and the December 18, 2012 letter from your counsel, Kraig J. Marton, to Juliette Pryor of US Foods; and any allegations by you regarding US Foods' pricing on its contracts with or purchases by the federal government, including whether US Foods instructs its vendors to increase the amount of their invoices to amounts greater than actual true prices paid to the vendor, whether such invoices are then submitted to the US government or other governmental entities, and any and all subjects related to the above topics. The interview may be recorded and/or transcribed at the Company's discretion. Your counsel may be present at the interview. You understand that you have an obligation to provide truthful, complete, responsive and accurate statements in response to counsel's questions. You will also provide information to either support or rescind your implied allegations related to US Foods' pricing practices under its government contracts. The Settlement Payment will not be made until you have complied with this Paragraph by appearing for the interview and by completely and truthfully answering questions about the above topics for such time as required by the person conducting the interview, but not more than eight (8) hours. US Foods will have the option of requiring you to sign a sworn statement summarizing all or a portion of your statements during the interview.

16. <u>Entire Agreement.</u> This Separation Agreement contains the entire understanding between you and the Company regarding the subject matters set forth herein, and supersedes any and all other prior agreements, understandings, discussions, and negotiations whether written or oral between you and the Company, except the Other Agreements referenced in Paragraph 10. This Separation Agreement cannot be changed except in a writing signed by you and an authorized representative of the Company. You acknowledge that neither the Company nor any representative of the Company has made any representation or promise to you other than as set forth herein.

17. <u>Construction.</u> Each party and its counsel have reviewed this Separation Agreement and have been provided the opportunity to review this Separation Agreement and accordingly, the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Separation Agreement. Instead, the language of all parts of this Separation Agreement shall be construed as a whole, and according to their fair meaning, and not strictly for or against either party.

18. <u>Severability.</u> If any provision in this Separation Agreement is found to be unenforceable, all other provisions will remain fully enforceable. The covenants set forth in this Separation Agreement shall be considered and construed as separate and independent covenants. Should any part or provision of any provision of this Separation Agreement be held invalid, void or unenforceable in any court of competent jurisdiction, such invalidity, voidness or unenforceability shall not render invalid, void or unenforceable any other part or provision of this Separation Agreement.

19. <u>Interpretation.</u> This Agreement shall be construed as a whole according to its fair meaning. It shall not be construed strictly for or against you or the Company. Unless the context indicates otherwise, the singular or plural number shall be deemed to include the other. Captions are intended solely for convenience of reference and shall not be used in the interpretation of this Agreement.

20. <u>Choice of Law/Dispute Resolution.</u> The terms of this Agreement shall be interpreted under the laws of the State of Delaware. The parties shall use good faith efforts to resolve any controversy or claim arising out of, or relating to this Agreement or the breach thereof. If, despite their good faith efforts, the parties are unable to resolve such controversy or claim, then such controversy or claim shall be resolved by arbitration in Chicago, Illinois, with one (1) arbitrator, in accordance with the National Rules for Resolution of Employment Disputes of the American Arbitration Association, and judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. The arbitrator shall have the discretion to award reasonable attorneys' fees, costs and expenses, including fees and costs of the arbitrator and the arbitration, to the prevailing party.

21. <u>Non-Admission of Liability.</u> This Separation Agreement does not constitute an admission of any liability or wrongdoing on the part of any party, and each party expressly denies same.

22. <u>Consideration Period.</u> You know and understand the contents of this Separation Agreement and its binding effect, and you are hereby advised to consult with an attorney prior to signing this Agreement. You voluntarily and knowingly agree to the terms of this Separation Agreement, You acknowledge that you have been advised that you have twenty-one (21) days to consider this Separation Agreement. In the event that you execute this Separation Agreement prior to the expiration of the 21-day period, you hereby waive the balance of said period. If you do not sign this Separation Agreement within the 21-day period, you understand that it will become null and void.

23. <u>Revocation Period.</u> You will have seven (7) days following the date on which you execute this Separation Agreement to revoke this Separation Agreement, and this Separation Agreement shall not become effective or enforceable until such revocation period has expired. Any revocation within this period shall be submitted in writing and personally delivered or mailed to Juliette Pryor, Executive Vice President, General Counsel and Chief Compliance Officer, US Foods, 9399 West Higgins Road, Rosemont, Illinois 60018, and post-marked, where applicable, within seven (7) days of the date following execution of this Separation Agreement. No Separation Payment or other benefits will be paid or provided until after such seven (7) day revocation period has expired and this Separation Agreement has become effective. If this Separation Agreement is revoked by you then you shall forfeit all of your Separation Payment and/or other benefits, and the Company shall not be required to provide you with any such payments, benefits or other consideration.

24. <u>Counterparts.</u> This Separation Agreement may be executed in counterparts, and each counterpart, when executed, shall have the efficacy of a signed original. Photographic and facsimiled copies of such signed counterparts may be used in lieu of the originals for any purpose.

25. <u>Effective Date.</u> The Effective Date of this Agreement shall be the latest of the date that is fully executed by the Parties, the expiration of the seven-day revocation period set forth in Paragraph 23, the certification of the return of all Company property in Paragraph 9, complete production of the records and data by Quest as described in Paragraph 14, and the completion of the interview required by Paragraph 15.


PLEASE READ THIS AGREEMENT CAREFULLY. EXCEPT AS OTHERWISE PROVIDED HEREIN, IT CONTAINS A **RELEASE** OF ALL KNOWN AND UNKNOWN CLAIMS.

YOU AGREE THAT YOU RECEIVED VALUABLE CONSIDERATION IN EXCHANGE FOR ENTERING INTO THIS AGREEMENT AND THAT THE COMPANY HEREBY ADVISES YOU TO CONSULT AN ATTORNEY PRIOR TO SIGNING THIS AGREEMENT. YOU HAVE BEEN PROVIDED 21 DAYS WITHIN WHICH TO CONSIDER WHETHER YOU SHOULD SIGN THIS AGREEMENT AND WAIVE AND RELEASE ALL CLAIMS AND RIGHTS INCLUDING BUT NOT LIMITED TO THOSE ARISING UNDER THE FEDERAL AGE DISCRIMINATION IN EMPLOYMENT ACT. YOU SHALL HAVE SEVEN (7) DAYS WITHIN WHICH TO REVOKE THIS AGREEMENT AND THIS

AGREEMENT SHALL NOT BECOME EFFECTIVE OR ENFORCEABLE UNTIL THAT
REVOCATION PERIOD HAS EXPIRED.

YOU PROMISE THAT NO REPRESENTATIONS OR INDUCEMENTS HAVE BEEN
MADE TO YOU EXCEPT AS SET FORTH HEREIN, AND THAT YOU HAVE SIGNED
THE SAME KNOWINGLY AND VOLUNTARILY.


      If the terms of this Separation Agreement are acceptable to you, please sign and date this
Separation Agreement and return it to the undersigned.

US FOODS, INC.

By: _____
    Name
    Juliette Pryor

Date: _05 February 2013_

Agreed and accepted on this

_____ day of _____, 2013

Signature: _____
        Michael J. Noble

AGREEMENT SHALL NOT BECOME EFFECTIVE OR ENFORCEABLE UNTIL THAT REVOCATION PERIOD HAS EXPIRED.

YOU PROMISE THAT NO REPRESENTATIONS OR INDUCEMENTS HAVE BEEN MADE TO YOU EXCEPT AS SET FORTH HEREIN, AND THAT YOU HAVE SIGNED THE SAME KNOWINGLY AND VOLUNTARILY.

      If the terms of this Separation Agreement are acceptable to you, please sign and date this Separation Agreement and return it to the undersigned.

US FOODS, INC.

By: _____
      Name
      Juliette Pryor

Date:_____

Agreed and accepted on this

_5th_ day of _February_, 2013

Signature: _Michael J. Noble_
      Michael J. Noble

# **EXHIBIT B**



3200 N. Central Avenue, 20th Floor, Phoenix, AZ 85012

jaburgwilk.com

**Kraig J. Marton**

kjm@jaburgwilk.com
**602.248.1017 - Direct Phone**
**602.248.0522 - Main Fax**

June 5, 2013

Via Email - KristyAllison@adr.org

Kristy Allison
Manager of ADR Services
AMERICAN ARBITRATION ASSOCIATION
950 Waren Avenue
East Providence, RI  02914

David L. Allen
Shawdy Banihashemi
Mark D. Bogard
Neal H. Bookspan
Mervyn T. Braude
Kelly Brown
Roger L. Cohen
Beth S. Cohn
Jennifer R. Erickson
David N. Farren
Lauren L. Garner
Renee Gerstman
Laurence B. Hirsch
Amy M. Horwitz
Ronald M. Horwitz
Gary J. Jaburg
Janessa E. Koenig
Michelle M. Lauer
Michelle C. Lombino
Valerie L. Marciano
Kraig J. Marton
Nate D. Meyer
Mitchell Reichman
Laura A. Rogal
Kathi M. Sandweiss
Jeffrey A. Silence
Maria Crimi Speth
Bridget O'Brien Swartz
Susan E. Wells
Lawrence E. Wilk
Nichole H. Wilk


Adam S. Kunz
*Of Counsel*

Re:     13 166 01022 13
        US Foods, Inc. and Michael Noble and Phillip Roszak

**RESPONDENT MICHAEL NOBLE'S:**
**(1) RESPONSE TO DEMAND FOR ARBITRATION,**
**(2) ANSWER TO CLAIMS SUBMITTED FOR ARBITRATION,**
**(3) EXPLANATION OF VENUE, AND**
**(4) CROSS-DEMAND FOR ARBITRATION**

Dear  Ms. Allison:

This firm represents Respondent Michael Noble ("Noble").  By this letter we (1) respond to the Demand for Arbitration filed by US Foods, Inc. ("US Foods"), (2) answer the claims submitted for arbitration by US Foods; (3) Explain why venue of any arbitration must be in Chicago and not New York; and (4) make a cross-demand for arbitration.

Noble agrees that this matter is subject to a mandatory arbitration agreement. The applicable arbitration agreement, however, is *not* the purported November 16, 2007, agreement that US Foods asserts in its demand – attaching an *un*signed copy of the alleged agreement – but is a fully executed *post*-employment Confidential Separation Agreement and Release signed and dated February 5, 2013 (the "Settlement Agreement").   That Settlement Agreement requires a cash payment to Noble of $675,000 – he giving up $175,000 in equity in order to settle the matter – and releases any and all claims US Foods has or may have against Noble, including the claims made by US Foods in its Demand for Arbitration.  A true and correct copy of the Settlement Agreement is attached as **Exhibit A** to this Response.[1]

---

[1]  You should note that, although the Settlement Agreement is confidential (see Ex. A ¶8), US Foods has violated that confidentiality by filing it in connection with a concurrent federal court lawsuit pending in the Northern District of Illinois, titled *US Foods, Inc. v. Michael J. Noble, et al*., Civil Action No. 1:13-cv-03640 (the "Concurrent Lawsuit").  Noble need not submit the Agreement to this tribunal under seal because US Foods has already made it a public record in breach of the parties' agreement.

JABURG WILK
Attorneys at Law

Kristy Allison
June 5, 2013
Page 2

Noble objects to and opposes US Foods's Demand for Arbitration as contrary to the terms of the parties' Settlement Agreement in the following respects:

1. Litigation or arbitration of any and all claims US Foods has submitted to this tribunal is foreclosed by the parties' Settlement Agreement, which includes a full release by US Foods of any and all such claims arising out or related to Noble's former employment with the company (Ex. A ¶7);

2. Any arbitration of matters arising out or related to the parties' Settlement Agreement must occur in Chicago, Illinois (Ex. A ¶20), *not* New York City, as US Food's Demand for Arbitration requests;

3. The scope of any such arbitration – including whether and to what extent the claims made by US Foods in this matter are foreclosed by the parties' Settlement Agreement – should be determined by the Chicago, Illinois, arbitrator assigned to this matter; and

4. Noble makes a Cross-Demand for Arbitration pursuant to the parties' applicable Settlement Agreement, seeking to enforce the agreement and immediate payment of the $675,000 US Foods agreed to pay him pursuant to the agreement, together with interest, costs, fees and expenses.

### ALL CLAIMS MADE BY US FOODS IN ITS DEMAND FOR ARBITRATION ARE FORECLOSED BY THE PARTIES' SETTLEMENT AGREEMENT.

US Foods's Demand for Arbitration is an attempted end-run around the parties' February 5, 2013, Settlement Agreement by trying to arbitrate the very claims against Noble it has expressly agreed to release. The Settlement Agreement clearly states:

The Company releases you [Noble], as well as your heirs, executors, administrators, and assigns, from any and all claims, debts, rights, demands, judgments, obligations, causes of action, liabilities, costs and expenses, known or unknown, in law or in equity, arising out of or related to your employment with the Company. . . . [Inapplicable exceptions omitted.]

(Ex. A at 3, ¶7). US Foods's arbitration demand ignores that and instead relies on a purported, unexecuted November 16, 2007, "Management Stockholder's Agreement" that Noble allegedly signed (the "Shareholder Agreement").

The Shareholder Agreement, if there was one, however, has limited applicability because it only applies, if at all, to disputes related to the $500,000 Noble paid for US Foods stock. It provides in Section 17 that: "In the event of any controversy among the parties hereto arising out of, or relating to, *this Agreement* which cannot be settled amicably by the parties, such controversy shall be finally, exclusively and conclusively settled by mandatory arbitration conducted expeditiously in accordance with the American Arbitration Association rules by a single independent arbitrator." (Emphasis ours). The Shareholder Agreement reflects its scope in the Whereas Clause, where it is made clear that it deals solely with the purchase of stock and issues related to that stock. US Foods, however, wants to use this

Kristy Allison
June 5, 2013
Page 3

provision to arbitrate unrelated employment claims, such as alleged "Violation of the CFAA" (Count 1), alleged breaches of fiduciary duty and duty of loyalty (Count 2), and a "civil conspiracy" (Count 5), none of which has anything remotely to do with the shares of stock Noble had purchased.

Regardless, once US Foods and Noble entered into the Settlement Agreement in 2013, that agreement superseded any such earlier agreement.

**A.   The Settlement Agreement is a Fully Executed, Valid and Binding Agreement.**

US Foods terminated Noble for exposing an affair that it candidly admits its CEO, John Lederer ("Lederer") was having with the owner of a US Foods vendor that supplied event planning services to the company.  (See Demand for Arbitration at 7-8, ¶23).  Lederer was caught "red-handed" and has finally confessed to the transgression.  (Id.).  Despite US Foods's negotiation of a full settlement and release of all claims concerning the matter, however, he is apparently out to get his revenge by ignoring the Settlement Agreement and staging a sneak attack in both the Illinois District Court and this tribunal.

US Foods dramatically calls Noble's discovery and threatened disclosure of Lederer's clandestine affair with the owner of a US Foods vendor an illegal "conspiracy and a scheme to threaten and embarrass" Lederer and the economic viability of the company by "abusing, misusing and destroying" company property" and by breaching his fiduciary duties to the company. (See, e.g., Demand for Arbitration at 3-4, ¶¶ 8-9).  To the contrary, as US Foods well knows, Noble is the classic "whistle-blower" who suspected and reported potentially illegal or inappropriate misconduct – here, a CEO who is sleeping with the owner of a vendor who is able to sell services to the company at higher-than-market prices because of the relationship – and is promptly terminated for doing so.  "Blowing the whistle" on such shenanigans is not a crime or breach of duty, but is valued, protected and encouraged by the law. *See Smith v. Delaware State University*, 47 A.3d 472, 476 (Del.Supr. 2012) (Delaware Whistleblower Act "serves a valuable function by protecting employees who report violations of law for the benefit of the public" and, "[b]y protecting these employees, the statute encourages such reporting and promotes public health and safety"); *see also Murcott v. Best Western Intern., Inc.*, 198 Ariz. 349, 357, ¶¶ 39-42, 9 P.3d 1088, 1096 (App. 2000). [2]

Noble protested his termination on this basis and demanded re-payment of his stock purchases and damages.  The parties, through their counsel, negotiated and resolved the dispute on January 11, 2013, when Noble accepted the terms of US Foods' settlement offer.  A true and correct copy of the letter confirming this sent by Noble's counsel, Kraig J. Marton, to US Foods's counsel, Juliette Prior, dated January 11, 2013, is attached as **Exhibit B** to this Response.  Counsel exchanged drafts of the Settlement Agreement and, when all was acceptable to both parties, Noble and US Foods exchanged signature pages on February 5, 2013.  True and correct copies of the confirming emails exchanged between counsel on that date are attached as **Exhibit C** to this Response.

---

[2]   Delaware law is cited because the parties' Settlement Agreement provides that it applies to interpret its provisions.  (Ex. A at 6, ¶20).  Arizona law is also cited here as well because it may also apply in the state where the whistle-blowing at issue occurred.

JABURG WILK
Attorneys at Law

Case: 1:13-cv-03640 Document #: 28 Filed: 06/13/13 Page 31 of 104 PageID #:572

Kristy Allison
June 5, 2013
Page 4

In the Settlement Agreement, Noble agreed to do three things before he would be entitled to the agreed on $675,000 ($500,000 of which is simply the return of his own money): (1) He agreed that the private investigator he had hired, Quest Consultants ("Quest") give its file to US Foods (Ex. A at 5, ¶14); (2) He agreed to return any company property in his possession or control to US Foods (Id. at 3-4, ¶9); and (3) He agreed to be interviewed by US Foods's counsel about the matters leading up to his termination (Id. at 15, ¶15). He did all of those things, including flying to Chicago to be interviewed by US Foods's counsel. A true and correct copy of Mr. Marton's email confirming this sent to Ms. Prior on March 6, 2013, is attached as **Exhibit D** to this Response.

US Foods, however, then balked at Noble's request for payment. It claimed that, among other things, he had not returned all of the company emails in his possession or control because, as he testified during his interview, he had wisely deleted those emails from his computer after they had been located, downloaded and saved on the "thumb drive" storage device he gave to US Foods. The emails obviously had been returned, as promised, and had not been "lost" or "destroyed" by deleting them from Noble's computer after downloading and saving them on the storage devise given to US Foods. A true and correct copy of Mr. Marton's email explaining this and denying other allegations made by US Foods with regard to Quest's document production sent to Ms. Prior on March 13, 2013, is attached as **Exhibit E** to this Response. US Foods clearly was looking for some excuse, regardless of merit, to breach the parties' Settlement Agreement.

Subsequent efforts to satisfy US Foods and secure its compliance with the parties' Settlement Agreement were stalled by the company's legal counsel. True and correct copies of Mr. Marton's letters confirming these efforts sent to the company's legal counsel are dated March 26, 2013, attached as **Exhibit F**, April 10, 2013, attached as **Exhibit G**, April 16, 2013, attached as **Exhibit H**, May 2, 2013, attached as **Exhibit I**, and May 10, 2013, attached as **Exhibit J** to this Response.

Suddenly, without forewarning, Noble's received a certified delivery of US Foods's Northern District of Illinois lawsuit and the Demand for Arbitration in this tribunal. Both proceedings ignore the parties' Settlement Agreement, as if it didn't exist. It does exist. It is fully executed and is attached as **Exhibit A** to this Response.

**B. US Food's Unfounded Complaints Do Not Undo the Settlement Agreement.**

US Foods in its Demand for Arbitration acknowledges the Settlement Agreement, but casually tosses it aside in a single, unexplained allegation that "[t]he separation and release agreement never became effective because Respondent Noble failed to comply with his obligations under agreement." (Demand for Arbitration at 13, ¶45). As demonstrated above, however, Noble has fully performed all three of the obligations required of him by the Settlement Agreement. And even if he had not done that, the Settlement Agreement is a valid, binding and enforceable contract.

Noble's obligations to have Quest give its file to US Foods, to return company property in his possession or control and to be interviewed by US Foods's counsel are not stated to be conditions precedent to the validity and enforceability of the Settlement Agreement. (See Ex. A at 5, ¶14, 3-4, ¶9, and 15, ¶15). A contract term must be clearly stated as such before a court will construe the term as a condition precedent. *See Realty Associates of Sedona v. Valley Nat. Bank of Arizona*, 153 Ariz. 514,

JABURG·WILK
Attorneys at Law

Kristy Allison
June 5, 2013
Page 5

519, 738 P.2d 1121, 1126 (App. 1986) (noting that "[c]onditions precedent are not favored and the courts are not inclined to construe a contractual provision as a condition precedent unless such construction is plainly and unambiguously required by the language of the contract"); *Commonwealth Const. Co. v. Cornerstone Fellowship Baptist Church, Inc.*, 2006 WL 2567916, 21 (Del.Super. 2006) (explaining that "a condition precedent is not a favorable result when interpreting a contract," but that, "where the contract language is clear and unambiguous, the Court must give that language its plain meaning"); *see also PAMI-LEMB I Inc. v. EMB-NHC, L.L.C.*, 857 A.2d 998, 1014 (Del.Ch. 2004), *citing Pacific Coast Eng'g Co. v. Merritt-Chapman & Scott Corp.*, 411 F.2d 889, 895-96 (9th Cir. 1969) (repudiation of a contract occurs when a party is "not asserting a good faith interpretation of the contract terms" and yet has "persistently demanded an unwarranted condition precedent to its required performance").

Thus, regardless of whether US Foods is right or, we believe, provably wrong, its complaints that Noble has not completed the tasks assigned to him by the Settlement Agreement do not prevent the agreement from being a valid and enforceable contract. US Foods does not have a "no contract" claim. At best, even if it is absolutely right about everything it claims Noble has not done, it has a breach of contract claim that must be arbitrated in accordance with the agreement.

## C. The Shareholder Agreement Does Not Apply.

US Foods's Demand for Arbitration relies on and alleges breaches of the Shareholder Agreement. That agreement, however, ended when he was terminated, as expressly stated in the parties' Settlement Agreement. (See Ex. A at 1, ¶1 – "Your employment with the Company terminated effective December 1, 2012 . . . ."). As also expressly stated in the parties' Settlement Agreement, all benefits that Noble was entitled to receive pursuant to the Shareholder Agreement were terminated at that time. (See id. at 2, ¶3 – "You acknowledge that, except as expressly provided in this Separation Agreement, you will not receive any additional compensation or benefits, including salary, stock or equity rights or payments, bonus, or severance benefits from the Company."). The only post-termination benefits that US Foods was entitled to receive under the Shareholder Agreement – essentially post-employment restrictive covenants – were either modified or incorporated by specific reference. (See, e.g., id. at 4, ¶10 – "You agree that you remain bound by . . . [listing specific covenants in prior agreements]"). If there be any doubt, all such prior agreements were expressly disclaimed and superseded. (See id. at 6, ¶10 – "This Separation Agreement . . . supersedes any and all prior agreements . . . ."). And, of course, all claims and issues pertaining to the parties' prior employment relationship were subject to the full release and waiver included in the Settlement Agreement. (See id. at 2, 4, ¶4, and 3, 4, ¶7).

The Shareholder Agreement is dead and buried. It has no relevance to the matters alleged by US Foods in its Demand for Arbitration and should not be considered in determining the venue or scope of arbitration or the matters presented for arbitration. The parties' Settlement Agreement has, by its terms, replaced and superseded that agreement and is the *only* relevant document to determine those issues. *See, e.g.*, *Blades v. Wisehart*, 2010 WL 4638603, 6 (Del.Ch. 2010) (rejecting a liability argument that, the Court found, "flew in the face of the plain language of the March 2008 Agreement that plainly superseded the December 2007 Agreement").

JABURG WILK
Attorneys at Law

Kristy Allison
June 5, 2013
Page 6

## ANY ARBITRATION OF US FOODS'S CLAIMS MUST OCCUR IN CHICAGO, ILLINOIS, NOT NEW YORK CITY.

US Foods demands arbitration of its claims against Noble in New York City in accordance with the Shareholder Agreement. (Demand for Arbitration at 4-5, ¶¶ 11-12). The Shareholder Agreement, however, is dead and buried and irrelevant.

The parties' Settlement Agreement, however, the *only* relevant document to determine those issues, also contains a mandatory arbitration provision which provides that any "controversy or claim arising out of or relating to this Agreement or the breach therefor" shall be arbitrated in Chicago, Illinois. (Ex. A at 6, ¶20). US Foods's claims against Noble in its Demand for Arbitration are such a controversy or claim arising out of or relating to the Settlement Agreement. Chicago, Illinois, then is where any arbitration of those claims should occur.

## THE SCOPE OF ANY SUCH ARBITRATION – INCLUDING WHETHER AND TO WHAT EXTENT US FOODS' CLAIMS ARE FORECLOSED BY THE PARTIES' SETTLEMENT AGREEMENT – SHOULD BE DETERMINED BY THE CHICAGO, ILLINOIS, ARBITRATOR ASSIGNED TO THIS MATTER.

The scope of any arbitration between the parties is a matter that should be determined, in the first instance, by the arbitrator pursuant to both the Federal Arbitration Act (FAA) and AAA rules. *See* AAA Rule 6(a)("The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement"); *Moses H. Cone Memorial Hosp. v. Mercury Const.*, 460 U.S. 1, 25, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983) ("[the FAA] establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration"); *Medtronic AVE Inc. v. Cordis Corp.*, 2004 WL 1557328, 3 (3rd Cir. 2004) (noting the "long line of cases that hold that arbitrability is ultimately a question for the arbitrator to resolve); *see also New Castle County v. U.S. Fire Ins. Co.*, 728 F.Supp. 318, 321 (D.Del. 1989) (noting the Supreme Court in *Moses* requires that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration"). If there were any doubt, the recent of case *Nitro-Lift v Howard*, __ U.S. __. 133 S.Ct. 500, 504 (2012) should resolve that doubt as the Supreme Court clearly, once again stated that the arbitrator decides such matters ("it is for the arbitrator to decide in the first instance whether the covenants not to compete are valid").

Thus, for all of the foregoing reasons, all the scope of arbitration – including whether and to what extent the claims made by US Foods in this matter are foreclosed by the parties' Settlement Agreement – should be determined by the Chicago. Illinois, arbitrator assigned to this matter in accordance with the parties' Settlement Agreement. (See Ex. A at 6, ¶20).

## NOBLE'S ANSWER TO US FOODS'S CLAIMS

As a precaution, and without waiving the foregoing response and objections to US Foods's Demand for Arbitration, Noble answers all claims made against him by US Foods in its Demand for Arbitration consistently with the facts set forth above, unequivocally *denying* any and all liability for

JABURG · WILK
Attorneys at Law

Kristy Allison
June 5, 2013
Page 7

computer fraud (Count I), breach of fiduciary duty (Count II), breach of contract (Count IV), or civil conspiracy (Count V). [3]

## NOBLE CROSS-DEMANDS ARBITRATION PURSUANT TO
## THE PARTIES' SETTLEMENT AGREEMENT.

Finally, as we said at the outset, Noble agrees that the dispute between the parties should be submitted for arbitration. The applicable arbitration agreement, however, is the parties' Settlement Agreement rather than the Shareholder Agreement on which US Foods bases its demand. The Settlement Agreement states:

> The parties shall use good faith efforts to resolve any controversy or claim arising out of or related to this Agreement or the breach thereof. If, despite their good faith efforts, the parties are unable to resolve such controversy or claim, then such controversy or claim shall be resolved by arbitration in Chicago, Illinois, with one (1) arbitrator, in accordance with the National Rules for resolution of Employment Disputes of the American Arbitration Association, and judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. . . . .

(Ex. A at 6, ¶20). Noble therefore makes a formal cross-demand for arbitration of the parties' dispute pursuant to this mandatory provision in their agreement and request that an arbitrator duly appointed to the mater in Chicago, Illinois, as the agreement specifies, determine all such matters and related issues, including, as set forth here, whether and to what extent the claims made by US Foods in this matter are foreclosed by the Settlement Agreement. Again, US Foods's claims against Noble in its Demand for Arbitration are a controversy or claim arising out of or relating to the Settlement Agreement that must be arbitrated pursuant to that agreement.

Noble specifically states that he has fully complied with his obligations under the Settlement Agreement and that he is entitled to not only the $675,000 set forth there, but also all fees, costs, expenses and interest as contemplated in the agreement and as allowed by applicable law.

## CONCLUSION

For all of the foregoing reasons, we ask that you: (1) *deny* US Foods's Demand for Arbitration as based on an arbitration agreement that has been foreclosed and superseded by the parties' Settlement Agreement and which does not apply anyway; (2) *re-assign* this matter for AAA arbitration in Chicago, Illinois, in accordance with the parties' Settlement Agreement; (3) *permit* the arbitrator assigned to the matter in Chicago, Illinois, to determine all such matters and related issues – including whether and to what extent the claims made by US Foods in this matter are foreclosed by the Settlement Agreement; and (4) *grant* Noble's Cross-Demand for Arbitration and award him his $675,000 plus interest, costs fees and expenses.

---

[3] Count III was apparently omitted from the demand.

JABURG·WILK
Attorneys at Law

Kristy Allison
June 5, 2013
Page 8

Sincerely,

**JABURG & WILK,** P.C.

Kraig J. Marton

KJM:dnf

cc:     Connie N. Bertram, Esq.
        Philip J. Nathanson, Esq.

Attachments:

Exhibit A:  February 5, 2103, Settlement Agreement

Exhibit B:  Copy of the letter sent by Kraig J. Marton to Juliette Prior dated January 11, 2013

Exhibit C:  Copies of emails and signature pages exchanged by Kraig J. Marton to Juliette Prior dated February 5, 2013

Exhibit D:  Copy of Kraig J. Mr. Marton email confirming completion of contract performance sent to Juliette Prior dated March 6, 2013

Exhibit E:  Copy of Kraig J. Marton email to Juliette Prior regarding Quest document production dated March 13, 2013

Exhibit F:  Copy of email sent by Kraig J. Marton to Juliette Prior dated March 26, 2013

Exhibit G: Copy of email sent by Kraig J. Marton to Juliette Prior dated April 10, 2013

Exhibit H: Copy of email sent by Kraig J. Marton to Juliette Prior dated April 16, 2013

Exhibit I: Copy of email sent by Kraig J. Marton to Juliette Prior dated May 2, 2013

Exhibit J: Copy of email sent by Kraig J. Marton to Juliette Prior dated May 10, 2013

# Exhibit A



February 4, 2013

Michael J. Noble
4717 E Quartz Mountain Road
Paradise Valley, AZ 85253-3202

<u>CONFIDENTIAL SEPARATION AGREEMENT AND RELEASE</u>

Dear Mr. Noble:

　　　　This letter (hereinafter, the "Separation Agreement") confirms the terms related to the termination of your employment with US Foods, Inc. ("US Foods" or the "Company").

1. <u>Termination.</u> Your employment with the Company terminated effective December 11, 2012 (your "Termination Date"). Since your Termination Date, a dispute has arisen concerning the Company's obligation to repurchase stock and options in the Company held by you on your Termination Date and to pay severance and a bonus to you. Without admitting any liability or fault, the Company and you have agreed to the following terms to resolve these and all other disputes and claims between you and the Company.

2. <u>Settlement Payment.</u> In consideration of the promises and other good and valuable consideration set forth herein, if you sign and do not revoke this Separation Agreement, the Company agrees to pay you $175,000 (the "Settlement Payment").

    a. The parties agree that $100,000 of the payment represents the appreciation on the value of the 100,000 shares of Company stock purchased by you in 2007 and $75,000 of the payment is for the repurchase of that number of shares of vested stock options held by you as of the Termination Date determined by the Company to have a value of $75,000. All remaining vested stock options held by you as of the Termination Date shall expire and have no value.

    b. The Company agrees to repurchase your stock for a total of $600,000. $500,000 of that amount represents in the amount you initially paid for the stock. The $100,000 payment referenced above represents the appreciation in the value of the stock since you purchased it.

Page 1 of 8

    c. The Settlement Payment and stock purchase monies, totaling $675,000, will be mailed to your counsel within ten (10) days of the Effective Date of this Agreement.

3. <u>No Additional Benefits.</u> Your right to continue qualifying coverage at your own cost pursuant to COBRA (the Consolidated Omnibus Budget Reconciliation Act of 1986, as amended) shall be governed by applicable law and the terms of the Company's plans and programs as has or will be explained to you in separate correspondence. You agree that you are not and will not be entitled to any severance benefits under the Company's Severance Plans. You further agree that you are not entitled to any additional compensation under the Management Stockholder's Agreement, Sale Participation Agreement, or Stock Option Agreement that you signed on November 16, 2007 and that the Settlement Payment satisfies any and all of US Foods' obligations to pay you for stocks and options issued to you pursuant to those agreements or any other agreement. You further agree that any remaining stocks and options you previously held or owned have expired. You acknowledge that it is the Company's position that the Settlement Payment is a payment to which you are not otherwise entitled. You acknowledge that, except as expressly provided in this Separation Agreement, you will not receive any additional compensation or benefits, including salary, stock or equity rights or payments, bonus, or severance benefits from the Company.

4. <u>Claims Released.</u> It is also understood that, in exchange for your Separation Payment and other benefits set forth herein, you **release and waive** all claims, causes of action or the like, known or unknown, to the extent permitted by law, that you, your heirs, executors, administrators, and assigns have, had or may have in the future against the Company, and/or any of their respective owners, parents, predecessors, successors, affiliates, and/or subsidiaries, employee benefit plans, employee benefit plan administrators and/or fiduciaries, including each of their current or past directors, officers, agents and employees, and/or anyone else connected with any of the foregoing (collectively, "Released Parties"), with respect to all matters of your employment and separation from employment with the Company, including but not limited to, all allegations, claims, and violations related to severance, any reductions-in-force, notice of termination, the payment of your salary and benefits and all claims arising under the following, in each case as amended: the Age Discrimination in Employment Act of 1967, as amended by the Older Workers Benefit Protection Act of 1990; Title VII of the Civil Rights Act of 1964; the Civil Rights Act of 1991; the Equal Pay Act of 1963; the Americans with Disabilities Act of 1990; the Family and Medical Leave Act of 1993; the Civil Rights Act of 1866; the Worker Adjustment and Retraining Notification Act; the Employee Retirement Income Security Act of 1974; any applicable Executive Order Programs; the Fair Labor Standards Act; section 806 of the Sarbanes-Oxley Act of 2002; the False Claims Act and all of the state or local counterparts, or any other federal, state or local statute, constitution or ordinance; or under any public policy, contract or tort, or under any common law, including without limitation for wrongful discharge; or arising under any practices or procedures of the Company; or any claim for breach of contract, infliction of emotional distress, defamation, or any claim for costs, fees or other expenses, including attorneys' fees and expenses, incurred in these matters.

5. **Pursuit of Released Claims and Scope of Release.** You agree and covenant not to file any suit, action, arbitration, or complaint against the Released Parties, and not to assist in any such action in any court, administrative or private proceeding with regard to any claim, demand, liability or obligation arising out of any alleged act or omission of US Foods, your employment with US Foods or your separation therefrom. You further represent that no claims, complaints, charges, arbitrations, or other proceedings are pending in any court, administrative agency or department, commission or other forum relating directly or indirectly to the conduct of US Foods or your employment with US Foods.

6. **Unreleased Claims.** You understand that this Agreement is a full and final release applying to all known and unknown or unanticipated injuries or damages of any kind arising from those matters released herein. You expressly and knowingly waive all rights you may have under any law that is intended to protect you from waiving unknown claims. You understand that this release and waiver does not waive or release your right to unemployment benefits or worker's compensation in accordance with applicable law, claims that arise based on acts or occurrences after the Effective Date, your right to enforce this Separation Agreement, vested retirement savings benefits, and your right to file a charge with the Equal Employment Opportunity Commission ("EEOC"). You are, however, waiving your right to recover money in connection with any such EEOC charge. You are also waiving your right to recover money in connection with a charge filed by any other individual or by the EEOC or other federal or state agency.

7. **Release of Claims Against Employee.** The Company releases you, as well as your heirs, executors, administrators, and assigns, from any and all claims, debts, rights, demands, judgments, obligations, causes of action, liabilities, costs and expenses, known or unknown, in law or in equity, arising out of or related to your employment with the Company. Notwithstanding anything to the contrary in the subsection above, the Company's release of Employee does not apply to nor prohibit any claims by the Company unknown to the General Counsel of the Company as of the Effective Date of this Agreement. The Parties' releases also do not prohibit claims by any Party to enforce the terms of this Agreement.

8. **Confidentiality.** You agree that, except as hereinafter provided, you will keep the negotiations leading to and the terms, conditions and existence of this Separation Agreement in strict confidence and shall not disclose them to anyone except: (a) to your attorney and bona fide tax and financial advisors (only if they agree in writing to be bound by and to comply with the provisions of this Agreement); (b) your spouse (only if she agrees in writing to be bound by and to comply with the provisions of this paragraph); or (c) pursuant to compulsory legal process or a court order. If there is any proceeding to enforce the terms of this Agreement, this Agreement shall be filed under seal, pursuant to the rules and provisions of the court in which the proceeding is filed. If you receive a subpoena or other request to produce this Agreement, or to provide or produce testimony or documents subject to this Paragraph, you will immediately notify in writing the General Counsel of US Foods.

9. **Return of Company Property.** You certify that you have returned to the Company all property, documents and data of the Company or relating to your work for the Company

("Company Data") in your possession, custody or control, including without limitation, all keys and access cards, badges, credit and telephone cards, telephones, pagers, all computers and computer related equipment (i.e. hardware, software, diskettes, electronic storage devices, etc), all passwords, access codes and other information necessary to access any computer, communications device or electronic database, and all books, files, documents and electronic data and media. Electronic data should be returned in native format, with all associated metadata intact. You agree, upon the Company's request, to permit a third-party IT technician retained by the Company to inspect all of your personal computers and electronic communications and storage devices to identify and recover any additional Company Data and to undertake the permanent deletion of any Company Data. Said technician will not transmit or disclose to the Company any data on your personal computers and devices that is not Company Data.

10. <u>Other Agreements.</u> You agree that you remain bound by all post-employment restrictions in your previous agreements with US Foods as found in:

- Sections 17 and 22 of the Management Stockholder's Agreement signed by you on November 16, 2007; and

- The provisions of the Non-Solicitation and Non-Disclosure Agreement signed by you on November 16, 2007 that are incorporated by reference into Section 22 of the Management Stockholder's Agreement.

11. <u>Non-Disparagement.</u> You agree not to make any disparaging remarks now, or at any time in the future, about the Released Parties. You further agree that you will not, directly or indirectly, follow, investigate, photograph, videotape, or stalk (in person or through electronic or other means) any of the Releasees. US Foods will instruct John Lederer, Juliette Pryor, Stuart Schuette, David Esler, Al Swanson and Michael Ranchino not to make any statements that disparage or defame you. If US Foods is contacted by your prospective employers, it will provide neutral reference information consistent with Company policy. Nothing in this Agreement shall prohibit you or the Company from providing accurate information to any court or governmental entity; or to any person or organization in response to legal process or otherwise as required by law. You agree that if you violate this provision you forfeit the Settlement Payment given to you as part of this Separation Agreement.

12. <u>Cooperation.</u> You agree to cooperate and assist the Company and the Released Parties in any court, agency, arbitration or other legal matters about which you have knowledge relevant to the matter. You acknowledge and agree that such assistance may include, but will not be limited to, providing complete and truthful background information regarding any matter on which you previously worked, aiding in the drafting of declarations and similar documents, executing declarations and similar documents, testifying or otherwise appearing at investigation interviews, depositions, arbitrations or court hearings and preparation for the above-described or similar activities as requested by the Company or required by legal process. The Company will use its best efforts to ensure that any assistance requested will be arranged so that it does not unreasonably interfere with your other employment or family commitments. The Company will reimburse you for the

reasonable expenses that you incur in complying with this cooperation obligation, as long as they are approved in writing in advance by the General Counsel. Nothing in this Paragraph is intended to cause you to make a false statement or testify untruthfully in any legal proceeding, and you agree not to do so.

13. Disgorgement. You agree and understand that if you materially breach Paragraphs 8, 9, 10, 11 or 12, the Company may recover from you the Settlement Payment as liquidated damages, as well as its reasonable attorneys' fees and costs and any other damages or remedies allowed by law.

14. Quest Consultants. You will authorize and direct Quest Consultants International, Ltd. ("Quest") to provide all information related to the project for which you hired Quest including, but not limited to, all communications with you, all surveillance reports, all video and audio recordings, all pictures, and all supporting documentation and work product and all US Foods documents and data. US Foods agrees to reimburse Quest for the reasonable copying costs that it incurs in producing the information required by this Paragraph. This Agreement will not be effective until Quest complies with your directive and produces all documents and data subject to this Paragraph.

15. Interview. You agree that you will be interviewed by US Foods and/or its designated counsel in Chicago, Illinois, but not in Rosemont. US Foods will pay for your reasonable food, travel, and lodging expenses for traveling to and attending the interview. The interview will cover the following topics: the anonymous letters to US Foods postmarked September 20, 2012 and November 9, 2012; your participation in the preparation and sending of those letters; the allegations contained in the letters; the surveillance referenced in that letter and otherwise performed by Quest or by or at the request of you or any other current or former employee of US Foods; the retention and payment of Quest; the topics addressed in the December 12, 2012 letter from Juliette Pryor to you and the December 18, 2012 letter from your counsel, Kraig J. Marton, to Juliette Pryor of US Foods; and any allegations by you regarding US Foods' pricing on its contracts with or purchases by the federal government, including whether US Foods instructs its vendors to increase the amount of their invoices to amounts greater than actual true prices paid to the vendor, whether such invoices are then submitted to the US government or other governmental entities, and any and all subjects related to the above topics. The interview may be recorded and/or transcribed at the Company's discretion. Your counsel may be present at the interview. You understand that you have an obligation to provide truthful, complete, responsive and accurate statements in response to counsel's questions. You will also provide information to either support or rescind your implied allegations related to US Foods' pricing practices under its government contracts. The Settlement Payment will not be made until you have complied with this Paragraph by appearing for the interview and by completely and truthfully answering questions about the above topics for such time as required by the person conducting the interview, but not more than eight (8) hours. US Foods will have the option of requiring you to sign a sworn statement summarizing all or a portion of your statements during the interview.

16. <u>Entire Agreement.</u> This Separation Agreement contains the entire understanding between you and the Company regarding the subject matters set forth herein, and supersedes any and all other prior agreements, understandings, discussions, and negotiations whether written or oral between you and the Company, except the Other Agreements referenced in Paragraph 10. This Separation Agreement cannot be changed except in a writing signed by you and an authorized representative of the Company. You acknowledge that neither the Company nor any representative of the Company has made any representation or promise to you other than as set forth herein.

17. <u>Construction.</u> Each party and its counsel have reviewed this Separation Agreement and have been provided the opportunity to review this Separation Agreement and accordingly, the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Separation Agreement. Instead, the language of all parts of this Separation Agreement shall be construed as a whole, and according to their fair meaning, and not strictly for or against either party.

18. <u>Severability.</u> If any provision in this Separation Agreement is found to be unenforceable, all other provisions will remain fully enforceable. The covenants set forth in this Separation Agreement shall be considered and construed as separate and independent covenants. Should any part or provision of any provision of this Separation Agreement be held invalid, void or unenforceable in any court of competent jurisdiction, such invalidity, voidness or unenforceability shall not render invalid, void or unenforceable any other part or provision of this Separation Agreement.

19. <u>Interpretation,</u> This Agreement shall be construed as a whole according to its fair meaning. It shall not be construed strictly for or against you or the Company. Unless the context indicates otherwise, the singular or plural number shall be deemed to include the other. Captions are intended solely for convenience of reference and shall not be used in the interpretation of this Agreement.

20. <u>Choice of Law/Dispute Resolution.</u> The terms of this Agreement shall be interpreted under the laws of the State of Delaware. The parties shall use good faith efforts to resolve any controversy or claim arising out of, or relating to this Agreement or the breach thereof. If, despite their good faith efforts, the parties are unable to resolve such controversy or claim, then such controversy or claim shall be resolved by arbitration in Chicago, Illinois, with one (1) arbitrator, in accordance with the National Rules for Resolution of Employment Disputes of the American Arbitration Association, and judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. The arbitrator shall have the discretion to award reasonable attorneys' fees, costs and expenses, including fees and costs of the arbitrator and the arbitration, to the prevailing party.

21. <u>Non-Admission of Liability.</u> This Separation Agreement does not constitute an admission of any liability or wrongdoing on the part of any party, and each party expressly denies same.

22. <u>Consideration Period.</u> You know and understand the contents of this Separation Agreement and its binding effect, and you are hereby advised to consult with an attorney prior to signing this Agreement. You voluntarily and knowingly agree to the terms of this Separation Agreement, You acknowledge that you have been advised that you have twenty-one (21) days to consider this Separation Agreement. In the event that you execute this Separation Agreement prior to the expiration of the 21-day period, you hereby waive the balance of said period. If you do not sign this Separation Agreement within the 21-day period, you understand that it will become null and void.

23. <u>Revocation Period.</u> You will have seven (7) days following the date on which you execute this Separation Agreement to revoke this Separation Agreement, and this Separation Agreement shall not become effective or enforceable until such revocation period has expired. Any revocation within this period shall be submitted in writing and personally delivered or mailed to Juliette Pryor, Executive Vice President, General Counsel and Chief Compliance Officer, US Foods, 9399 West Higgins Road, Rosemont, Illinois 60018, and post-marked, where applicable, within seven (7) days of the date following execution of this Separation Agreement. No Separation Payment or other benefits will be paid or provided until after such seven (7) day revocation period has expired and this Separation Agreement has become effective. If this Separation Agreement is revoked by you then you shall forfeit all of your Separation Payment and/or other benefits, and the Company shall not be required to provide you with any such payments, benefits or other consideration.

24. <u>Counterparts.</u> This Separation Agreement may be executed in counterparts, and each counterpart, when executed, shall have the efficacy of a signed original. Photographic and facsimiled copies of such signed counterparts may be used in lieu of the originals for any purpose.

25. <u>Effective Date.</u> The Effective Date of this Agreement shall be the latest of the date that is fully executed by the Parties, the expiration of the seven-day revocation period set forth in Paragraph 23, the certification of the return of all Company property in Paragraph 9, complete production of the records and data by Quest as described in Paragraph 14, and the completion of the interview required by Paragraph 15.


PLEASE READ THIS AGREEMENT CAREFULLY. EXCEPT AS OTHERWISE PROVIDED HEREIN, IT CONTAINS A **RELEASE** OF ALL KNOWN AND UNKNOWN CLAIMS.

YOU AGREE THAT YOU RECEIVED VALUABLE CONSIDERATION IN EXCHANGE FOR ENTERING INTO THIS AGREEMENT AND THAT THE COMPANY HEREBY ADVISES YOU TO CONSULT AN ATTORNEY PRIOR TO SIGNING THIS AGREEMENT. YOU HAVE BEEN PROVIDED 21 DAYS WITHIN WHICH TO CONSIDER WHETHER YOU SHOULD SIGN THIS AGREEMENT AND WAIVE AND RELEASE ALL CLAIMS AND RIGHTS INCLUDING BUT NOT LIMITED TO THOSE ARISING UNDER THE FEDERAL AGE DISCRIMINATION IN EMPLOYMENT ACT. YOU SHALL HAVE SEVEN (7) DAYS WITHIN WHICH TO REVOKE THIS AGREEMENT AND THIS

AGREEMENT SHALL NOT BECOME EFFECTIVE OR ENFORCEABLE UNTIL THAT REVOCATION PERIOD HAS EXPIRED.

YOU PROMISE THAT NO REPRESENTATIONS OR INDUCEMENTS HAVE BEEN MADE TO YOU EXCEPT AS SET FORTH HEREIN, AND THAT YOU HAVE SIGNED THE SAME KNOWINGLY AND VOLUNTARILY.

      If the terms of this Separation Agreement are acceptable to you, please sign and date this Separation Agreement and return it to the undersigned.

US FOODS, INC.

By: _____
    Name
    Juliette Pryor

Date: _05 February 2013_

Agreed and accepted on this

_____ day of _____, 2013

Signature: _____
    Michael J. Noble

AGREEMENT SHALL NOT BECOME EFFECTIVE OR ENFORCEABLE UNTIL THAT REVOCATION PERIOD HAS EXPIRED.

YOU PROMISE THAT NO REPRESENTATIONS OR INDUCEMENTS HAVE BEEN MADE TO YOU EXCEPT AS SET FORTH HEREIN, AND THAT YOU HAVE SIGNED THE SAME KNOWINGLY AND VOLUNTARILY.

If the terms of this Separation Agreement are acceptable to you, please sign and date this Separation Agreement and return it to the undersigned.

US FOODS, INC.

By: _____

    Name
    Juliette Pryor

Date:_____

Agreed and accepted on this

5th day of February, 2013

Signature: Michael J. Noble
    Michael J. Noble

Page 8 of 8

# Exhibit B

3200 N. Central Avenue, 20th floor, Phoenix, AZ 85012



jaburgwilk.com

**Kraig J. Marton**

kjm@jaburgwilk.com
602.248.1017 - Direct Phone
602.297.5017 - Direct Fax

January 11, 2013

***Via E-Mail [j.Pryor@USfoods.com] and US Mail***

Juliette Pryor
Executive Vice President
General Counsel and Chief Compliance Officer
US Foods
9399 West Higgins Road, Suite 500
Rosemont, Illinois 60018

  *Re: Michael J. Noble*

Dear Ms. Pryor:

  Mike Noble has authorized me to accept your offer. Here are the terms of the offer I believe you made, together with some clarification about those terms as you and I had discussed:

  1. US Foods will pay Michael the sum of $175,000, and all of it will be treated as capital gain. We propose that the first $100,000 be paid as appreciation on the stock (@ $6.00) and the $75,000 be determined by agreeing that the numbers of options needed to total this amount are vested and then purchased by US Foods;

  2. The parties will exchange full and complete mutual releases. While Michael is agreeable to a full release to US Foods, he must receive a mutual release especially in light of your suggestion that US Foods has claims against him;

  3. Mike will direct Quest Investigations to provide their entire file to US Foods, including all communications they had with him. If Quest has any charge for the production, US Foods will pay it;

  4. Mike will agree to submit to an interview with US Food's outside counsel concerning all of the issues raised in my litigation hold letter. He will also answer all questions about how he came to suspect the conduct of the CEO. Mike will also explain in that interview why he expressed concerns about US Foods pricing policies, and will explain how he issued various certifications in light of those concerns. If the interview is to take place outside of Arizona, US Foods will pay Mike's food, travel and lodging expenses. Mike may be represented by counsel at the interview;

  5. Mike will return or destroy all US Foods confidential documents including anything stored electronically, and he will insure that my law office does so, too;

  6. The terms of settlement are to be confidential;

16829-1/KJM/KMR/1045027_v1

JABURG | WILK
Attorneys at Law

Juliette Pryor
January 11, 2013
Page 2

7. There will be a nondisparagement clause, but it must be mutual. US Foods must undertake to state nothing about Mike other than to confirm his position, dates of employment and pay.

Assuming I have correctly understood the bullet points, you will prepare the first draft of the documentation needed to accomplish the above terms. We look forward to a prompt resolution.

Very truly yours,

**JABURG & WILK**, P.C.

Kraig J. Marton

KJM:kmr

# Exhibit C

| | |
|---|---|
| **From:** | Kraig J. Marton |
| **Sent:** | Tuesday, February 05, 2013 11:02 AM |
| **To:** | 'Pryor, Juliette' |
| **Cc:** | Michael J. Noble [mn5967@yahoo.com]; Kimberly M. Rogers |
| **Subject:** | RE: Revised AGreement |
| **Attachments:** | Noble Release Agreement FINAL.pdf |

Juliette,

Mike Noble has determined to accept this last version and an executed copy is attached. Could you please now send us an executed copy, too, so Mike can get started with his obligations under this agreement?.

Also, Mike and I can be in Chicago on Thursday, February 14, ready for an interview at 9 am. Please confirm the date and tell us where..

Kraig J. Marton
Jaburg & Wilk, P.C.
3200 North Central #2000
Phoenix, AZ 85012

602 248 1017 (DID)
602 297 5017 (Direct Fax)
www.jaburgwilk.com

NOTICE: this email may be between attorney and client, and, as such, is intended to be private, privileged and confidential. If you have received this transmission in error, please reply that you have received it mistakenly, and destroy the original email and any attachments. Thank you.

---

**From:** Pryor, Juliette [mailto:Juliette.Pryor@usfoods.com]
**Sent:** Monday, February 04, 2013 12:58 PM
**To:** Kraig J. Marton
**Subject:** Revised AGreement

Per my voicemail, please see attached revised document. We reject further edits to paragraphs 15 and 20. I've attached a redline and clean version of the agreement. Please have Mike sign this version. Thanks, Juliette

**Juliette Pryor** | General Counsel and Chief Compliance Officer
9399 W. Higgins Road | Suite 500 | Rosemont, IL 60018
**O 847.720.8013 | F 480.293.2705**
juliette.pryor@usfoods.com

# US Foods
**KEEPING KITCHENS COOKING™**

*****************************************************************

This e-mail message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

This email message and any attachments are for the sole use of the intended recipient(s) and may contain information that is proprietary to US Foods, Inc. and/or its subsidiaries or otherwise confidential or legally privileged. If you have received this message in error, please notify the sender by reply, and delete all copies of this message and any attachments. If you are the intended recipient you may use the information contained in this message and any files attached to this message only as authorized by US Foods, Inc. Files attached to this message may only be transmitted using secure systems and appropriate means of encryption, and must be secured using the same level password and security protection with which the file was provided to you. Any unauthorized use, dissemination or disclosure of this message or its attachments is strictly prohibited.

| | |
|---|---|
| **From:** | Pryor, Juliette <Juliette.Pryor@usfoods.com> |
| **Sent:** | Tuesday, February 05, 2013 4:02 PM |
| **To:** | Kraig J. Marton |
| **Subject:** | Executed Agreement |
| **Attachments:** | Noble Executed Separation and Release Agreement.pdf |

Kraig:

Attached please find the executed agreement. We will conduct the interview on Thursday, February 14, 2013 at 9:30 am at the offices of Kaye Scholer, located at 3 First National Plaza, 70 W. Madison, Suite 4200, Chicago, IL. When you arrive please ask for Z Scott.

Juliette

**Juliette Pryor** | General Counsel and Chief Compliance Officer
9399 W. Higgins Road | Suite 500 | Rosemont, IL 60018
**O 847.720.8013 | F 480.293.2705**
juliette.pryor@usfoods.com

## US Foods
**KEEPING KITCHENS COOKING™**
**************************************************************

This e-mail message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

This email message and any attachments are for the sole use of the intended recipient(s) and may contain information that is proprietary to US Foods, Inc. and/or its subsidiaries or otherwise confidential or legally privileged. If you have received this message in error, please notify the sender by reply, and delete all copies of this message and any attachments. If you are the intended recipient you may use the information contained in this message and any files attached to this message only as authorized by US Foods, Inc. Files attached to this message may only be transmitted using secure systems and appropriate means of encryption, and must be secured using the same level password and security protection with which the file was provided to you. Any unauthorized use, dissemination or disclosure of this message or its attachments is strictly prohibited.

# Exhibit D

**From:** Jackson, Paula L <Paula.Jackson@usfoods.com>
**Sent:** Wednesday, March 06, 2013 12:28 PM
**To:** Kraig J. Marton
**Subject:** RE: Today is the Effective Date for Mike Noble

Kraig

I was able to open the file. Thank you!  Paula

**From:** Kraig J. Marton [mailto:kjm@jaburgwilk.com]
**Sent:** Wednesday, March 06, 2013 1:22 PM
**To:** Jackson, Paula L
**Cc:** Michael J. Noble [mn5967@yahoo.com]; Pryor, Juliette
**Subject:** RE: Today is the Effective Date for Mike Noble

Paula,

Were you able to open the attached? It is just a big PDF, and we had no problem opening it here.  Just in case, I am resending it as an attachment here.

Kraig

**From:** Pryor, Juliette [mailto:Juliette.Pryor@usfoods.com]
**Sent:** Wednesday, March 06, 2013 11:36 AM
**To:** Kraig J. Marton
**Cc:** Michael J. Noble [mn5967@yahoo.com]; Jackson, Paula L
**Subject:** Re: Today is the Effective Date for Mike Noble

File can't be opened. Please contact my assistant Paula to resolve.

**Juliette Pryor** | General Counsel and Chief Compliance Officer
9399 W. Higgins Road | Suite 500 | Rosemont, IL 60018
**O 847.720.8013 | F 480.293.2705**
juliette.pryor@usfoods.com

**US Foods**
**KEEPING KITCHENS COOKING™**
***********************************************************
This e-mail message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

On Mar 6, 2013, at 11:44 AM, "Kraig J. Marton" <kjm@jaburgwilk.com> wrote:

Juliette,

As you know, paragraph 14 of Mike Noble's Agreement provides:

You will authorize and direct Quest Consultants International, Ltd. ("Quest") to provide all information related to the project for which you hired Quest including, but not limited to, all communications with you, all surveillance reports, all video and audio recordings, all pictures, and all supporting documentation and work product and all US Foods documents and data.

Mike did just that, and the documents have now been provided by Quest. They are attached as one PDF file. Quest has represented to me and to Mike that this is their entire file. They did not keep a copy of the video, but you have that already.

Therefore, Mike has now fully complied with all of the obligations necessary for payment. In terms of the Agreement, today is the "effective date".

Paragraph 25 of the Agreements reads:

25. Effective Date. The Effective Date of this Agreement shall be the latest of the date that is fully executed by the Parties, the expiration of the seven-day revocation period set forth in Paragraph 23, the certification of the return of all Company property in Paragraph 9, complete production of the records and data by Quest as described in Paragraph 14, and the completion of the interview required by Paragraph 15.

As you well know, Mike (1) did not revoke within the time allowed: (2) certified that he returned all company property and provided you with a written certification in person in Chicago on February 15; (3) today has seen to the complete production of Quest's records and data; and (4) appeared for the interview on February 15, and answered all questions asked of him. That means that the "Effective Date" is today. It also means that under paragraph 2(c) "The Settlement Payment and stock purchase monies, totaling $675,000, will be mailed to your counsel within ten (10) days of the Effective Date".

We therefore look forward to your sending the Settlement payment by no later than March 16. When you mail it, could you also email me to expect it?

Thank you for your continued cooperation.

Kraig J. Marton
Jaburg & Wilk, P.C.
3200 North Central #2000
Phoenix, AZ 85012

602 248 1017 (DID)
602 297 5017 (Direct Fax)
www.jaburgwilk.com<http://www.jaburgwilk.com/>

NOTICE: this email may be between attorney and client, and, as such, is intended to be private, privileged and confidential. If you have received this transmission in error, please reply that you have received it mistakenly, and destroy the original email and any attachments. Thank you.

<Flosi File.pdf>

This email message and any attachments are for the sole use of the intended recipient(s) and may contain information that is proprietary to US Foods, Inc. and/or its subsidiaries or otherwise confidential or legally privileged. If you have received this message in error, please notify the sender by reply, and delete all copies of

this message and any attachments. If you are the intended recipient you may use the information contained in this message and any files attached to this message only as authorized by US Foods, Inc. Files attached to this message may only be transmitted using secure systems and appropriate means of encryption, and must be secured using the same level password and security protection with which the file was provided to you. Any unauthorized use, dissemination or disclosure of this message or its attachments is strictly prohibited.

This email message and any attachments are for the sole use of the intended recipient(s) and may contain information that is proprietary to US Foods, Inc. and/or its subsidiaries or otherwise confidential or legally privileged. If you have received this message in error, please notify the sender by reply, and delete all copies of this message and any attachments. If you are the intended recipient you may use the information contained in this message and any files attached to this message only as authorized by US Foods, Inc. Files attached to this message may only be transmitted using secure systems and appropriate means of encryption, and must be secured using the same level password and security protection with which the file was provided to you. Any unauthorized use, dissemination or disclosure of this message or its attachments is strictly prohibited.

# Exhibit E

**From:** Kraig J. Marton
**Sent:** Wednesday, March 13, 2013 11:37 AM
**To:** 'Pryor, Juliette'
**Cc:** Michael J. Noble [mn5967@yahoo.com]
**Subject:** RE: Today is the Effective Date for Mike Noble

Juliette,

This position is disappointing and wrong.

Mike and I attended a day long interview in Chicago on February 15 and you never said a word to us about some claimed lack of compliance (other than about the Quest material which was not available). As I explained in my 3/6 email below, Mike has fully complied with his obligations as of March 6, and March 6 is and was the "Effective Date".

You are wrong in claiming that "Several conditions of the agreement have not been met."

You first cite paragraph 9 and claim Mike must have US Foods documents because Quest had some and because Mike did not give you anything with metadata. However, please review the very first sentence of paragraph 9: "You certify that you have returned to the Company all property, documents and data of the Company or relating to your work for the Company ("Company Data") in your possession, custody or control". In his interview, Mike gave you that certification - even in writing. He provided you with the documents he had and he explained that he had deleted others. He answered all of the questions asked of him about company documents, and clearly said he had no others. He can't give you something he does not have. Further, Quest's possession of company documents months before does not prove Mike has any now.

Yes, the inspection of Mike's electronically stored information has not yet been completed, but there are two problems with your reasoning. First, the agreement is very clear in saying that the inspection is NOT a condition of payment. Read the plain language of paragraph 25 ("Effective Date"). Second, US Foods is the one delaying that matter. The Agreement was signed February 5. When we had head nothing from you about an inspection, on February 25 I emailed you and said "I want it a matter of record that Mike stands ready, willing and able to provide his computer and peripherals for inspection." The first time we heard from you was in an email on March 6 where you asked Mike to sign a release to Kroll and to do other things he is not obligated to do. I will be addressing that matter separately, but the completion of that inspection is absolutely not a condition of payment to Mike.

Finally, you suggest that Quest may not have produced everything. However, Quest has represented that it did. It did not keep any copy of the video nor does it have any photographs other than the ones produced. It did produce its entire file. Again we can not produce something that does not exist.

Mike has been saying that US Foods administration will do everything it can to avoid paying him what it agreed to pay him. I have not believed that. But the delays and excuses since his interview are beginning to make me wonder if he is not correct.

We expect payment to be sent on or before March 16, and we will be commencing arbitration proceedings immediately thereafter if this does not occur.

Kraig J. Marton
Jaburg & Wilk, P.C.
3200 North Central #2000
Phoenix, AZ 85012

602 248 1017 (DID)
602 297 5017 (Direct Fax)
www.jaburgwilk.com

1

NOTICE: this email may be between attorney and client, and, as such, is intended to be private, privileged and confidential. If you have received this transmission in error, please reply that you have received it mistakenly, and destroy the original email and any attachments. Thank you.

---

**From:** Pryor, Juliette [mailto:Juliette.Pryor@usfoods.com]
**Sent:** Wednesday, March 06, 2013 6:04 PM
**To:** Kraig J. Marton
**Subject:** RE: Today is the Effective Date for Mike Noble

Kraig:

We do not consider today to be the Effective Date of Mr. Noble's agreement with US Foods. Several conditions of the agreement have not been met. First, Paragraph 9 requires that US Foods' "[e]lectronic data . . . be returned in native format, with all associated metadata intact." We have not yet seen any such electronic data from Mr. Noble. It is evident from the documents produced by Quest, the review of Mr. Noble's US Food email account and company computer, and the statements of witnesses that Mr. Noble has company documents in his possession.

For instance, Mr. Noble attached two emails to Quest copies of a US Foods lease, an Excel spreadsheet and other documents and information of US Foods. In addition, witnesses and Mr. Noble himself described extensive communications with Mr. Noble on his personal email account concerning the travel plans of US Foods' executives and other company information. None of those documents or data has been returned to US Foods. In addition, Mr. Noble has not produced or returned the communications and reports of Quest, including the "soft" copies of the investigation and observation reports Quest provided to Mr. Noble, which incorporate and describe company information.

Second, Paragraph 9 requires Mr. Noble to allow a third-party IT technician to inspect all of his "personal computers and electronic communications and storage devices." The parties still need to coordinate and complete this inspection.

Third, Paragraph 14 requires that Quest produce specified "documents and data" to US Foods. Although US Foods has not had sufficient time to determine whether the information you have provided satisfies Paragraph 14, our preliminary review has identified documents that have not been produced by Quest. For instance, on July 9, 2012, Mr. Noble provided an Excel spreadsheet to Quest. Although Mr. Noble provided the email transmitting the spreadsheet and the password for it, neither Quest nor Mr. Noble produce the spreadsheet. Also, it appears that Quest has not produced any pictures from its surveillance of Mr. Lederer, other than the two pictures included in its reports, or any of its surveillance notes.

Please let us know when Mr. Noble will provide the data (and associated metadata) and when we can conduct the inspection of his computers and devices. We would like to conduct this review next week. We are in the process of reviewing the information from Quest and determining whether the continuation of Mr. Noble's interview needs to be arranged. I look forward to coordinating with you further concerning the completion of these tasks.

Juliette

**Juliette Pryor** | General Counsel and Chief Compliance Officer
9399 W. Higgins Road | Suite 500 | Rosemont, IL 60018
**O 847.720.8013 | F 480.293.2705**
juliette.pryor@usfoods.com

# US Foods
**KEEPING KITCHENS COOKING™**
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This e-mail message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

# Exhibit F

3200 N. Central Avenue, 20th Floor, Phoenix, AZ 85012



jaburgwilk.com

**Kraig J. Marton**

kjm@jaburgwilk.com
602.248.1017 - Direct Phone
602.297.5017 - Direct Fax

March 26, 2013

*Via E-Mail [j.Pryor@USfoods.com]*

Juliette Pryor
Executive Vice President
General Counsel and Chief Compliance Officer
US Foods
9399 West Higgins Road, Suite 500
Rosemont, Illinois 60018

      Re:    *Michael J. Noble*
             *The "effective date" has passed and it is time to pay*

Dear Ms. Pryor:

The Agreement between US Foods and our client, Mike Noble, requires that we "use good faith efforts to resolve any controversy." (Para. 20). While Mike Noble has already made more than good faith efforts, we will make one more attempt to resolve the issues through this letter. Failing that, we will be proceeding to arbitration as described in the agreement.

In your email of 3/18/2013 4:39 PM., you state the following:

The simple point is that, once Quest makes a complete production and Mr. Noble complies with his obligation to have an IT technician preserve and delete Company Data from his computer and devices, US Foods will pay him pursuant to the terms of the Agreement. All we need to do at this point is work together on these last steps.

Although we have already communicated about these matters, I will try, yet again, to explain why you are mistaken:

    *1.*    ***Quest has produced its files.*** It is not clear whether you had seen Lee Flosi's email to you of March 15, 2013 1:30 PM when you wrote your email three days later. Attached is another copy of the Flosi declaration and that email. Please note what Mr. Flosi swore under oath. Indeed, Flosi's declaration almost verbatim tracks the language of Para 14 of the Agreement. Specifically, Flosi swears that Mike Noble:

asked us to provide a copy of all information related to the project for which he hired Quest, including, but not limited to, all communications with him, all surveillance reports, all video and audio recordings, all pictures, and all US Foods documents and data.

**JABURG|WILK**
Attorneys at Law

Juliette Pryor
March 26, 2013
Page 2

Flosi goes on to swear:

> 5. I have made a diligence search of Quest files and hereby certify that I have done exactly that. I previously supplied this information to Mr. Noble and his attorney.

Flosi had expressed concern to me about his internal administrative file. He did not want to go to the trouble of locating internal billing records and the internal administrative materials that Quest keeps for every client, and I told him that he need not produce those matters if they were purely internal and not part of the investigation. He therefore signed the declaration you have.

It is flat wrong to delay payment when you have had the entire Quest file since I sent it to you on 3/6/2013 10:43 AM. But if there were any doubt, once you obtained a certification from Lee Flosi on March 15, this issue has been absolutely and fully addressed.

**2.** *The inspection of Noble's computers is not a condition precedent.* We have communicated about this before. Yes, Mike has an obligation to allow his computers to be inspected, but no, that is not a condition precedent that would allow you to delay payment.

The agreement makes it clear that the inspection is NOT a condition of payment. Read the plain language of paragraph 25 ('Effective Date'). A number of conditions are set forth in that paragraph that do need to be accomplished before Mike is paid, but inspection is not one of them. No other reading of the agreement is possible. We have already provided documents and otherwise fully complied with every single condition listed in Para. 25, and that is why it is time to pay Mike now. .

**3.** *Mike will allow an inspection as agreed.* Although the inspection can not be a reason to delay payment, we will still discuss it here. Our doing so, however, should not be construed to be an admission that you can withhold payment until the inspection has been completed.

Mike has and had every intention of allowing the inspection described in paragraph 9. However, we can not agree to the inspection as first proposed in your email dated Wed 3/6/2013 8:15 AM. Attached to that email was Kroll's "Authorization and Release" that you wanted Mike to sign. That document is unacceptable for many reasons. First, we did not agree to release the computer vendor, and will not sign any such release. The vendor should be held to the same standard of care as any vendor without any release. Second, the form you provided does not protect Mike's right to privacy. The vendor should be limited in what it can look at. Also, the vendor should be prohibited from sending you anything until Mike has had a reasonable opportunity to review it and agree that it belongs to you. Finally, the form should be prepared in the form of an agreement rather than an authorization, since the vendor must agree to do the things set forth.

We are in the process of revising the Kroll form, and a redlined version and acceptable revised version will be forthcoming. Mike will sign this revised version for Kroll or for any other vendor, if they agree to sign it too. Incidentally, you indicate you may change vendors. We don't are who you use, Kroll or others, as long as they are a credible and experienced company that does that kind of work..

**JABURG|WILK**
Attorneys at Law

Juliette Pryor
March 26, 2013
Page 3

I will not debate whether the delay in completing this inspection is your fault or Mike's but I again make it a matter of record that as soon as you obtain a vendor who will agree in writing to address Mike's concerns, he will immediately make all of his computers, etc available as agreed.

**4.** *It is time to pay Mike his $675,000.* We ask that you pay Mike what he is owed, now. Mike Noble has fully complied with all conditions precedent and it is time to complete that aspect of his dealings with US Foods.

Very truly yours,

**JABURG & WILK, P.C.**

Kraig J. Marton

KJM:kmr

cc: Mike Noble

Enc: Flosi email and Declaration

# Exhibit G



3200 N. Central Avenue, 20th Floor, Phoenix, AZ 85012

jaburgwilk.com

**Kraig J. Marton**

kjm@jaburgwilk.com
602.248.1017 - Direct Phone
602.297.5017 - Direct Fax

April 10, 2013

*Via E-Mail [cbertraum@proskauer.com]*

Connie N. Bertram
Proskauer/Rose, LLP
1001 Pennsylvania Avenue, NW
Suite 400 South
Washington, DC 2004-2533

David L. Allen
Mark D. Bogard
Neal H. Bookspan
Mervyn T. Braude
Kelly Brown
Roger L. Cohen
Beth S. Cohn
Jennifer R. Erickson
David N. Farren
Lauren L. Garner
Renee Gerstman
Laurence B. Hirsch
Amy M. Horwitz
Ronald M. Horwitz
Gary J. Jaburg
Janessa E. Koenig
Michelle M. Lauer
Michelle C. Lombino
Valerie L. Marciano
Kraig J. Marton
Nate D. Meyer
Mitchell Reichman
Scott J. Richardson
Laura A. Rogal
Kathi M. Sandweiss
Jeffrey A. Silence
Maria Crimi Speth
Bridget O'Brien Swartz
Susan E. Wells
Lawrence E. Wilk
Nichole H. Wilk

Adam S. Kunz
*Of Counsel*

Re:    *Michael Noble – US Foods*

Dear Ms. Bertram:

The purpose this letter is to follow-up our conversation of earlier today. We talked about each of the issues that we had discussed April 5 in the context of my letter sent to you earlier today.  Here is how I believe we left matters:

***Quest production***. I offered to make Lee Flosi available for a telephonic interview tomorrow at 11 AM but you said you were not available until later. You also were not sure whether you would be interviewing Flosi. Please immediately advise as to who will be interviewing him, if anyone, and provide alternate times and dates if tomorrow at 11 AM will not work. He can be available at various times on Monday, as can I.

You had asked about evidence of payment to Quest of their investigation. As for proof of payment to Quest, Mike Noble provided me with the attached documents – a cancelled check made payable to Quest as well as proof that he wired the initial $5000 retainer to them. These sums total the invoice you already have.

***IT Inspection.***  You did not provide me with the name of an IT vendor or with a proposed protocol. You indicate you have drafted a protocol but it has not yet been approved by US foods. You intend to have a protocol in the name of an IT vendor to me well before we speak again this Friday.

You asked whether Mike has deleted any US Foods documents from his computer since his interview. Mike authorized me to make the following statement on his behalf:

> "I have no memory of the deleting any US foods documents since the interview. I do not believe I have deleted any."

JABURG|WILK
Attorneys at Law

Connie N. Bertram
April 10, 2013
Page 2

*Conflict of interest issues.* You raised the issue of Mike's relationship with ICG as set forth in your April 3 letter. We do not agree that this is an issue at all, and we don't feel obligated to even address it. However, you asked me for documentation that proves that the ICG child support payments predated US Foods and I said we need to determine whether we will produce those documents. I can tell you that the documents attest to the fact that the payments predate US Foods and have been made since early 2002. Since you raised the matter, I asked that you provide a copy of whatever certifications Mike signed related to conflicts of interest as well as US Food's policies related to such Certifications, and you said you would check to see if US Foods has them and whether they will be produced.

When we speak this Friday I hope we are both able to address the remaining loose ends. Again, participation in this exercise of providing more documents and information to US Foods should not be considered a waiver of our right to claim that US Foods is already in breach.

Very truly yours,

JABURG & WILK, P.C.

Kraig J. Marton

KJM:kmr

Enc: Cancelled check to Quest and Wire authorization

cc: Michael Noble

# Exhibit H



3200 N. Central Avenue, 20th Floor, Phoenix, AZ 85012

jaburgwilk.com

**Kraig J. Marton**

kjm@jaburgwilk.com
602.248.1017 - Direct Phone
602.297.5017 - Direct Fax

April 16, 2013

*Via E-Mail [cbertraum@proskauer.com]*

Connie N. Bertram
Proskauer/Rose, LLP
1001 Pennsylvania Avenue, NW
Suite 400 South
Washington, DC 2004-2533

David L. Allen
Mark D. Bogard
Neal H. Bookspan
Mervyn T. Braude
Kelly Brown
Roger L. Cohen
Beth S. Cohn
Jennifer R. Erickson
David N. Farren
Lauren L. Garner
Renee Gerstman
Laurence B. Hirsch
Amy M. Horwitz
Ronald M. Horwitz
Gary J. Jaburg
Janessa E. Koenig
Michelle M. Lauer
Michelle C. Lombino
Valerie L. Marciano
Kraig J. Marton
Nate D. Meyer
Mitchell Reichman
Scott J. Richardson
Laura A. Rogal
Kathi M. Sandweiss
Jeffrey A. Silence
Maria Crimi Speth
Bridget O'Brien Swartz
Susan E. Wells
Lawrence E. Wilk
Nichole H. Wilk


Adam S. Kunz
*Of Counsel*

Re:     *Michael Noble -- U.S. Foods*

Dear Ms. Bertram:

We had a prearranged time to speak on Friday April 12 (8:00 a.m. MST) but when I called, your staff said you were running behind so we rescheduled to a set time on Monday April 15 (1:00 p.m. MST). I called you then, and you were not available then, either[1]. I understand that such things happen but I still await your call. We are particularly troubled that you and U.S. Foods still have not provided the identity of an acceptable IT vendor. And while you did send me a draft protocol late last Friday, we have still to discuss many of its provisions.

You and U.S. Foods have taken the position that the "Effective Date" of the Noble agreement cannot occur until Mike's computer and peripherals have been imaged. We did not agree with that interpretation, but rather than debate that issue, we agreed to proceed with the imaging. The problem is that for that process to be completed, U.S. Foods must identify a vendor and agree on a protocol. Neither you nor your client has done that.

Let me remind you of some dates. The Separation Agreement was signed on February 5, and Mike submitted to an interview in Chicago on February 15. After we provided the Quest file, we initially took the position that the "Effective Date" was March 6, 2013. However, both you and Juliette Pryor disagreed and claimed, in part, that the inspection contemplated in paragraph 9 must be completed before the Effective Date provision applies. We decided to acquiesce with your interpretation rather than fight about it, but these delays show the problem with your interpretation.

By email dated February 25, I was already complaining to Ms. Pryor about her delay in completing the IT inspection. I reminded her that Mike stood ready,

---

[1] I know we called 17 minutes after the scheduled time, but we only received a voice message that you could not take the call. I left a message to call me back, but you did not do so.

JABURG|WILK
Attorneys at Law

Connie N. Bertram
April 16, 2013
Page 2

willing and able to allow an inspection, but that US Foods had not named a vendor. Ms. Pryor finally named a vendor (Kroll) by email on March 6, but we rejected Kroll's protocol because it required Mike to sign a full release and it allowed Kroll and U.S. Foods unfettered access to Mike's ESI. Pryor withdrew Kroll soon thereafter.

However U.S. Foods has yet to name another vendor. This reflects one reason why we did not feel that an IT inspection is necessary for the "Effective Date" -- resolution of this issue is entirely in the control of U.S. Foods.

When you and I last spoke (on April 10), you said you have a possible vendor, but you have yet to provide the name. You also owe me a call as there remain significant problems with the protocol you sent me and we need to discuss it.

To be specific, please: (1) name a vendor; and (2) contact me to discuss the protocol you submitted. If I am not available, my staff will set a time that works on your calendar and mine.

Very truly yours,

JABURG & WILK, P.C.

Kraig J. Marton

KJM:kmr

cc: Michael Noble

# Exhibit I

3200 N. Central Avenue, 20th Floor, Phoenix, AZ 85012

jaburgwilk.com



**Kraig J. Marton**

kjm@jaburgwilk.com
602.248.1017 - Direct Phone
602.297.5017 - Direct Fax

May 2, 2013

*Via E-Mail [cbertraum@proskauer.com]*

Connie N. Bertram
Proskauer/Rose, LLP
1001 Pennsylvania Avenue, NW
Suite 400 South
Washington, DC 2004-2533

David L. Allen
Mark D. Bogard
Neal H. Bookspan
Mervyn T. Braude
Kelly Brown
Roger L. Cohen
Beth S. Cohn
Jennifer R. Erickson
David N. Farren
Lauren L. Garner
Renee Gerstman
Laurence B. Hirsch
Amy M. Horwitz
Ronald M. Horwitz
Gary J. Jaburg
Janessa E. Koenig
Michelle M. Lauer
Michelle C. Lombino
Valerie L. Marciano
Kraig J. Marton
Nate D. Meyer
Mitchell Reichman
Scott J. Richardson
Laura A. Rogal
Kathi M. Sandweiss
Jeffrey A. Silence
Maria Crimi Speth
Bridget O'Brien Swartz
Susan E. Wells
Lawrence E. Wilk
Nichole H. Wilk


Adam S. Kunz
*Of Counsel*

        Re:     *Michael Noble – U.S. Foods*

Dear Ms. Bertram:

        The purpose of this letter is in to respond to yours of April 29, to address our discussion of April 30, and to set forth certain matters related to the ongoing dispute between Mr. Noble and your client, US Foods.

        Let me start with the issues raised in your April 29 letter:

        1.    *Production of Quest documents.* You are flat wrong in claiming there is any "deficiency" in Quest's production.  By email dated March 15, Lee Flosi sent his entire file together with a formal declaration to Juliette Pryor. That should have ended further discussion. However because Flosi did not want to send internal information unrelated to Quest's investigation, US Foods somehow contends there is some deficiency.

        Without waiving our position that there has been a full and complete production already accomplished, we agreed to allow Flosi to be interviewed. In our prior conversations I made this clear and I also provided you with specific dates when he would be available.  I did this on two separate conversations. Rather than accomplishing the interview on any of the offered dates, another US Foods attorney, Ms. Z Scott, contacted Flosi directly even though I had made it clear to you that there would only be a telephonic interview and I would be participating. In our April 30 conversation, you indicated it was your "error in communication", and Ms. Scott has since contacted me. As I informed you and I will be informing her, Flosi will present himself for a telephonic interview as long as I am participating in the interview. However, our agreement to allow this interview is without waiver of our position that there was already a full and complete production on March 15.

        2.    *ICG child-support payments.* In your letter, you accurately reflected the conditions under which we will provide the referred to documents.  Since you do

16829-1\KJM\KJM\1076859.1

JABURG|WILK
Attorneys at Law

Connie N. Bertram
May 2, 2013
Page 2

not agree to our conditions for production, the referred to documents will not be produced. However as an officer of the court, and as an attorney, I again avow to you that I have in my possession a canceled ICG check that predates Mr. Noble's employment with US Foods as well as a ledger reflecting continuous child support payments from early 2002, again long before Mr. Noble's employment with US Foods. All of this was explained to US Foods when it interviewed ICG's principal, Mike Makings. Accordingly we have nothing further to discuss on this topic.

     *3.*    *IT protocol.* You have either misstated or misunderstood our prior conversations. I did not "agree" on April 19 that your draft protocol was "consistent" with what we had talked about but instead told you that Mike Noble has "lots" of problems with it.

    Further, the intent of the Separation Agreement, as you should know, was to identify and recover Company Data that Mr. Noble may or may not have on his electronic devices. The intent, was not to permit US Foods to seriously violate Mr. Noble's privacy in order to purse some investigation.

    It is ironic that US Foods is beginning to "suspect That Mr. Noble has no intentions of allowing US Foods to complete the inspection". Mr. Noble suspects that US Foods does not intend to pay him ever and is doing everything it can to delay, and when it can no longer delay it will simply refuse to pay until an arbitrator forces them to do so.

    Regardless, we as attorney have an obligation to at least try to resolve the disputes and that is why I have been working with you. We are trying to comply with US Food's continued requests, even though we do not agree with them.

    As for a protocol, we continue to agree that a signed protocol is necessary and that it needs to be completed. Accordingly I have now enclosed suggested changes to your protocol, redlined. While they should be self-explanatory, I am more than willing to discuss them. Please contact my office and set a time when you can discuss these changes so we can finalize this matter.

                   Very truly yours,

                   **JABURG & WILK, P.C.**

                   Kraig J. Marton

KJM:kmr

cc: Michael Noble

Enc: IT protocol with redlined changes

# Exhibit J



3200 N. Central Avenue, 20th Floor, Phoenix, AZ 85012

jaburgwilk.com

**Kraig J. Marton**

kjm@jaburgwilk.com
602.248.1017 - Direct Phone
602.297.5017 - Direct Fax

May 10, 2013

*Via E-Mail [cbertraum@proskauer.com]*

Connie N. Bertram
Proskauer/Rose, LLP
1001 Pennsylvania Avenue, NW
Suite 400 South
Washington, DC 2004-2533

David L. Allen
Mark D. Bogard
Neal H. Bookspan
Mervyn T. Braude
Kelly Brown
Roger L. Cohen
Beth S. Cohn
Jennifer R. Erickson
David N. Farren
Lauren L. Garner
Renee Gerstman
Laurence B. Hirsch
Amy M. Horwitz
Ronald M. Horwitz
Gary J. Jaburg
Janessa E. Koenig
Michelle M. Lauer
Michelle C. Lombino
Valerie L. Marciano
Kraig J. Marton
Nate D. Meyer
Mitchell Reichman
Scott J. Richardson
Laura A. Rogal
Kathi M. Sandweiss
Jeffrey A. Silence
Maria Crimi Speth
Bridget O'Brien Swartz
Susan E. Wells
Lawrence E. Wilk
Nichole H. Wilk


Adam S. Kunz
*Of Counsel*

Re:     *Michael Noble – U.S. Foods*

Dear Ms. Bertram:

The purpose of this letter is to respond to yours of May 9 and to address the surprising position you assert that that if Mr. Noble does not respond to your May 9 letter by today that you "will consider Mr. Noble in breach" because we suggested changes to a protocol that you do not agree with. Let me start with a little history about this protocol. Here are some dates to consider:

February 4, 2012: the parties enter into a "Confidential Settlement Agreement and Release" which states that Noble agrees:

> upon the Company's request, to permit a third-party IT technician retained by the Company to inspect all of your personal computers and electronic communications and storage devices to identify and recover any additional Company Data and to undertake the permanent deletion of any Company Data. Said technician will not transmit or disclose to the Company any data on your personal computers and devices that is not Company Data.

February 25, 2013: having heard no request for any inspection from US Foods, I email Ms. Pryor and say:

> We have not heard from you with respect to having an IT person view Mike's computer, etc. I note that the Agreement does not say you can withhold payment because that issue is not completed, but I want it a matter of record that Mike stands ready, willing and able to provide his computer and peripherals for inspection.

JABURG|WILK
Attorneys at Law

Connie N. Bertram
May 10, 2013
Page 2

     **March 6, 2013**: Ms. Pryor provides a protocol for a company called Kroll, and says this in her accompanying email: "Please review and execute the attached form. Also, please advise availability for the computer sweep next week. Thanks, JP". Two comments about this: (1) it took US Foods over a month to even suggest this voluntary review; and (2) that protocol was seriously flawed, so much so that after I reviewed concerns about it, Ms. Pryor withdrew Kroll entirely.

     **April 3, 2013**: you first appear (from our standpoint) and send the first of your letters. In your April 3 letter you claim many things, including this about the protocol:

> US Foods has invoked its right under Paragraph 9 to conduct a third-party inspection of Mr. Noble's personal computers and electronic communications. Despite several attempts on US Foods' part, that inspection has not yet occurred. Until that inspection is completed, Mr. Noble will be unable to certify in compliance with that Paragraph that all Company Data has been returned to US Foods. Because Mr. Noble's certification is inaccurate and incomplete and because the third-party inspection has not been completed, Paragraph 9 of the Agreement has not been satisfied.

What is ironic is that although you claim Mike does not get paid until this IT inspection is completed, it was by then just about two months since the Settlement was reached and still no acceptable protocol or even the identity of an IT provider was being provided to Mr. Noble.

     **April 12, 2013:** by email you provide me with a proposed protocol but you did not provide the identity of a proposed provider.

     **April 16, 2013**: I wrote you a letter that stated, in part: "When you and I last spoke (on April 10), you said you have a possible vendor, but you have yet to provide the name. You also owe me a call as there remain significant problems with the protocol you sent me and we need to discuss it. To be specific, please: (1) name a vendor; and (2) contact me to discuss the protocol you submitted. If I am not available, my staff will set a time that works on your calendar and mine."

     **April 19, 2013**: you finally provide the identity of a proposed provider, James Vaughn, of Intelligent Discovery Solutions, Inc.

     **April 23, 2013**: we had a prearranged call scheduled for this day, but you could not make it. We tried to connect on April 24 and April 25, but were not able to connect then either. My goal, in part, was to talk to you about the protocol and problems with it.

     **April 29, 2013**: you write a letter complaining that I had not yet provided you with our suggested revisions to the protocol. However, as you know, I had been trying to schedule a phone conversation with you about the protocol issues and we had been unable to connect.

**JABURG|WILK**
Attorneys at Law

Connie N. Bertram
May 10, 2013
Page 3

     <u>May 2, 2013</u>:  I email you a letter and our proposed revisions to the protocol.  I also had my staff schedule a call with you for today (May 10), and you sent me a calendar invitation where you agreed to speak this morning.

     <u>May 9, 2013</u>:  you email me your letter complaining about our changes to the protocol, and state that those revisions "are inconsistent with the parties' Release Agreement and are entirely unacceptable."  You then list five bullet point issues you have with our revisions, and end your letter with this astonishing statement:

> We will provide [Noble] one last and final opportunity to provide an acceptable protocol for the retrieval, review and return of US Foods' data. If we do not receive such a protocol by 5:00 p.m. EDT on Friday, May 10, we will consider Mr. Noble in breach of this additional provision of the Release Agreement.

     <u>May 10, 2013</u>: Just before our scheduled phone conference set for today, you send me an email that says: "I need to cancel the call that Jessica scheduled while I was out of town for my hearing earlier this week.  I have a conflict that has arisen.  In any event, I do not believe that it will be productive for us to talk until we receive an appropriate protocol from you today."

     ***Conclusions about US Foods actions concerning this protocol:***

     The above state of affairs leads to the following conclusions:

     1.    US Foods does not really care about the protocol, it just wants an excuse not to pay Mike Noble.  If this protocol was so important why did it take over a month to even start on it, and so many delays since then to complete it, almost entirely caused by US Foods?

     2.    US Foods, not Noble, has delayed resolution of the protocol issues.  This appears intentional, as US Foods also takes the position (wrongly) that it does not need to pay Noble what it owes him until the IT inspection has been completed.

     3.    You don't really want to negotiate or even discuss an acceptable protocol. It is ironic and unfortunate that you refuse to talk to me *at all*, and instead tell me we have to submit another protocol, when you have a protocol in your hands that Noble will sign.  What is particularly ironic is that we proposed revisions to *every single paragraph* of the protocol you wrote, including the Exhibit A. In response you state our revisions are "entirely unacceptable."  But you only point out issues with four of the 15 paragraphs and with a portion of the exhibit A.

     4.    The settlement agreement provides that "the parties shall use good faith efforts to resolve any controversy."  You refuse to talk to me and on May 9 you provide exactly one day to address your concerns.  Your declaration of a breach is disingenuous, and your conduct does not reflect good faith.

JABURG|WILK
Attorneys at Law

Connie N. Bertram
May 10, 2013
Page 4

While it is tempting to proceed directly to arbitration, we will still address your concerns. I would have preferred to discuss them by phone, but you demand that I address them immediately and in writing, and I do so here, based on the five bullet points in your May 9 letter:

Your concern: "The protocol states that the 'Effective Date' of the Release Agreement will occur on the delivery of Mr. Noble's devices to the IT technician."

Response: we are willing to discuss removing this provision, and leaving the definition as it appears in the Settlement Agreement

Your concern: "Paragraph 5 of the draft protocol requires the IT technician to delete all Noble Data, other than Searched Noble Data. The Noble Data should be preserved until the parties resolve their disputes concerning the production of documents by Mr. Noble."

Response: Your position makes no sense. Under your definition and under ours, "Noble data" means ALL data copied from all of Noble's devices. There is no reason to preserve a mirror image of all of that data, since the protocol contemplates that the IT technician will preserve the results of its searches that may contain company data, called "Searched Noble Data." Everything else is Mr. Noble's data.

Your concern: "The logging process required by Paragraph 6 places an undue burden on the IT technician and excessive costs on US Foods. In addition, the log does not provide information sufficient for US Foods to determine whether to challenge Mr. Noble's designation of individual documents."

Response: We do not agree. The information on the log is information we regularly see on such logs and is readily available. I don't understand the difficulty to the technician of extracting that information and putting it on a log. We also feel that the information in the log will be sufficient. However, we are willing to discuss the protocol provisions about the log, but believe that what we have proposed is reasonable.

Your concern: "Paragraph 7, which gives Mr. Noble the authority to "deem" any document non-Company Data, is inappropriate. US Foods - not Mr. Noble - should review the data identified through the search process (after an appropriate screening for privilege) to identify what constitutes Company Data."

Response: You misread paragraph 7. It contemplates that after the IT technician gets "hits" then he will prepare a log and give the log to us together with the data listed on the log. Noble and I will review the data to see if any is company data. We will either agree that it is Company data – in which case the IT technician sends it to you and if you agree, the technician will insure it is permanently deleted off Mike's devices. If it is not company data we will refuse to allow the IT technician to provide it to you and we will so state on the log. This general protocol is common. This is not about Noble deciding what is company property, it is about Noble's privacy being protected, as US Foods is not entitled to every document just because it has a keyword and there is a "hit" on it. In your terms, this is the "screening process."

JABURG|WILK
Attorneys at Law

Connie N. Bertram
May 10, 2013
Page 5

    <u>Your concern</u>: "The restrictions and modifications to the search terms are inappropriate. For instance, by requiring specified names to also be included in a communication or document with another search name, the name searches are nullified"

    <u>Response</u>: One might also claim that the search terms you suggest are inappropriate. For instance, the term 7/26/2012 will presumably hit every email sent or received that day as well as every document created or saved that day. There is no way that such matters would be "US Foods Company data".

    In sum, there are areas in the protocol we are willing to address, but the idea of rejecting all of our revisions is not the way we are willing to do that. Instead, I propose we do what I had hoped to do today —speak about the areas where we differ and see if common ground can be reached. If you still feel that further discussion will be of no benefit please advise and we can look at other alternatives. If you feel that we may be able to address our differences, please have your staff call mine and set a time when we can speak.

    ***One other issue: Production of Quest documents.*** As you know, by email dated March 15, Lee Flosi sent his entire file together with a formal declaration to Juliette Pryor. You claimed this was not sufficient and so we allowed US Foods to interview Mr. Flosi, but without waving our position that there was full compliance on that issue, on March 15. Mr. Flosi was interviewed yesterday by Ms. Z Scott and the interview was tape recorded. He answered all questions asked of him for almost an hour. He confirmed that he sent his entire investigative file and he confirmed the accuracy of his declaration. This should end the issue about Noble's compliance with the Quest issue (paragraph 14). Please advise if you disagree.

    Please contact my office and set a time when you can discuss these changes so we can finalize this matter.

                Very truly yours,

                **JABURG & WILK, P.C.**

                Kraig J. Marton

KJM:kmr

cc: Michael Noble

# **<u>EXHIBIT C</u>**



3200 N. Central Avenue, 20th Floor, Phoenix, AZ 85012

jaburgwilk.com

**Kraig J. Marton**

kjm@jaburgwilk.com
**602.248.1017 - Direct Phone**
**602.248.0522 - Main Fax**

June 12, 2013

*Via Email - KristyAllison@adr.org*

Kristy Allison
Manager of ADR Services
AMERICAN ARBITRATION ASSOCIATION
950 Waren Avenue
East Providence, RI 02914

David L. Allen
Shawdy Banihashemi
Mark D. Bogard
Neal H. Bookspan
Mervyn T. Braude
Kelly Brown
Roger L. Cohen
Beth S. Cohn
Jennifer R. Erickson
David N. Farren
Lauren L. Garner
Renee Gerstman
Laurence B. Hirsch
Amy M. Horwitz
Ronald M. Horwitz
Gary J. Jaburg
Janessa E. Koenig
Michelle M. Lauer
Michelle C. Lombino
Valerie L. Marciano
Kraig J. Marton
Nate D. Meyer
Mitchell Reichman
Laura A. Rogal
Kathi M. Sandweiss
Jeffrey A. Silence
Maria Crimi Speth
Bridget O'Brien Swartz
Susan E. Wells
Lawrence E. Wilk
Nichole H. Wilk


Adam S. Kunz
*Of Counsel*

> Re:    13 166 01022 13
>        US Foods, Inc. and Michael Noble and Phillip Roszak

**RESPONDENT MICHAEL NOBLE'S:**
**(1) REPLY IN SUPPORT OF NOBLE'S OBECTION TO US FOODS'S DEMAND FOR ARBITRATION,**
**(2) RESONSE TO US FOOD'S OBJECTION TO APPRORIATE VENUE, AND**
**(4) REPLY IN SUPPORT OF CROSS-DEMAND FOR ARBITRATION**

Dear Ms. Allison:

As you know, we represent Respondent Michael Noble ("Noble"). By this letter we submit the following:

(1) Reply in support of our Objection to US Foods's Demand for Arbitration – filed June 5, 2103 ("Noble's Objection");

(2) Response to US Foods's June 6, 2013 Objection to the appropriate venue– i.e., whether the arbitration should be held in Chicago, Illinois, as required by the parties' February 5, 2103, Settlement Agreement (previously provided and attached as Exhibit A to Noble's Objection and called "Settlement Agreement") or in New York, as arguably required by the November 16, 2007, Management Stockholders Agreement ("Shareholder Agreement"); and

(3) Reply in support of our Cross-Demand for Arbitration.

US Foods, Inc. ("US Foods") has raised two issues in its response to Noble's Objection. First, it claims that the Settlement Agreement never came into existence because Noble "failed to satisfy conditions precedent," namely the return of all of its company property. Second, it argues that the Shareholder Agreement that Noble signed nearly six (6) years ago somehow applies and requires arbitration in New York City. US Foods is wrong on both counts for the following reasons.

JABURG·WILK
Attorneys at Law

Kristy Allison
June 12, 2013
Page 2

## AN ARBITRATOR AND NOT THE AAA SHOULD DECIDE
## WHETHER THE 2013 SETTLEMENT AGREEMENT CONTAINS
## ANY CONDITION PRECEDENT

It is uncontested that the parties entered into a Settlement Agreement on February 5, 2013, and that Settlement Agreement specifically calls for Chicago as the venue for the arbitration[1]. That should end the inquiry. However, US Foods wants to ignore their own settlement by claiming it is "not effective" because, they falsely claim, Noble did not return documents he was supposed to return to US Foods. The main problem with this reasoning is that if US Foods' position were accepted by the AAA, it would effectively be *determining an issue that must be decided by an arbitrator.*

Noble fully complied with his agreement to provide all documents to US Foods when he flew to Chicago on February 14 and provided a folder of documents, a thumb drive and a sworn statement that he had fully complied (See pages from Transcript and attached exhibits, Ex. A, hereto). US Foods now says he did not comply, but they fail to tell us what document they think Noble has and they fail to provide any evidence of noncompliance other than a strained and unreasonable interpretation of Noble's own explanations. It has been over six (6) months since Noble's termination and over three (3) months since his interview until US Foods decided that the Company Data issue was so concerning it abruptly and wrongly claimed the Settlement Agreement was not valid. US Foods, at the very least, given their claimed current level of concern, should have addressed these concerns with Mr. Noble on February 15, the day after his interview was conducted. Regardless, it is not for the AAA to decide that issue - it is entirely up to an arbitrator. If the AAA were to decide that the Arbitration were to be held in New York, US Foods would undoubtedly claim that the AAA already found that the Settlement Agreement was not effective.

Rule 10 of the AAA's "Employment Arbitration Rules and Mediation Procedures" (the "Rules") does provide that the AAA is to fix the locale and that determination "shall be made having regard for the contentions of the parties and the circumstances of the arbitration."

Noble's contentions are these. The Settlement Agreement was negotiated as the result of Noble's termination for having exposed US Food's CEO, John Lederer, of having a now-admitted illicit sexual affair with a company vendor. Noble was illegally fired for "whistle-blowing" in violation of Delaware law, which applies. *See Smith v. Delaware State University*, 47 A.3d 472, 476 (Del.Supr. 2012) (Delaware Whistleblower Act "serves a valuable function by protecting employees who report violations of law for the benefit of the public" and, "[b]y protecting these employees, the statute encourages such reporting and promotes public health and safety"); *see also Murcott v. Best Western Intern., Inc.*, 198 Ariz. 349, 357, ¶¶ 39-42, 9 P.3d 1088, 1096 (App. 2000). [2]

---

[1] Paragraph 30 of the Settlement Agreement reads: "The parties shall use good faith efforts to resolve *any controversy or claim arising out of, or relating to this Agreement or the breach thereof*. If, despite their good faith efforts, the parties are unable to resolve such controversy or claim, then such controversy or claim shall be resolved by *arbitration in Chicago*, Illinois, with one (1) arbitrator, in accordance with the National Rules for Resolution of Employment Disputes of the American Arbitration Association."

[2] Here, as in Noble's Objection, we cite both Delaware law, which applies pursuant to the parties' Settlement Agreement provides (see Noble's Objection Ex. A at 6, ¶20), and Arizona law, which is the state where the whistle-blowing at issue occurred.

The parties settled this matter by negotiating and, on February 5, 2013, fully executing their Settlement Agreement. The Settlement Agreement: (1) formally terminated Noble's employment (see Noble's Objection Ex. A at 1, ¶1 – "Your employment with the Company terminated effective December 1, 2012 . . . ."); (2) all employment benefits that Noble was entitled to receive pursuant to the Shareholder Agreement were terminated at that time (see id. at 2, ¶3 – "You acknowledge that, except as expressly provided in this Separation Agreement, you will not receive any additional compensation or benefits, including salary, stock or equity rights or payments, bonus, or severance benefits from the Company."); (3) the only post-termination benefits that US Foods was entitled to receive under the Shareholder Agreement – essentially post-employment restrictive covenants – were either modified or incorporated by specific reference (see, e.g., id. at 4, ¶10 – "You agree that you remain bound by . . . [listing specific covenants in prior agreements]"); and (4) all prior agreements, including the Shareholder Agreement, were expressly disclaimed and superseded (see id. at 6, ¶10 – "This Separation Agreement . . . supersedes any and all prior agreements . . . .").

Moreover, the $675,000 that US Foods agree to pay Noble in exchange for a full release of all claims of any kind by and between the parties (see Noble's Objection Ex. A at 2, 4, ¶4, and 3, 4, ¶7) includes the return of a principal balance of $500.000 in company stock that was due to be paid to Noble regardless of the settlement (i.e., Noble's money) and Noble giving up another $175,000 in equity as a compromise of such claims. This was an arm's length, supposedly good faith negotiation and settlement of all disputes and claims between the parties, finalized by the Settlement Agreement that both parties signed, sealed and delivered to each other on February 5, 2103.

US Foods, however, now wants to discard the parties' Settlement Agreement and demands arbitration of its released claims in New York City based on the 2006 Shareholder Agreement that Noble signed nearly six (6) years ago when he joined the company. It claims that – contrary to what its attorneys have represented to Noble's attorneys and what both he and his attorneys believed until US Foods filed and served its mid-conversation Demand for Arbitration (see Noble's Objection Exs. D-J) – the parties' Settlement Agreement "never became effective" because Noble supposedly failed to satisfy a "condition precedent" of the agreement that he return all company property (specifically emails) to the company.[3]

First, and foremost, that claim has no substantive merit whatsoever. As we explained in Noble's Objection and above, the emails US Foods is referring to have all been returned to the company as promised. The only gripe US Foods appears to have is that after Noble copied them onto a "thumb drive" and gave the copies to US Foods, he then deleted the emails form his computer. That is hardly cause to believe he has not returned everything or that he has kept copies for himself. (See Noble's

---

[3] As more fully explained in Noble's Objection, US Foods mounted an end-run "sneak attack" on the Settlement Agreement by suddenly, in mid-discussion of such issues, filing its Demand for Arbitration and, simultaneously as well as inconsistently, filing a federal court action in the Northern District of Illinois. It has blatantly breached the Settlement Agreement's confidentiality provisions by doing so. Furthermore, US Foods in deliberate *bad faith* used the information it got from Noble in his interview to concoct its theory that he had failed to return all company property – thus breaching the express confidentiality agreement that applied to the interview. These are some of the many breach of contract issues that Noble has cross-demanded to arbitrate in the appropriate forum.

JABURG WILK
Attorneys at Law

Kristy Allison
June 12, 2013
Page 4

Objection Exs. D-J and Ex A hereto).  US Foods fails to justify its purported "concern" in response to Noble's Objection because there is no justification.

Second, and even if there were any substantive merit to its claims, absolutely nothing in the parties' Settlement Agreement constitutes a condition precedent.  As set forth in Noble' Objection, a contract term must be clearly stated as such before a court will construe the term as a condition precedent.  *See Realty Associates of Sedona v. Valley Nat. Bank of Arizona*, 153 Ariz. 514, 519, 738 P.2d 1121, 1126 (App. 1986) (noting that "[c]onditions precedent are not favored and the courts are not inclined to construe a contractual provision as a condition precedent unless such construction is plainly and unambiguously required by the language of the contract"); *Commonwealth Const. Co. v. Cornerstone Fellowship Baptist Church, Inc.*, 2006 WL 2567916, 21 (Del.Super. 2006) (explaining that "a condition precedent is not a favorable result when interpreting a contract," but that, "where the contract language is clear and unambiguous, the Court must give that language its plain meaning"); *see also PAMI-LEMB I Inc. v. EMB-NHC, L.L.C.*, 857 A.2d 998, 1014 (Del.Ch. 2004), *citing Pacific Coast Eng'g Co. v. Merritt-Chapman & Scott Corp.*, 411 F.2d 889, 895-96 (9th Cir. 1969) (repudiation of a contract occurs when a party is "not asserting a good faith interpretation of the contract terms" and yet has "persistently demanded an unwarranted condition precedent to its required performance").

Noble's obligations to return company property in his possession is or control are *not* stated anywhere in the Settlement Agreement to be conditions precedent to its validity or enforceability, and so cannot be conditions precedent as a matter of law. (See Noble's Objection Ex. A at 5, ¶14, 3-4, ¶9, and 15, ¶15, and the foregoing case law).  US Foods cannot repudiate the entire contract and its own obligations to perform the contract on the basis of provisions that do not appear in the 2013 Settlement Agreement.

Third, and, regardless of whether US Foods is right or wrong or what the AAA thinks, all such issues are matters that must be decided by an arbitrator.  *See* AAA Rule 6(a)("The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement"); *Moses H. Cone Memorial Hosp. v. Mercury Const.*, 460 U.S. 1, 25, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983) ("[the FAA] establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration"); *Medtronic AVE Inc. v. Cordis Corp.*, 2004 WL 1557328, 3 (3rd Cir. 2004) (noting the "long line of cases that hold that arbitrability is ultimately a question for the arbitrator to resolve); *see also New Castle County v. U.S. Fire Ins. Co.*, 728 F.Supp. 318, 321 (D.Del. 1989) (noting the Supreme Court in *Moses* requires that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration").   If there were any doubt, we refer the AAA to the U.S. Supreme Court's recent decision in *Nitro-Lift v Howard*, __ U.S. __, 133 S.Ct. 500, 504 (2012), where the Court once again that the arbitrator decides all such matters.

Forth, the 2006 Shareholder agreement does not apply to the disputes now raised.  It does not apply because the 2013 Settlement Agreement is the newer agreement between the parties and that 2013 Agreement says it applies to "All disputes" between the parties.  It superseded the 2006 Shareholders agreement by its own terms.  Second, the 2006 Shareholders agreement only applied, if at all, to the stock sold to Noble which is a small part of the issues now raised by both parties.

Kristy Allison
June 12, 2013
Page 5

Nor can US Foods say that the 2013 Settlement Agreement somehow "carved out" the claim to arbitrate in New York. It is true that the 2013 Settlement agreement says this:

> You agree that you remain bound by all *post-employment restrictions* in your previous agreements with US Foods as found in:
>
> • Sections 17 and 22 of the Management Stockholder's Agreement signed by you on November 16, 2007
> • The provisions of the Non-Solicitation and Non-Disclosure Agreement signed by you on November 16, 2007 that are incorporated by reference into Section 22 of the Management Stockholder's Agreement.

While paragraph 17 of the 2006 agreement does say venue is to be in New York, that is in no way a "restriction" on Noble's "post-employment" activities. Obviously, and by plain language, a "post-employment restriction" means some limit on what Noble can or cannot do in his future employment. Choosing the locale of an arbitration is no restriction – it is simply where the arbitration is to be held. Had US Foods intended to incorporate the arbitration provisions found in paragraph 17 of the 2006 agreement into the 2013 Settlement Agreement they should have said so – the 2013 Agreement would then have read that the parties incorporate paragraph 17 by reference or otherwise said that the entire paragraph is intended to be binding even if it does not include a post-employment restriction. Venue is a procedural provision, not a "restriction." Moreover, the Settlement Agreement specifically states that it "supersedes any and all prior agreements" between the parties, including the Shareholder Agreement, with the one exception of incorporating the "post-employment restrictions" found in ¶17 of the Shareholder Agreement, which, again, does not include the non-restriction venue provision. The 2006 provisions about the locale of an arbitration no longer apply.

## THE CIRCUMSTANCES OF THE ARBITRATION
## REQUIRE VENUE IN CHICAGO.

As noted, AAA Rule 10 requires that the AAA consider "the circumstances of the arbitration". There are very good practical and legal reasons why arbitrating the parties' disputes in New York City, instead of Chicago, Illinois, is a very bad idea and why the circumstances here require an arbitration in Chicago.

First, we believe that all of the parties and witnesses are located in Arizona, where Noble resides, or Chicago, Illinois, where US Foods and other witnesses to the parties' disputes are based. While we have not seen US Foods' list of witnesses, Noble provided his in the recently filed conflict list. In that list he named 11 possible witnesses. Two of them (Noble and Roszak) reside in the Phoenix Arizona area while we are confident that every other witness resides in the Chicago area. To the best of our knowledge, absolutely no witness from either side resides in New York or anywhere new that city or state. While the corporate owners of US Foods may be based in New York, no witness lives there and none of the matters at issue here even happened in New York.

Second, arbitrating in New York City would be needlessly expensive to both parties, and especially to Noble. Noble lived and worked in Chicago for many years and still has friends and family

JABURG WILK
Attorneys at Law

Kristy Allison
June 12, 2013
Page 6

there, but he has almost no contact with New York. Besides, Noble, of course, has the furthest to travel, and traveling to and obtaining hotel accommodations in New York City would only compound that time and expense, especially because he may be called on to pay for the expenses of the witnesses he would call- who would be traveling from Chicago or Phoenix to attend to the arbitration. Despite the claimed "similar" cost of arbitration in either locale, New York City is even more expensive than Chicago in nearly all respects. US Foods should not be allowed to force the venue for arbitration to New York City as a tactic to make it as financially painful as Noble as possible.

Third, if it is not a tactic, why on earth would US Foods object to arbitrating in Chicago, Illinois, where it and nearly all of its witnesses are located? Its position does not make sense, except as a ploy to make it as financially painful for Noble as possible.

## US FOODS HAS NOT RESPONDED OR OBJECTED TO
## NOBLE'S CROSS-DEMAND FOR ARBITARTION

It is worth noting that US Foods has not responded or objected to Noble's Cross-Demand for Arbitration. It has not disagreed that the arbitrator must consider the 2013 Settlement Agreement and determine the issues related to it.

## CONCLUSION.

Venue in Chicago is required by AAA Rule 10 and by the plain language of the 2013 Settlement Agreement. The arbitration should be held in Chicago, and the arbitrator should be the one to decide if the 2013 Settlement agreement is effective. If the AAA decides that this matter is to be arbitrated in New York, it has effectively already determined that the Settlement Agreement is not effective and that is the exact issue an arbitrator should decide.

Sincerely,

**JABURG & WILK, P.C.**

Kraig J. Marton

KJM:dnf

cc:     Connie N. Bertram, Esq.
        Philip J. Nathanson, Esq.

## **<u>EXHIBIT A</u>**

# In The Matter Of:

*The interview of*
*Michael Noble*

---

*February 14, 2013*

---

*Marzullo Reporting Agency*
*345 North LaSalle, 1605*
*Chicago, IL  60654*
*(312) 321-9365*

Original File pm2-14-13.txt
**Min-U-Script®**

1

```
 1

 2

 3    --------------------------------------- )
                                              )
 4    IN THE:  THE INTERVIEW OF MICHAEL NOBLE )
                                              )
 5    ---------------------------------------)

 6

 7            The report of interview of MICHAEL NOBLE in the

 8    above-entitled matter, taken before PAMELA A. MARZULLO, a

 9    Certified Shorthand Reporter and Notary Public in and for

10    the County of Cook and State of Illinois, at Three First

11    National Plaza, Suite 4200, Chicago, Illinois, on February

12    14th, 2013, at the hour of 8:00 o'clock a.m.

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1   PRESENT:

 2        JABURG, WILK
          BY:  MR. KRAIG J. MARTON
 3        3200 North Central Avenue
          20th Floor
 4        Phoenix, Arizona   85012

 5            on behalf of Michael Nobel;

 6        KAYE SCHOLER, LLP.
          BY:  MS. Z. SCOTT and MS. LAUREN SCHRERO
 7        Three First National Plaza
          Suite 4100
 8        Chicago, Illinois   60602

 9               and

10        US FOODS
          BY:  MS. JULIETTE PRYOR
11        9399 West Higgins Road
          Suite 500
12        Rosemont, Illinois   60018

13            on behalf of US Foods.

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                    I N D E X

 2   WITNESS:                              PAGE

 3   MICHAEL NOBLE

 4       Questions by Ms. Scott                4

 5                  E X H I B I T S

 6   EXHIBIT                               PAGE

 7       1                                 16
         2                                 75
 8       3                                 79
         4                                 87
 9       5                                 89
         6 and 7                           93
10       8                                105
         9                                115
11      10 and 11                         125
        12                                130
12      13                                131
        14                                133
13      15                                135
        16                                136
14      17                                139
        18                                148
15      19 and 20                         151

16

17

18

19

20

21

22

23

24
```

**Marzullo Reporting Agency**
**(312) 321-9365**

```
 1                    MICHAEL NOBLE,
 2   called in for an interview herein, was questioned and
 3   answered as follows:
 4                    QUESTIONS BY
 5   BY MS. SCOTT:
 6        Q.    First of all, I want to say good morning.
 7   We are here pursuant to the agreement between Mr.
 8   Noble and the company.  I know you've had ample time
 9   to go over that agreement with him and the
10   parameters of our discussion today.
11             We will attempt to move expeditiously with
12   our questions.  This isn't designed to harass or you
13   know upset anyone.  At any point, Mr. Noble, if you
14   would like to speak to your counsel outside the
15   room, we have a private room for you to consult with
16   that.
17        A.    I appreciate that.
18        Q.    We'll give you time to do that.  We are
19   going to time our discussion today, so we'll make
20   sure we follow the parameters of the agreement.
21             One concern we did have we don't have the
22   documents from Quest.  While I understand that you
23   brought documents here from your own private file,
24   one of the important parts of the agreement is that
```

1     Q.   The question is:  It's May, the dates that

2  are on here are the dates for John Lederer's trip to

3  San Francisco?

4     A.   Actually, I think these are the dates for

5  a golf tournament that Phil went to in Wisconsin at

6  North Shore Country Club.

7     Q.   Okay.

8     A.   There is a North Shore.  It is up in,

9  like, I don't know, Milwaukee or some place.  That's

10  my recollection of this.

11     MS. PRYOR:  Do you know if he went on that trip

12  on that same weekend?

13     THE WITNESS:  I think so.

14     MR. MARTON:  We have a few things to say on the

15  record while we're here.

16     MS. SCOTT:  Okay.

17     MR. MARTON:  First of all, as is obvious, Mike

18  is here to answer questions; and from all I've

19  heard, you furnished all questions you have, unless

20  there are other questions, once you get the Quest

21  file.

22     We agreed if you wish to have a telephonic

23  conference, just contact me.  Are there any other

24  questions you want him to answer today?

1    MS. SCOTT:  Not at this moment.

2    MR. MARTON:  Okay.  Second, one of our

3    obligations is for Mike to provide with Metadata all

4    the E-mails he could find.

5        THE WITNESS:  And any other files.

6        MR. MARTON:  And any files.  I wanted the court

7    reporter to mark a certification of Mike Noble where

8    he certifies that he searched his records, and you

9    have with you a pink file that you're going to give

10   them, a thumb drive he's going to give, that has the

11   Metadata, if you will, the electronic things he

12   found earlier today.

13       You asked about an E-mail that Mike didn't

14   have and couldn't recall.  He checked his files.  He

15   must have deleted it.  You can ask him any question

16   you want.  He must have deleted it some time ago.

17       I also have a certification from a

18   paralegal in my office to make sure that we are

19   returning any US Foods documents we have.

20       So, I'll ask the court reporter to mark

21   them, and you can then have them, or however you

22   handle the exhibits, and I'll hand you a folder that

23   has all US Foods document, there weren't many, from

24   my file.

1    So, we no longer have any, nor did we keep

2  copies, of the exhibits you marked today.  I looked

3  at them, but I don't have them.  So, my

4  representation to you is that with this thumb drive,

5  this is it.

6                    (Said documents were marked as

7                    Exhibit No. 19 and 20 for

8                    identification.)

9    THE WITNESS:  And I had some random stuff in my

10  car, in my desk.  I remembered I had this.  I'm sure

11  it doesn't work.

12    MR. MARTON:  It is the American Express card.

13  So, we handed you a thumb drive, and another folder

14  from Mike, all the documents he was able to

15  receivable.

16    So, you're welcome to ask Mike more

17  questions, but it is our statement on the record we

18  have fully complied with the obligations.

19    THE WITNESS:  It's pretty random stuff.  Most

20  of it is pretty old.

21    MR. MARTON:  Paragraph 9 that requires us to

22  provide to you all of the documents that we have.

23  So, that is all I have to say.

24    Well, do you have questions you want to

1    ask Mike by way of followup to satisfy yourself with

2    what he's done, or how he's done it, or the basis

3    for the certifications that he and I put in the

4    record?

5        MS. SCOTT:   If you could just summarize for us

6    what process you followed to collect the documents.

7        THE WITNESS:   I searched various areas in my

8    home and my car for any documents that I had laying

9    around in piles that were hard copy, and put them

10   altogether, and they are in that file.  That's all I

11   could find.

12            It's really random stuff, and then with

13   respect to what's on that --

14       MR. MARTON:  Thumb drive.

15       THE WITNESS:  -- thumb drive, I went to my

16   documents in the home computer, and there weren't

17   that many, honestly, and there was some random, you

18   know, spreadsheets from cash flow statements, or

19   they could have been, you know, my budget

20   information or some random Powerpoints that, you

21   know, probably some stuff I did when I did meetings

22   at home or prepared something, and it ended up

23   staying on my computer.

24            But I put everything I could find, and I

1   deleted all of them.

2   BY MS. SCOTT:

3       Q.   Did any of the documents that are in the

4   file that you've given us, the accordion file, or on

5   the thumb drive, have anything to do with the

6   matters that we've discussed today?

7       A.   Not that I'm aware of, but I wouldn't bet,

8   you know, I wouldn't bet my life on it.  Not that

9   I'm aware of.

10      MR. MARTON:  I'll make this offer if after you

11  look at the thumb drive, if there is some document

12  that you want to ask us about, whenever we schedule

13  the call, we'll be glad to answer them.

14          I do want to note the court reporter will

15  keep a copy of all exhibits, along with the

16  transcript, in the event that I order it is that

17  normal process here?

18      MS. PRYOR:  When should we expect that we'll

19  hear from Lee Flosi?  When is he back in the

20  country.

21      MR. MARTON:  Did he tell you that, Mike?

22      THE WITNESS:  His E-mail was very

23  disappointing.  He promised me last week he would do

24  this, and he didn't.

## Certification of Michael J. Noble

Michael J. Noble, upon his oath states and declares as follows:

1.      I entered into a Confidential Separation Agreement and Release with my prior
employer, U.S. Foods, Inc.

2.      I have certain obligations under paragraph 9 of that Agreement.

3.      I hereby certify that I have fully complied with paragraph 9 of that agreement.
Specifically, I have returned to U.S. Foods:

> All property, documents and data of the Company or
> relating to [my] work for the Company ("Company Data")
> in [my] possession, custody or control, including without
> limitation, all keys and access cards, badges, credit and
> telephone cards, telephones, pagers, all computers and
> computer related equipment (i.e. hardware, software,
> diskettes, electronic storage devices, etc), all passwords,
> access codes and other information necessary to access any
> computer, communications device or electronic database,
> and all books, files, documents and electronic data and
> media.

4.      I certify, under penalty of perjury under the laws of the United States of
America that the foregoing is true and correct[1].

Executed on this 12th day of February, 2013

.

Michel J. Noble

**EXHIBIT**

---

[1] This declaration complies with 28 USC § 1746.

## CERTIFICATION OF JESSICA L. VAN DOUSER

State of Arizona ⟩
⟩  ss
County of Maricopa ⟩

I, Jessica L. Van Douser, being duly sworn, deposes and says:

1.      I am over the age of 18 years and have knowledge of the matters stated herein.

2.      I am a paralegal at Jaburg Wilk and I make this certification at the request of Kraig J. Marton.

3.      Under Mr. Marton's direction, I reviewed our firm's electronic and paper files concerning Mr. Mike Noble and US Foods. I have also reviewed firm emails from Mr. Noble.

4.      I then removed all documents and emails from our files that appeared to be a US Foods document and I placed those documents in the attached file. I also removed all copies, and I saw that all emails were deleted after I printed copies and placed them in this folder.

5.      Mr. Marton does not consider settlement communications after he was retained to be US Food documents and they are therefore not included.

6.      The files of Jaburg Wilk no longer contain any US Food documents.

7.      I have read the Settlement Agreement and Release ("Agreement") between US Foods and Mr. Noble and I hereby certify that Jaburg Wilk has no "Company Data" as defined in Paragraph 9 of that Agreement.

8.      I declare under penalty of perjury that the foregoing is true and correct.

*Jessica L. VanDouser*
Jessica L. Van Douser

Subscribed and sworn before me this 13th day of February, 2013.

_____
Notary Public

My Commission Expires:

OFFICIAL SEAL
PAMELA ANDERSON
Notary Public - State of Arizona
MARICOPA COUNTY
My Comm. Expires April 15, 2013


EXHIBIT

# **EXHIBIT D**



## MANAGEMENT EQUITY OFFERING DOCUMENTS

### FOR

### MICHAEL NOBLE

## OMNIBUS SIGNATURE PAGE

Name of Management Stockholder:
Mike Noble


Address:
4717 E Quartz Mountain Rd
Paradise Valley, AZ 85253


Do you wish to purchase shares of common stock of USF Holding Corp. pursuant to the Management Stockholder's Agreement?

☑ Yes  ☐ No

If yes, please indicate the dollar value of shares of USF Holding Corp. common stock that you wish to purchase (*note that shares purchased with this amount will be rounded down to the nearest whole share*): $500,000.00.


IN WITNESS WHEREOF, I hereby agree to be a party to each of the following agreements as a "Management Stockholder", "Optionee" or "Participant", as applicable, as of the date of such agreements:

1.   Management Stockholder's Agreement with USF Holding Corp.

2.   Sale Participation Agreement with USF Holding Corp., U.S. Foodservice, Inc., and the Sponsors

3.   Stock Option Agreement with USF Holding Corp.

Signature: *Michael Noble*

Dated as of: November 16, 2007

Execution Copy

## MANAGEMENT STOCKHOLDER'S AGREEMENT

This Management Stockholder's Agreement (this "Agreement") is entered into as of November 16, 2007 (the "Effective Date") among USF Holding Corp., a Delaware corporation (the "Company") and the undersigned person (the "Management Stockholder") (the Company and the Management Stockholder being hereinafter collectively referred to as the "Parties"). All capitalized terms not immediately defined are hereinafter defined in Section 6(b) of this Agreement.

WHEREAS, pursuant to the Stock Purchase Agreement (the "Stock Purchase Agreement"), dated May 2, 2007, by and between Restore Acquisition Corp., a Delaware corporation and direct, wholly owned subsidiary of the Company ("Restore"), Ahold U.S.A., Inc., a Maryland corporation ("Seller"), and Koninklijke Ahold N.V., a public company with limited liability organized under the laws of the Netherlands, on July 3, 2007 (the "Closing Date"), Restore purchased from Seller all of the outstanding shares of common stock of U.S. Foodservice, a Delaware corporation ("USF"), and certain related assets (the "Acquisition");

WHEREAS, it is contemplated that USF will be merged with and into U.S. Foodservice, Inc., its wholly owned subsidiary;

WHEREAS, in connection with the Acquisition, Clayton, Dubilier & Rice Fund VII, L.P., Clayton, Dubilier & Rice Fund VII (Co-Investment), L.P., CD&R Parallel Fund VII, L.P., CDR USF Co-Investor L.P., CDR USF Co-Investor No. 2, L.P., KKR 2006 Fund L.P., KKR PEI Investments, L.P., KKR Partners III, L.P. and OPERF Co-Investment LLC (collectively, the "Investors") contributed certain funds to the Company in exchange for shares of the Company's common stock, par value $0.01 per share (the "Common Stock");

WHEREAS, in connection with the Acquisition, the Management Stockholder has been selected by the Company (i) to purchase shares of Common Stock from the Company for cash (the "Purchased Stock"); and (ii) to receive options to purchase shares of Common Stock (the "Options") pursuant to the terms set forth below and the terms of the 2007 Stock Incentive Plan for Key Employees of USF Holding Corp. and its Affiliates (the "Option Plan") and the Stock Option Agreement, dated as of the date hereof, entered into by and between the Company and the Management Stockholder (the "Option Agreement"); and

WHEREAS, this Agreement is one of several other agreements ("Other Management Stockholders Agreements"), which, concurrently with the execution hereof or in the future, will be entered into between the Company and other individuals who are or will be key employees of the Company or one of its subsidiaries (collectively, the "Other Management Stockholders").

NOW THEREFORE, to implement the foregoing and in consideration of the mutual agreements contained herein, the Parties agree as follows:

1. Issuance of Purchased Shares; Options; Voting.

(a) Subject to the terms and conditions hereinafter set forth, the Management Stockholder hereby subscribes for and shall purchase, as of the Effective Date, and the Company shall issue and deliver to the Management Stockholder as of the Effective Date, the

number of shares of Purchased Stock at a per share purchase price (such price, with respect to the shares of Purchased Stock, or the price per share paid by the Management Stockholder with respect to any shares of Common Stock purchased after the date hereof, as applicable, the "Base Price"), in each case as set forth on Schedule I hereto, which per share purchase price is equal to the effective per share purchase price paid by the Investors for the shares of Common Stock of the Company in connection with the Acquisition.

(b) Subject to the terms and conditions hereinafter set forth and as set forth in the Option Plan and the Option Agreement, as of the Effective Date the Company is granting to the Management Stockholder Options to acquire the number of shares of Common Stock as set forth on Schedule I hereto, at an initial per share exercise price equal to the Base Price, and the Parties shall execute and deliver to each other copies of the Option Agreement concurrently with the issuance of the Options.

(c) The Company shall have no obligation to sell any Purchased Stock to any person who (i) is a resident or citizen of a state or other jurisdiction in which the sale of the Common Stock to him or her would constitute a violation of the securities or "blue sky" laws of such jurisdiction or (ii) is not an employee or director of the Company or its subsidiaries as of the Effective Date.

2. Management Stockholder's Representations, Warranties and Agreements.

(a) The Management Stockholder agrees and acknowledges that he or she will not, directly or indirectly, offer, transfer, sell, assign, pledge, hypothecate or otherwise dispose of (any of the foregoing acts being referred to herein as a "transfer") any shares of Purchased Stock, and, at the time of exercise, Common Stock issuable upon exercise of Options ("Option Stock"; together with all Purchased Stock and any other Common Stock otherwise acquired and/or held by the Management Stockholder Entities as of or after the date hereof, "Stock"), except as provided in this Section 2(a) below and Section 3 hereof. If the Management Stockholder is an Affiliate of the Company, the Management Stockholder also agrees and acknowledges that he or she will not transfer any shares of Stock unless:

(i) the transfer is pursuant to an effective registration statement under the Securities Act of 1933, as amended, and the rules and regulations in effect thereunder (the "Act"), and in compliance with applicable provisions of state securities laws; or

(ii) (A) counsel for the Management Stockholder (which counsel shall be reasonably acceptable to the Company) shall have furnished the Company with an opinion or other advice, reasonably satisfactory in form and substance to the Company, that no such registration is required because of the availability of an exemption from registration under the Act and (B) if the Management Stockholder is a citizen or resident of any country other than the United States, or the Management Stockholder desires to effect any transfer in any such country, counsel for the Management Stockholder (which counsel shall be reasonably satisfactory to the Company) shall have furnished the Company with an opinion or other advice reasonably satisfactory in form and substance to the Company to the effect that such transfer will comply with the securities laws of such jurisdiction.

Notwithstanding the foregoing, the Company acknowledges and agrees that any of the following transfers of Stock are deemed to be in compliance with the Act and this Agreement (including without limitation any restrictions or prohibitions herein) and no opinion of

2

counsel is required in connection therewith: (I) a transfer made pursuant to Sections 3, 4, 5 or 8 hereof, (II) a transfer upon the death or Permanent Disability of the Management Stockholder to the Management Stockholder's Estate or a transfer to the executors, administrators, testamentary trustees, legatees or beneficiaries of a person who has become a holder of Stock in accordance with the terms of this Agreement; provided that it is expressly understood that any such transferee shall be bound by the provisions of this Agreement, (III) a transfer made after the Closing Date in compliance with the federal securities laws to a Management Stockholder's Trust, provided that such transfer is made expressly subject to this Agreement and that the transferee agrees in writing to be bound by the terms and conditions hereof as a "Management Stockholder" with respect to the representations and warranties and other obligations of this Agreement, and provided further that it is expressly understood and agreed that if such Management Stockholder's Trust at any point includes any person or entity other than the Management Stockholder, his spouse (or ex-spouse) or his lineal descendants (including adopted children) such that it fails to meet the definition thereof as set forth in Section 6(b) hereof, such transfer shall no longer be deemed in compliance with this Agreement and shall be subject to Section 3(d) below, (IV) a transfer of Stock made by the Management Stockholder to Other Management Stockholders, provided that it is expressly understood that any such transferee(s) shall be bound by the provisions of this Agreement (in addition to the provisions set forth in an Other Management Stockholders Agreement to which such Other Management Stockholders are a party), and (V) a transfer made by the Management Stockholder, with the Board's approval, to the Company or any subsidiary of the Company.

(b) The certificate (or certificates) representing the Stock, if any, shall bear the following legend:

> "THE SHARES REPRESENTED BY THIS CERTIFICATE MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED OF UNLESS SUCH TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION COMPLIES WITH THE PROVISIONS OF THE MANAGEMENT STOCKHOLDER'S AGREEMENT BETWEEN USF HOLDING CORP. (THE "COMPANY") AND THE MANAGEMENT STOCKHOLDER NAMED ON THE FACE HEREOF AND THE SALE PARTICIPATION AGREEMENT AMONG SUCH MANAGEMENT STOCKHOLDER AND CLAYTON, DUBILIER & RICE FUND VII, L.P., CLAYTON, DUBILIER & RICE FUND VII (CO-INVESTMENT), L.P., CD&R PARALLEL FUND VII, L.P., CDR USF CO-INVESTOR L.P., CDR USF CO-INVESTOR NO. 2, L.P., KKR 2006 FUND L.P., KKR PEI INVESTMENTS, L.P., KKR PARTNERS III, L.P. AND OPERF CO-INVESTMENT LLC, IN EACH CASE DATED AS OF NOVEMBER 16, 2007 (COPIES OF WHICH ARE ON FILE WITH THE SECRETARY OF THE COMPANY) AND ALL APPLICABLE FEDERAL AND STATE SECURITIES LAWS."

(c) The Management Stockholder acknowledges that he or she has been advised that (i) the shares of the Stock are characterized as "restricted securities" under the Act inasmuch as they are being acquired from the Company in a transaction not involving a Public Offering and that the Stock may be resold without registration under the Act only in certain limited circumstances, (ii) a restrictive legend in the form heretofore set forth shall be placed on the certificates (if any) representing the Stock and (iii) a notation shall be made in

3